Proposed Bid Procedures Hearing Date:  July 19, 2011 at __:00 _.m. (EDT)
Proposed Bid Procedures Objection Deadline:  July 15, 2011 at 4:00 p.m. (EDT)
Proposed Date of Auction: August 8, 2011 at 10:00 a.m. (EDT)
Proposed Sale Hearing Date: August 10, 2011 at __:00 _.m. (EDT)
Proposed Sale Hearing Objection Deadline:  August 1, 2011 at 4:00 p.m. (EDT)
Proposed Objection Deadline as to Auction and Selection of Successful Bidder: August 9, 2011 at 12:00 p.m. (EDT)

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Michael P. Cooley
Alexis Freeman

*Proposed Counsel to the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ARCHBROOK LAGUNA HOLDINGS LLC, *et al.*,[1] | ) | Case No. 11-13292 (    ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

## DEBTORS' MOTION, PURSUANT TO 11 U.S.C. §§ 105, 363, 364, 365, 503 AND 507 AND FED. R. BANKR. P. 2002, 4001, 6004, 6006, 9008 AND 9014, FOR ENTRY OF (I) AN ORDER APPROVING (A) BID PROCEDURES, (B) NOTICE OF SALE, AUCTION, AND SALE HEARING, (C) ASSUMPTION PROCEDURES AND RELATED NOTICES; AND (II) AN ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

ArchBrook Laguna Holdings LLC ("***ArchBrook***") and certain of its affiliates, as debtors

and debtors in possession (collectively, the "***Debtors***"), file this Motion (the "***Motion***"), seeking

entry of an order (the "***Bid Procedures Order***"), substantially in the form attached hereto as

**Exhibit 1** (1) approving the (a) bid procedures, (b) notice of sale, Auction, and Sale Hearing

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number, are: ArchBrook Laguna LLC (6166); ArchBrook Laguna Holdings LLC (6156); Chimerica Global Logistics LLC (3745); ArchBrook Laguna West LLC (9631); Lehrhoff ABL LLC (6386); Expert Warehouse LLC (4487); and ArchBrook Laguna New York LLC (5385).

(each as defined below), (c) assumption procedures and related notices; and (2) an order (the "*Sale Order*"), substantially in the form to be filed with the Court on or prior to the Sale Hearing, approving the sale of substantially all of the Debtors' assets. In support of this Motion, the Debtors submit the Declaration of Daniel J. Boverman, Interim Chief Financial Officer, in Support of the First Day Pleadings (the "*Boverman Declaration*") filed concurrently herewith. In further support of the Motion, the Debtors respectfully state as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105, 363, 364, 365, 503 and 507 of title 11 of the United States Code (the "*Bankruptcy Code*"), Rules 2002, 4001, 6004, 6006, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), Rules 6004-1, 6006-1 and 9006-1 of the Local Rules of the Bankruptcy Court for the Southern District of New York (the "*Local Rules*"), and General Order M-383 of the Bankruptcy Court for the Southern District of New York ("*General Order M-383*").

## Background

### A.      Introduction

4.      On July 8, 2011 (the "*Petition Date*"), each of the Debtors filed a petition with this Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no statutory committees have been appointed or designated.

5. Contemporaneously with the filing of this Motion, the Debtors have sought procedural consolidation and joint administration of these chapter 11 cases under the case of ArchBrook Laguna Holdings LLC. A description of the Debtors' businesses, the reasons for filing these chapter 11 cases and the relief sought from this Court to allow for a smooth transition into operations under chapter 11 is set forth in the Boverman Declaration, which is being filed contemporaneously with this Motion.

**B.     The Marketing Process**

6. Beginning on May 26, 2011, the Debtors embarked on a comprehensive restructuring effort, including exploring various strategic alternatives, such as a transaction involving a sale of all or a portion of the Debtors' assets. Prior to the commencement of these cases, the Debtors, together with their advisors, initiated an extensive sale process, which included actively marketing their assets in an effort to maximize value for all of their creditors. This marketing process included calling various parties that the Debtors and their advisors believed may have an interest in potentially purchasing some or all of the Debtors' assets (the "*Assets*") and discussing such possibilities with them. Specifically, the Debtors or their advisors: (i) contacted 47 potential bidders; (ii) sent form non-disclosure agreements ("*NDAs*") to 47 parties; and (iii) entered into 23 NDAs. Given the Debtors' significant liquidity constraints and the difficulty of obtaining long term financing to support the Debtors in their reorganization efforts, the Debtors believe that sale of all or substantially of the Debtors' assets is necessary in order to maximize value for the Debtors' estates and their creditors.

7. As a result of these efforts, the Debtors received several preliminary indications of interest from potential purchasers expressing an interest in acquiring the Debtors' assets. Ultimately, however, the Debtors were unable to negotiate a stalking horse agreement prior to the commencement of these cases because of their liquidity needs. Rather than delay the

filing of these cases, the Debtors have determined that it is in the best interests of their estates and creditors to file these cases without a stalking horse bidder and to open the sale to all interested parties.

8.      Based on the foregoing, the Debtors believe that the Bid Procedures (as defined below) and an auction (the "***Auction***") will afford the Debtors the best opportunity to market their assets and maximize value.

### Relief Requested

9.      Pursuant to Bankruptcy Code sections 105, 363, 364, 365, 503 and 507 and Bankruptcy Rules 2002, 4001, 6004, 6006, 9008 and 9014, Local Rules of the Court for the Southern District of New York (the "***Local Rules***") 6004-1, 6006-1 and 9006-1 and General Order of the Court of the Southern District of New York M-383, the Debtors respectfully request that the Court grant the following relief in connection with the sale (the "***Sale Transaction***") of substantially all of the Assets and related transactions to the bidder who submits the highest or otherwise best offer at the conclusion of the Auction, which bidder may be selected by the Debtors as the winning bidder (the "***Successful Bidder***").

10.     First, the Debtors request entry of the Bid Procedures Order, which will authorize and approve, among other things:  (i) the procedures (the "***Bid Procedures***") for the conduct of the Auction of the Assets, substantially in the form attached as **Exhibit A** to the Bid Procedures Order; (ii) the procedures for the assumption and assignment of certain contracts and leases (the "***Assumption Procedures***") to the Successful Bidder and the resolution of any objections thereto and related notices; (iii) the scheduling of a hearing to approve any such Sale Transaction with respect to any bid accepted by the Debtors (the "***Sale Hearing***"); and (iv) the form and manner of notice with respect to the proposed sale of the Assets, the Auction, and the Sale Hearing (the "***Sale Notice***"), substantially in the form attached as **Exhibit B** to the Bid Procedures Order.

11. Second, the Debtors request entry of the Sale Order that will, *inter alia*, approve (i) the sale of the Assets pursuant to Bankruptcy Code sections 105, 363(b), (f), and (m), and 365 and Bankruptcy Rules 6004, 6006, 9008, and 9014 in accordance with the terms of a purchase agreement executed by the Successful Bidder, which purchase agreement (the "***Purchase Agreement***") shall be free and clear of all liens, claims, encumbrances, and other interests (other than certain expressly specified permitted encumbrances and assumed liabilities, all as more specifically set forth in the applicable Purchase Agreement); and (ii) the assumption and assignment of certain executory contracts and unexpired leases related to the Assets and the Sale Transaction pursuant to Bankruptcy Code sections 363 and 365.

**I. Sale Notice, Bid Procedures, Auction and Related Deadlines**

    **A.** <u>**Notice of Sale, Auction, Sale Hearing, and Related Deadlines**</u>

12. The Debtors propose the following notice and other procedures to be implemented in connection with the sale process:

    a. <u>Notice of Sale, Auction, and Sale Hearing</u>: Within five (5) business days after entry of the Bid Procedures Order, the Debtors (or their agents) shall:

        i. Provide the Sale Notice and the Bid Procedures Order by email, mail, facsimile, or overnight delivery service, upon: (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Declaration Concerning List of the Debtors' 30 Largest Unsecured Claims on an Consolidated Basis filed pursuant to Bankruptcy Rule 1007(d); (c) GE Capital Commercial Services, Inc., as administrative agent under the Debtors' prepetition credit facility and debtor in possession credit facility, (d) Latham & Watkins LLP, as counsel to GE Capital Commercial Services, Inc.; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) the United States Attorney for the Southern District of New York; (h) parties in interest who have filed a notice of appearance in these cases pursuant to Bankruptcy Rule 2002; and (i) all known parties that have previously expressed a bona fide interest in purchasing the Assets in

the twelve (12) months preceding the date of the Motion (collectively, the "*Sale Notice Parties*");

      ii.      Publish the Sale Notice on one occasion in *The New York Times*; and

      iii.      Cause the Sale Notice to be published on www.archbrookrestructuring.com (the "*Website*").

b.      <u>Date, Time, and Place of Auction</u>: The Auction shall be conducted at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 on a date approved by the Court commencing **on August 8, 2011 at 10:00 a.m. (prevailing Eastern Time)**.

c.      <u>Date, Time, and Place of Sale Hearing</u>: The Sale Hearing shall be conducted by the Court on **August 10, 2011 at ___:00 __.m. (prevailing Eastern Time)** and may be adjourned or rescheduled without notice. At the Sale Hearing, the Debtors will seek Court approval of the Successful Bid and the Back-Up Bid (each as defined below). Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Proposed Sale and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder cannot or refuses to consummate the sale because of the breach or failure on the part of the Successful Bidder, the Back-Up Bidder will be deemed the new Successful Bidder and the Debtors shall be authorized, but not required, to close with the Back-Up Bidder on the Back-Up Bid without further order of the Court.

d.      <u>Notice of Successful Bidder</u>: As soon as immediately practicable after the Auction, but no later than one (1) business day after conclusion of the Auction, the Debtors will provide electronic notice of the results of the Auction on the Court's docket.

e.      <u>Objection Deadline to Sale Order</u>: Objections to the relief sought in the Sale Order shall be in writing, filed and served so as to be actually received by the Notice Parties (defined below) no later than **August 1, 2011 at 4:00 p.m. (prevailing Eastern Time)**; *provided, however,* that objections as to the Auction or the selection of the highest or otherwise best bid shall be in writing, filed and served so as to be actually received by the Notice Parties by **August 9, 2011 at 12:00 p.m. (prevailing Eastern Time).**

f.      <u>Data Room</u>: Any person or entity that wishes to conduct due diligence with respect to the Assets must first deliver to the Debtors an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors (a form of which is attached as <u>Schedule 2</u> to the Bid Procedures) (it being understood that any person or entity who previously

signed a confidentiality agreement in a form satisfactory to the Debtors shall not be required to execute a new confidentiality agreement). The executed confidentiality agreement must be signed and transmitted by the person or entity wishing to become a potential bidder (the "***Potential Bidder***") so as to be received by each of the following parties (the "***Notice Parties***") prior to any dissemination of confidential information: (i) Macquarie Capital (USA) Inc., 125 West 55th Street, New York, NY 10019 (Attn: David Miller; david.miller@macquarie.com and Matthew Wayman matthew.wayman@macquarie.com), financial advisors to the Debtors; and (ii) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 (Attn: Ira S. Dizengoff, Esq., idizengoff@akingump.com; Michael P. Cooley, Esq., mcooley@akingump.com; and Alexis Freeman, Esq., afreeman@akingump.com), counsel to the Debtors.

**B.    The Bid Deadline and Bid Procedures**[2]

13.    The deadline for a Potential Bidder to submit bids shall be **August 4, 2011 at 5:00 p.m. (prevailing Eastern Time)** (the "***Bid Deadline***"). Any Potential Bidder who fails to submit a bid so as to be received by the Notice Parties in advance of the Bid Deadline shall not be permitted to participate in the Bidding Process and will not be a Qualified Bidder.

14.    Before the Bid Deadline, a Potential Bidder that desires to make a bid shall deliver copies of its bid in writing and executed by an individual or individuals authorized to bind the Potential Bidder. Each bid shall be served by courier, facsimile, e-mail or as otherwise specified by the Debtors to each of the Notice Parties. The Debtors shall provide copies of such bids to the Consulting Parties.

15.    The Debtors believe that the Bid Procedures are appropriate and provide the Debtors with the best opportunity to maximize the recovery for the Debtors and their estates in connection with the sale of the Assets. The Bid Procedures provide an appropriate framework for selling the Assets in an orderly fashion and will enable the Debtors to review, analyze and compare all bids received to determine which bid(s) are in the best interests of the Debtors, their

---

[2]    Capitalized terms used but not defined in this section of the Motion shall have the meanings ascribed to them in the Bid Procedures. To the extent of any inconsistency between this summary and the Bid Procedures, the Bid Procedures shall control.

estates and creditors. Furthermore, the Debtors believe that the Bid Procedures are designed to ensure that the Debtors do not discourage any Potential Bidder from participating in the Auction and, thus, to maximize the value of the Assets.

16. The salient provisions of the Bid Procedures are as follows:

| | |
|---|---|
| ***Assets to be Sold*** | The Auction shall consist of substantially all of the Assets used in the Debtors' business operations. |
| ***Potential Bidders*** | A "***Potential Bidder***" is a person or entity that the Debtors in consultation with the Prepetition Agent (as defined below) and the DIP Agent (as defined below) (collectively, the "***Consulting Parties***") determine is reasonably likely to: (a) submit a bona fide offer and (b) be able to consummate the Proposed Sale if selected as a Successful Bidder or Back-Up Bidder (as defined below). |
| ***Due Diligence*** | The Debtors may afford each Potential Bidder the time and opportunity to conduct reasonable due diligence; *provided, however,* that neither the Debtors nor any of their representatives shall be obligated to furnish any due diligence information: (i) at any time to any person or entity other than a Potential Bidder; or (ii) after the Bid Deadline (as defined below) to any Potential Bidder. The Debtors may, in the exercise of their business judgment, extend a Qualified Bidder's time to conduct due diligence after the Bid Deadline until the Auction; *provided, however,* that the Successful Bidder and Back-Up Bidder shall be permitted to continue to conduct due diligence until closing of the Sale Transaction (subject to the terms of the Purchase Agreement); provided, further, however, that a Qualified Bid shall not be subject to further due diligence after the Bid Deadline. |
| ***Required Bid Materials*** | To participate in the Auction, a bidder must be a Potential Bidder and must deliver a written offer, which includes, at a minimum, the following items (the "***Required Bid Materials***") prior to the Bid Deadline: <br><br>i. Two executed originals of the purchase agreement and other documents by which the Potential Bidder offers to purchase the Assets that are the subject of the bid from the Debtors at the purchase price and upon the terms and conditions as the Potential Bidder sets forth therein, which documents should be in substantially the form of the Purchase Agreement, and any ancillary agreements, together with a marked copy showing any proposed changes, amendments or |

modifications to the Purchase Agreement (and exhibits) attached as **<u>Schedule 1</u>** to the Bid Procedures.

ii. A written acknowledgment that the bid is not subject to any due diligence or financing contingency, is not conditioned on the payment in any circumstances of a break-up fee, expense reimbursement or similar type of payment to the bidder, is irrevocable until entry of the Sale Order (unless it is chosen as the Successful Bid or Back-Up Bid (each as defined below)) and is not subject to any approvals, consents or conditions except as specified therein.

iii. A written acknowledgement by the bidder that it agrees to all of the terms for sale set forth in these Bid Procedures and that the offer constitutes a good faith bona fide offer to purchase some or all of the Assets.

iv. Specification of the proposed purchase price and any of the Assets that are the subject of the bid.

v. Delivery by certified check or wire transfer of a good faith deposit in immediately available funds equal to the greater of (i) $2 million or (ii) 10% of the proposed purchase price for the Assets that are the subject of the bid (the "***Deposit***"), *provided, however,* that the required Deposit for a bid in any amount less than substantially all of the Assets shall be 10% of the proposed purchase price of such Assets. The Deposit shall be held in escrow and will be refunded on the terms set forth below.

vi. Evidence or a statement indicating that the bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission and consummation of its bid and acceptance of the terms of sale in these Bid Procedures, or a representation that no such authorization or approval is required and that any and all initial consents required in connection with the submission and consummation of the bid have been obtained and that no other initial consents are required.

| | |
|---|---|
| | vii.     Evidence of sufficient cash or other acceptable forms of currency on hand or written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtors with appropriate contact (and any other necessary) information for such financing sources.<br><br>viii.     Full disclosure of the identity of each entity that will be bidding for or purchasing all of or a portion of the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed bid.<br><br>ix.     A statement that the offering parties consent to the jurisdiction of the Court<br><br>x.     A list of the Debtors' executory contracts and unexpired leases with respect to which the bidder seeks assignment from the Debtors and a specification of what the bidder believes to be the appropriate cure amounts.  Such cure amounts will be the bidder's responsibility.<br><br>xi.     Such other information as may be reasonably requested in writing by the Debtors at least two calendar days prior to the Bid Deadline. |
| ***Qualified Bid*** | In order to be a Qualified Bid, a bid (including all Required Bid Materials) must:<br><br>i.     Be received by the Bid Deadline;<br><br>ii.     Not be subject to any due diligence or financing contingency; and<br><br>iii.     Not request or entitle the bidder to any break-up fee, expense reimbursement or similar type of payment, *provided*, *however*, that the Debtors, in consultation with  the Consulting Parties, may decide to grant break-up fee and expense reimbursement protections to any bidder approved as a "Stalking Horse" bidder in accordance with these procedures. |

| | |
|---|---|
| | A bid received from a Potential Bidder that includes all of the Required Bid Materials and meets all of the above requirements is a "**Qualified Bid**" if the Debtors, in consultation with the Consulting Parties, determine that such bid evidences a bona fide interest and ability to purchase the Assets or any material portion thereof. A Potential Bidder that submits a Qualified Bid (a "**Qualified Bidder**") shall be entitled to participate in the Auction. The Debtors reserve the right to contact bidders before or after the Bid Deadline to discuss or clarify the terms of their bid and to indicate any terms which may need to be modified in order to conform the bid to a Qualified Bid or otherwise evaluate the bid. |
| ***Acceptance of Qualified Bids*** | The Debtors, in consultation with the Consulting Parties, may accept a single Qualified Bid or multiple bids for non-overlapping material portions of the Assets such that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid. The Debtors, in consultation with the Consulting Parties, may also permit otherwise Qualified Bidders who submitted bids by the Bid Deadline for a material portion of the Assets but who were not identified as a component of a single Qualified Bid consisting of multiple bids, to participate in the Auction and to submit higher or otherwise better bids that in subsequent rounds of bidding may be considered, together with other bids for non-overlapping material portions of the Assets, as part of such a single Qualifying Bid. |
| ***Opening Bid*** | The Qualified Bid selected by the Debtors, in consultation with the Consulting Parties, as the highest or otherwise best bid following the Bid Deadline and prior to the start of the Auction shall be provided to all other Qualified Bidders by 5:00 p.m. (prevailing Eastern Time) on the day preceding the start of the Auction (the "**Opening Bid**"). |
| ***Credit Bidding*** | Notwithstanding anything contained herein to the contrary, the (i) lenders (collectively, the "**Prepetition Lenders**") under that certain Second Amended and Restated Credit Agreement (the "**Credit Agreement**"), dated as of December 22, 2010, as further amended from time to time, among ArchBrook Laguna LLC, Expert Warehouse LLC, Lehrhoff ABL LLC and additional affiliates as borrowers and GE Capital Commercial Services, Inc. as collateral agent (the "**Prepetition Agent**") and as a Prepetition Lender, and the other Prepetition Lenders party thereto, shall have all rights available under Bankruptcy Code section 363(k) to submit a credit bid (a "**Credit Bid**") on the Collateral (as such term is defined in the Credit Agreement) securing the loans advanced under the Credit Agreement and (ii) lenders (collectively, the "**DIP Lenders**") under that certain Senior Secured Priming and Super-Priority Debtor-In-Possession Credit Agreement (the "**DIP Credit Agreement**"), dated |

| | |
|---|---|
| | as of July [ ], 2011 among the Borrowers and GE Capital Commercial Services, Inc. as agent (the "***DIP Agent***"), and as a DIP Lender, and the other DIP Lenders party thereto, shall have all rights available under Bankruptcy Code section 363(k) to submit a Credit Bid on the Collateral (as such term is defined in the DIP Credit Agreement) securing the loans advanced under the DIP Credit Agreement. The DIP Agent (on behalf of the DIP Lenders) and the Prepetition Agent (on behalf of the Prepetition Lenders) shall each be considered to be a Qualified Bidder for all purposes pursuant to the Bid Procedures, notwithstanding the requirements that bidders must satisfy to be a Qualified Bidder. Neither the DIP Agent nor the Prepetition Agent shall be required to take any further action in order to participate in the Auction; *provided, however*; that any Prepetition Lender or DIP Lender that intends to submit a Credit Bid at the Auction must provide written notice to the Debtors of its intent to submit Credit Bid prior to the commencement of the Auction, at which point such Credit Bid shall be deemed a Qualified Bid, *provided, further, however*, that the right of any Prepetition Lender or DIP Lender to Credit Bid shall be subject to such Prepetition Lender's or DIP Lender's rights under the respective Loan Documents (as defined in the Credit Agreement and DIP Credit Agreement, respectively). |
| ***Stalking Horse Agreement*** | At any time before the Bid Deadline, the Debtors, after consultation with the Consulting Parties, may seek Bankruptcy Court approval to enter into a purchase agreement (the "***Stalking Horse Agreement***"), subject to higher and better offers at the Auction, with any bidder that submits a bid (the "***Stalking Horse Bidder***") to establish a minimum Qualified Bid at the Auction. The Stalking Horse Agreement may contain certain customary terms and conditions, including expense reimbursement and a break-up fee in an amount to be determined by the Debtors and in consultation with the Consulting Parties. To the extent the Debtors seek Bankruptcy Court approval to enter into any such Stalking Horse Agreement, the Debtors may seek expedited approval thereof, but in no event shall the Debtors seek such expedited approval on less than five (5) calendar days notice. The Debtors shall serve notice of the Stalking Horse Agreement and any hearing to consider approval thereof on all parties on the Debtors' Rule 2002 notice list. To the extent that the Bankruptcy Court approves the Debtors' entry into a Stalking Horse Agreement, and the order approving a Stalking Horse Agreement is entered less than two (2) business days before the date of the Auction, the Auction date (and any corresponding dates thereafter) shall be adjusted to allow for two (2) business days notice between entry of any such approval order and the date of the Auction and shall account for the exact number of days so adjusted. |

| | |
|---|---|
| *Reservation of Rights* | The Debtors in consultation with the Consulting Parties reserve the right to (i) modify the Bid Procedures including without limitation, modifying the requirements for a Qualified Bid, at or prior to the Auction if such modification will better promote the goals of the Auction, (ii) impose, at or prior to the Auction, additional customary terms and conditions on the Sale of some or all of the Assets and (iii) adjourn or cancel the Auction at the Auction and/or adjourn the Sale Hearing in an open court without further notice, all in such a manner that is not materially inconsistent with any prior order of the Bankruptcy Court and the Debtors deem such modifications consistent with the performance of their fiduciary obligations. |

## C.    **The Auction**

17.    If, but only if, more than one Qualified Bid is received by the Debtors before the Bid Deadline, the Auction[3] shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036-6745 and shall commence on **August 8, 2011 at 10:00 a.m. (prevailing Eastern time)**; *provided, however,* that the Debtors shall have the right to adjourn or cancel the Auction at any time by delivering notice of such adjournment or cancellation to all Qualified Bidders; *provided*, *further*, that the Debtors shall have the right to conduct any number of Auctions on such date to accommodate Qualified Bids for certain, but less than all, of the Assets if the Debtors, in consultation with the Consulting Parties, determine that such process would be in the best interests of the Debtors' estates.    The Debtors shall confirm to all Qualified Bidders the time and place of the Auction.

18.    Only a Qualified Bidder who is designated as such by the Debtors, in consultation with the Consulting Parties, is eligible to participate at the Auction.    During the Auction, bidding shall begin initially with the Opening Bid, and subsequently continue with minimum increments of at least $1 million (subject to the Debtors' right to announce reduction or increases in minimum incremental bids at any time during the Auction).

---

[3]  Auction date proposed to be two (2) business days prior to the date of the Sale Hearing.

19. The Auction shall be governed by the following procedures, which procedures shall be subject to modification by the Debtors, in consultation with the Consulting Parties, as the Debtors deem necessary to better promote the goals of the Auction and to comply with their fiduciary obligations:

    a. The Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative.

    b. Only representatives of (i) the Debtors, (ii) persons or entities making Qualified Bids, (iii) the DIP Agent, (iv) the Prepetition Agent and (v) any statutorily created committee of unsecured creditors appointed to these cases shall be permitted to be present at the Auction. For the avoidance of doubt, although these parties shall be permitted to be present at the Auction, only Qualified Bidders may bid at the Auction.

    c. The terms of each Qualified Bid selected from time to time by the Debtors, in consultation with the Consulting Parties, as being the highest or otherwise best offer at any such time (each such Qualified Bid selected at any time, the "***Leading Bid***" at such time) shall be fully disclosed to all other Qualified Bidders. For the avoidance of doubt, each Leading Bid and each bid identified as being the highest or otherwise best offer for any or all of the Assets at any time shall have no conditions other than those disclosed.

    d. The Auction shall commence with the Debtors confirming the particulars of the Opening Bid and asking for higher and better offers. The Auction shall continue with subsequent rounds of bidding and, after each round, the Debtors shall announce the Leading Bid.

    e. The Debtors shall provide for a court reporter to be present at and prepare a transcript of the Auction. The Debtors may determine, in their discretion, to make all or any part of the transcript subject to confidentiality requirements and seal.

    f. Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the proposed sale.

    g. The Debtors, acting in good faith and in the exercise of their fiduciary duties to maximize value to the Debtors' estates, and in consultation with the Consulting Parties, may accept Qualified Bids as Leading Bids or as the Successful Bid if such Qualified Bid(s), taken together, constitute a sale of all, substantially all or a portion of the Assets without overlap.

h. Bidding shall commence at the amount of the Opening Bid. Qualified Bidders may then submit successive bids higher than the previous bid in increments of no less than **$1 million**. The Debtors reserve the right to announce reductions or increases in minimum incremental bids (or in valuing such bids) at any time during the Auction.

i. All Qualified Bidders shall have the right to submit additional bids and make additional modifications to the Purchase Agreement or their respective modified purchase agreements, as applicable, at the Auction to improve such bids.

j. The Auction may include individual negotiations with the Qualified Bidders and/or open bidding in the presence of all other Qualified Bidders.

k. The Debtors, in consultation with the Consulting Parties, reserve the right to (i) determine in their discretion which bid is the highest or otherwise best, and (ii) reject at any time, without liability, any offer that the Debtors, in their discretion deem to be (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or procedures set forth therein or in the Bid Procedures Order, or (3) contrary to the best interests of the Debtors and their estates.

l. The Auction shall continue until there is only one bid (or more than one bid for non-overlapping portions of the Assets that collectively constitute substantially all or a portion of the Assets) that the Debtors in consultation with the Consulting Parties determine, subject to Bankruptcy Court approval, is the highest or otherwise best offer or offers that together constitute the highest or otherwise best offer or offers for the Assets from among the Qualified Bidders submitted at the Auction (the "***Successful Bid***"). In determining the Successful Bid, the Debtors, in the exercise of their business judgment and in consultation with the Consulting Parties, shall consider, without limitation, the amount of the purchase price, the form of consideration being offered (*i.e.*, although the Debtors will consider all forms of consideration, the Debtors prefer cash to all other types of consideration), the Qualified Bidders' ability to complete the transaction constituting the Successful Bid (including without limitation, the ability to obtain any required regulatory approvals or consents or the lack thereof), the proposed timing thereof, the contracts being assumed by the bidder,[4] the rights of such Qualified Bidder and the Debtors with respect to the termination thereof, the number, type and nature of any changes reflected in the purchase agreement requested by each Qualified Bidder, and the net benefit to the Debtors' estates. The Qualified Bidder(s) submitting such Successful Bid(s) for the Assets shall become

---

[4] In this regard, the form of Purchase Agreement contains a closing condition with respect to the assumption of certain specified contracts.

the "**Successful Bidder**," and shall have such rights and responsibilities of a purchaser, as set forth in the Purchase Agreement, or modified definitive purchase agreement, as applicable. The next highest or otherwise best bid will be the "**Back-Up Bid**" and the maker of the bid will be the "**Back-Up Bidder**." Prior to the Sale Hearing, but in no event later than two (2) business days after conclusion of the Auction, the Successful Bidder, the Back-Up Bidder and the Debtors shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid and the Back-Up Bid were made (subject, in the case of the Debtors, to the qualifications set forth in "Acceptance and Termination of Qualified Bids" in the Bid Procedures).

20. The Successful Bid(s) submitted at the Auction shall constitute an irrevocable offer and be binding on the Successful Bidder and the Back-Up Bidder from the time the bid is submitted until the earliest of (1) September 15, 2011[5] or (2) entry of the Sale Order. If the Successful Bid and Back-Up Bid are approved pursuant to the Sale Order, the Successful Bid shall be binding in accordance with the terms of the Purchase Agreement, and the Back-Up Bid shall be binding until 30 days after entry of the Sale Order. Each Qualified Bid that is not the Successful Bid or the Back-Up Bid as approved by the Court at the Sale Hearing shall be deemed withdrawn and terminated at the conclusion of the Sale Hearing. Each bid (including the Successful Bid) shall be deemed withdrawn if the Auction is canceled or does not take place prior to 45 days after Court approval of the Bid Procedures unless extended by mutual agreement of the Debtors and the bidder in question.

21. The Debtors intend to sell some or all of the Assets to the Successful Bidder upon the approval of the Successful Bid and the Back-Up Bid(s) by the Court after the Sale Hearing. The Debtors' presentation of a particular Successful Bid and Back-Up Bid to the Court for approval does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing.

---

[5] Proposed to be 38 days from the Auction date.

22.     Each Deposit submitted pursuant to the Bid Procedures will be held in escrow by the Escrow Agent and will not become property of the Debtors' estates absent further order of the Court.  Within five (5) business days following the approval by the Court of the Successful Bidder and Back-Up Bidder, the Escrow Agent shall return the Deposits made by any other Qualified Bidders and the Escrow Agent shall return the Back-Up Bidder's Deposit within five (5) business days after the Back-Up Bid is terminated in accordance with the provisions herein.

23.     If the Successful Bidder or the Back-Up Bidder shall fail to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder (or Back-Up Bidder, as the case may be), the Debtors shall be entitled to retain such Successful Bidder's (or Back-Up Bidder's, as the case may be) Deposit, in addition to other additional remedies available to the Debtors under applicable law.  The Debtors shall credit the Deposit of such Successful Bidder or the Back-Up Bidder towards the purchase price at the time of funding pursuant to the terms of the Purchase Agreement.

### D.     <u>Reservation of Rights to Enter into Stalking Horse Agreement</u>

24.     Pursuant to the Motion, the Debtors have determined, in their reasonable business judgment, that seeking the relief requested herein without entering into a stalking horse agreement is warranted and necessary.  The Debtors are, however, continuing their discussions with potential purchasers, and reserve the right to enter into a stalking horse agreement and grant to the stalking horse certain bid protections (such as a break-up fee and expense reimbursement), subject to this Court's approval, if the Debtors believe that such an agreement will further the purposes of the Auction, by among other things, enticing value maximizing bids.

## II.    Assumption Procedures

25.     Within two (2) business days after receiving the schedule from each Qualified Bidder of those executory contracts and unexpired leases it wishes to assume (the "***Designated***

*Contracts*"), and no later than one (1) business day before the Sale Hearing (subject to adjustment as provided below), the Debtors shall file with the Court and serve on each counterparty to an executory contract or unexpired lease set forth on such schedule a notice of assumption, assignment, and cure (the "***Cure Notice***"), substantially in the form attached as **<u>Exhibit C</u>** to the proposed Bid Procedures Order. The Cure Notice shall include the proposed purchasers' calculation of the cure amount (the "***Cure Amount***") for each such Designated Contract. A list of the Designated Contracts and Cure Amounts shall be posted on the Website by two (2) calendar days after the Bid Deadline and updated as modified by each bidder.

26. Any counterparty to a Designated Contract shall file and serve any objections to (i) the proposed assumption and assignment set forth in the Cure Notice and (ii) if applicable, the proposed Cure Amount, no later than two (2) calendar days before the Sale Hearing. If any executory contract or unexpired lease is added to the schedule of Designated Contracts, a copy of the applicable Cure Notice shall be served on the counterparty by overnight courier service within one (1) business day of such addition (and in no event less than one (1) business day before the Sale Hearing) and any counterparty may file an objection as aforesaid at any time that is four (4) hours prior to the Sale Hearing.

27. At the Sale Hearing, only those contracts (and the corresponding Cure Amounts) listed on the Cure Notice that have been selected to be assumed by the Successful Bidder at the Auction (the "***Selected Contracts***") shall be subject to approval by the Bankruptcy Court, and the Debtors shall reserve their rights for all other contracts. If no objection to the Cure Notice with respect to the Selected Contracts is timely received, (i) the counterparty to a Selected Contract shall be deemed to have consented to the assumption and assignment of the Selected Contract to the Successful Bidder and shall be forever barred from asserting any objection with regard to

such assumption and assignment, and (ii) the Cure Amount set forth in the Cure Notice shall be controlling, notwithstanding anything to the contrary in any Selected Contract, or any other document, and the counterparty to a Selected Contract shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Selected Contract against the Debtors or the Successful Bidder, or the property of any of them.

## III.  The Sale is in the Best Interests of the Debtors, Their Estates and Creditors

### A.  <u>Sale of the Assets</u>

28.     Bankruptcy Code section 363 provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…" 11 U.S.C. § 363(b)(1). Courts in the Second Circuit and others, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor. *See*, *e.g.*, *Official Comm. of Unsecured Creditors v. LTV Corp. (In re Chateaugay Corp.),* 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge reviewing a Bankruptcy Code section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp*.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same). Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *In re Betty Owens Schs., Inc*., No. 96 Civ. 3576 (PKL), 1997 WL 188127, at *4 (Bankr. S.D.N.Y. Apr. 17, 1997); *In re Del. and Hudson Ry. Co*., 124 B.R. 169, 176 (D. Del. 1991); *In re Decora Indus., Inc*., No. 00-4459 (JJF), 2002 WL 32332749, at *2 (Bankr. D. Del. May 20, 2002).

29.     As described above, the Debtors have attempted to maximize value in these cases through a stalking horse bidder. Currently, however, it is the Debtors' business judgment that a

Sale Transaction without a stalking horse bidder provides the Debtors with the best alternative to maximize the value of their estates. By proceeding with the Sale Transaction, the Debtors will encourage competitive bidding to obtain the best recovery for their creditors on assets in which the market has demonstrated an interest while still maintaining sufficient flexibility for other parties to propose alternative transactions that may yield more value for the Debtors' estates and their creditors. At this juncture, the Debtors believe that the Sale Transaction presents the best path to unlock the value of their Assets. Through the Auction process, at the Sale Hearing, and after the Auction is concluded, the Court will be assured that the Debtors have selected the party or parties with the highest or otherwise best offer for the Assets.

30. The proposed Sale Notice and the proposed Bid Procedures are appropriate, reasonable and designed to ensure the most robust bidding and auction process possible for the Assets. As stated, the Sale Notice will be promptly served on the Sale Notice Parties and will be timely published in newspapers of general circulation. In addition, before the Bid Deadline, the Debtors' financial advisors will continue to contact various parties who have previously expressed an interest in acquiring assets of the Debtors to determine whether such parties are interested in submitting a bid. The Debtors believe that this process provides more than sufficient notice and a reasonable period in which to attract bids, particularly in view of the extensive marketing activities engaged in by the Debtors and their financial advisors prior to the Petition Date with respect to any potential alternative transaction.

**B.**     <u>**Sale Free and Clear of Liens, Claims, Encumbrances, and Interests**</u>

31. Pursuant to Bankruptcy Code section 363(f), a debtor in possession may sell property of the estate:

> "free and clear of any interest in such property of an entity other than the estate if (1) applicable nonbankruptcy law permits the sale of such property free and clear of such interest; (2) such entity

> consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."

11 U.S.C. § 363(f).

32.     The Debtors believe that, pursuant to the Purchase Agreement corresponding to any Successful Bid, one or more of the tests of Bankruptcy Code section 363(f) are satisfied with respect to the transfer of the Assets.  In particular, the Debtors believe that they meet, among others, the test set forth in Bankruptcy Code section 363(f)(5).  Any parties in interest that assert liens, claims, encumbrances or other interests in, to or against the acquired Assets will be adequately protected by having their liens, if any, attach to the proceeds of the Sale Transaction, in the same order of priority, with the same validity, force and effect that such parties had prior to the Sale Transaction, subject to any claims and defenses that the Debtors and their estates may possess with respect thereto.  Accordingly, Bankruptcy Code section 363(f) authorizes the transfer and conveyance of the Assets free and clear of all liens, claims, encumbrances and all other interests.

33.     The Debtors also submit that it is appropriate to sell the Assets free and clear of successor liability relating to the Debtors' businesses.  Such a provision ensures that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors.  Courts have consistently held that a buyer of a debtor's assets pursuant to a Bankruptcy Code section 363 sale takes free from successor liability relating to the debtor's business.  *See, e.g.*, *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (holding that channeling of claims to proceeds is consistent with intent of sale free and clear under Bankruptcy Code section 363(f)); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009)

("[S]uccessor or transferee liability claims against [the purchaser], as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction."), *aff'd*, 2009 U.S. App. LEXIS 17441 (2d Cir. Aug. 5, 2009). The purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, without such assurances, the Debtors would run the risk that potential bidders may not enter the Auction or, if they did, would do so with reduced bid amounts. To that end, the Successful Bidder should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the purchased Assets free and clear.

### C. Protections as a Good Faith Purchaser

34. Bankruptcy Code section 363(m) protects a good-faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under Bankruptcy Code section 363(b) is later reversed or modified on appeal. Specifically, Bankruptcy Code section 363(m) states that:

> "The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal."

11 U.S.C. § 363(m). Bankruptcy Code section 363(m) "affords 'finality to judgment by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bids.'" *Reloeb Co. v. LTV Corp* (*In re Chateaugay Corp.*), No. 92 Civ. 7054 (PKL), 1993 WL 159969, at *3 (Bankr. S.D.N.Y. May 10, 1993) (quoting *In re Stadium Mgmt. Corp.*, 895 F.2d 845, 847 (1st Cir. 1990)); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of

property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

35.     The Second Circuit has indicated that a party would have to show fraud or collusion between the buyer and the debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith. *See Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); *see also In re Angelika Films 57th, Inc.*, Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *7 (Bankr. S.D.N.Y. 1997) (same; holding that purchaser's status as an insider was not *per se* bad faith).

36.     Here, the Successful Bidder will have engaged in the Auction pursuant to the proposed Bid Procedures, and any Purchase Agreement proposed by a Successful Bidder will be the product of arm's-length, good-faith negotiations in a competitive bidding process.  Indeed, and to that end, the Debtors have included a form asset purchase agreement for bidders to use that was formulated by the Debtors to ensure that all parties are beginning on a level playing field.  Moreover, by subjecting the Assets to a market test through the Auction, the Debtors submit that the consideration to be received will be fair and reasonable.  Based upon the record to be made at the Sale Hearing, the Debtors will request a finding that the Successful Bidder is a good-faith purchaser entitled to the protections of Bankruptcy Code section 363(m).

**D.** **Bid Procedures**

37.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets of the estate.  *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (holding that the business judgment standard protects break-up fees and other contractual provisions negotiated in good faith).

38.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See, e.g., Integrated Res.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [Debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bag Co. Inc. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)); *see also Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").  To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g., Integrated Res.*, 147 B.R. at 659 (such procedures "encourage bidding and [to] maximize the value of the debtor's assets").

39.     The Debtors believe that the currently proposed Bid Procedures will establish parameters pursuant to which the value of the Assets may be fully tested at the Auction and

ensuing Sale Hearing. Such procedures will increase the likelihood that the Debtors receive the greatest possible consideration for the Assets because they will ensure a competitive and fair bidding process that will encourage participation by financially capable bidders who demonstrate the ability to close such a transaction. Indeed, the Debtors have put limited (if any) constraints on the ability of prospective purchasers to bid on the Debtors' assets, and instead have encouraged bid flexibility by, among other features, allowing bidders to pool bids and bid with non-cash consideration. Further, the Debtors have instituted mechanisms to ensure an open and robust bidding process at the Auction. Therefore, the Debtors believe that the Bid Procedures (i) will encourage bidding for the Assets, (ii) are consistent with other procedures previously approved by courts in this district and (iii) are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. *See*, *e.g.*, *Integrated Res.*, 147 B.R. at 659; *995 Fifth Ave. Assocs.*, 96 B.R. at 28.

40. Thus, the proposed Bid Procedures are reasonable, appropriate and within the Debtors' sound business judgment under the circumstances because they will serve to maximize the value the Debtors will recover on account of a sale of the Assets.

### E. Ability to Enter into Stalking Horse Agreement

41. Pursuant to the Motion, the Debtors are seeking the pre-approval of this Court to allow the Debtors to choose a Stalking Horse Bidder at any time after entry of the Bid Procedures Order. The Debtors intend to file the appropriate motion seeking approval of the Stalking Horse Bidder and the necessary bidding protections, if a Stalking Horse Bidder is identified and secured.

### F. Assumption and Assignment of Designated Contracts

42. To facilitate and affect the sale of the Assets, the Debtors seek authorization to assume and assign the Selected Contracts to the Successful Bidder. Bankruptcy Code section

365(a) provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). A debtor's decision to assume an executory contract or unexpired lease must be an exercise of its sound business judgment for the Court to approve the assumption under Bankruptcy Code section 365(a). *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.),* 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1099 (2d Cir. 1993). In connection with the proposed sale, the Debtors will assume and assign only the Selected Contracts (i.e., those executory contracts and unexpired leases that the Successful Bidder has indicated it wants to assume).

43. Bankruptcy Code section 365(k) provides that assignment by the debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k). Therefore, upon the closing of the Sale Transaction (or the effective date of a plan, whichever is earlier), the Debtors will be relieved of their obligations under the Selected Contracts, thereby further decreasing the obligations of the estate and creating value for creditors.

44. The Debtors' assumption of the Selected Contracts will be contingent upon payment of the Cure Amounts. Bankruptcy Code section 365(b)(1) requires that any outstanding defaults under contracts that will be assumed must be cured or that adequate assurance be provided to the contract counterparties that such defaults will be promptly cured. As set forth in the Assumption Procedures above, the Debtors propose to file with the Court, publish on the Website, and serve on each counterparty to a Designated Contract a notice[6] that shall include the

---

[6] To be clear, the notice will include the Cure Amounts for each contract that any Qualified Bidder seeks to assume. If a contract was included in the notice but is not part of the Successful Bidder's list of Selected Contracts (which will be noticed at least 1 business day prior to the Sale Hearing), the Debtors will not seek to assume such contracts at the Sale Hearing.

Debtors' calculation of the Cure Amount for each such Designated Contract. Contract counterparties shall have the opportunity to object to the proposed assumption and assignment to the Successful Bidder and, if applicable, the proposed Cure Amount, and any such objections will be heard and determined at the Sale Hearing. The Successful Bidder shall be obligated to pay or cause to be paid any and all Cure Amounts with respect to the Selected Contracts to be assumed. In the event of any dispute relating to any Cure Amount, the Successful Bidder may elect not to assume the Selected Contract if it is unsatisfied with the resolution of such dispute.

45. Pursuant to Bankruptcy Code section 365(f)(2), a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided...." 11 U.S.C. § 365(f)(2)(B). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (internal citations omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (holding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance when prospective assignee of lease had financial resources and expressed

willingness to devote sufficient funding to business to give it strong likelihood of succeeding; in the leasing context, chief determinant of adequate assurance is whether rent will be paid).

46.     At the Sale Hearing, to the extent necessary, the Debtors will be prepared to proffer testimony or present evidence to demonstrate the ability of the Successful Bidder to perform under the Selected Contracts.  The Sale Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under the Selected Contracts, as required by Bankruptcy Code section 365(b)(1)(C).  Accordingly, it is requested that, at the conclusion of the Sale Hearing, the proposed assumption and assignment of the Selected Contracts be approved.

47.     To facilitate the assumption and assignment of the Selected Contracts, the Debtors further request the Court find all anti-assignment provisions of the Selected Contracts to be unenforceable under Bankruptcy Code section 365(f).[7]  Absent such a finding, the Debtors' ability to attract the highest or otherwise best offer to maximize value for the estates may be imperiled.

G.     **Notice of the Auction and Sale Hearing**

48.     The Debtors submit that the Sale Notice as set forth above, along with publication of the Sale Notice in *The New York Times*, national edition, and on the Website, is reasonable and appropriate and will be adequate to ensure that all interested parties have the opportunity to bid for the Assets, and/or object to the proposed sale of the Debtors' Assets.  Such notice is intended,

---

[7]  Bankruptcy Code section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease...."  11 U.S.C. § 365(f)(1).  Bankruptcy Code section 365(f)(3) further provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

through the use of electronic mail, fax, overnight mail, first class mail and publication, to effect service as quickly as possible in the context of the expedited schedule proposed herein. All parties, including all potential bidders at the Auction and other parties in interest will thus receive prompt notice. Accordingly, the Debtors submit that the foregoing method of notice is reasonable under the circumstances.

### H. Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d)

49. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

50. The Debtors believe that the sale of the Assets should be consummated as soon as practicable in order to preserve and maximize value. Accordingly, the Debtors request that the Sale Order approving the sale of the Assets and the assumption and assignment of the Designated Contracts be effective immediately upon entry of such order and that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

### Notice

51. The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Declaration Concerning List of the Debtors' 30 Largest Unsecured Claims on an Consolidated Basis filed pursuant to Bankruptcy Rule 1007(d); (c) GE Capital Commercial Services, Inc., as administrative agent under the Debtors' pre-petition credit facility and debtor-in-possession credit facility, (d) Latham & Watkins LLP, as counsel to GE Capital Commercial Services, Inc.;

(e) the Internal Revenue Service; (f) the Securities and Exchange Commission; and (g) the United States Attorney for the Southern District of New York. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just, proper and equitable.

New York, New York  
Dated: July 8, 2011

*/s/ Ira S. Dizengoff*
_____
AKIN GUMP STRAUSS HAUER & FELD LLP  
One Bryant Park  
New York, New York 10036  
(212) 872-1000 (Telephone)  
(212) 872-1002 (Facsimile)  
Ira S. Dizengoff  
Michael P. Cooley  
Alexis Freemen  

*Proposed Counsel to the Debtors and Debtors in Possession*

**EXHIBIT 1**

**Proposed Bid Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ARCHBROOK LAGUNA HOLDINGS LLC, *et al.*,[1] | ) | Case No. 11-13292 (    ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

## ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, 364, 365, 503 AND 507 AND FED. R. BANKR. P. 2002, 4001, 6004, 6006, 9008, AND 9014 APPROVING (A) BID PROCEDURES, (B) NOTICE OF SALE, AUCTION, AND SALE HEARING, AND (C) ASSUMPTION PROCEDURES AND RELATED NOTICES

Upon the motion (the "***Motion***")[2] of the above-captioned debtors (collectively, the "***Debtors***"), pursuant to 11 U.S.C. §§ 105, 363, 364, 365, 503 and 507 and Fed. R. Bankr. P. 2002, 4001, 6004, 6006, 9008, and 9014, for entry of (1) an order approving (a) bid procedures in connection with the sale of substantially of all of the Debtors' assets (the "***Assets***"), substantially in the form attached hereto as __**Exhibit A**__, (b) the notice (the "***Sale Notice***") of sale, Auction, and Sale Hearing (each as defined below) and (c) procedures and a cure notice with respect to the assumption and assignment of executory contracts and unexpired leases in connection with the Sale Transaction (as hereinafter defined); and (2) an order approving the sale of the Assets and related transactions (the "***Sale Transaction***") to the Successful Bidder(s); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. §§ 157 and 1334; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and it appearing that no other or

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number, are: ArchBrook Laguna LLC (6166); ArchBrook Laguna Holdings LLC (6156); Chimerica Global Logistics LLC (3745); ArchBrook Laguna West LLC (9631); Lehrhoff ABL LLC (6386); Expert Warehouse LLC (4487); and ArchBrook Laguna New York LLC (5385).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

further notice need be provided; and upon the Court's consideration of the Motion, the record of the hearing with respect to the Motion (the "***Bid Procedures Hearing***"), including any objections filed and raised at the Hearing; and upon all of the proceedings had before the Court; and any objections to the Motion having been withdrawn, resolved, or overruled on the merits; and it appearing that there exists just cause for the relief granted herein and such relief is in the best interests of the Debtors, their estates and creditors and all other parties in interest

IT IS HEREBY ORDERED THAT:[3]

1.    The Motion is granted to the extent provided herein.

## Bid Procedures

2.    The Bid Procedures, substantially in the form attached hereto as **Exhibit A** and incorporated herein by reference, are hereby approved.  The failure specifically to include or reference a particular provision of the Bid Procedures in this order shall not diminish or impair the effectiveness of such provision.

## Bid Deadline, Auction and Sale Hearing

3.    The deadline for a Potential Bidder to submit bids shall be August 4, 2011 at 5:00 p.m. (prevailing Eastern Time) (the "***Bid Deadline***").  The Auction shall be held on August 8, 2011 at 10:00 a.m. (prevailing Eastern Time) at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036.

4.    The Court shall hold a hearing on August 10, 2011 at _____ __.m. (prevailing Eastern Time) (the "***Sale Hearing***") in the United States Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, at which time the Court shall consider the approval of the Sale Transaction as

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law.  *See* Fed. R. Bankr. P. 7052.

set forth in the Motion, approve the Successful Bidder(s), and confirm the results of the Auction, if any. Objections to the Sale Transaction[4] shall be in writing, filed and served so as to be actually received by the Court and the following parties (the "***Objection Recipients***") on or before August 1, 2011 at 4:00 p.m. (prevailing Eastern Time) (the "***Objection Deadline***"), *provided*, *however*, that objections as to the Auction or the selection of the highest or otherwise best bid shall be in writing, filed and served so as to be actually received by the Notice Parties by August 9, 2011 at 12:00 p.m. (prevailing Eastern Time).

   a.   Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 (Attn: Ira S. Dizengoff, Esq., idizengoff@akingump.com; Michael P. Cooley, Esq., mcooley@akingump.com; and Alexis Freeman, Esq., afreeman@akingump.com), counsel to the Debtors;

   b.   Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, New York, NY 10004 (Attn: Susan D. Golden and Serene Nakano);

   c.   Latham & Watkins LLP, 885 Third Avenue, New York NY 10022 (Attn: Roger G. Schwartz, Esq., roger.schwartz@lw.com), counsel to GE Capital Commercial Services, Inc., as administrative agent under the Debtors' prepetition credit facility and debtor in possession credit facility;

   d.   Internal Revenue Service, 290 Broadway, New York, NY 10007;

   e.   Securities and Exchange Commission, New York Regional Office, 3 World Financial Center, Suite 400, New York, NY 10281 (Attn: George S. Canellos);

   f.   United States Attorney for the Southern District of New York, One St. Andrews Plaza, New York, NY 10007 (Attn: Preet Bharara); and

   g.   Parties in interest who have filed a notice of appearance in these cases pursuant to Bankruptcy Rule 2002.

---

[4] Objections to the assumption and assignment of Designated Contracts are addressed below.

5.     The failure to file and serve an objection to the Sale Transaction by the Objection Deadline shall be a bar to the assertion thereof at the Sale Hearing or thereafter.

6.     At any time before the Bid Deadline, the Debtors, after consultation with the Consulting Parties, may seek Court approval to enter into a purchase agreement (the "***Stalking Horse Agreement***"), subject to higher and better offers at the Auction, with any Qualified Bidder that submits a Qualified Bid (the "***Stalking Horse Bidder***") to establish a minimum Qualified Bid (the "***Stalking Horse Bid***") at the Auction.  The Stalking Horse Agreement may contain certain customary terms and conditions, including expense reimbursement and a break-up fee in an amount to be determined by the Debtors and in consultation with the Consulting Parties.  To the extent the Debtors seek Court approval to enter into any such Stalking Horse Agreement, the Debtors may seek expedited approval thereof, but in no event shall the Debtors seek such expedited approval on less than five (5) calendar days notice.  The Debtors shall serve notice of the Stalking Horse Agreement and any hearing to consider approval thereof on all parties on the Debtors' Rule 2002 notice list.  To the extent that the Court approves the Debtors' entry into a Stalking Horse Agreement, and the order approving a Stalking Horse Agreement is entered less than two (2) business days before the date of the Auction, the Auction date (and any corresponding dates thereafter) shall be adjusted to allow for two (2) business days notice between entry of any such approval order and the date of the Auction and shall account for the exact number of days so adjusted.

7.     The Sale Hearing may be adjourned from time to time without further notice to the Sale Notice Parties (as defined below), creditors or other parties in interest other than by announcement of the adjournment in open court with an entry of a notice of such adjournment on the Court's docket.

## Authorization

8.      The Debtors are authorized to take such actions as contemplated by the Motion prior to the Auction and the Sale Hearing, including, without limitation, actions to notify creditors, customers, regulators or other interested parties regarding the Sale Transaction and to obtain any necessary consents or approvals regarding the Sale Transaction or any other actions necessary to effectuate the Sale Transaction.

## Notice

9.      Notice of (a) the Motion, (b) the Bid Procedures, (c) the Auction, (d) the Sale Hearing and (e) the proposed assumption and assignment of the Designated Contracts or other similarly designated contracts to the Successful Bidder shall be good and sufficient, and no other or further notice shall be required, if given as follows:

Notice of Sale, Auction and Sale Hearing

10.     Within five (5) business days after entry of this order, the Debtors (or their agents) shall:

> a.      Provide (i) notice, in substantially the form attached hereto as **Exhibit B** (the *"Sale Notice"*), of the Sale Transaction, the Auction, and the Sale Hearing, and (ii) this order by email, mail, facsimile or overnight delivery service, upon the Sale Notice Parties;
>
> b.      Publish the Sale Notice on one occasion in *The New York Times, national edition*; and
>
> c.      Cause the Sale Notice to be published on the Website.

Assumption, Assignment and Cure Notice:

11.     Within two (2) business days after receiving the schedule from each Qualified Bidder of those executory contracts and unexpired leases it wishes to assume (the "***Designated Contracts***"), and no later than one (1) business day before the Sale Hearing (subject

to adjustment as provided below), the Debtors shall file with the Court and serve on each counterparty to an executory contract or unexpired lease set forth on such schedule a notice of assumption, assignment, and cure (the "***Cure Notice***"), substantially in the form attached hereto as **<u>Exhibit C</u>**. The Cure Notice shall include the proposed purchasers' calculation of the cure amount (the "***Cure Amount***") for each such Designated Contract. A list of the Designated Contracts and Cure Amounts shall be posted on the Website two (2) calendar days after the Bid Deadline and updated as modified by each bidder. The Debtors reserve the right to provide the Cure Notice to counterparties not yet so designated by each Qualified Bidder, and each Qualified Bidder shall have the right to supplement its designation of contracts for assumption and assignment up until one (1) business day prior to the Sale Hearing, and to remove a contract from the list of Designated Contracts at any time prior to the conclusion of the Auction.

12. Any counterparty to a Designated Contract shall file and serve any objections to (i) the proposed assumption and assignment set forth in the Cure Notice and (ii) if applicable, the proposed Cure Amount, no later than two (2) calendar days before the Sale Hearing. If any executory contract or unexpired lease is added to the schedule of Designated Contracts, a copy of the applicable Cure Notice shall be served on the counterparty by overnight courier service within one (1) business day of such addition (and in no event less than one (1) business day before the Sale Hearing) and any counterparty may file an objection as aforesaid at any time that is four (4) hours prior to the Sale Hearing.

13. At the Sale Hearing, only those contracts (and the corresponding Cure Amounts) listed on the Cure Notice that have been selected to be assumed by the Successful Bidder at the Auction (the "***Selected Contracts***") shall be subject to approval by the Court, and the Debtors shall reserve their rights for all other contracts. If no objection to the Cure Notice

with respect to the Selected Contracts is timely received, (i) the counterparty to a Selected Contract shall be deemed to have consented to the assumption and assignment of the Selected Contract to the Successful Bidder and shall be forever barred from asserting any objection with regard to such assumption and assignment, and (ii) the Cure Amount set forth in the Cure Notice shall be controlling, notwithstanding anything to the contrary in any Selected Contract, or any other document, and the counterparty to a Selected Contract shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Selected Contract against the Debtors or the Successful Bidder, or the property of any of them.

14.     Nothing in paragraphs 11 through 13 of this order shall interfere with the applicability of the Anti-Assignment Act, 41 U.S.C. § 15 (the "*Act*") or otherwise affect the rights of the United States under the Act.

15.     Notwithstanding Bankruptcy Rules 6004, 6006 or otherwise, this order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.

16.     This Court shall retain jurisdiction to hear and determine all matters arising from the interpretation, implementation and enforcement of this order.  To the extent any provisions of this order shall be inconsistent with the Motion, the terms of this order shall control.

New York, New York
Date: _____, 2011

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**

**Bid Procedures**

# ARCHBROOK LAGUNA HOLDINGS LLC

## BID PROCEDURES

### Introduction

Set forth below are the bid procedures (the "Bid Procedures") to be employed with respect to the proposed sale of a portion of or substantially all of the Debtors'[1] assets (the "Assets") pursuant to Bankruptcy Code section 363 (such sale of some or all of the Assets, the "Proposed Sale" or "Proposed Sales"). These Bid Procedures provide interested parties with the opportunity to qualify and participate in the auction (the "Auction") and submit competing bids for all or a portion of the Assets. The Debtors will seek entry of an order (the "Sale Order") from the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") authorizing and approving the Proposed Sale or Proposed Sales to the Successful Bidder(s) (as defined below) at a hearing following the Auction.

### Key Dates for Potential Bidders

The Debtors shall assist Potential Bidders (as defined below) in conducting their respective due diligence investigations and shall accept bids until 5:00 p.m., Eastern Time on August 4, 2011.[2]

The key dates for the sale process are as follows:

| | |
|---|---|
| August 4, 2011 at 5:00 P.M. EDT | Bid Deadline - Due Date for Bids and Deposits |
| August 8, 2011 at 10:00 A.M. EDT[3] | Auction |
| August 10, 2011 at 2:00 P.M. EDT[4] | Sale Hearing |

### Purchase Agreement

Attached hereto as **Schedule 1** is a form purchase agreement (together with certain ancillary agreements thereto, the "Purchase Agreement"). Pursuant to the Purchase Agreement, and to the maximum extent permitted by Bankruptcy Code section 363, the Successful Bidder shall acquire some or all of the Assets, as more fully set forth in Section 2.1 of the Purchase Agreement (the "Acquired Assets"), excluding only those certain assets expressly identified as

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the *Debtors' Motion, Pursuant to 11 U.S.C. §§ 105, 363, 364, 365, 503 and 507 and Fed. R. Bankr. P. 2002, 4001, 6004,6006, 9008 and 9014, for Entry of (I) an Order Approving (A) Bid Procedures, (B) Notice of Sale, Auction, and Sale Hearing, (C) Assumption Procedures and Related Notices; and (II) an Order Approving the Sale of Substantially All of the Debtors' Assets*
[2] Bid Deadline to be 4 calendar days prior to the date of the Auction.
[3] Auction date to be 2 business days prior to the date of the Sale Hearing.
[4] The Sale Hearing date, subject to Bankruptcy Court availability, to be 2 days from the date of conclusion of the Auction.

Retained Assets under Section 2.2 of the Purchase Agreement, free and clear of any and all Interests (as defined below), subject to certain conditions.

**Bid Procedures**

Any person or entity who wishes to participate in the Bidding Process (as defined below) and the Proposed Sale must meet the participation requirements to become a Potential Bidder as specified below and must thereafter timely submit a Qualified Bid (as defined below) to become a Qualified Bidder (as defined below). Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person or entity that is not a Potential Bidder (or their legal counsel and financial advisors) and the Debtors and their representatives shall use good faith efforts to provide all Potential Bidders with substantially similar access and information.

The Debtors and their representatives, in consultation with the agent for the Prepetition Lenders (as defined below) (the "Prepetition Agent"), the agent for the DIP Lenders (as defined below) (the "DIP Agent") and any advisors to the Prepetition Agent and the DIP Agent (the Prepetition Agent, the DIP Agent, and any advisors thereto, the "Consulting Parties") shall (i) receive and evaluate all offers made hereunder, (ii) determine whether any person or entity has met the participation requirements to become a Potential Bidder and has timely submitted a Qualified Bid so as to become a Qualified Bidder and (iii) negotiate in good faith with respect to any Qualified Bids. The Debtors and their representatives shall coordinate the efforts of Potential Bidders in conducting any required due diligence investigations (collectively, all of the aforementioned actions, the "Bidding Process").

**Participation Requirements**

Any person or entity that wishes to conduct due diligence with respect to the Assets must first deliver to the Debtors an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors (a form of which is attached hereto as **Schedule 2**) (it being understood that any person or entity who previously signed a confidentiality agreement in a form satisfactory to the Debtors shall not be required to execute a new confidentiality agreement). The executed confidentiality agreement must be signed and transmitted by the person or entity wishing to become a Potential Bidder so as to be received by each of the following parties (the "Notice Parties") prior to any dissemination of confidential information: (i) Macquarie Capital (USA) Inc., 125 West 55th Street, New York, NY 10019 (Attn: David Miller; david.miller@macquarie.com and Matthew Wayman; matthew.wayman@macquarie. com), financial advisors to the Debtors; (ii) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036-6745 (Attn: Ira S. Dizengoff, Esq.; idizengoff@akingump. com and Alexis Freeman, Esq.; afreeman@akingump.com), counsel to the Debtors, (iii) Arch Brook Laguna Holdings LLC 350 Starke Road, Suite 400, Carlstadt, NJ 07072 (attn: Daniel J. Boverman, Interim Chief Financial Officer; dboverman@esend.com.

A "Potential Bidder" is a person or entity that the Debtors in consultation with the Consulting Parties determine is reasonably likely to: (a) submit a *bona fide* offer and (b) be able

2

to consummate the Proposed Sale if selected as a Successful Bidder or Back-Up Bidder (as defined below).

## Due Diligence

The Debtors may afford each Potential Bidder the time and opportunity to conduct reasonable due diligence; *provided*, *however*, that neither the Debtors nor any of their representatives shall be obligated to furnish any due diligence information: (i) at any time to any person or entity other than a Potential Bidder; or (ii) after the Bid Deadline (as defined below) to any Potential Bidder. The Debtors may, in the exercise of their business judgment, extend a Qualified Bidder's time to conduct due diligence after the Bid Deadline until the Auction; *provided*, *however*, that the Successful Bidder and Back-Up Bidder shall be permitted to continue to conduct due diligence until closing of the Sale Transaction (subject to the terms of the Purchase Agreement); *provided*, *further*, *however*, that a Qualified Bid shall not be subject to further due diligence after the Bid Deadline.

## Bid Deadline

The deadline for a Potential Bidder to submit bids shall be **August 4, 2011 at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline").[5] Any Potential Bidder who fails to submit a bid so as to be received by the Notice Parties in advance of the Bid Deadline shall not be permitted to participate in the Bidding Process and will not be a Qualified Bidder and the Debtors shall provide copies of such bids to the Consulting Parties.

Prior to the Bid Deadline, a Potential Bidder that desires to make a bid shall deliver written copies of its bid in writing and executed by an individual or individuals authorized to bind the Potential Bidder. Each bid shall be served by courier, facsimile, e-mail or as otherwise specified by the Debtors to each of the Notice Parties.

## Bid Requirements

To participate in the Auction, a bidder must be a Potential Bidder and must deliver a written offer, which includes, at a minimum, the following items (the "Required Bid Materials") prior to the Bid Deadline:

1. Two executed originals of the purchase agreement and other documents by which the Potential Bidder offers to purchase the Assets that are the subject of the bid from the Debtors at the purchase price and upon the terms and conditions as the Potential Bidder sets forth therein, which documents should be in substantially the form of the Purchase Agreement, and any ancillary agreements, together with a marked copy showing any proposed changes, amendments or modifications to the Purchase Agreement (and exhibits) attached as **Schedule 1** hereto.

2. A written acknowledgment that the bid is not subject to any due diligence or financing contingency, is not conditioned on the payment in any circumstances of

---

[5] Bid Deadline to be 4 calendar days prior to the date of the Auction.

a break-up fee, expense reimbursement or similar type of payment to the bidder, is irrevocable until entry of the Sale Order (unless it is chosen as the Successful Bid or Back-Up Bid (each as defined below) and is not subject to any approvals, consents or conditions except as specified therein.

3.      A written acknowledgement by the bidder that it agrees to all of the terms for sale set forth in these Bid Procedures and that the offer constitutes a good faith bona fide offer to purchase some or all of the Assets.

4.      Specification of the proposed purchase price and any the Assets that are the subject of the bid.

5.      Delivery by certified check or wire transfer of a good faith deposit in immediately available funds equal to the greater of (i) $2 million or (ii) 10% of the proposed purchase price for the Assets that are the subject of the bid (the "Deposit"), *provided, however,* that the required Deposit for a bid in any amount less than substantially all of the Assets shall be 10% of the proposed purchase price of such Assets. The Deposit shall be held in escrow and will be refunded on the terms set forth below.

6.      Evidence or a statement indicating that the bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission and consummation of its bid and acceptance of the terms of sale in these Bid Procedures, or a representation that no such authorization or approval is required and that any and all initial consents required in connection with the submission and consummation of the bid have been obtained and that no other initial consents are required.

7.      Full disclosure of the identity of each entity that will be bidding for or purchasing all of or a portion of the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed bid;

8.      A statement that the offering parties consent to the jurisdiction of the Court

9.      Evidence of sufficient cash or other acceptable forms of currency on hand or written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtors with appropriate contact (and any other necessary) information for such financing sources.

10.     A list of the Debtors' executory contracts and unexpired leases with respect to which the bidder seeks assignment from the Debtors and a specification of what the bidder believes to be the appropriate cure amounts. Such cure amounts will be the bidder's responsibility.

4

11.    Such other information as may be reasonably requested in writing by the Debtors at least two calendar days prior to the Bid Deadline.

In order to be a Qualified Bid, a bid (including all Required Bid Materials) must:

12.    Be received by the Bid Deadline;

13.    Not be subject to any due diligence or financing contingency; and

14.    Not request or entitle the bidder to any break-up fee, expense reimbursement or similar type of payment, *provided*, *however*, that the Debtors, in consultation with the Consulting Parties, may decide to grant break-up fee and expense reimbursement protections to any bidder approved as a "Stalking Horse" bidder in accordance with these procedures.

A bid received from a Potential Bidder that includes all of the Required Bid Materials and meets all of the above requirements is a "Qualified Bid" if the Debtors, in consultation with the Consulting Parties, determine that such bid evidences a *bona fide* interest and ability to purchase the Assets or any material portion thereof. A Potential Bidder that submits a Qualified Bid (a "Qualified Bidder") shall be entitled to participate in the Auction. The Debtors reserve the right to contact bidders before or after the Bid Deadline to discuss or clarify the terms of their bid and to indicate any terms which may need to be modified in order to conform the bid to a Qualified Bid or otherwise evaluate the bid.

The Debtors in consultation with the Consulting Parties may accept a single Qualified Bid or multiple bids for non-overlapping material portions of the Assets such that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid. The Debtors in consultation with the Consulting Parties may also permit otherwise Qualified Bidders who submitted bids by the Bid Deadline for a material portion of the Assets but who were not identified as a component of a single Qualified Bid consisting of multiple bids, to participate in the Auction and to submit higher or otherwise better bids that in subsequent rounds of bidding may be considered, together with other bids for non-overlapping material portions of the Assets, as part of such a single Qualifying Bid.

The Qualified Bid selected by the Debtors in consultation with the Consulting Parties as the highest or otherwise best bid following the Bid Deadline and prior to the start of the Auction shall be provided to all other Qualified Bidders by 5:00 p.m. (prevailing Eastern Time) on the day preceding the start of the Auction (the "Opening Bid").

Notwithstanding anything contained herein to the contrary, the (i) lenders (collectively, the "Prepetition Lenders") under that certain Second Amended and Restated Credit Agreement (the "Credit Agreement"), dated as of December 22, 2010, as further amended from time to time, among ArchBrook Laguna LLC, Expert Warehouse LLC, Lehrhoff ABL LLC and additional affiliates as borrowers (the "Borrowers") and the Prepetition Agent and the Prepetition Lenders party thereto, shall have all rights available under Bankruptcy Code section 363(k) to submit a credit bid (a "Credit Bid") on the Collateral (as such term is defined in the Credit Agreement) securing the loans advanced under the Credit Agreement and (ii) lenders (collectively, the "DIP

Lenders") under that certain Senior Secured Priming and Super-Priority Debtor-In-Possession Credit Agreement (the "DIP Credit Agreement"), dated as of July [  ], 2011 among the Borrowers and the DIP Agent and the DIP Lenders party thereto, shall have all rights available under Bankruptcy Code section 363(k) to submit a Credit Bid on the Collateral (as such term is defined in the DIP Credit Agreement) securing the loans advanced under the DIP Credit Agreement. The DIP Agent (on behalf of the DIP Lenders) and the Prepetition Agent (on behalf of the Prepetition Lenders) shall each be considered to be a Qualified Bidder for all purposes pursuant to the Bid Procedures, notwithstanding the requirements that bidders must satisfy to be a Qualified Bidder. Neither the DIP Agent nor the Prepetition Agent shall be required to take any further action in order to participate in the Auction; *provided; however*; that any Prepetition Lender or DIP Lender that intends to submit a Credit Bid at the Auction must provide written notice to the Debtors of its intent to submit Credit Bid prior to the commencement of the Auction, at which point such Credit Bid shall be deemed a Qualified Bid, *provided, further, however*, that the right of any Prepetition Lender or DIP Lender to Credit Bid shall be subject to such Prepetition Lender's or DIP Lender's rights under the respective Loan Documents (as defined in the Credit Agreement and DIP Credit Agreement, respectively).

At any time before the Bid Deadline, the Debtors, after consultation with the Consulting Parties, may seek Bankruptcy Court approval to enter into a purchase agreement (the "Stalking Horse Agreement"), subject to higher and better offers at the Auction, with any bidder that submits a bid (the "Stalking Horse Bidder") to establish a minimum Qualified Bid at the Auction. The Stalking Horse Agreement may contain certain customary terms and conditions, including expense reimbursement and a break-up fee in an amount to be determined by the Debtors and in consultation with the Consulting Parties. To the extent the Debtors seek Bankruptcy Court approval to enter into any such Stalking Horse Agreement, the Debtors may seek expedited approval thereof, but in no event shall the Debtors seek such expedited approval on less than five (5) calendar days notice. The Debtors shall serve notice of the Stalking Horse Agreement and any hearing to consider approval thereof on all parties on the Debtors' Rule 2002 notice list. To the extent that the Bankruptcy Court approves the Debtors' entry into a Stalking Horse Agreement, and the order approving a Stalking Horse Agreement is entered less than two (2) business days before the date of the Auction, the Auction date (and any corresponding dates thereafter) shall be adjusted to allow for two (2) business days notice between entry of any such approval order and the date of the Auction and shall account for the exact number of days so adjusted.

## Conduct of the Auction, if Any

If, but only if, more than one Qualified Bid is received by the Debtors prior to the Bid Deadline, the Auction shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036-6745 and shall commence on **August 8, 2011 at 10:00 a.m. (prevailing Eastern time)**;[6] *provided, however,* that the Debtors shall have the right to adjourn or cancel the Auction at any time by delivering notice of such adjournment or cancellation to all Qualified Bidders; *provided, further*, that the Debtors shall have the right to conduct any number of Auctions on such date to accommodate Qualified Bids for certain, but

---

[6] Auction date to be 2 business days prior to the date of the Sale Hearing.

100939282 v11

less than all, of the Assets if the Debtors in consultation with the Consulting Parties determine that such process would be in the best interests of the Debtors' estates. The Debtors shall confirm to all Qualified Bidders the time and place of the Auction.

Only a Qualified Bidder who is designated as such by the Debtors in consultation with the Consulting Parties is eligible to participate at the Auction. During the Auction, bidding shall begin initially with the Opening Bid, and subsequently continue with minimum increments of at least $1 million.

The Auction shall be governed by the following procedures, which procedures shall be subject to modification by the Debtors in consultation with the Consulting Parties as the Debtors deem necessary to better promote the goals of the Auction and to comply with their fiduciary obligations:

(a)     The Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative.

(b)     Only representatives of (i) the Debtors, (ii) persons or entities making Qualified Bids, (iii) the DIP Agent, (iv) the Prepetition Agent and (v) any statutorily created committee of unsecured creditors appointed to these cases shall be permitted to be present at the Auction. For the avoidance of doubt, although these parties shall be permitted to be present at the Auction, only Qualified Bidders may bid at the Auction.

(c)     The terms of each Qualified Bid selected from time to time by the Debtors, in consultation with the Consulting Parties, as being the highest or otherwise best offer at any such time (each such Qualified Bid selected at any time, the "Leading Bid" at such time) shall be fully disclosed to all other Qualified Bidders. For the avoidance of doubt, each Leading Bid and each bid identified as being the highest or otherwise best offer for any or all of the Assets at any time shall have no conditions other than those disclosed.

(d)     The Auction shall commence with the Debtors confirming the particulars of the Opening Bid and asking for higher and better offers. The Auction shall continue with subsequent rounds of bidding and, after each round, the Debtors shall announce the Leading Bid.

(e)     The Debtors shall provide for a court reporter to be present at and prepare a transcript of the Auction. The Debtors may determine, in their discretion, to make all or any part of the transcript subject to confidentiality requirements and seal.

(f)     Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Proposed Sale.

(g)     The Debtors, acting in good faith and in the exercise of their fiduciary duties to maximize value to the Debtors' estates, and in consultation with the Consulting Parties, may accept Qualified Bids as Leading Bids or as the Successful Bid if

7

such Qualified Bid(s), taken together, constitute a sale of all, substantially all or a portion of the Assets without overlap.

(h)     Bidding shall commence at the amount of the Opening Bid.  Qualified Bidders may then submit successive bids higher than the previous bid in increments of no less than $1 million.  The Debtors reserve the right to announce reductions or increases in minimum incremental bids (or in valuing such bids) at any time during the Auction.

(i)     All Qualified Bidders shall have the right to submit additional bids and make additional modifications to the Purchase Agreement or their respective modified purchase agreements, as applicable, at the Auction to improve such bids.

(j)     The Auction may include individual negotiations with the Qualified Bidders and/or open bidding in the presence of all other Qualified Bidders.

(k)     The Debtors in consultation with the Consulting Parties reserve the right to (i) determine in their discretion which bid is the highest or otherwise best and (ii) reject at any time, without liability, any offer that the Debtors, in their discretion deem to be (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or procedures set forth therein or in the Bid Procedures Order, or (3) contrary to the best interests of the Debtors and their estates.

(l)     The Auction shall continue until there is only one bid (or more than one bid for non-overlapping portions of the Assets that collectively constitute substantially all or a portion of the Assets) that the Debtors in consultation with the Consulting Parties determine, subject to Bankruptcy Court approval, is the highest or otherwise best offer or offers that together constitute the highest or otherwise best offer or offers for the Assets from among the Qualified Bidders submitted at the Auction (the "Successful Bid").  In determining the Successful Bid, the Debtors, in the exercise of their business judgment and in consultation with the Consulting Parties , shall consider, without limitation, the amount of the purchase price, the form of consideration being offered (*i.e.*, although the Debtors will consider all forms of consideration, the Debtors prefer cash to all other types of consideration), the Qualified Bidders' ability to complete the transaction constituting the Successful Bid (including without limitation, the ability to obtain any required regulatory approvals or consents or the lack thereof), the proposed timing thereof, the contracts being assumed by the bidder,[7] the rights of such Qualified Bidder and the Debtors with respect to the termination thereof, the number, type and nature of any changes reflected in the purchase agreement requested by each Qualified Bidder, and the net benefit to the Debtors' estates. The Qualified Bidder(s) submitting such Successful Bid(s) for the Assets shall become the "Successful Bidder," and shall have such rights and responsibilities of

---

[7] In this regard, the form of Purchase Agreement contains a closing condition with respect to the assumption of certain specified contracts.

a purchaser, as set forth in the Purchase Agreement, or modified definitive purchase agreement, as applicable. The next highest or otherwise best bid will be the "Back-Up Bid" and the maker of the bid will be the "Back-Up Bidder." Prior to the Sale Hearing, but in no event later than two (2) business days after conclusion of the Auction, the Successful Bidder, the Back-Up Bidder and the Debtors shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid and the Back-Up Bid were made (subject, in the case of the Debtors, to the qualifications set forth in "Acceptance and Termination of Qualified Bids" below).

THE SUCCESSFUL BID(S) SUBMITTED AT THE AUCTION SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER AND THE BACK-UP BIDDER FROM THE TIME THE BID IS SUBMITTED UNTIL THE EARLIEST OF (1) SEPTEMBER 15, 2011[8] OR (2) ENTRY OF THE SALE ORDER. IF THE SUCCESSFUL BID AND BACK-UP BID ARE APPROVED PURSUANT TO THE SALE ORDER, THE SUCCESSFUL BID SHALL BE BINDING IN ACCORDANCE WITH THE TERMS OF THE PURCHASE AGREEMENT AND THE BACK-UP BID SHALL BE BINDING UNTIL 30 DAYS AFTER ENTRY OF THE SALE ORDER. EACH QUALIFIED BID THAT IS NOT THE SUCCESSFUL BID OR THE BACK-UP BID AS APPROVED BY THE BANKRUPTCY COURT AT THE SALE HEARING SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING. EACH BID (INCLUDING THE SUCCESSFUL BID) SHALL BE DEEMED WITHDRAWN IF THE AUCTION IS CANCELLED OR DOES NOT TAKE PLACE PRIOR TO 45 DAYS AFTER BANKRUPTCY COURT APPROVAL OF THE BID PROCEDURES UNLESS EXTENDED BY MUTUAL AGREEMENT OF THE DEBTORS AND THE BIDDER IN QUESTION.

## Acceptance and Termination of Qualified Bids

The Debtors intend to sell some or all of the Assets to the Successful Bidder upon the approval of the Successful Bid and the Back-Up Bid(s) by the Bankruptcy Court after the Sale Hearing. The Debtors' presentation of a particular Successful Bid and Back-Up Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

## Sale Hearing

The Sale Hearing shall be conducted by the Bankruptcy Court on **August 10, 2011 at 2 p.m. (prevailing Eastern Time)**[9] and may be adjourned or rescheduled without notice. At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Successful Bid and the Back-Up Bid. Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an

---

[8] To be 38 days from date of the conclusion of the Auction.
[9] The Sale Hearing date, subject to Bankruptcy Court availability, to be 2 business days from the date of conclusion of the Auction.

100939282 v11

evidentiary hearing on matters relating to the Proposed Sale and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder cannot or refuses to consummate the sale because of the breach or failure on the part of the Successful Bidder, the Back-Up Bidder will be deemed the new Successful Bidder and the Debtors shall be authorized, but not required, to close with the Back-Up Bidder on the Back-Up Bid without further order of the Bankruptcy Court.

## Terms of Sale

Except as and to the extent provided in the Purchase Agreement, and subject to Bankruptcy Court approval, the sale of the Assets shall be on an "AS IS, WHERE IS" basis and without representations or warranties of any kind, nature or description by the Debtors or their agents, and by submitting a bid, each bidder is deemed to acknowledge and agree to the foregoing. Subject to Bankruptcy Court approval and the terms of the Purchase Agreement, all of the Debtors' right, title and interest in and to the Assets shall be sold free and clear of all liens, claims, interests, encumbrances, rights, remedies, restrictions, liabilities and contractual commitments of any kind or nature whatsoever, whether arising before or after the Petition Date, whether at law or in equity (collectively "Interests"), to the fullest extent available under Bankruptcy Code section 363 with such Interests, if any, attaching to the net proceeds of the sale of the Assets in the same order, dignity and priority as existed at the commencement of the bankruptcy cases and subject to the conditions set forth in the Purchase Agreement. Notwithstanding the foregoing, the Debtors, subject to any prior order of the Bankruptcy Court, reserve the right to contest the validity, nature, extent or priority of and/or seek to set aside or avoid any and all Interests under applicable law

## Return of Deposits

Each Deposit submitted pursuant to the Bid Procedures will be held in escrow by the escrow agent (the "Escrow Agent") and will not become property of the Debtors' estates absent further order of the Bankruptcy Court. Within five (5) business days following the approval by the Bankruptcy Court of the Successful Bidder and Back-Up Bidder, the Escrow Agent shall return the Deposits made by any other Qualified Bidders and the Escrow Agent shall return the Back-Up Bidder's Deposit within two business days after the Back-Up Bid is terminated in accordance with the provisions herein.

If the Successful Bidder or the Back-Up Bidder shall fail to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder (or Back-Up Bidder, as the case may be), the Debtors shall be entitled to retain such Successful Bidder's (or Back-Up Bidder's, as the case may be) Deposit, in addition to other additional remedies available to the Debtors under applicable law. The Debtors shall credit the Deposit of such Successful Bidder or the Back-Up Bidder towards the purchase price at the time of funding pursuant to the terms of the Purchase Agreement.

100939282 v11

**<u>Reservation of Rights</u>**

The Debtors in consultation with the Consulting Parties reserve the right to (i) modify the Bid Procedures including without limitation, modifying the requirements for a Qualified Bid, at or prior to the Auction if such modification will better promote the goals of the Auction, (ii) impose, at or prior to the Auction, additional customary terms and conditions on the Sale of some or all of the Assets and (iii) adjourn or cancel the Auction at the Auction and/or adjourn the Sale Hearing in an open court without further notice, all in such a manner that is not materially inconsistent with any prior order of the Bankruptcy Court and the Debtors deem such modifications consistent with the performance of their fiduciary obligations.

# # # # #

100939282 v11

# Schedule 1

**(Purchase Agreement)**

**PURCHASE AGREEMENT**

**by and between**

**ARCHBROOK LAGUNA HOLDINGS LLC,**

**ARCHBROOK LAGUNA LLC,**

**ARCHBROOK LAGUNA WEST LLC,**

**LEHRHOFF ABL LLC,**

**ARCHBROOK LAGUNA NEW YORK LLC,**

**CHIMERICA GLOBAL LOGISTICS LLC,**

**EXPERT WAREHOUSE LLC**


**and**

**[_____]**

**dated as of [●], 2011**

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS ...............................................................................................2

ARTICLE II. PURCHASE AND SALE OF ASSETS ......................................................2

    Section 2.1    Sale and Transfer of Assets.................................................................2
    Section 2.2    Retained Assets....................................................................................3
    Section 2.3    Assumption of Liabilities....................................................................4
    Section 2.4    Non-Assumed Liabilities .....................................................................4
    Section 2.5    The Purchase Price..............................................................................5
    Section 2.6    Sale Free and Clear.............................................................................6

ARTICLE III. CLOSING ...................................................................................................6

    Section 3.1    Closing ................................................................................................6
    Section 3.2    Deliveries by Sellers ...........................................................................7
    Section 3.3    Deliveries by Purchaser ......................................................................7
    Section 3.4    Nonassignable Assets..........................................................................8

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF SELLER................................8

    Section 4.1    Organization........................................................................................8
    Section 4.2    Financial Statements ...........................................................................8
    Section 4.3    Real and Personal Property..................................................................8
    Section 4.4    Authorization; Enforceability .............................................................9
    Section 4.5    No Conflicts.......................................................................................10
    Section 4.6    Consents and Approvals ....................................................................10
    Section 4.7    Intellectual Property ..........................................................................10
    Section 4.8    Material Contracts.............................................................................11
    Section 4.9    Litigation...........................................................................................11
    Section 4.10   Permits and Compliance with Laws ..................................................11
    Section 4.11   Taxes.................................................................................................12
    Section 4.12   Employees.........................................................................................12
    Section 4.13   Compliance With ERISA...................................................................12
    Section 4.14   Brokers..............................................................................................13
    Section 4.15   Environmental Matters......................................................................13
    Section 4.16   Title to Assets; Sufficiency of Assets ...............................................13
    Section 4.17   Insurance ..........................................................................................13

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF PURCHASER .......................14

    Section 5.1    Organization......................................................................................14
    Section 5.2    Authorization; Enforceability ...........................................................14
    Section 5.3    No Conflicts.......................................................................................14
    Section 5.4    Consents and Approvals ....................................................................14

Section 5.5     Financial Capability ........................................................................15
Section 5.6     Bankruptcy ....................................................................................15
Section 5.7     Broker's, Finder's or Similar Fees ...............................................15
Section 5.8     Litigation ........................................................................................15
Section 5.9     Condition of Business ....................................................................15

ARTICLE VI. COVENANTS ..........................................................................................16

Section 6.1     Interim Operations of the Business ...............................................16
Section 6.2     Access; Confidentiality .................................................................17
Section 6.3     Efforts and Actions to Cause Closing to Occur ...........................18
Section 6.4     Notification of Certain Matters .....................................................19
Section 6.5     Transition of the Business .............................................................20
Section 6.6     Submission for Court Approvals ...................................................20
Section 6.7     Employee Matters ..........................................................................20
Section 6.8     Subsequent Actions ........................................................................21
Section 6.9     Publicity .........................................................................................21
Section 6.10    Tax Matters ....................................................................................22
Section 6.11    Prompt Payment of Cure Amounts ...............................................23
Section 6.12    Completion of Nonassignable Contracts .....................................23

ARTICLE VII. CONDITIONS ........................................................................................23

Section 7.1     Conditions to Obligations of Purchaser ........................................23
Section 7.2     Conditions to Obligations of Sellers .............................................25

ARTICLE VIII. TERMINATION .....................................................................................26

Section 8.1     Termination ....................................................................................26
Section 8.2     Effect of Termination ....................................................................28
Section 8.3     Good Faith Deposit ........................................................................28

ARTICLE IX. MISCELLANEOUS ..................................................................................28

Section 9.1     Survival of Covenants, Representations and Warranties ..............28
Section 9.2     Amendment and Modification .......................................................28
Section 9.3     Notices ...........................................................................................28
Section 9.4     Counterparts ...................................................................................30
Section 9.5     Entire Agreement; No Third Party Beneficiaries ..........................30
Section 9.6     Severability ....................................................................................30
Section 9.7     Governing Law ...............................................................................30
Section 9.8     Exclusive Jurisdiction ...................................................................30
Section 9.9     Remedies ........................................................................................31
Section 9.10    Specific Performance .....................................................................31
Section 9.11    Assignment .....................................................................................31
Section 9.12    Confidential Information ................................................................31
Section 9.13    Headings .........................................................................................31

Section 9.14     No Consequential or Punitive Damages ....................................................31
Section 9.15     Definitions...........................................................................................31
Section 9.16     Bulk Transfer Notices ............................................................................40
Section 9.17     Interpretation ........................................................................................40

EXHIBITS

Exhibit A     Form of Bill of Sale
Exhibit B     Form of Escrow Agreement
Exhibit C     Form of Instrument of Assumption
Exhibit D     Form of Sale Order

# PURCHASE AGREEMENT

This Purchase Agreement, dated as of **[●]**, 2011, is made and entered into by and between ArchBrook Laguna Holdings LLC ("<u>ArchBrook Holdings</u>"), a Nevada limited liability company, ArchBrook Laguna LLC, a Nevada limited liability company, ArchBrook Laguna West LLC, a Nevada limited liability company, Lehrhoff ABL LLC, a Nevada limited liability company, ArchBrook Laguna New York LLC, a New York limited liability company, Chimerica Global Logistics LLC, a Wyoming limited liability company, and Expert Warehouse LLC, a Nevada limited liability company, (each, a "<u>Seller</u>" and collectively, "<u>Sellers</u>"), on the one hand, and [_____], a [_____] ("<u>Purchaser</u>") on the other hand.[1]

## RECITALS

WHEREAS, Sellers are engaged in the business of providing distribution, fulfillment, marketing and logistics services for consumer electronics, computer products and other goods to vendors and customers throughout the United States as conducted through the Acquired Assets (as defined below) (the "<u>Business</u>");

WHEREAS, on **[●]**, 2011, Sellers filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), which cases are being jointly administered under Case No. **[●]** (the "<u>Bankruptcy Cases</u>");

WHEREAS, Purchaser desires to purchase and acquire from Sellers substantially all of the assets and rights used in the operation of the Business, and Sellers desire to sell, convey, assign and transfer such assets and rights to Purchaser, in the manner and subject to the terms and conditions set forth herein and as authorized under sections 105, 363 and 365 of the Bankruptcy Code; and

WHEREAS, Sellers desire to assign to Purchaser, and Purchaser desires to assume from Sellers, certain liabilities, in the manner and subject to the terms and conditions set forth herein and as authorized under sections 105, 363 and 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

---

[1] Depending on the entity that will be the Purchaser, a guarantee from a credit worthy entity may be required by Seller in connection with this Agreement.

# ARTICLE I.

## DEFINITIONS

The terms defined or referenced in <u>Section 9.15</u>, whenever used herein, shall have the meanings set forth therein for all purposes of this Agreement.

# ARTICLE II.

## PURCHASE AND SALE OF ASSETS

Section 2.1 <u>Sale and Transfer of Assets</u>. On the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Sellers shall unconditionally Transfer to Purchaser and/or one or more of Purchaser's Affiliates or Subsidiaries, as designated by Purchaser, and Purchaser and/or one or more of its Affiliates or Subsidiaries, as applicable, shall purchase, acquire, assume and accept from Sellers, free and clear of all Seller Liabilities, Liens, Claims and Interests (except for Liens created by Purchaser and any Assumed Permitted Liens and Assumed Liabilities), all of Sellers' right, title and interest in and to substantially all of the Assets of Sellers other than the Retained Assets (collectively, the "<u>Acquired Assets</u>"), which shall generally include, without limitation:

(a) all Intellectual Property of the Sellers;

(b) subject to <u>Section 6.12</u>, all Contracts of Sellers;

(c) the Real Property and personal property of Sellers, including the Leased Real Property, all easements and rights of way and all buildings, fixtures and improvements erected on the Real Property;

(d) all books, files, data, customer and supplier lists, cost and pricing information, business plans, quality control records and manuals, blueprints, research and development files, personnel records of Transferred Employees to the extent the Transfer of such items is permitted under Applicable Law (excluding personnel files for employees who are not Transferred Employees) and related books and records for the Acquired Assets and all other records of Sellers;

(e) all computer systems, computer hardware and Software of Sellers;

(f) all inventory, supplies, finished goods, works in process, goods-in-transit, packaging materials and other consumables of Sellers (the "<u>Inventory</u>");

(g) all Transferable Permits of any Sellers;

(h) all machinery, vehicles, tools, equipment, furnishings, office equipment, fixtures, furniture, spare parts and other fixed Assets which are owned by Sellers (and Sellers' right, title and interest in any leases relating to the same) (all of the foregoing, collectively, "<u>Equipment</u>");

(i)　　all advertising or promotional materials of Sellers to the extent related to the other Acquired Assets set forth in this Section 2.1;

(j)　　all manufacturer's warranties, rights to rebates and other similar assets to the extent related to the Acquired Assets and all claims under such assets;

(k)　　to the extent Transferable under Applicable Law, all rights to the telephone numbers (and related directory listings), Internet domain names, Internet sites and other electronic addresses used by, assigned or allocated to Sellers;

(l)　　all prepaid expenses (excluding prepaid expenses related to Taxes) of Sellers relating to any portion of the Acquired Assets;

(m)　　all advances or similar prepayments relating to Transferred Employees;

(n)　　all Investments and any and all Cash and Cash Equivalents received by Sellers after the date hereof in respect of the Transfer of any Acquired Assets to a Third Party;

(o)　　proceeds received after the date hereof under insurance policies of Sellers to the extent received or receivable with respect to the Business or the Acquired Assets other than any policies relating to the liability of Sellers' directors and officers;

(p)　　all Accounts Receivable and Intercompany Receivables, whether or not reflected on the books of Sellers as of the Closing Date;

(q)　　customer relationships, goodwill and all other intangible assets relating to, symbolized by or associated with the Business;

(r)　　all other Assets owned by the Sellers necessary to or utilized in the operation of the Business as it is presently conducted other than the Retained Assets; and

(s)　　all rights, privileges, claims, demands, choses in action, prepayments, deposits, refunds, indemnification rights, warranty claims, offsets and other claims of Sellers against Third Parties ("Actions") relating to the Acquired Assets set forth in clauses (a) through (r) of this Section 2.1, other than the Avoidance Actions.

Section 2.2　　Retained Assets.　Notwithstanding anything in this Agreement to the contrary, the Acquired Assets shall not include the Assets which are to be retained by Sellers and not sold or assigned to Purchaser (collectively, the "Retained Assets"), which shall be limited to the following:

(a)　　all personnel files for employees who are not Transferred Employees and personnel files of Transferred Employees that may not be Transferred under Applicable Laws;

(b)　　books and records that Sellers are required by Applicable Law to retain to the extent they relate exclusively to the Retained Assets or the Non-Assumed Liabilities;

(c) rights and any assets under any Employee Benefit Plan of Sellers which are not being assumed by Purchaser;

(d) any directors and officers liability insurance policies of Sellers and any claims thereunder;

(e) the Avoidance Actions and all other Actions, including those related to the Retained Assets set forth in clauses (a) through (c) of this <u>Section 2.2</u>;

(f) all right and claims of Sellers arising under this Agreement and the Ancillary Agreements;

(g) all cash, cash equivalents, securities, instruments, bank or other deposit accounts, and other investments of Sellers;

(h) any shares of capital stock or other equity interests of any Seller; and

(i) Sellers' corporate constitutional documents, minute books, stockholder records, stock transfer or similar corporate records, corporate seal and any other corporate records.

Section 2.3    <u>Assumption of Liabilities</u>.

(a) Purchaser shall (or shall cause its designated Subsidiaries and/or Affiliates to) assume, and become solely and exclusively liable for, the following liabilities of Sellers and no other liabilities (collectively, the "<u>Assumed Liabilities</u>"): (i) all liabilities and obligations of Sellers under Contracts that arise exclusively on or after the Closing Date, (ii) any and all Cure Amounts, (iii) any other liabilities and obligations that are specifically designated by Purchaser in writing on or prior to the Closing Date, (iv) all liabilities relating to, or arising in respect of the Acquired Assets accruing, arising out of or relating to events, occurrences, acts or omissions occurring or existing on or after the Closing Date, or the operation of the Business or the Acquired Assets on or after the Closing Date, (v) all liabilities with respect to the Employees and the Transferred Employees, including all accrued salary, vacation, severance and other compensation, except as set forth in <u>Section 2.4</u>, (vi) all liabilities arising out of or resulting from a change of control, layoffs or termination of the Employees and the Transferred Employees by any Seller prior to or on the Closing Date that arises from the consummation of the Transactions, including any such layoffs or terminations that are or were sufficient in the aggregate to require notice under the WARN Act and (vii) all liabilities and obligations of the Purchaser under <u>Section 6.7</u> herein.

Section 2.4    <u>Non-Assumed Liabilities</u>.  Notwithstanding anything in this Agreement to the contrary, Purchaser shall not assume, and shall be deemed not to have assumed, any Seller Liabilities or any obligations or liabilities of any of its Subsidiaries or Affiliates or the Business, other than the Assumed Liabilities specified in <u>Section 2.3(a)</u> (collectively, the "<u>Non-Assumed Liabilities</u>").  For purposes of clarity, each of (a) any liabilities or obligations with respect to any Employee Benefit Plan and (b) any liabilities or obligations of Sellers with respect to Taxes with respect to Sellers, respectively, the Business, or the Acquired Assets (except as provided in <u>Section 6.10</u>), and (c) other claims (including Taxes) against or

relating to any of the Acquired Assets, Assumed Liabilities and/or the Business arising prior to the Closing Date, shall be Non-Assumed Liabilities.

Section 2.5    <u>The Purchase Price</u>.

(a)    <u>Purchase Price</u>.  The purchase price for the Acquired Assets shall be $[●] (the "<u>Purchase Price</u>"); provided, that the parties agree there shall be no reduction in the amount of the Purchase Price to the extent any Asset is determined to be a Nonassignable Asset.

(b)    <u>Payment of Purchase Price</u>.

    (i)    Simultaneously with the execution of this Agreement, the parties shall execute and deliver the Escrow Agreement and Purchaser shall contemporaneously deposit into the Escrow Account, by wire transfer of immediately available funds, cash in the amount of $[●], which funds shall be held by the Escrow Agent and invested as provided for in the Escrow Agreement (such funds, together with all interest, income, dividends, distributions and earnings thereon, the "<u>Good Faith Deposit</u>") and released by the Escrow Agent only in accordance with the Escrow Agreement.

    (ii)    On the Closing Date, Purchaser shall pay the Purchase Price by wire transfer of immediately available funds to one or more accounts specified by Sellers in writing, less the amount of the Good Faith Deposit (which shall be released from the Escrow Account pursuant to the Escrow Agreement and credited against the Purchase Price on such date); provided that, for the avoidance of doubt, amounts of or in respect of Transfer Taxes shall be paid directly by the Purchaser to the relevant Tax Authority or Sellers pursuant to and in accordance with the relevant provisions of this Agreement; provided, further, that Purchaser waives any rights to withholding, set-off or deduction in connection with payment of the Purchase Price.

(c)    <u>Allocation of Purchase Price</u>.  Within fourteen (14) days of the Closing Date, Purchaser shall prepare and deliver to Sellers a statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder and the Income Tax Act and upon reasonable consultation with Sellers, and with Sellers' consent, which consent shall not be unreasonably withheld or delayed (such statement, the "<u>Allocation Statement</u>").  The parties shall follow the Allocation Statement for purposes of filing IRS Form 8594 and all other Tax Returns, and shall not voluntarily take any position inconsistent therewith.  If the IRS or any other taxation authority proposes a different allocation, Sellers or Purchaser, as the case may be, shall promptly notify the other party of such proposed allocation. Sellers or Purchaser, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this section.  Except as otherwise required by Applicable Law or pursuant to a

"determination" under Section 1313(a) of the Code (or any comparable provision of United States state or local law), (i) the transactions contemplated by Article II of this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this Section 2.5(c); and (ii) neither party (nor any of their Affiliates) will take any position inconsistent with this Section 2.5(c) in any Tax Return, in any refund claim, in any litigation or otherwise. Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Acquired Assets or the allocation of the value of the Acquired Assets in any plan of reorganization or liquidation that may be proposed and the Sellers reserve the right, to the extent not prohibited by Applicable Law and accounting rules, for purposes of any plan of reorganization or liquidation, to ascribe values to the Acquired Assets and to allocate the value of the Acquired Assets to different Subsidiaries in the event of, or in order to resolve, inter-estate creditor disputes in the Bankruptcy Cases.

Section 2.6    Sale Free and Clear. Sellers acknowledge and agree and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising Seller Liabilities, Claims, Interests and Liens (other than those in favor of Purchaser created under this Agreement and/or any Ancillary Agreement, the Assumed Permitted Liens, if any, and Assumed Liabilities) of, against or created by any of Sellers or their bankruptcy estates, to the fullest extent permitted by section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Acquired Assets and thereupon shall attach to the Purchase Price with the same force, effect, validity, enforceability, and priority as such Seller Liabilities, Claims, Interests and Liens had attached to the Acquired Assets as of the Closing Date. On the Closing Date in accordance with Section 3.1(b) of this Agreement, the Acquired Assets shall be Transferred to Purchaser and/or one or more of its Affiliates or Subsidiaries, as applicable, to the fullest extent permitted by section 363 of the Bankruptcy Code, free and clear of all Seller Liabilities, Claims, Interests, and Liens other than the Assumed Permitted Liens, if any, and the Assumed Liabilities.

ARTICLE III.

CLOSING

Section 3.1    Closing.

(a)    Upon the terms and subject to the conditions of this Agreement, the Closing shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, at 10:00 a.m., New York time as specified below, unless another date, time and/or place is agreed in writing by each of the parties hereto.

(b)    The Closing shall occur on the date (the "Closing Date") that is not later than the fifth Business Day following the satisfaction and/or waiver of all conditions to the Closing as set forth in Article VII (other than conditions which by their nature can be satisfied only at the Closing). On the Closing Date, the Good Faith Deposit shall be released to Sellers and Purchaser shall deliver the Purchase Price to Sellers in accordance with Section 2.5(b)(ii).

Section 3.2    Deliveries by Sellers.

At the Closing, Sellers shall deliver or cause to be delivered to Purchaser (unless previously delivered):

(i)     the officers' certificate referred to in Section 7.1(viii);

(ii)    a certified copy of the Sale Order and a copy of the docket of the Bankruptcy Court evidencing the entry of the Sale Order (updated through the date and time of the Closing);

(iii)   the duly executed Bill of Sale and duly executed counterparts of each Conveyance Document in respect of the Acquired Assets;

(iv)    a duly executed Instrument of Assumption for the Contracts and Assumed Liabilities;

(v)     a certification of non-foreign status for each Seller in a form and manner which complies with the requirements of Section 1445 of the Code and the Treasury regulations promulgated thereunder;

(vi)    executed copies of the consents and approvals referred to in Section 7.1(i); and

(vii)   all other documents required to be delivered by Sellers to Purchaser at or prior to the Closing in connection with the Transactions, including any tax election provided in Section 6.10 hereof.

Subject to the provisions of Section 6.12 hereof, nothing contained in this Section 3.2 is intended to nor shall be deemed to require the assignment or novation of, at the Closing, any Nonassignable Contract.

Section 3.3    Deliveries by Purchaser.

At the Closing, Purchaser shall deliver or cause to be delivered to Sellers (unless previously delivered):

(i)     the Purchase Price, as provided in Section 2.5(b)(ii);

(ii)    all other documents required to be delivered by Purchaser to Sellers at or prior to the Closing in connection with the Transactions;

(iii)   a duly executed Instrument of Assumption for the Contracts and Assumed Liabilities; and

(iv)    all other documents required to be delivered by Purchaser to Sellers at or prior to the Closing in connection with the Transactions, including any tax election provided in Section 6.10 hereof.

Section 3.4     <u>Nonassignable Assets</u>.  To the extent that any Asset otherwise to be acquired by Purchaser upon the Closing pursuant to <u>Section 2.1</u> hereof is determined by the Bankruptcy Court to be non-assignable pursuant to section 365(c) of the Bankruptcy Code (each, a "<u>Nonassignable Asset</u>"), such Nonassignable Asset shall be held, as of and from the Closing Date, for the benefit and burden of Purchaser and the covenants and obligations thereunder shall be fully performed by Purchaser on the relevant Seller's behalf (to the extent such covenants and obligations are Assumed Liabilities) and all rights (to the extent such rights are Acquired Assets) existing thereunder shall be for Purchaser's account.  To the extent permitted by Applicable Law, the relevant Seller shall take or cause to be taken, at Purchaser's expense, such actions as Purchaser may reasonably request which are required to be taken or appropriate in order to provide Purchaser with the benefits and burdens of the Nonassignable Asset.  The relevant Seller shall promptly pay over to Purchaser the net amount (after expenses and Taxes of Seller (after taking into account any Tax benefits arising from such payments)) of all payments received by it in respect of all Nonassignable Assets, other than payments received from Purchaser pursuant to this Agreement.

ARTICLE IV.

REPRESENTATIONS AND WARRANTIES OF SELLER

The Sellers jointly and severally represent and warrant to Purchaser that the statements contained in this <u>Article IV</u> are true and correct as of the date of this Agreement, except as otherwise stated in this <u>Article IV</u> and except as set forth in the corresponding sections or subsections of the Disclosure Letter delivered by Sellers to Purchaser concurrently with the execution and delivery hereof (it being agreed that disclosure of any information in a particular section or subsection of the Disclosure Letter shall be deemed disclosure with respect to any other section or subsection to the extent that the relevance of such item is apparent).

Section 4.1     <u>Organization</u>.  Each of Sellers has been duly organized and is validly existing in good standing under the laws of its respective jurisdiction of incorporation or organization, with the requisite power and authority to own its properties and conduct its business as currently conducted.  Each of Sellers has been duly qualified as a foreign corporation or organization for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except to the extent that the failure to be so qualified or be in good standing has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.2     <u>Financial Statements</u>.

(a)     [To come]

Section 4.3     <u>Real and Personal Property</u>.

(a)     Each Seller has good and insurable fee simple title to, or valid leasehold interests in, or easements or other limited property interests in, all of its Real Properties constituting Acquired Assets and has good and marketable title to its personal property and Assets

constituting Acquired Assets, in each case, except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and Assets for their intended purposes and except where the failure to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. All such Acquired Assets are free and clear of Liens, other than as (i) [are described in the consolidated balance sheets included in the Historical Financial Statements], (ii) are Permitted Liens or (iii) individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect.

(b)     Each Seller has complied with all obligations under all leases relating to Acquired Assets to which it is a party, except where the failure to comply would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect. All such leases may be assumed or rejected in the Bankruptcy Cases and otherwise are in full force and effect, except as set forth in Section 4.3(b) of the Disclosure Letter, or in respect of which the failure to be in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Except as set forth in Section 4.3(b) of the Disclosure Letter, each Seller enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)     Section 4.3(c) of the Disclosure Letter is a true and correct list, as of the date of this Agreement, of all Real Property constituting Acquired Assets owned by Sellers and the addresses thereof.

(d)     Section 4.3(d) of the Disclosure Letter is a true and correct list, as of the date of this Agreement, of all Real Property constituting Acquired Assets leased by Sellers and the addresses thereof.

(e)     As of the date of this Agreement, no Seller has received any written notice of any pending or contemplated condemnation proceeding affecting any of their owned Real Property constituting Acquired Assets or any sale or disposition thereof in lieu of condemnation that remains unresolved.

Section 4.4     Authorization; Enforceability. Subject to the entry of the Sale Order, each Seller has all requisite corporate power and authority to enter into, execute and deliver this Agreement and the other Ancillary Agreements to which it is or is to be a party and to perform its obligations hereunder and thereunder. The execution, delivery and performance by each Seller of this Agreement and each of the other Ancillary Agreements to which it is or is to be a party, and the consummation by each Seller of the Transactions, have been duly authorized by all necessary corporate action on the part of each Seller. The Manager, Member or Board of Directors, as applicable, of each Seller has resolved to recommend that the Bankruptcy Court approve this Agreement, the Ancillary Agreements and the Transactions. This Agreement has been and, when executed and delivered, each other Ancillary Agreement to which each of them is to be a party, will be, duly and validly executed and delivered by each Seller and, subject to the entry of the Sale Order, constitutes (in the case of this Agreement) and will constitute (in the case of each of the Ancillary Agreements) the valid and binding obligation of each Seller, enforceable against such Seller in accordance with its terms, subject to laws of general

application relating to bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies.

Section 4.5    No Conflicts.  Subject to the entry of the Sale Order, the execution, delivery and performance of this Agreement and each other Ancillary Agreement, and the consummation of the Transactions will not (a) result in a violation of the articles of organization or bylaws or similar organizational document of any Seller, (b) assuming receipt of all required consents and approvals from Governmental Entities in accordance with Section 7.1(i), result in a violation of any Applicable Law, except for violations which, individually or in the aggregate, would not be reasonably likely to have a Material Adverse Effect, or (c) result in the creation or imposition of any Lien upon or with respect to any Acquired Asset, other than in favor of Purchaser as specified in the Ancillary Agreements and Permitted Liens.  No Seller is in violation of its articles of organization or bylaws or similar organizational document (as applicable in each case).

Section 4.6    Consents and Approvals.  Except as set forth in Section 4.6 of the Disclosure Letter or otherwise in this Agreement, no consent, approval, authorization, order, registration or qualification of or with any Governmental Entity having jurisdiction over Sellers or any of their properties is required for the execution and delivery by Sellers of the Agreement and the Ancillary Agreements and performance of and compliance by Sellers with all of the provisions hereof and thereof and the consummation of the Transactions, except (a) the entry of the Sale Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, (b) filings with respect to and any consents, approvals or expiration or termination of any waiting period, required under any United States or foreign antitrust or investment laws which may include the HSR Act and any other Regulatory Approvals required, and (c) such other consents, approvals, authorizations, registrations or qualifications the absence of which will not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.7    Intellectual Property.

(a)    Sellers own or possess valid and enforceable rights to use all Intellectual Property used in the conduct of the Business, the failure to own or possess which has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  All registrations with and applications to Governmental Entities in respect of such Intellectual Property are valid and in full force and effect, have not, except in accordance with the ordinary course practices of Sellers, lapsed, expired or been abandoned (subject to the vulnerability of a registration for trademarks to cancellation for lack of use), are not the subject of any opposition filed with the United States Patent and Trademark Office or any other applicable Intellectual Property registry.  The consummation of the Transactions will not result in the loss or impairment of any rights to use such Intellectual Property or obligate Purchaser to pay any royalties or other amounts to any third party in excess of the amounts that would have been payable by Sellers absent the consummation of the Transactions.

(b)    Each Seller has taken reasonable security measures to protect the confidentiality and value of its and their trade secrets (or other Intellectual Property for which the value is

dependent upon its confidentiality), and no such information has been misappropriated or the subject of an unauthorized disclosure, except to the extent that such misappropriation or unauthorized disclosure has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.8    Material Contracts.  Except as may have occurred solely as a result of the commencement of the Bankruptcy Cases (or any other action taken by Sellers during the Bankruptcy Cases), each of the Contracts that is material to the conduct and operations of the Business, taken as a whole (each a "Material Contract"), is in full force and effect and, to the Knowledge of Sellers, there are no material defaults thereunder on the part of any other party thereto which are not subject to an automatic stay or which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  None of Sellers is in default in any material respect in the performance, observance or fulfillment of any of its obligations, covenants or conditions contained in any Material Contract to which it is a party or by which it or its property is bound which are not subject to an automatic stay or which would reasonably be expected to have a Material Adverse Effect.

Section 4.9    Litigation. There are no legal, governmental or regulatory actions, suits, proceedings or, to the Knowledge of Sellers, investigations pending or threatened to which any Seller is or may be a party or to which any property of any Seller, any director or officer of a Seller in their capacities as such, or the Business, Assumed Liabilities or Acquired Assets is or may be the subject that, individually or in the aggregate, has had or, if determined adversely to Sellers, would reasonably be expected to have a Material Adverse Effect.

Section 4.10    Permits and Compliance with Laws.

(a)    No Seller is, or has been at any time since January 1, 2009, in violation of any Applicable Law except for any such violation that has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    No Seller has received written notification from any Governmental Entity (i) asserting a violation of any Applicable Law regarding the conduct of the Business; (ii) threatening to revoke any Permit; or (iii) restricting or in any way limiting its operations as currently conducted, except for notices of violations, revocations or restrictions which, individually or in the aggregate, would not reasonably be likely to have a Material Adverse Effect.

(c)    Sellers possess all Permits issued by, and have made all declarations and filings with, the appropriate Governmental Entities that are necessary for the ownership, lease, use and operation of the Acquired Assets (collectively, the "Seller Permits"), except any such Permits the absence of which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Section 4.10(c) of the Disclosure Letter sets forth a true and correct list of all Seller Permits as presently in effect and a true and correct list of all material pending applications for Permits, that would be Seller Permits if issued or granted and all material pending applications by Sellers for modification, extension or renewal of the Seller Permits.  All Seller Permits constitute Acquired Assets.  Sellers have operated the Business in compliance with the terms and conditions of the Seller Permits except where the failure to comply would not

reasonably be likely to have a Material Adverse Effect, and no Seller has received any written notice alleging any such failure to comply. Except as, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect, no Seller has received notice of any revocation or modification of any such Permit or have any reason to believe that any such Permit will not be renewed in the ordinary course.

Section 4.11    Taxes.

(a)    Each Seller has timely filed or caused to be filed all Tax Returns required to have been filed that are material to the Acquired Assets, taken as a whole, and, as of the time of filing, each such Tax Return is complete and correct in all material respects.

(b)    Each Seller has timely paid or withheld, or caused to be timely paid or withheld, all Taxes shown to be due and payable by it or them on the returns referred to in Section 4.11(a) and all other Taxes or assessments (or made adequate provision (in accordance with GAAP) for the payment of all Taxes due) with respect to all periods or portions thereof ending on or before the Closing Date (except Taxes or assessments that are being contested in good faith by appropriate proceedings and for which any Seller has set aside on its books adequate reserves in accordance with GAAP), which Taxes, if not paid or adequately provided for, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    Except as set forth in Section 4.11(c) of the Disclosure Letter to Sellers' Knowledge, there are no material audits, examinations, investigations or other administrative proceedings or court proceedings have been commenced or are presently pending or threatened in writing with regard to any Taxes or Tax Returns with respect to the Acquired Assets. There is no material unresolved dispute or claim concerning any Tax liability with respect to the Acquired Assets either claimed or raised by any Tax Authority in writing.

(d)    Except as set forth in Section 4.11(d) of the Disclosure Letter, there are no statutory Liens for Taxes upon any of the Acquired Assets or the Business.

(e)    Except for the representations and warranties contained in this Section 4.11, Sellers makes no other express or implied representation or warranty with respect to Taxes.

Section 4.12    Employees.  Section 4.12 of the Disclosure Letter contains a complete and accurate list of all current employees of Sellers and each such employee's respective positions, dates of hire, current annual salary and any other relevant compensation and benefits and indicates which employees are parties to a written or oral agreement with Sellers (including confidentiality and non-competition agreements). Except as disclosed in Section 4.12 of the Disclosure Letter, No Seller is party to any currently in effect agreement(s) with past or present employees, agents or independent contractors in connection with the Business.

Section 4.13    Compliance With ERISA.  Section 4.13 of the Disclosure Letter contains a complete and accurate list of all material Employee Benefit Plans of Sellers. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each Seller and any trade or business (whether or not incorporated) that, together with a Seller, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely

for purposes of Section 302 of ERISA, and Section 412 of the Code, is treated as a single employer under Section 414 of the Code (the "ERISA Affiliates"), are in compliance with the applicable provisions of ERISA and the provisions of the Code relating to ERISA Plans and the regulations and published interpretations thereunder.   No ERISA Plan is subject to Title IV of ERISA or Section 412 of the Code.

Section 4.14    Brokers.  No Seller is a party to any contract, agreement or understanding with any Person that would give rise to a valid claim against Purchaser for a brokerage commission, finder's fee or like payment in connection with the Transactions.

Section 4.15    Environmental Matters.  Except as disclosed in Section 4.15 of the Disclosure Letter and except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (i) no written notice, request for information, claim, demand, order, complaint or penalty has been received by any Seller, and there are no judicial, administrative or other actions, suits or proceedings pending or, to any Seller's Knowledge, threatened, which allege a violation of or liability under any Environmental Laws, in each case relating to any Seller or any of the Acquired Assets, (ii) each Seller has all Permits necessary for its or their operations to comply with all applicable Environmental Laws and are, and during the term of all applicable statutes of limitation, have been, in compliance with the terms of such Permits and with all other applicable Environmental Laws, and (iii) no pollutants, contaminants, wastes, chemicals, materials, substances and constituents of any nature which are subject to regulation or which would reasonably be likely to give rise to liability under any Environmental Law, including Hazardous Material, is located at, in, or under any property currently or formerly owned, operated or leased by any Seller that would reasonably be expected to give rise to any liability or obligation of any Seller under any Environmental Laws, and no Hazardous Material has been generated, owned or controlled by any Seller and has been transported to or released at any location in a manner that would reasonably be expected to give rise to any liability or obligation on any Seller under any Environmental Laws.

Section 4.16    Title to Assets; Sufficiency of Assets.

(a)    Sellers hold, and subject to the entry of the Sale Order, at the Closing shall cause to be delivered to Purchaser, good and valid title to or, in the case of leased or licensed Assets, a valid and binding leasehold interest in or license to or rights under (as the case may be), all of the Acquired Assets, free and clear of all Liens, other than Assumed Permitted Liens and Permitted Liens.

(b)    Except as would not constitute a Material Adverse Effect, the Acquired Assets include all tangible Assets, intangible Assets and Intellectual Property that are necessary for the conduct of the Business immediately following the Closing Date in substantially the same manner as conducted by Sellers prior to the commencement of the Bankruptcy Cases, except for (i) Employees that are not Transferred Employees and (ii) the Retained Assets.

Section 4.17    Insurance.  Section 4.17 of the Disclosure Letter sets forth a true, complete and correct description of all material insurance maintained by or on behalf of any

Seller as of the date of this Agreement other than those relating to any Employee Benefit Plan. As of such date, such insurance is in full force and effect.

ARTICLE V.

REPRESENTATIONS AND WARRANTIES
OF PURCHASER

Purchaser hereby represents and warrants to Sellers that the statements contained in this Article V are true and correct as of the date of this Agreement.

Section 5.1    Organization.  Purchaser is a [_____] duly organized, validly existing and in good standing under the laws of the State of [_____].  Purchaser is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction where the nature of the property owned or leased by it or the nature of the business conducted by it makes such qualification necessary, except where the failure to be so qualified would not have a Purchaser Material Adverse Effect.

Section 5.2    Authorization; Enforceability.  Purchaser has all requisite corporate power and authority to enter into this Agreement and the other Ancillary Agreements to which Purchaser is a party.  The execution, delivery and performance by Purchaser of this Agreement and each of the other Ancillary Agreements to which Purchaser is a party, and the consummation by Purchaser of the Transactions, have been duly authorized by all necessary corporate action on the part of Purchaser.  Subject to the entry of the Sale Order, this Agreement and, when executed, each other Ancillary Agreement to which Purchaser is a party, have been duly and validly executed and delivered by Purchaser and, assuming due and valid execution and delivery by Sellers, constitute the valid and binding obligation of Purchaser, enforceable against them in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies.

Section 5.3    No Conflicts.  Subject to the entry of the Sale Order, the execution, delivery and performance of this Agreement and each other Ancillary Agreement, and the consummation of the Transactions will not (a) result in a violation of the certificate of incorporation, certificate of formation or bylaws or similar organizational document of Purchaser or (b) assuming receipt of all required consents and approvals from Governmental Entities in accordance with Section 7.1(i), result in a violation of any law, statute, rule or regulation of any Governmental Entity or any applicable order of any court or any rule, regulation or order of any Governmental Entity applicable to Purchaser or by which any property or asset of Purchaser is bound, except for violations which, individually or in the aggregate, has not had and would not reasonably be likely to have a Purchaser Material Adverse Effect.

Section 5.4    Consents and Approvals.  Except as set forth in this Agreement, no consent, approval, authorization, order, registration or qualification of or with any Governmental Entity having jurisdiction over Purchaser or any of its properties is required for the execution and delivery by Purchaser of the Agreement and the Ancillary Agreements and

performance of and compliance by Purchaser with all of the provisions hereof and thereof and the consummation of the Transactions, except (a) the entry of the Sale Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, (b) filings with respect to and any consents, approvals or expiration or termination of any waiting period, required under any United States or foreign antitrust investment laws which may include the HSR Act and any other Regulatory Approvals required, and (c) such other consents, approvals, authorizations, registrations or qualifications the absence of which will not have or would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

   Section 5.5 <u>Financial Capability</u>. Purchaser (a) has as of the date of this Agreement and will have on the Closing Date sufficient funds available to pay the Purchase Price and any expenses incurred by Purchaser in connection with the Transactions, (b) has as of the date of this Agreement and will have on the Closing Date the resources and capabilities (financial or otherwise) to perform its obligations hereunder and (c) on the Closing Date, will be capable of satisfying the conditions in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Contracts.

   Section 5.6 <u>Bankruptcy</u>. There are no bankruptcy, reorganization or arrangement proceedings pending against, being contemplated by, or to the knowledge of Purchaser, threatened against, Purchaser.

   Section 5.7 <u>Broker's, Finder's or Similar Fees</u>. Except fees payable to [_____], there are no brokerage commissions, finder's fees or similar fees or commissions payable by Purchaser in connection with the Transactions.

   Section 5.8 <u>Litigation</u>. There are no legal proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party, which, if adversely determined, would reasonably be expected to have a Purchaser Material Adverse Effect.

   Section 5.9 <u>Condition of Business</u>. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that no Seller, its Affiliates or any other Person is making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers in <u>Article IV</u> hereof (as modified by the Disclosure Letter), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Acquired Assets are being transferred on a "where is" and, as to condition, "as is" basis.  Purchaser further represents that no Seller, its Affiliates or any other Person has made any representation or warranty, express or implied as to the accuracy or completeness of any information regarding Sellers, the Business or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and no Seller, its Affiliates or any other Person will have or be subject to liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives of Purchaser's use of, any such information, including data room information provided to Purchaser or its representatives, in connection with the sale of the Business and the Transactions.  Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Business and, in making the

determination to proceed with the Transactions, Purchaser has relied on the results of its own independent investigation.

ARTICLE VI.

COVENANTS

Section 6.1    Interim Operations of the Business.  From the date of this Agreement through the Closing Date, subject to any matters set forth in Section 6.1 of the Disclosure Letter and any limitations imposed on Sellers as a result of their status as debtor-in-possession in the Bankruptcy Cases, including the exercise of their fiduciary duties to maximize the value of its estate, Sellers shall use their commercially reasonable efforts to ensure that, and Sellers covenant and agree that, except as expressly provided in this Agreement, required by Applicable Law or as may be agreed in writing by Purchaser, such agreement not to be unreasonably withheld, conditioned or delayed:

(a)    subject to prudent management of workforce and business needs, each Seller shall use commercially reasonable efforts to preserve intact the business organization of the Business, keep available the services of the current officers and employees of the Business and maintain the existing relations with customers, suppliers, vendors, creditors, business partners and others having business dealings with the Business;

(b)    Sellers shall use commercially reasonable efforts to, maintain, preserve and protect all of the Acquired Assets in the condition in which they exist on the date hereof, except for ordinary wear and tear and except for replacements, modifications or maintenance in the ordinary course of business;

(c)    Sellers shall use commercially reasonable efforts to make all payments related to Contracts that become or became due or payable pursuant to the terms thereof and promptly pay, as approved and directed pursuant to any Bankruptcy Court order, and on the terms set forth therein, all Cure Amounts due or under any order of the Bankruptcy Court authorizing the assumption and assignment of any such Contract to Purchaser;

(d)    Sellers shall use commercially reasonable efforts not to take or agree to or commit to assist any other Person in taking any action that would reasonably be expected to result (i) in a failure of any of the conditions to the Closing as set forth in Article VII or (ii) that would reasonably be expected to impair the ability of Sellers or Purchaser to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

(e)    Sellers shall use commercially reasonable efforts not to, with respect to the Acquired Assets or the Business, make or authorize (i) any material change to its accounting principles, methods or practices or (ii) any material change to its Tax accounting principles, methods or practices other than, in each case, as required by changes in Applicable Law, or GAAP, or would not reasonably be expected to affect any material Tax related to the Acquired Assets after the Closing Date;

-16-

(f)     no Seller shall (i) cause or permit the amendment, restatement or modification of the articles of organization, certificate of incorporation, certificate of formation or bylaws or similar organizational document of itself or any other Seller, except as otherwise required by Applicable Law, (ii) effect a split or reclassification or other adjustment of any equity interests of itself or any other Seller or a recapitalization thereof, (iii) issue, sell, pledge, dispose of or encumber, or authorize the issuance, sale, pledge, disposition or encumbrance of, any equity interest of itself or any other Seller or any equity interest of, or similar interest in, a joint venture or similar arrangement to which a Seller is a party which is an Acquired Asset hereunder, (iv) alter, whether through a complete or partial liquidation, dissolution, merger, consolidation, restructuring, reorganization or in any other manner, the legal structure or ownership of itself or any other Seller or any joint venture or similar arrangement to which a Seller is a party which is an Acquired Asset hereunder, (v) declare, set aside or pay any type of dividend, whether in cash, stock or other property, in respect of any of the equity interests of itself or any other Seller, or repurchase, redeem or otherwise acquire or offer to repurchase, redeem or otherwise acquire any such equity interests, or (vi) propose, adopt or approve a plan with respect to any of the foregoing; and

(g)     Sellers shall not enter into any Contract, directly or indirectly, unilaterally or in concert, and whether orally, in writing, formally or informally, to do any of the foregoing or assist or cooperate with any other Person in doing any of the foregoing, or authorize, recommend, propose or announce an intention to do any of the foregoing.

Section 6.2     Access; Confidentiality.

(a)     Subject to Section 9.12, from the date hereof until the earlier of (i) termination of this Agreement or (ii) the Closing, Sellers will, (w) upon reasonable notice, give Purchaser and its employees, accountants, financial advisors, counsel and other representatives reasonable access during normal business hours to the offices, properties, books and records of Sellers relating to the Acquired Assets, the Assumed Liabilities, and the Business; (x) furnish to Purchaser such financial and operating data and other information relating to the Acquired Assets, the Assumed Liabilities, and the Business as may be reasonably requested; and (y) instruct the executive officers and senior business managers, employees, counsel, auditors and financial advisors of Sellers to cooperate with Purchaser's employees, accountants, counsel and other representatives; provided (A) all activities covered by this Section 6.2(a) shall be at the sole cost and expense of Purchaser and (B) that any such activities pursuant to this provision shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Sellers. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Sellers to disclose information, (i) subject to attorney-client privilege or that conflicts with any confidentiality obligations to which Sellers are bound, (ii) related to pricing or other matters that are highly competitively sensitive or (iii) that would otherwise in the exercise of Sellers' good faith judgment, be inappropriate in light of the Bankruptcy Cases.

(b)     Purchaser shall cooperate with Sellers and make available to Sellers such documents, books, records or information Transferred to Purchaser and relating to activities of the Business prior to the Closing as Sellers may reasonably require after the Closing in connection with any Tax determination or contractual obligations to Third Parties or to defend or

prepare for the defense of any claim against Sellers or to prosecute or prepare for the prosecution of claims against Third Parties by Sellers relating to the conduct of the Business by Sellers prior to the Closing or in connection with any governmental investigation of Sellers or any of its Affiliates; provided that any such activities pursuant to this provision shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Purchaser.

(c)    Purchaser shall reasonably cooperate with Sellers, and shall take any necessary actions, after the Closing with respect to Sellers' efforts to wind down, liquidate and dispose of any Retained Assets or discharge any Non-Assumed Liabilities.

(d)    No party shall destroy any files or records which are subject to this Section 6.2 without giving reasonable notice to the other parties, and within 15 days of receipt of such notice, any such other party may cause to be delivered to it the records intended to be destroyed, at such other party's expense.

Section 6.3    Efforts and Actions to Cause Closing to Occur.

(a)    At all times prior to the Closing, upon the terms and subject to the conditions of this Agreement, Sellers and Purchaser shall use their reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done all things necessary, proper or advisable (subject to any Applicable Laws) to cause the Closing Date to occur and consummate the Closing and the other Transactions as promptly as practicable including, (i) the preparation and filing of all forms, registrations and notices required to be filed to cause the Closing Date to occur and to consummate the Closing and the other Transactions and the taking of such actions as are necessary to obtain any requisite approvals, authorizations, consents, releases, orders, licenses, Permits, qualifications, exemptions or waivers by any Third Party or Governmental Entity; and (ii) at the sole cost of Purchaser, the preparation of any documents reasonably requested by Purchaser in order to facilitate financing (if any) of any of the Transactions.  In addition, subject to the terms of this Agreement, no party hereto shall take any action after the date hereof that would reasonably be expected to materially delay the obtaining of, or result in not obtaining, any permission, approval or consent from any Governmental Entity or other Person required to be obtained prior to the Closing as applicable.  Each of Purchaser and Sellers shall bear their own costs, fees and expenses relating to the obtaining of any approvals, authorizations, consents, releases, orders, licenses, Permits, qualifications, exemptions or waivers referred to in this Section 6.3(a).

(b)    Prior to the Closing, each of Sellers, on the one hand, and Purchaser, on the other hand, shall promptly consult with the other with respect to, provide any necessary information with respect to, and provide the other (or its counsel) with copies of, all filings made by such party with any Governmental Entity or any other information supplied by such party to a Governmental Entity in connection with this Agreement and the Transactions.  Each of Sellers, on the one hand, and Purchaser, on the other hand, shall promptly provide the other with copies of any written communication received by it from any Governmental Entity regarding any of the Transactions.  If any of Sellers or their respective Affiliates, on the one hand, and Purchaser or its Affiliates, on the other hand, thereof receives a request for additional information or documentary material from any such Governmental Entity with respect to any of the Transactions, then such party shall endeavor in good faith to make, or cause to be made, as soon

as reasonably practicable and after consultation with the other, an appropriate response in compliance with such request. To the extent that Transfers, amendments or modifications of Permits are required as a result of the execution of this Agreement or consummation of any of the Transactions, Sellers shall use their commercially reasonable efforts to effect such Transfers, amendments or modifications.

(c)     In addition to and without limiting the agreements of the parties contained above, Sellers and Purchaser shall:

(i)     take promptly, but in no event more than twenty (20) Business Days after the execution of this Agreement, all actions, necessary to make any filings required of them or any of their Affiliates in order to obtain any required approvals or consents;

(ii)     comply at the earliest practicable date with any request for additional information or documentary material received by Sellers or Purchaser or any of their Affiliates from any Governmental Entity in connection with any required approvals or consents;

(iii)     cooperate with each other in connection with any filing in connection with any required approvals or consents;

(iv)     use all reasonable best efforts to resolve such objections, if any, as may be asserted under any antitrust law or otherwise in connection with any other required approvals or consents;

(v)     advise the other party promptly of any material communication received by such party from any Governmental Entity in connection with any of the Transactions; and

(vi)     where a party seeks not to provide the other party with any information under this Section 6.3 on grounds that such information is competitively sensitive, such party will be required to provide the information to the other party's external counsel and such external counsel will not provide the information to its client.

(d)     Nothing in this Agreement shall be deemed to require Purchaser or Sellers to (i) commence any litigation against any Person in order to facilitate the consummation of any of the Transactions, except as otherwise set forth in Section 6.3 hereof; (ii) take or agree to take any other action or agree to any limitation that would reasonably be expected to have a Purchaser Material Adverse Effect on the one hand, or a Material Adverse Effect on the other hand; or (iii) defend against any litigation brought by any Governmental Entity seeking to prevent the consummation of, or impose limitations on, any of the Transactions, except as otherwise set forth in Section 6.3 hereof.

Section 6.4     Notification of Certain Matters.  Sellers shall give written notice to Purchaser promptly after becoming aware of (i) the occurrence of any event, which would be likely to cause any condition set forth in Article VII to be unsatisfied in any material

respect at any time from the date hereof to the Closing Date or (ii) any notice or other communication from (x) any Person alleging that the consent of such Person is or may be required in connection with any of the Transactions or (y) any Governmental Entity in connection with any of the Transactions; provided, however, that the delivery of any notice pursuant to this Section 6.4 shall not limit or otherwise affect the remedies available hereunder to Purchaser.

Section 6.5     Transition of the Business.  Sellers shall use commercially reasonable efforts to assist Purchaser in accomplishing a smooth transition of the Business from Sellers to Purchaser.  In this regard, Sellers and Purchaser agree that they will enter into good faith discussions concerning the Business, including, personnel policies and procedures, and other operational matters relating to the Business.

Section 6.6     Submission for Court Approvals.

(a)     Promptly upon the execution of this Agreement, Sellers shall use commercially reasonable efforts to obtain as soon as possible, but subject to the full notice requirements of the Bankruptcy Code and Bankruptcy Rules, and the Bankruptcy Court's availability and the Bankruptcy Court's entry of the Sale Order.  The Sale Order shall be in form and substance reasonably satisfactory to Purchaser.

(b)     If the Sale Order shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing, reargument or leave to appeal shall be filed with respect to any such order), Sellers and Purchaser will cooperate in taking steps to reasonably diligently defend such appeal, petition or motion and use reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion.

Section 6.7     Employee Matters.

(a)     Prior to the Closing Date, Purchaser shall offer to employ, such employment to begin on the Closing Date, each of the employees of Sellers (each such employee who accepts the offer, a "Transferred Employee") on terms and conditions that are at least the same as or better than the terms and conditions that are in effect for those employees immediately prior to the Closing Date Purchaser shall assume all obligations and liabilities with respect to the Transferred Employees including all accrued salary, vacation, severance and other compensation, except as set forth in Section 2.4, including workers' compensation liability. Purchaser shall also assume all liabilities arising out of or resulting from a change of control, layoffs or termination of the Transferred Employees by any Seller prior to or on the Closing Date that arises from the consummation of the Transactions, including any such layoffs or terminations that are or were sufficient in the aggregate to require notice under the WARN Act. Sellers shall use reasonable efforts to cooperate with Purchaser in Purchaser's recruitment of and offer to employ the Transferred Employees.

(b)     Purchaser will assume all costs, obligations, and liabilities arising from or relating to any Employee who does not become a Transferred Employee, including (i) all accrued salary, vacation, severance and other compensation, except as set forth in Section 2.4; and (ii) all

liabilities arising out of or resulting from a change of control, layoffs or termination of the Employees by any Seller prior to or on the Closing Date that arises from the consummation of the Transactions, including any such layoffs or terminations that are or were sufficient in the aggregate to require notice under the WARN Act, and to the extent that an offer made pursuant to Section 6.7(a) is not a qualifying offer under the applicable Employee's severance package, such offer shall not reduce Purchaser's liability under this Section 6.7(b).

(c) With respect to the Employees and Transferred Employees, Purchaser shall assume all obligations and liabilities under the Worker Adjustment Retraining Notification Act ("WARN"), 29 U.S.C. Section 2101 *et seq.*, or under any similar provision of any United States federal, state, regional or local law, rule or regulation (hereinafter referred to collectively as "WARN Act") for any actions prior to, on, or after the Closing Date, including without limitation actions arising as a result of the Transactions. With respect to the Employees and Transferred Employees, Purchaser hereby indemnifies Sellers against and agrees to hold each of them harmless from any and all damages, costs, liabilities and/or obligations incurred or suffered by Sellers with respect to the WARN Act for any actions prior to, on, or after the Closing Date, including actions arising as a result of the Transactions.

Section 6.8    Subsequent Actions. If at any time after the Closing Date, Purchaser or Sellers consider or is advised that any deeds, bills of sale, instruments of conveyance, assignments, assurances or any other actions or things are necessary or desirable to vest, perfect or confirm ownership (of record or otherwise) in Purchaser, its right, title or interest in, to or under any or all of the Acquired Assets or otherwise to carry out this Agreement, including the assumption of the Assumed Liabilities, Purchaser or Sellers shall at Purchaser's expense, execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances and take and do all such other actions and things as may be requested by the other party in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Purchaser or otherwise to carry out this Agreement.

For the avoidance of doubt, this Section 6.8 shall survive the Closing.

Section 6.9    Publicity. Prior to the Closing and without limiting or restricting any party from making any filing with the Bankruptcy Court with respect to this Agreement or the Transactions, no party shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other party, which approval will not be unreasonably withheld or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by Applicable Law, the Bankruptcy Code or the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of the Securities Exchange Commission or any stock exchange on which Purchaser lists securities, provided that the party intending to make such release shall use its reasonable best efforts consistent with such Applicable Law, the Bankruptcy Code or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

Section 6.10    Tax Matters.

(a)       The Purchaser and the Sellers agree that the Purchase Price is exclusive of any Transfer Taxes.  The Purchaser shall promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the Transactions provided that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller, such Transfer Taxes shall be paid by the Purchaser to such Seller at the Closing or thereafter, as requested of or by Seller.

(b)       In the event that Sellers elect to file a plan of reorganization or liquidation in conjunction with the Transactions, Purchaser and Sellers covenant and agree that they will use their reasonable best efforts to obtain an order from the Bankruptcy Court pursuant to section 1146 of the Bankruptcy Code exempting, to the maximum extent possible, the Transfer of the Acquired Assets from Sellers to Purchaser from any and all Transfer Taxes (as hereinafter defined).  To the extent the Transactions or any portion of the Transactions are not exempt from Transfer Taxes under section 1146 of the Bankruptcy Code, Purchaser shall be responsible for and shall pay all Transfer Taxes in accordance with Section 6.10(a).  Purchaser and Sellers shall cooperate in providing each other with any appropriate certification and other similar documentation relating to exemption from Transfer Taxes (including any appropriate resale exemption certifications), as provided under Applicable Law.

(c)       Purchaser and Sellers agree to furnish, or cause to be furnished, to each other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets or the Business as is reasonably necessary for the preparation and filing of all Tax Returns, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Taxes and for the answer of any governmental or regulatory inquiry relating to Taxes.  Purchaser agrees to retain possession of all Tax files, books and records delivered to Purchaser by Sellers for a period of at least five years from the Closing Date.  From and after the Closing Date, Purchaser agrees that it shall provide reasonable access to Sellers and their attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to such files, books and records as Sellers may reasonably deem necessary to prepare for, file, prove, answer, prosecute or defend any claim, suit, inquiry or other proceeding, related to Taxes in connection with the Acquired Assets or the Business.

(d)       Real and personal property Taxes and assessments, and all rents, utilities and other charges, on the Acquired Assets for any taxable period commencing on or prior to the Closing Date and ending after the Closing Date (the "Straddle Period Property Tax") shall be prorated on a per diem basis between Purchaser and Sellers as of the Closing Date; provided, however, that Sellers shall not be responsible for, or benefit from, any increased or decreased assessments on real or personal property resulting from the transactions contemplated hereby. All such prorations of Straddle Period Property Taxes shall be allocated so that items relating to time periods ending on or prior to the Closing Date shall be allocated to Sellers and items relating to time periods beginning after the Closing Date shall be allocated to Purchaser.  The amount of all such prorations shall be settled and paid on the Closing Date.  If any of the rates

for the Straddle Period Property Taxes for any taxable period commencing on or prior to the Closing Date and ending after the Closing Date are not established by the Closing Date, the prorations shall be made on the basis of such rates in effect for the preceding taxable period.  The apportioned obligations under this <u>Section 6.10(d)</u> shall be timely paid and all applicable filings made in the same manner as set forth for the apportioned Transfer Taxes in <u>Section 6.10(a)</u> and <u>(b)</u>.

          Section 6.11    <u>Prompt Payment of Cure Amounts</u>.  With respect to each Contract, Purchaser shall pay or cause to be paid (and shall reimburse or cause to be reimbursed to Sellers on an after-Tax basis any amounts paid after the date hereof), on the Closing Date, all amounts (the "<u>Cure Amounts</u>") that (i) are required to be paid under section 365(b)(1)(A) or (b)(1)(B) of the Bankruptcy Code in order to assume and assign such contract, or (ii) are due pursuant to an order of the Bankruptcy Court as a condition to assuming and assigning such Contract; <u>provided</u>, <u>however</u>, that Cure Amounts that are the subject of a bona fide dispute shall be paid within two (2) Business Days of the effectiveness of a settlement or order of the Bankruptcy Court, as the case may be, with respect thereto.

          Section 6.12    <u>Completion of Nonassignable Contracts</u>.  Sellers shall use their commercially reasonable efforts to obtain any consent, approval or amendment, if any, required to novate and/or assign any Contract to be assigned to Purchaser hereunder which the Bankruptcy Court determines is not able to be assumed and assigned under section 365(c) of the Bankruptcy Code (a "<u>Nonassignable Contract</u>").  Sellers shall keep Purchaser reasonably informed from time to time of the status of the foregoing and Purchaser shall cooperate with Sellers in this regard.  To the extent that the rights of Sellers under any Nonassignable Contract, or under any other Asset to be assigned to Purchaser hereunder, may not be assigned without the consent of a Third Party which has not been obtained prior to the Closing this Agreement shall not constitute an agreement to assign the same at the Closing, if an attempted assignment would be unlawful.  If any such consent has not been obtained or if any attempted assignment would be ineffective or would impair Purchaser's rights under the instrument in question so that Purchaser would not acquire the benefit of all such rights, then Sellers, to the maximum extent permitted by Applicable Law and the instrument, shall act as Purchaser's agent in order to obtain for Purchaser the benefits thereunder and shall cooperate, to the maximum extent permitted by Applicable Law and the instrument, with Purchaser in any other reasonable arrangement designed to provide such benefits to Purchaser; <u>provided</u>, <u>however</u>, that nothing contemplated by this <u>Section 6.12</u> shall reduce the amount of the Purchase Price.

ARTICLE VII.

CONDITIONS

          Section 7.1    <u>Conditions to Obligations of Purchaser</u>.  The obligations of Purchaser to consummate the Closing shall be subject to the satisfaction (or waiver by Purchaser) on or prior to the Closing Date of the following conditions; provided, that to the extent the failure of any of the following conditions to occur is caused by Purchaser's failure to comply with any provision of this Agreement, Purchaser shall not rely on the failure of such condition to avoid its obligation to consummate the Closing:

(i)     <u>Government Action</u>. There shall be no injunction or restraining order of any Governmental Entity:

(1)     prohibiting Purchaser's ownership or operation (or that of any of its Subsidiaries) of all or a material portion of its businesses or assets or the Acquired Assets;  or

(2)     restraining or prohibiting the consummation of the Closing or the performance of any of the other Transactions, or imposing upon Purchaser or any of its Subsidiaries any damages or payments that are material;

(ii)    <u>Consents, Approvals and Permits</u>. All consents and approvals of any Person (other than a Governmental Entity) set forth in Section 7.1(ii) of the Disclosure Letter shall have been obtained, except (x) to the extent that the requirement for a particular consent or approval is rendered inapplicable by the Sale Order or other order of the Bankruptcy Court, if applicable, or (y) in the case of any Nonassignable Contract.  All consents and approvals of any Governmental Entity, whether United States federal, state, local, required in connection with the consummation of the Closing and the other Transactions, including consents and approvals required in connection with the Designated set forth in Section 7.1(ii) of the Disclosure Letter, shall have been obtained except where the failure to obtain would not constitute a Material Adverse Effect.  A copy of each such consent or approval referred to in this <u>Section 7.1(ii)</u> shall have been provided to Purchaser at or prior to the Closing.  All Permits necessary for the operation of the Business included in the Acquired Assets will be Transferred to Purchaser or have been obtained by Purchaser except where the failure to Transfer or obtain would not constitute a Material Adverse Effect.

(iii)   <u>Bill of Sale; Conveyance Documents</u>.  Sellers shall have duly executed and delivered to Purchaser the Bill of Sale, each of the Intellectual Property Instruments and each other Conveyance Document.

(iv)    <u>Antitrust Approvals</u>.  All terminations or expirations of waiting periods imposed by any Governmental Entity necessary for the consummation of the transactions contemplated by this Agreement shall have occurred and all other notifications, consents and authorizations shall have been obtained for the transactions contemplated by this Agreement.

(v)     <u>Material Adverse Effect</u>.  Since the date of this Agreement, there shall not have occurred and be continuing any Material Adverse Effect.

(vi)    <u>Sellers' Representations and Warranties</u>.  Each of the representations and warranties set forth in Article IV disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct

(i) as of the date hereof or (ii) if made as of a date specified therein, as of such date, except for any failure to be true and correct that, individually and together with other such failures, has not had a Material Adverse Effect.

(vii) <u>Sellers' Performance of Covenants</u>. Sellers shall not have failed to perform in any material respect any material obligation or to comply in any material respect with any material agreement or material covenant of Sellers to be performed or complied with by them under this Agreement, only to the extent any such material obligation, material agreement or material covenant is required to be performed or complied with by them on or prior to the Closing Date.

(viii) <u>Certificate of Sellers' Officers</u>. Purchaser shall have received from Sellers a certificate, dated the Closing Date, duly executed by the Chief Executive Officer, and the Chief Financial Officers of each individual Seller, reasonably satisfactory in form to Purchaser, to the effect of paragraph <u>(v)</u> through <u>(vii)</u> above.

(ix) <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order, the Sale Order shall have become a Final Order and the Sale Order shall not have been reversed, stayed, modified or amended in any manner materially adverse to Purchaser without Purchaser's consent.

(x) <u>Tax Certifications</u>. Purchaser shall have received a certification of non-foreign status for each Seller in the form and manner which complies with the requirements of Section 1445 of the Code and the Treasury regulations promulgated thereunder.

The foregoing conditions in this <u>Section 7.1</u> are for the sole benefit of Purchaser and may be waived by Purchaser, in whole or in part, at any time and from time to time in its sole discretion. The failure by Purchaser at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

Section 7.2 <u>Conditions to Obligations of Sellers</u>. The obligations of Sellers to consummate the Closing shall be subject to the satisfaction (or waiver by Sellers) on or prior to the Closing Date of the following conditions; provided, that to the extent the failure of any of the following conditions to occur is caused by any Seller's failure to comply with any provision of this Agreement, Sellers shall not rely on the failure of such condition to avoid its obligation to consummate the Closing:

(i) <u>Government Action</u>. There shall be no injunction or restraining order of any Governmental Entity in effect restraining or prohibiting the consummation of the Closing or imposing upon Sellers any damages or payments that are material.

(ii) <u>Consents, Approvals and Permits</u>.  All consents and approvals of any Person (other than a Governmental Entity) set forth in Section 7.1(i) of the Disclosure Letter, shall have been obtained, except (x) to the extent that the requirement for a particular consent or approval is rendered inapplicable by the Sale Order or other order of the Bankruptcy Court, if applicable, or (y) in the case of any Nonassignable Contract.  All consents and approvals of any Governmental Entity, whether United States federal, state or local required in connection with the consummation of the Closing and the other Transactions, including consents and approvals required in connection with the Contracts set forth in Section 7.1(i) of the Disclosure Letter, shall have been obtained except where the failure to obtain would not constitute a Material Adverse Effect.

(iii) <u>Assumption of Contracts</u>.  Purchaser shall have executed an Instrument of Assumption for the Contracts.

(iv) <u>Antitrust Approvals</u>.  All terminations or expirations of waiting periods imposed by any Governmental Entity necessary for the consummation of the transactions contemplated by this Agreement shall have occurred and all other notifications, consents and authorizations shall have been obtained for the transactions contemplated by this Agreement.

(v) <u>Representations and Warranties</u>.  The representations and warranties of Purchaser set forth in this Agreement shall be true and correct, in all material respects, as of the date of this Agreement and as of the Closing Date as though made as of the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date).

(vi) <u>Sale Order</u>.  The Sale Order, in form and substance reasonably satisfactory to Sellers, shall have become a Final Order and the Sale Order shall not have been reversed, stayed, modified or amended in any manner materially adverse to Sellers without Sellers' consent.

The foregoing conditions in this <u>Section 7.2</u> are for the sole benefit of Sellers and may be waived by Sellers, in whole or in part, at any time and from time to time in its sole discretion.  The failure by Sellers at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

ARTICLE VIII.

TERMINATION

Section 8.1     <u>Termination</u>.  This Agreement may be terminated or abandoned at any time prior to the Closing Date as follows:

(a)    By the mutual written consent of Purchaser and Sellers;

(b)    By either Purchaser or Sellers upon written notice given to the other, if the Bankruptcy Court or any other Governmental Entity shall have issued an order, decree or ruling or taken any other action (which order, decree, ruling or other action the parties hereto shall use their reasonable best efforts to prevent the entry of and remove), which permanently restrains, enjoins or otherwise prohibits the consummation of the Transactions and such order, decree, ruling or other action shall have become final and non-appealable;

(c)    By either Purchaser or Sellers upon written notice given to the other, if the Closing Date shall not have taken place on or before August 19, 2011 (the "Termination Date"); provided, however, that if all of the conditions to Closing shall have been satisfied or shall be then capable of being satisfied (other than the conditions set forth in Sections 7.1(iv) and 7.2(iv), the Termination Date may be extended by the Sellers from time to time by written notice to Purchaser up to but not beyond September 2, 2011, the latest of any of which dates shall thereafter be deemed to be the Termination Date; provided, further that the failure of the Closing to occur on or before such date is not the result of a material breach of any covenant, agreement, representation or warranty hereunder by the party seeking such termination; and

(d)    By Sellers upon written notice given to Purchaser, if Purchaser shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 7.2 and (ii) cannot be cured within ten (10) Business Days after Sellers notify Purchaser of such breach.

(e)    By Purchaser upon written notice given to Sellers:

(i)    if any Sellers shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 7.1 and (ii) cannot be cured within ten (10) Business Days after Purchaser notifies Sellers of such breach;

(ii)    unless, on or prior to August 15, 2011, (i) the Bankruptcy Court has entered the Sale Order; provided that Purchaser shall have the right to designate any later date for this purpose in its sole discretion; or

(iii)    if the Sale Order has been revoked, rescinded or modified in any material respect and the order revoking, rescinding or modifying such order shall not be reversed or vacated within three days after the entry thereof; provided that Purchaser shall have the right to designate any later date for this purpose in its sole discretion.

Any party seeking to invoke its rights to terminate this Agreement shall give written notice thereof to the other party or parties specifying the provision hereof pursuant to

which such termination is made and the effective date of such termination being the date of such notice.

Section 8.2    Effect of Termination.  If this Agreement is terminated by either party in accordance with and pursuant to Section 8.1, then, except as otherwise provided in Section 8.3 and Section 9.10, all rights and obligations of the parties under this Agreement shall terminate; provided, however, that nothing herein shall relieve any party from liability for any breach of this Agreement prior to such termination.

Section 8.3    Good Faith Deposit.

(a)    Solely in the event that this Agreement is terminated by Sellers pursuant to Section 8.1(d), the Good Faith Deposit shall be paid to Sellers in accordance with a Final Instruction delivered pursuant to the Escrow Agreement.

(b)    Except as described in Section 8.3(a), in all other cases under Section 8.1, upon the termination or abandonment of this Agreement by any party, the Good Faith Deposit shall be returned to Purchaser by wire transfer in immediately available funds or applied as Purchaser may in its sole discretion direct the Escrow Agent, in each case without withholding, set-off or deduction and so as to be received not later than five (5) Business Days following the date of such termination or abandonment.

(c)    The parties acknowledge that the agreements contained in this Section 8.3 are an integral part of the transactions contemplated by this Agreement and that without these agreements neither Sellers nor Purchaser would enter into this Agreement.

ARTICLE IX.

MISCELLANEOUS

Section 9.1    Survival of Covenants, Representations and Warranties.
The representations and warranties set forth in Article IV and Article V and the other covenants and agreements of the parties herein shall not survive the Closing Date; provided, however, that all covenants and agreements of Purchaser set forth herein that contemplate or may involve actions to be taken or obligations in effect after the Closing Date shall survive the Closing Date.

Section 9.2    Amendment and Modification.  This Agreement may be amended, modified and supplemented in any and all respects, but only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement.

Section 9.3    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed given when mailed, delivered personally, telecopied (which is confirmed) or sent by an overnight courier service, such as Federal Express, to the parties at the following addresses:

if to Purchaser, to:

[To come]

with a copy (which shall not constitute notice) to:

[To come]

if to Sellers, to:

Archbrook Laguna, LLC

350 Starke Road, Suite 400
Carlstadt NJ, 07072
Attention: Stephen Gawrylewski and Daniel Boverman

with copies to (which shall not constitute notice):

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036-6745
Attention:  Ira S. Dizengoff and Alexis Freeman
Tel:  (212) 872-1000
Fax:  (212) 872-1002
e-mail:  idizengoff@akingump.com

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
Attention:  Rick L. Burdick
Tel:  (202) 887-4110
Fax:  (202) 955-7792
e-mail:  rburdick@akingump.com

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
Attention:  Daniel I. Fisher
Tel:  (202) 887-4121
Fax:  (202) 887-4288
e-mail:  dfisher@akingump.com

or to such other address as a party may from time to time designate in writing in accordance with this Section 9.3.  Each notice or other communication given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been received (i) on the Business Day it is sent, if sent by personal delivery or telecopy, or (ii) on the first Business Day after sending, if sent by overnight delivery, properly addressed and prepaid or (iii) upon receipt, if sent by mail (regular, certified or registered); provided, however, that notice of change of address shall be effective only upon receipt.  The parties agree that delivery of process or

other papers in connection with any such action or proceeding in the manner provided in this Section 9.3, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof.

Section 9.4    Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other party.

Section 9.5    Entire Agreement; No Third Party Beneficiaries.  This Agreement, the Disclosure Letter and other schedules, annexes, and exhibits hereto, the Ancillary Agreements, the Conveyance Documents, the Sale Order and the Confidentiality Agreement (i) constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof and supersede and cancel all prior agreements, negotiations, correspondence, undertakings, understandings and communications of the parties, oral and written, with respect to the subject matter hereof, and (ii) are not intended to confer upon any Person other than the parties hereto and thereto any rights or remedies hereunder.

Section 9.6    Severability.  Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

Section 9.7    Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.

Section 9.8    Exclusive Jurisdiction.  If the Bankruptcy Court does not have or declines to exercise subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party (i) agrees that all such actions or proceedings shall be heard and determined in federal court of the United States for the Southern District of New York, (ii) irrevocably submits to the jurisdiction of such courts in any such action or proceeding, (iii) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court, and (iv) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such

party at its address as provided in <u>Section 9.3</u> (<u>provided</u> that nothing herein shall affect the right to effect service of process in any other manner permitted by New York law).

Section 9.9    <u>Remedies</u>.  Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit Sellers or Purchaser in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

Section 9.10    <u>Specific Performance</u>.  Purchaser acknowledges and agrees that any breach of the terms of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy, and, accordingly agrees that, in addition to any other remedies, Sellers shall be entitled to enforce the terms of this Agreement, including, for the avoidance of doubt, Purchaser's obligation to fund the Purchase Price, by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting a bond.

Section 9.11    <u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written content of the other party.  Subject to the first sentence of this <u>Section 9.11</u>, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

Section 9.12    <u>Confidential Information</u>.  Notwithstanding anything to the contrary contained in this Agreement, Purchaser shall not have access to any of Sellers' confidential information, until such time that Purchaser executes a confidentiality agreement in form and substance reasonably acceptable to Sellers.

Section 9.13    <u>Headings</u>.  The article, section, paragraph and other headings contained in this Agreement are inserted for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.14    <u>No Consequential or Punitive Damages</u>. NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

Section 9.15    <u>Definitions</u>.  For all purposes of this Agreement, except as otherwise expressly provided or unless the context clearly requires otherwise:

"<u>Accounts Receivable</u>" means any and all trade accounts, notes and other receivables and indebtedness for borrowed money or overdue accounts receivable, in each case owing to any Seller and all claims relating thereto or arising therefrom.

"Acquired Assets" has the meaning set forth in Section 2.1.

"Actions" has the meaning set forth in Section 2.1(s).

"Affiliate" has the meaning set forth in Rule 12b-2 of the Exchange Act.

"Agreement" or "this Agreement" means this Purchase Agreement, together with the Exhibits hereto and the exhibits and schedules thereto and the Disclosure Letter.

"Allocation Statement" has the meaning set forth in Section 2.5(c)

"Ancillary Agreements" means the Escrow Agreement and all exhibits and appendices thereto.

"Applicable Law" means any law, regulation, rule, order, judgment, guideline or decree to which the Business, any Acquired Asset, or any Seller, is subject.

"Assets" means assets, properties, rights, interests, claims, contracts, and businesses of every kind, type, character and description, whether tangible or intangible, whether real, personal or mixed, whether accrued, contingent, liquidated or unliquidated, whether owned, leased or licensed and wherever located, and all rents, issues, profits, royalties, entitlements, products and proceeds of any of the foregoing.

"Assumed Liabilities" has the meaning set forth in Section 2.3(a).

"Assumed Permitted Liens" means, (i) with respect to Real Property (a) zoning laws and other land use restrictions that do not materially impair the present use or occupancy of the property subject thereto; and (b) defects, easement rights of way, restrictions, covenants, claims or other similar charges, that would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect on the use, title, value or possession of such Real Property; and (ii) other Permitted Liens, if any, as may be expressly designated by Purchaser in its sole and absolute discretion by written notice delivered to Sellers at least two Business Days' prior to the Closing.

"Avoidance Action" means any claim, right or cause of action of Sellers arising under sections 544 through 553 of the Bankruptcy Code, except for any such actions (i) against Purchaser (all such claims to be released at the Closing); (ii) related to Designated Contracts; or (iii) in connection with any setoffs related to Acquired Assets.

"Bankruptcy Cases" has the meaning set forth in the recitals hereof.

"Bankruptcy Code" has the meaning set forth in the recitals hereof.

"Bankruptcy Court" has the meaning set forth in the recitals hereof.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Bill of Sale" means the bill of sale substantially in the form attached as Exhibit A hereto.

"Business" has the meaning set forth in the recitals hereof.

"Business Day" means any day other than a Saturday, Sunday or a day on which banks in New York are authorized or obligated by Applicable Law or executive order to close or are otherwise generally closed.

"Cash and Cash Equivalents" means (a) cash; (b) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof, maturing within one (1) year from the date of issuance; (c) certificates of deposit, time deposits, eurodollar time deposits, deposit accounts or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any commercial bank; (d) commercial paper of an issuer and maturing within six (6) months from the date of acquisition; (e) securities with maturities of one (1) year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory, the securities of which state, commonwealth, territory, political subdivision or taxing authority (as the case may be); (f) eurodollar time deposits having a maturity not in excess of 180 days to final maturity; (g) any other investment in United States Dollars which has no more than 180 days to final maturity; or (h) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (g) of this definition.

"Claim" has the meaning assigned to such term under Section 101(5) of the Bankruptcy Code.

"Closing" means the consummation of all transactions contemplated in this Agreement.

"Closing Date" has the meaning set forth in Section 3.1(b).

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means that certain non-disclosure agreement by and between Sellers and Purchaser dated [  ], 2011.

"Contract" means any written agreement, contract, lease, license, consensual obligation, promise or undertaking.

"Conveyance Documents" means (a) the Bill of Sale; (b) the Intellectual Property Instruments; (c) all documents of title and instruments of conveyance necessary to Transfer record and/or beneficial ownership to Purchaser of Acquired Assets composed of automobiles, trucks, or other vehicles, trailers, and any other property owned by any Seller which requires execution, endorsement and/or delivery of a certificate of title or other document in order to vest record or beneficial ownership thereof in Purchaser; and (d) all such other documents of title, customary title insurance affidavits, deeds, endorsements, assignments and other instruments of

conveyance or Transfer as, in the reasonable opinion of Purchaser's counsel, are necessary or appropriate to vest in Purchaser good and marketable title to any Acquired Assets.

"Copyrights" means any United States copyright registrations and applications for registration thereof, and any nonregistered copyrights, all content and information contained on any website, "mask works" (as defined under 17 U.S.C. § 901) and any registrations and applications for "mask works."

"Cure Amounts" has the meaning set forth in Section 6.11.

"Debtors" has the meaning set forth in the recitals hereof.

"Disclosure Letter" means the disclosure letter of even date herewith prepared by Sellers and delivered to Purchaser simultaneously with the execution hereof.

"Employee Benefit Plans" means all bonus, deferred compensation, pension, retirement, profit-sharing, thrift, savings, employee stock ownership, stock bonus, stock purchase, restricted stock and stock option plans, employment, termination, change-in-control or severance contracts, health and medical insurance plans, life insurance and disability insurance plans, other employee benefit plans, contracts or arrangements which cover employees or former employees of any Seller including "employee benefit plans" within the meaning of Section 3(3) of ERISA.

"Employee" means any employee of the Sellers as of the Closing Date.

"Environmental Laws" means United States federal, state and local permits and governmental agreements and requirements of Governmental Entities relating to human health, safety and the environment, including, but not limited to, Hazardous Materials.

"Equipment" has the meaning set forth in Section 2.1(h).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" has the meaning set forth in Section 4.13.

"ERISA Plan" means an "employee benefit plan" as defined in Section 3(3) of ERISA which is subject to Title I of ERISA or a "plan" within the meaning of Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code.

"Escrow Account" has the meaning specified for the term in the Escrow Agreement.

"Escrow Agent" has the meaning specified for the term in the Escrow Agreement.

"Escrow Agreement" means an agreement between Purchaser, Sellers and Escrow Agent in substantially the form attached as Exhibit B hereto.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Final Instruction" has the meaning specified for the term in the Escrow Agreement.

"Final Order" means an order or judgment of the Bankruptcy Cour or other court of competent jurisdiction, the implementation or operation or effect of which has not been stayed, and as to which the time to appeal or petition for certiorari, has expired and as to which no appeal or petition for certiorari, shall then be pending or in the event that an appeal or writ of certiorari thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, shall have been denied and the time to take any further appeal or petition for certiorari shall have expired.

"GAAP" means United States generally accepted accounting principles, Canadian generally accepted accounting principles or international financial reporting standards, as may be applicable, and as consistently applied.

"Good Faith Deposit" has the meaning set forth in Section 2.5(b)(i).

"Governmental Entity" means any national, federal, state, municipal, local, provincial, territorial, government or any department, commission, board, bureau, agency, regulatory authority or instrumentality thereof, or any court, judicial, administrative or arbitral body or public or private tribunal, including any United States or other such entity anywhere in the world.

"Hazardous Material" means all substances or materials regulated as hazardous, toxic, explosive, dangerous, flammable or radioactive under any Environmental Law including, but not limited to: (i) petroleum, asbestos, or polychlorinated biphenyls; and (ii) all substances defined as Hazardous Substances, Oils, Pollutants or Contaminants in the National Oil and Hazardous Substances Pollution Contingency Plan.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended.

"Indebtedness" means, at any time and with respect to any Person: (a) all indebtedness of such Person for borrowed money; (b) all indebtedness of such Person for the deferred purchase price of property or services (other than trade payables, other expense accruals and deferred compensation items arising in the ordinary course of business, consistent with past practice); (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the ordinary course of business in respect of which such Person's liability remains contingent); (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (e) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases, to the extent required to be so

recorded; (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities; (g) all Indebtedness of others referred to in clauses (a) through (f) above guaranteed directly or indirectly by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (i) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness, (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness, (iii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (iv) otherwise to assure a creditor against loss in respect of such Indebtedness; and (h) all Indebtedness referred to in clauses (a) through (g) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Instrument of Assumption" means the instrument of assumption substantially in the form attached as Exhibit C hereto.

"Intellectual Property" means Trademarks; Patents; Copyrights; Software; rights of publicity and privacy relating to the use of the names, likenesses, voices, signatures and biographical information of real persons; inventions (whether or not patentable), discoveries, improvements, ideas, know-how, formulae, methodologies, research and development, business methods, processes, technology, interpretive code or source code, object or executable code, libraries, development documentation, compilers (other than commercially available compilers), programming tools, drawings, specifications and data, and applications or grants in any jurisdiction pertaining to the foregoing, including re-issues, continuations, divisions, continuations-in-part, reexaminations, renewals and extensions; trade secrets, including confidential information and the right in any jurisdiction to limit the use or disclosure thereof; database rights; Internet websites, web pages, domain names and applications and registrations pertaining thereto and all intellectual property used in connection with or contained in websites; all rights under agreements relating to the foregoing; all books and records pertaining to the foregoing, and claims or causes of action arising out of or related to past, present or future infringement or misappropriation of the foregoing; in each case used in or necessary for the conduct of Sellers' businesses as currently conducted or contemplated to be conducted.

"Intellectual Property Instruments" instruments of Transfer, in form suitable for recording in the appropriate office or bureau, effecting the Transfer of the Copyrights, Trademarks and Patents owned or held by Sellers.

"Intercompany Receivables" means any and all amounts that are (i) owed by any direct or indirect Subsidiary or Affiliate of any Seller to any Seller; or (ii) from one Seller to another, in each case pursuant to bona fide obligations, and all claims relating thereto or arising therefrom.

"Interests" means all liens, claims, interests, encumbrances, rights, remedies, restrictions, liabilities and contractual commitments of any kind or nature whatsoever, whether arising before or after the petition date in the Bankruptcy Cases, whether at law or in equity.

"Inventory" has the meaning set forth in Section 2.1(f).

"Investment" means shares of stock (other than shares of stock in Subsidiaries), notes, bonds, debentures, options and other securities but not including Cash and Cash Equivalents.

"IRS" means the United States Internal Revenue Service.

"Knowledge" as applied to Sellers, means a person listed on Section 9.15(a) of the Disclosure Letter hereto with respect to the applicable Seller is actually aware of a particular fact (without any obligation of inquiry); and "knowledge" as applied to Purchaser, means any officer of Purchaser or any other person listed in Section 9.15(a) of the Disclosure Letter hereto is actually aware of a particular fact (without any obligation of inquiry).

"Leased Real Property" means the leasehold interests held by Sellers under the Real Property Leases.

"Lien" means, with respect to any asset, any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code as in effect from time to time in the State of New York or comparable law of any jurisdiction) and, in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Material Adverse Effect" means any change, effect, event or condition that has had or would reasonably be expected to have (i) a material adverse effect on the assets or operations of the Business taken as a whole, or (ii) a material adverse effect on the ability of Sellers to consummate the Transactions; provided that the following shall not constitute a Material Adverse Effect and shall not be taken into account in determining whether or not there has been or would reasonably be expected to be a Material Adverse Effect: (A) changes in general economic conditions or securities or financial markets in general, (B) changes in the industry in which Sellers, (C) changes in Applicable Law or interpretations thereof by any Governmental Entity, (D) any outbreak or escalation of hostilities or war (whether declared or not declared) or any act of terrorism or weather, act of God or natural disaster, (E) changes to the extent resulting from the announcement or the existence of, or compliance with, this Agreement and the Transactions or the Bankruptcy Cases (including without limitation any lawsuit related thereto), the impact on relationships with suppliers, customers, employees or others, (F) any changes in accounting regulations or principles and (G) any changes resulting from actions of Sellers expressly agreed to or requested in writing by Purchaser or permitted or required by this Agreement.

"Material Contract" has the meaning set forth in Section 4.8.

"Nonassignable Asset" has the meaning set forth in Section 3.4.

"Nonassignable Contract" has the meaning set forth in Section 6.12.

"Non-Assumed Liabilities" has the meaning set forth in Section 2.4.

"Patents" means all patents and patent applications, and industrial designs (including any continuations, divisionals, continuations-in-part, renewals, reissues, and applications for any of the foregoing).

"Permits" means permits, certificates, licenses, filings, approvals and other authorizations of any Governmental Entity.

"Permitted Liens" means (i) zoning laws and other land use restrictions that do not materially impair the present use or occupancy of the property subject thereto, (ii) any statutory Liens imposed by law for material Taxes that are not yet due and payable, or that a Seller is contesting in good faith in proper proceedings and which are set forth on Section 9.15(b) of the Disclosure Letter, (iii) any mechanics', workmen's, repairmen's, warehousemen's, carriers' or other similar Liens arising in the ordinary course of business, consistent with past practice or being contested in good faith, (iv) with respect to any Real Property, any defects, easement rights of way, restrictions, covenants, claims or other similar charges, that would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect on the use, title, value or possession of such Real Property.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, incorporated organization, association, corporation, institution, public benefit corporation, Governmental Entity or other entity.

"Purchase Price" has the meaning set forth in Section 2.5(a).

"Purchaser" has the meaning set forth in the preamble hereof.

"Purchaser Material Adverse Effect" means a material adverse effect on the business, assets, operations, results of operations or financial condition of Purchaser or on Purchaser's ability to consummate the Transactions or delay the same in any material respect.

"Real Property" means all real property that is owned or used by any Seller or that is reflected as an Asset of any Seller on the Balance Sheet.

"Real Property Leases" means the real property leases to which any Seller is a party as described in Section 2.1(b).

"Regulatory Approvals" means those sanctions, rulings, consents, orders, exemptions, permits and other approvals (including the lapse, without objection, of a prescribed time under a statute or regulation that states that a transaction may be implemented if a prescribed time lapses following the giving of notice without an objection being made), waivers, early termination authorizations, clearances or written confirmation of no intention to initiate legal proceedings from Governmental Entities as required and as set out in Section 4.6 of the Disclosure Letter.

"Retained Assets" has the meaning set forth in Section 2.2.

"Sale Order" means an order of the Bankruptcy Court in substantially the form attached as Exhibit D hereto (or as may be modified pursuant to any Bankruptcy Court hearing with regard thereto), approving the Agreement and consummation of the Transactions under sections 105, 363 and 365 of the Bankruptcy Code.

"Seller" has the meaning set forth in the preamble hereof.

"Seller Liabilities" means all Indebtedness, Claims, Liens, demands, expenses, commitments and obligations (whether accrued or not, known or unknown, disclosed or undisclosed, matured or unmatured, fixed or contingent, asserted or unasserted, liquidated or unliquidated, arising prior to, at or after the commencement of the Bankruptcy Cases) of or against any Seller or any of the Acquired Assets.

"Seller Permits" has the meaning set forth in Section 4.10(c).

"Software" means any and all (a) computer programs, including any and all software implementation of algorithms, models and methodologies, whether in source code or object code form, (b) computerized databases and compilations, including any and all data and collections of data, and (c) all documentation, including user manuals and training materials, relating to any of the foregoing.

"Straddle Period Property Tax" has the meaning set forth in Section 6.10(d).

"Subsidiary" means, with respect to any Person, any corporation, association trust, limited liability company, partnership, joint venture or other business association or entity (i) at least 50% of the outstanding voting securities of which are at the time owned or controlled directly or indirectly by such Person or (ii) with respect to which such Person possesses, directly or indirectly, the power to direct or cause the direction of the affairs or management.

"Tax" or "Taxes" means any and all United States federal, state or local taxes, fees, levies, duties, tariffs, imposts, and other similar charges on or with respect to net income, alternative or add-on minimum, gross income, gross receipts, sales, use, *ad valorem*, franchise, capital, paid-up capital, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, or windfall profit tax, customs duties, value added or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any Governmental Entity responsible for the imposition of any such tax.

"Tax Authority" means any Governmental Entity with responsibility for, and competent to impose, collect or administer, any form of Tax.

"Tax Return" means any return, claim, election, information return, declaration, report, statement, schedule, or other document required to be filed in respect of Taxes and amended Tax Returns and claims for refund.

"Termination Date" has the meaning set forth in Section 8.1(c).

"Third Party" means any Person other than Sellers, Purchaser or any of their respective Affiliates.

"Trademarks" means any trademarks, service marks, trade names, corporate names, Internet domain names, designs, trade dress, product configurations, logos, slogans, and general intangibles of like nature, together with all translations, adaptations, derivations and combinations thereof, all goodwill, registrations and applications in any jurisdiction pertaining to the foregoing.

"Transfer" means sell, convey, assign, transfer and deliver, and "Transferable" shall have a corollary meaning.

"Transfer Taxes" means all goods and services, harmonized sales, excise, sales, use, transfer, stamp, stamp duty, recording, value added, gross receipts, documentary, filing, and all other similar Taxes or duties, fees or other like charges, however denominated (including any real property transfer taxes and conveyance and recording fees and notarial fees), in each case including interest, penalties or additions attributable thereto whether or not disputed, arising out of or in connection with the Transactions, regardless of whether the Governmental Entity seeks to collect the Transfer Tax from Sellers or Purchasers.

"Transferred Employee" has the meaning set forth in Section 6.7(a).

"Transactions" means all the transactions provided for or contemplated by this Agreement and/or the Ancillary Agreements.

"WARN" has the meaning set forth in Section 6.7(d).

"WARN Act" has the meaning set forth in Section 6.7(d).

Section 9.16    Bulk Transfer Notices.  Sellers and Purchaser hereby waive compliance with any bulk transfer provisions of the Uniform Commercial Code (or any similar Applicable Law), to the extent not repealed in any applicable jurisdiction, in connection with this Agreement and the Transactions.

Section 9.17    Interpretation.

(a)    When a reference is made in this Agreement to a Section, Article, subsection, paragraph, item or Exhibit, such reference shall be to a Section, Article, subsection, paragraph, item or Exhibit of this Agreement unless clearly indicated to the contrary.

(b)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)     The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term, and words denoting any gender shall include all genders.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)     The conjunction "or" shall be understood in its inclusive sense (and/or).

(f)     Any agreement, instrument or document, or any annex, schedule or exhibit thereto, or any other part thereof, includes that agreement, instrument or document, or annex, schedule or exhibit, or part, respectively, as amended, modified or supplemented from time to time in accordance with its terms and any agreement, instrument or document entered into in substitution or replacement therefor.

(g)     Each exhibit, annex and schedule to this Agreement is incorporated in, and shall be deemed to be a part of, this Agreement.

(h)     The words "Agreement," "this Agreement," "hereby," "herein," "hereto," "hereof" and "hereunder" and words of similar import, when used herein refer to this Agreement as a whole and not to any particular provision.

(i)     A reference to any party to this Agreement or any other agreement or document shall include such party's predecessors, successors, permitted purchasers and permitted assigns.

(j)     A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or re-enactment thereof, any legislative provision substituted therefore and all regulations and statutory instruments issued thereunder or pursuant thereto.

(k)     References to "Dollars," "US$," "USD" or "$" shall be deemed references to the lawful money of the United States.

(l)     Headings and tables of contents used in this Agreement are for convenience only and shall not in any way affect the construction of, or be taken into consideration in interpreting, this Agreement.

(m)     The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**[Remainder of page intentionally left blank]**

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**SELLERS:**

ARCHBROOK LAGUNA HOLDINGS LLC

By: _____
    Name:
    Title:

ARCHBROOK LAGUNA LLC

By: _____
    Name:
    Title:

ARCHBROOK LAGUNA WEST LLC

By: _____
    Name:
    Title:

LEHRHOFF ABL LLC

By: _____
    Name:
    Title:

ARCHBROOK LAGUNA NEW YORK LLC

By: _____
    Name:
    Title:

CHIMERICA GLOBAL LOGISTICS LLC


By: _____
   Name:
   Title:

EXPERT WAREHOUSE LLC


By: _____
   Name:
   Title:


**PURCHASER:**

[  ]


By: _____
   Name:
   Title:

## Exhibit A

## <u>Form of Bill of Sale</u>

**Exhibits**

## Exhibit B

## <u>Form of Escrow Agreement</u>

## Exhibit C

## <u>Form of Instrument of Assumption</u>

**Exhibits**

## Exhibit D

## <u>Form of Sale Order</u>

**Schedule 2**

**(Form of Confidentiality Agreement)**

[          ], 2011

[Counter Party]
[Address]
[Address]

Attention:      [Name; Title]

## CONFIDENTIALITY AGREEMENT

Ladies and Gentlemen:

In connection with your possible interest in a proposed transaction (the "<u>Transaction</u>") with a privately held distribution company that is a signatory hereto (the "<u>Company</u>" or "<u>we</u>"), you have requested that we and/or our Representatives furnish you or your representatives with certain information relating to the Company, its subsidiaries and a Transaction.  All such information, irrespective of the form of communication and whether in written, oral, electronic or other form or media and whether or not marked as confidential, furnished (whether before, on or after the date hereof) by us or our directors, officers, employees, consultants, affiliates, representatives (including, without limitation, financial advisors, attorneys and accountants) or agents (collectively, "<u>our Representatives</u>") to you or your directors, officers, employees, consultants or representatives (including financial advisors, attorneys and accountants) (collectively, but subject to the provisions of Section 2, "<u>your Representatives</u>"), or information which you and your Representatives otherwise learn or obtain through observation or through analysis of such information, and all analyses, compilations, data, summaries, forecasts, studies, notes, interpretations, memoranda or other documents or material prepared by you or your Representatives in connection with your or their review of, or your interest in, the Transaction to the extent they contain, reflect, or are based on any such information is hereinafter referred to as the "<u>Information</u>."  The term Information will not, however, include information which (i) is or becomes publicly available other than as a result of a disclosure by you or your Representatives in violation of this letter agreement or other obligation of confidentiality, (ii) is or becomes available to you on a nonconfidential basis from a source (other than by us or our Representatives) not known by you (after due inquiry) to be prohibited from disclosing such information to you by a legal, contractual or fiduciary obligation or (iii) is independently developed by you without the use of the Information we furnish you.

Accordingly, you hereby agree that:

1.      You and your Representatives (i) will keep the Information confidential and will not (except as required by applicable law or regulation, and only after compliance with paragraph 3 below), without our prior written consent, disclose any Information in any

manner whatsoever, in whole or in part and (ii) will not use any Information other than in connection with the Transaction; provided, however, that you may reveal the Information or portions thereof to those of your Representatives (a) who need to know the Information for the purpose of evaluating the Transaction, (b) who are informed by you of the confidential nature of the Information and (c) who are directed by you to treat the Information in a manner consistent with the terms of this letter agreement.  You will be responsible for any breach of this letter agreement by any of your Representatives as if they were a party hereto.

2.       (a)       You and your Representatives will not (except as required by applicable law or regulation, and only after compliance with paragraph 3 below), without our prior written consent, disclose to any person who is not your Representative the fact that the Company is considering a Transaction or that the Information has been prepared for purposes of a potential Transaction, the fact that the Information has been made available to you or any other person, that you are considering the Transaction involving the Company, or that discussions or negotiations are taking or have taken place concerning the Transaction or involving the Company or any term, condition or other fact relating to the Transaction or such discussions or negotiations, including, without limitation, the status thereof or the subject matter or existence of this letter agreement.  For the avoidance of doubt, the matters covered by this paragraph 2 shall be deemed to be included in the term "Information."

         (b)       You represent and agree that neither you nor any of your Representatives have as of the date hereof, nor will you from and after the date hereof, provide any Information to, directly or indirectly enter into any agreement, arrangement or understanding regarding a potential Transaction with, or have any discussions concerning a potential Transaction or which would reasonably be expected to lead to such agreement, arrangement or understanding with, any debt or equity financing sources or any other potential bidders or potential partners in a potential Transaction or any alternative to a Transaction without the prior written consent of the Company, such consent not to be unreasonably withheld, conditioned or delayed.

         (c)       In the event the Company provides such consent with respect to any potential financing source, such potential financing source shall be considered a Representative for all purposes of this letter agreement.

         (d)       Whether or not any such consent is granted, you agree that you have not and will not, directly or indirectly, require, instruct or encourage any financial institutions or financing sources, including any financial advisor, or any legal or other advisory firms or other persons, not to be retained by any other person in connection with a potential transaction with the Company or take any actions which may reasonably be expected to limit, restrict, restrain or otherwise impair in any manner, directly or indirectly, the ability of any such institutions, sources or other persons to provide financing or other assistance to any such other person in connection with a potential transaction with the Company

(including the Transaction).  In connection therewith, if requested by the Company or such other person, you agree to promptly consent to any such retention, and to waive any actual or alleged conflict that may arise from any existing or past relationship with you, in connection with a potential transaction with the Company (including the Transaction).

3.      In the event that you or any of your Representatives are requested pursuant to, or required by, applicable law or regulation to disclose any of the Information, you will notify us promptly (unless prohibited by law) so that we may seek an appropriate protective order or other appropriate remedy or, in our sole discretion, waive compliance with the terms of this letter agreement (and if we seek such an order, you will provide such cooperation as we shall reasonably request).  In the event that no such protective order or other remedy is obtained or that the Company waives compliance with the terms of this letter agreement and that you or any of your Representatives are nonetheless legally required to disclose such Information, you or your Representatives, as the case may be, will furnish only that portion of the Information which you are advised by legal counsel is legally required and will give the Company written notice (unless prohibited by law) of the Information to be disclosed as far in advance as practicable and exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the Information.  You will promptly advise us in the event that you become aware of the possession, use or knowledge of any Information by any third party not authorized to possess, use or have such knowledge in violation of this letter agreement.

4.      If you determine not to proceed with the Transaction, you will promptly inform us of that decision. At any time upon the request of the Company or any of our Representatives, you will at your expense (i) promptly deliver to the Company or, at your option, destroy and delete all copies (including paper, computer, photos or any other form of fixation) of the Information in your or your Representatives' possession and (ii) promptly destroy and delete all analyses, compilations, data, summaries, forecasts, studies, notes, interpretations, memoranda or other documents or material prepared by you or your Representatives and based in whole or in part on, or otherwise containing or reflecting any of, the Information.  Upon our request you will confirm such return and/or destruction to us in writing.  Without limiting the foregoing, you and your Representatives may retain Information solely to the extent and for the duration required by any applicable law or  regulation (including any binding rules of a professional body applicable to you or any Representative) (such retained materials, "Retained Information"), provided, in each case, that any Retained Information shall not be used for any purpose other than for compliance with such law or regulation.  Any oral Information and any Information that was not destroyed or returned for any reason in accordance with this paragraph 4 (including Retained Information) will continue to be subject to the terms of this letter agreement.

5.      The Information will at all times remain the property of Company.  No license under any trade secrets, copyrights, or other rights is granted by this letter agreement or any disclosure of Information. You will not use the trademarks, service marks, name or logo

of the Company in any way, including in connection with any advertising or publicity materials or activities, without the prior written consent of the Company.

6.      We disclaim all representation or warranties regarding the Information disclosed pursuant to this agreement. You acknowledge that neither we, nor any of our Representatives, nor any of our or their respective officers, directors, employees, agents or controlling persons within the meaning of Section 20 of the Securities Exchange Act of 1934 (the "Exchange Act"), make any representation or warranty, express or implied, as to the accuracy or completeness of the Information, and you agree that no such person will have any liability relating to the Information or for any errors therein or omissions therefrom.  You further agree that you are not entitled to rely on the accuracy or completeness of the Information and that you will be entitled to rely solely on such representations and warranties as may be included in any definitive agreement with respect to the Transaction, subject to such limitations and restrictions as may be contained therein.

7.      You hereby acknowledge that you are aware (and that prior to their receipt of any Information your Representatives have been or will be advised) that the Information may contain or may itself be material, non-public information concerning the Company and that the United States and other applicable securities laws prohibit any person in possession of material, non-public information about a company obtained directly or indirectly from that company from purchasing or selling securities of such company or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

8.      You agree that, for a period of twelve (12) months from the date of this letter agreement, you and your subsidiaries will not, without the prior written consent of Company, directly or indirectly, solicit for employment or consulting or other services or hire any employee of the Company or an employee of an affiliate of the Company (or any former employee of the Company or former employee of an affiliate of the Company that was employed by the Company or the affiliate of the Company as of or after the date of this letter agreement); provided, however, that the foregoing provision will not prevent you from conducting or sending out a bona fide general solicitation for employment (including through a recruiting firm) not targeted at employees of the Company or employees of affiliates of the Company, hiring a bona fide respondent to such general solicitation for employment with whom you and your Representatives have not had contact in connection with the Transaction or hiring anyone who contacts you independently without any solicitation by you. You also agree that until the earlier of (a) the consummation of a Transaction between the Company and you or (b) twelve (12) months from the date of this letter agreement, you and your subsidiaries will not, without the prior written consent of the Company, directly or indirectly, initiate or maintain contact with any officer, director, employee, supplier, distributor, broker or customer of the Company for the purposes of obtaining information regarding the Company's operations, assets, prospects or finances or otherwise regarding the Transaction.

9.      You and your Representatives shall direct and submit all (i) communications regarding the Transaction, (ii) requests for additional information, discussions with employees or business contacts of the Company, facility tours or management meetings, and (iii) questions regarding procedures with respect to the Transaction, first to Macquarie Capital (USA) Inc. (the "<u>Financial Advisor</u>") (or as otherwise directed in writing by the Financial Advisor or the Company after the date hereof.  You acknowledge and agree that (a) we and our Representatives are free to conduct the process relating to a possible Transaction as we and our Representatives, in our sole discretion, determine (including, without limitation, conduct of the due diligence process, negotiating with any prospective purchaser and entering into a preliminary or definitive agreement to effect a Transaction without prior notice to you or any other person) and (b) we reserve the right, in our sole discretion, to change the procedures relating to our consideration of the Transaction at any time without prior notice to you or any other person, to reject any and all proposals made by you or any of your Representatives with respect to the Transaction and to terminate discussions and negotiations with you at any time and for any reason. The parties acknowledge and agree that unless and until a written definitive agreement concerning the Transaction has been executed, neither party nor any of its Representatives will have any liability with respect to the Transaction or any obligation of any kind whatsoever with respect to a Transaction, whether by virtue of this letter agreement, any other written or oral expression with respect to the Transaction or otherwise.

10.     In consideration of the Information being furnished to you, you hereby agree that, for a period of one year from the date hereof (such period, the "Standstill Period"), unless you shall have been specifically invited in writing by the Company, neither you nor any of your subsidiaries, directors, officers or employees will in any manner, directly or indirectly:

(a)      effect or seek, offer or propose (whether publicly or otherwise) to effect, or cause or participate in or in any way advise, assist or encourage any other person to effect or seek, offer or propose (whether publicly or otherwise) to effect or participate in, (i) any acquisition of any securities (or beneficial ownership thereof), debt or assets of the Company, or any rights to acquire any such securities (including derivative securities representing the right to vote or economic benefit of any such securities), debt or assets; (ii) any tender or exchange offer, merger or other business combination involving the Company; or (iii) any recapitalization, restructuring, liquidation, dissolution or other similar extraordinary transaction with respect to the Company;

(b)      form, join or in any way participate in a "group" (as defined under the Exchange Act) with respect to any securities or debt of the Company;

(c)      otherwise act, alone or in concert with others, to seek to control or influence the management, Board of Directors or policies of the Company; or

(d)      enter into any discussions or arrangements with any third party (other than your Representatives in accordance with this letter agreement) with respect to any of the foregoing.

You also agree during the Standstill Period not to request that the Company or our Representatives, directly or indirectly, amend or waive any provision of this paragraph 10 (including this sentence).

11.      You acknowledge that remedies at law may be inadequate to protect us against any actual or threatened breach of this letter agreement by you or by your Representatives, and, without prejudice to any other rights and remedies otherwise available to us, you agree that the Company may seek the granting of specific performance and injunctive or other equitable relief in our favor without proof of actual damages  In the event of litigation initiated by us or you relating to this letter agreement,  the prevailing party shall reimburse the other party for its costs and expenses (including, without limitation, reasonable legal fees and expenses) incurred in connection with all such litigation.

12.      This letter agreement does not constitute a commitment by the Company to disclose any Information; to acquire or provide any product, service, or asset; or to take, continue, or forego any action related to the Transaction.  Nothing in this letter agreement will create or imply any partnership or joint venture between the parties or be construed to render either party the agent of the other.

13.      This letter agreement shall be binding on the parties hereto and their respective successors and permitted assigns and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided, however, that neither party shall assign this letter agreement to any person without the other party's prior written consent, which consent may be granted or withheld in its sole discretion.

14.      This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York applicable to contracts made and to be entirely performed therein.  In the event of any controversy or claim arising out of or relating to this Agreement or the breach or alleged breach hereof, each of the parties hereto irrevocably (i) submits to the exclusive jurisdiction of the United States Bankruptcy Court for the Southern District of New York in which the chapter 11 proceedings of the Company and its affiliated debtors currently are pending (the "***Bankruptcy Court***"), (ii) waives any objection which it may have at any time to the laying of venue of any action or proceeding brought in the Bankruptcy Court, (iii) waives any claim that such action or proceeding has been brought in an inconvenient forum, and (iv) agrees that service of process or of any other papers upon such party by registered mail at the address to which notices are required to be sent to such party under Section 21 shall be deemed good, proper and effective service upon such party.

15.     This letter agreement contains the entire agreement between you and us concerning the confidentiality of the Information, and no provision of this letter agreement may be waived, amended or modified, in whole or in part, nor any consent given, unless approved in writing by a duly authorized representative of each party, which writing specifically refers to this letter agreement and the provision so amended or modified or for which such waiver or consent is given.  No failure or delay by any party in exercising any of its rights, powers or privileges hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude such party from any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.  In the event that any provision of this letter agreement is deemed invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of this letter agreement will not in any way be affected or impaired thereby.

16.     This letter agreement shall terminate on the second anniversary hereof, <u>provided</u> <u>that</u> (i) this letter agreement shall continue in full force and effect with respect to any Retained Information and other Information described in the last sentence of paragraph 4, until it is returned or destroyed in accordance with paragraph 4 and (ii) no termination of this letter agreement or any provision hereof shall relieve either party from liability for any prior breach of any provision of this letter agreement.  Notwithstanding the foregoing, paragraphs 11 through 17 of this letter agreement shall survive any such termination for purposes of or in connection with any litigation or proceeding involving this letter agreement at any time.

17.     This letter agreement may be executed in counterparts, each of which, when executed, shall be an original hereof binding on the party executing it.  Exchange and delivery of this letter agreement by PDF via electronic mail or by exchange of facsimile copies bearing the facsimile signature of a party shall constitute a valid and binding execution and delivery of this letter agreement by such party.  Such PDF and facsimile copies shall constitute legally enforceable original documents.

*[Signature Page Follows]*

Please confirm your agreement with the foregoing by signing and returning to the undersigned a copy of this letter agreement.

Very truly yours,


ARCHBROOK LAGUNA LLC


By: _____
    Name:
    Title:


Accepted and agreed to
as of the date first written above:

[Counter Party Name]


By: _____
    Name:
    Title:

# Exhibit B

## Sale Notice

Bid Procedures Hearing Date: July 19, 2011 at __:00 _.m. (EDT)
Bid Procedures Objection Deadline: July 15, 2011 at 4:00 p.m. (EDT)
Date of Auction: August 8, 2011 at 10:00 a.m. (EDT)
Sale Hearing Date: August 10, 2011 at __:00 _.m. (EDT)
Sale Hearing Objection Deadline: August 1, 2011 at 4:00 p.m. (EDT)
Objection Deadline as to Auction and Selection of Successful Bidder: August 9, 2011 at 12:00 p.m. (EDT)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ARCHBROOK LAGUNA HOLDINGS LLC, *et al.*,[1] | ) | Case No. 11-13292 (   ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

### NOTICE OF (I) PROPOSED SALE OF SUBSTANTIALLY
### ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
### AND ENCUMBRANCES, (II) AUCTION AND (III) SALE HEARING THEREOF

**PLEASE TAKE NOTICE** that, on July 8, 2011, ArchBrook Laguna Holdings LLC ("***ArchBrook***"), and certain of its affiliates, as debtors and debtors in possession in the above captioned chapter 11 cases (collectively, the "***Debtors***") filed for protection under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***"). Joint administration of their chapter 11 cases is currently pending before the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that on July 8, 2011, the Debtors filed *Debtors' Motion, Pursuant to 11 U.S.C. §§ 105, 363, 364, 365, 503 and 507 and Fed. R. Bankr. P. 2002, 4001, 6004, 6006, 9008 and 9014, for Entry of (I) an order Approving (A) Bid Procedures, (B) Notice of Sale, Auction, and Sale Hearing, (C) Assumption Procedures and Related Notices; and (II) an Order Approving the Sale of Substantially all of the Debtors' Assets* (the "***Sale Motion***")[2] to, among other things, (a) establish auction and bid procedures (the "***Bid Procedures***") with respect to the sale (the "***Sale Transaction***") of substantially all of their assets (the "***Assets***"), (b) schedule an auction and sale hearing (the "***Sale Hearing***") with respect to the Sale Transaction, and (c) approve the sale of the Assets and the assumption and assignment of certain contracts and leases relating thereto free and clear of all liens, claims, encumbrances and other interests.

**PLEASE TAKE FURTHER NOTICE**, that the Debtors propose that an auction ("***Auction***") be conducted at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 on August 8, 2011 at 10:00 a.m. (prevailing Eastern Time). The Auction will

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number, are: ArchBrook Laguna LLC (6166); ArchBrook Laguna Holdings LLC (6156); Chimerica Global Logistics LLC (3745); ArchBrook Laguna West LLC (9631); Lehrhoff ABL LLC (6386); Expert Warehouse LLC (4487); and ArchBrook Laguna New York LLC (5385).

[2] Capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to them in the Sale Motion.

continue until such time as the highest or otherwise best offer is determined. The Debtors may adopt rules for the Auction that will promote the goals of the Auction process and that are not inconsistent with any of the provisions of the Bid Procedures. Only bidders who submit bids in accordance with the Bid Procedures will be allowed to attend the Auction. A copy of the Sale Motion, which contains the Bidding Procedures, may be obtained by (a) contacting the attorneys for the Debtors, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036-6745 (Attn: Ira S. Dizengoff, Esq., idizengoff@akingump.com; Michael P. Cooley, Esq., mcooley@akingump.com; and Alexis Freeman, Esq., afreeman@akingump.com); (b) accessing the Court's website at http://www.nysb.uscourts.gov (please note that a PACER password is needed to access documents on the Court's website); (c) viewing the docket of these cases at the Clerk of the Court, United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004; or (d) accessing the public website maintained by the Debtors' noticing agent, The Garden City Group, www.archbrookrestructuring.com, or upon request to the same at (888) 579-1199.

**PLEASE TAKE FURTHER NOTICE**, that a hearing to approve any such Sale Transaction with respect to any bid accepted by the Debtors (the "*Sale Hearing*") shall be conducted by the Court on, subject to availability, August 10, 2011 at __:__ _.m. (prevailing Eastern Time) and may be adjourned or rescheduled without notice.

**PLEASE TAKE FURTHER NOTICE**, that the Debtors will publish a copy of this notice (as may be modified for publication) in *The New York Times* within a week after the filing of this notice, subject to applicable publication deadlines.

**PLEASE TAKE FURTHER NOTICE** that this notice shall be served upon the following: (a) the Office of the United States Trustee for the Southern District of New York; (b) Latham & Watkins LLP, as counsel to GE Capital Commercial Services, Inc., agent for the Debtors' Prepetition Credit Facility; (c) the Internal Revenue Service; (d) the Securities and Exchange Commission; (e) parties in interest who have filed a notice of appearance in these cases pursuant to Bankruptcy Rule 2002; and (f) all known parties that have previously expressed interest in the Sale Transaction. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

**PLEASE TAKE FURTHER NOTICE THAT OBJECTIONS TO ANY RELIEF REQUESTED IN THE SALE MOTION, INCLUDING THE DEBTORS' REQUEST TO APPROVE THE SALE OF PURCHASED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, MUST BE PRESENTED BY AUGUST 1, 2011 AT 4:00 PM (ET).**

This notice is qualified in its entirety by any order approving the Bid Procedures (the "*Bid Procedures Order*"). All persons and entities are urged to read the Bid Procedures Order, when entered, and the provisions thereof carefully. To the extent that this notice is inconsistent with the Bid Procedures Order, the terms of the Bid Procedures Order shall govern.

New York, New York
Dated: _____, 2011

_____

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile:  (212) 872-1002
Ira S. Dizengoff
Michael P. Cooley
Alexis Freeman

*Proposed Counsel to the Debtors and Debtors in Possession*

**Exhibit C**

**Cure Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ARCHBROOK LAGUNA HOLDINGS LLC, *et al.*,[1] | ) | Case No. 11-13292 (    ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

## NOTICE OF PROPOSED ASSUMPTION, ASSIGNMENT AND CURE AMOUNT WITH RESPECT TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED TO THE SALE OF THE ASSETS OF THE DEBTORS

**TO:** **[COUNTERPARTY]:**

**PLEASE TAKE NOTICE** that, on July 8, 2011, the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") filed a motion (the "***Sale Motion***")[2] to, among other things, (a) establish auction and bid procedures (the "***Bid Procedures***") with respect to the sale (the "***Sale Transaction***") of substantially all of their assets (the "***Assets***"), (b) schedule an auction and sale hearing (the "***Sale Hearing***") with respect to the Sale Transaction, and (c) approve the sale of the Assets and the assumption and assignment of certain contracts and leases relating thereto free and clear of all liens, claims, encumbrances and other interests.

**PLEASE TAKE NOTICE** that, on July [__], 2011, the Court entered an order (the "***Bid Procedures Order***") approving the Bid Procedures and setting a date for the Sale Hearing. The Sale Hearing is currently scheduled to be held on August 10, 2011 at [      ] (prevailing Eastern Time) at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, before the Honorable [      ], United States Bankruptcy Court Judge, to consider the Debtors' selection of the highest or otherwise best bid and the approval of the Sale Transaction. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court or on the Court's docket.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Sale Motion, the Debtors have sought authorization to assume and assign certain executory contracts and unexpired leases relating to the Assets (the "***Designated Contracts***") upon consummation of the transactions contemplated by the Sale Transaction. A list of the executory contracts and unexpired leases proposed to be assumed by each Qualified Bidder is attached hereto as **Exhibit 1** and is also

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number, are: ArchBrook Laguna LLC (6166); ArchBrook Laguna Holdings LLC (6156); Chimerica Global Logistics LLC (3745); ArchBrook Laguna West LLC (9631); Lehrhoff ABL LLC (6386); Expert Warehouse LLC (4487); and ArchBrook Laguna New York LLC (5385).

[2] Capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to them in the Sale Motion.

available on the internet at www.archbrookrestructuring.com (the "*Website*"), or upon request to the Debtors' noticing agent, The Garden City Group, at (888) 579-1199. If any executory contract or unexpired lease is added to the schedule of Designated Contracts, a copy of the applicable notice shall be served on the counterparty by overnight courier service within one (1) business day of such addition (and in no event less than one (1) business day before the Sale Hearing).

        **PLEASE TAKE FURTHER NOTICE** that Bankruptcy Code section 365(b)(1) requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption. The required cure amount (the "*Cure Amount*") for each Designated Contract calculated by the Qualified Bidder(s) is listed on **Exhibit 1** hereto and on the Website. Please note that if no amount is stated for a particular Designated Contract, the Qualified Bidder(s) believes that there is no Cure Amount outstanding for such contract or lease.

**YOU ARE RECEIVING THIS NOTICE BECAUSE**
**YOU MAY BE A PARTY TO A DESIGNATED CONTRACT**
**(OR REPRESENT A PARTY TO A DESIGNATED CONTRACT).**

        **PLEASE TAKE FURTHER NOTICE** that, pending the outcome of the Auction, the Debtors are proposing to assume the Designated Contract(s) listed below to which the Debtors believe you are a counterparty:[3]

| Counterparty Name | Description of Contract | Cure Amount, if any |
|---|---|---|
|  |  | $_____ |

        Pursuant to the Bid Procedures Order, you must file and serve any objections to (i) the proposed assumption and assignment set forth in the Cure Notice and (ii) if applicable, the proposed Cure Amount, **no later than two (2) calendar days before the Sale Hearing**; *provided, however*, if your executory contract or unexpired lease was subsequently added to the original schedule of Designated Contracts you may file an objection as aforesaid at any time that is **four (4) hours prior to the Sale Hearing** (as applicable, the "*Objection Deadline*").

        To the extent that you object to (i) the proposed assumption and assignment of your respective Designated Contract as set forth in the Cure Notice or (ii) the Cure Amount, then **you must file with the Bankruptcy Court and serve an objection upon the following parties, so as to be actually received by no later than the applicable Objection Deadline:** (a) Akin

---

[3] Neither the exclusion nor inclusion of any Designated Contract on the list of Designated Contracts attached as **Exhibit A** or published on the Website shall constitute an admission by the Debtors that any such contract or lease is in fact an executory contract or unexpired lease capable of assumption, that any Debtor(s) has any liability thereunder or that such Designated Contract is necessarily a binding and enforceable agreement. Further, the Debtors expressly reserve the right to (i) remove any Designated Contract from the Designated Contracts list and reject such Designated Contract and (ii) contest any claim (or claim amount) asserted in connection with assumption of any Designated Contract.

Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036-6745 (Attn: Ira S. Dizengoff, Esq.; idizengoff@akingump. com and Alexis Freeman, Esq.; afreeman@akingump.com), counsel to the Debtors; (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, New York, NY 10004 (Attn: Susan Golden and Serene Nakano); and (c) parties in interest who have filed a notice of appearance in these cases pursuant to Bankruptcy Rule 2002. **Any objection to the proposed assumption and assignment must state with specificity the legal and factual basis on which the objection is premised. Any objection to the Cure Amount must state with specificity what other Cure Amount is required and provide appropriate documentation in support thereof.**

**PLEASE TAKE FURTHER NOTICE** that your objection, if any, will be heard and determined at the Sale Hearing.

**PLEASE TAKE FURTHER NOTICE** that, if an objection to a Cure Amount is filed, the Successful Bidder reserves the right to delete the applicable contract or lease as a Designated Contract if the Cure Amount is ultimately determined by order of the Court to be higher than the Cure Amount set forth on **Exhibit 1** hereto.

**PLEASE TAKE FURTHER NOTICE** that, if no objection to the assumption and assignment of a Designated Contract or Cure Amount is timely filed and served, (a) the counterparty to such a Designated Contract shall be deemed to have consented to the assumption and assignment of the Designated Contract in connection with the Sale Transaction and shall be forever barred from asserting any objection with regard to such assumption or assignment, and (b) the Cure Amount set forth on **Exhibit 1** or on the Website shall be controlling, notwithstanding anything to the contrary in any Designated Contract, or any other document, and the counterparty to a Designated Contract shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the successful bidder, or the property of any of them.

**PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION OF ANY DESIGNATED CONTRACT SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT AT ANY TIME BEFORE THE DEBTORS ASSUME SUCH EXECUTORY CONTRACT. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT.**

New York, New York
Dated: _____ 2011

_____
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile:  (212) 872-1002
Ira S. Dizengoff
Michael P. Cooley
Alexis Freeman

*Proposed Counsel to the Debtors and Debtors in Possession*

**Exhibit 1**

**Designated Contracts**

| Counterparty Name | Description of Contract | Cure Amount, if any |
|---|---|---|
|  |  | $_____ |