AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Michael P. Cooley
Alexis Freeman

*Proposed Counsel to the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| ARCHBROOK LAGUNA HOLDINGS LLC, *et al.*,[1] | Case No. 11-13292 (   ) |
| Debtors. | Joint Administration Requested |

## MOTION FOR INTERIM AND FINAL ORDERS (A) APPROVING POSTPETITION FINANCING, (B) AUTHORIZING USE OF CASH COLLATERAL, (C) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION, (E) MODIFYING AUTOMATIC STAY, AND (F) SCHEDULING A FINAL HEARING

ArchBrook Laguna Holdings LLC ("***ArchBrook***") and certain of its affiliates, as

debtors and debtors in possession (collectively, the "***Debtors***"), file this Motion (the "***Motion***"),

for entry of an interim and final order approving postpetition financing, (b) authorizing use of

cash collateral, (c) granting liens and providing superpriority administrative expense status, (d)

granting adequate protection, (e) modifying automatic stay, and (f) scheduling a final hearing.  In

support of the Motion, the Debtors submit the Declaration of Daniel J. Boverman, Interim Chief

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number, are: ArchBrook Laguna LLC (6166); ArchBrook Laguna Holdings LLC (6156); Chimerica Global Logistics LLC (3745); ArchBrook Laguna West LLC (9631); Lehrhoff ABL LLC (6386); Expert Warehouse LLC (4487); and ArchBrook Laguna New York LLC (5385).

Financial Officer, in Support of the First Day Pleadings (the "***Boverman Declaration***").  In further support of the Motion, the Debtors respectfully state as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      The continued viability of the Debtors' businesses and the success of the Debtors' reorganization efforts hinge upon approval of the DIP Facility.  Absent access to the DIP Facility and the use of Cash Collateral, the Debtors will not be able to operate their businesses for the duration of these chapter 11 cases and will be forced to shut down to the detriment of all parties in interest in these chapter 11 cases.  Approval of the DIP Credit Agreement will allow the Debtors to remain operational, to make critical capital expenditures, maintain business relationships with vendors, suppliers and customers, and pay their employees.

2.      As discussed in more detail below, the Debtors' decision to enter into the proposed DIP Credit Agreement is the culmination of an intense process targeted at procuring the best available financing under the circumstances.  Ultimately, the Debtors' decision to enter into the DIP Credit Agreement with the DIP Lenders was no decision at all – there was simply no available alternative.  The DIP Lenders are the only lenders willing to lend on the timeline and terms necessitated by the Debtors' current liquidity and collateral position.

3.      Pursuant to the DIP Motion, the Debtors request authority to incur postpetition debt on a "priming" basis.  This is appropriate because, as discussed in more detail below, (i) the Debtors were unable to obtain credit otherwise – the DIP Lenders insisted on a priming DIP – and (ii) the Prepetition Lenders are being provided adequate protection of their interests in the Debtors' assets.

4.      In light of the Debtors' urgent need for liquidity and given the extensive process the Debtors have undertaken to negotiate a DIP Credit Agreement on the best available terms,

the Debtors submit that entry into the DIP Credit Agreement is appropriate and should be approved.

## **RELIEF REQUESTED**

5.      By this motion (the "***DIP Motion***"), the Debtors request entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "***Interim Order***"), and a final order (the "***Final Order***" and, together with the Interim Order, the "***DIP Orders***"), pursuant to §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code  (the "***Bankruptcy Code***"),[2] Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "***Local Rules***"):

> (a)      authorizing the Borrowers to obtain post-petition financing (the "***DIP Facility***"), and for certain of the Borrowers' affiliates and each subsidiary of the Borrower that is party to the DIP Credit Agreement (as defined below) (collectively, the "***Guarantors***"), to guaranty the Borrowers' obligations in connection with the DIP Facility, up to the aggregate principal amount of $50,000,000 from GE Capital Commercial Services, Inc. ("***GE Capital***"), acting as administrative agent (in such capacity, the "***DIP Agent***"), for itself and certain other lenders (collectively, including GE Capital, the "***DIP Lenders***");

> (b)      approving the terms of, and authorization for the Debtors to execute and perform under, that certain Senior Super-Priority Debtor-In-Possession Credit Agreement, dated as of July __, 2011, substantially in the form attached as **Exhibit B** to the Motion (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "***DIP Credit Agreement***"),[3] and the other Loan Documents (as defined in the DIP Credit Agreement and, together with the DIP Credit Agreement, the "***DIP Loan Documents***") and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

---

[2]  Unless otherwise noted herein, section (§) references are to the Bankruptcy Code.
[3]  Unless otherwise stated, capitalized terms used herein have the meanings assigned to them in the DIP Credit Agreement.  The statements, summaries and discussion of the terms of the DIP Credit Agreement and the Interim Order are qualified in their entirety by reference to the actual provisions of the DIP Credit Agreement and the Interim Order.  To the extent of any inconsistency between the DIP Motion and the proposed DIP Credit Agreement or Interim Order, the DIP Credit Agreement or Interim Order, as applicable, shall govern.

(c)  authorizing the Debtors to grant (x) to the DIP Agent, for the benefit of itself and the other DIP Lenders, the DIP Liens (as defined below) on all of the DIP Collateral (as defined below) pursuant to §§ 364(c)(2), (c)(3) and (d), which DIP Liens shall be senior to the Primed Liens (as defined below) but shall be junior to any Permitted Prior Liens and (y) to the DIP Lenders, pursuant to § 364(c)(1), super-priority administrative claims having recourse to all pre-petition and post-petition property of the Debtors' estates, now owned or hereafter acquired, including, solely upon entry of the Final Order (as defined below), proceeds ("***Avoidance Action Proceeds***") of the Debtors' claims and causes of action under §§ 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law ("***Avoidance Actions***"), whether received by judgment, settlement or otherwise, and any Debtors' rights under § 506(c) and the proceeds thereof;

(d)  authorizing the Debtors to use "cash collateral," as such term is defined in § 363 (the "***Cash Collateral***"), including Cash Collateral in which the Pre-Petition Lenders (as defined below) and/or the DIP Lenders have a lien or other interest, in each case whether existing as of the Petition Date (as defined below), arising pursuant to this Interim Order or otherwise, which Cash Collateral, along with any proceeds of Pre-Petition Collateral (as defined below), shall be used after entry of the Interim Order for purposes of repaying outstanding Pre-Petition Credit Obligations;

(e)  authorizing the Debtors to grant, as of the Petition Date and as further described below, certain adequate protection to each lender (collectively, the "***Pre-Petition Lenders***") under a senior secured revolving asset based credit facility (the "***Pre-Petition Credit Facility***") pursuant to that certain Second Amended and Restated Credit Agreement, dated as of December 22, 2010 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "***Pre-Petition Credit Agreement***" and, together with all other loan and security documents executed in connection therewith, the "***Pre-Petition Credit Documents***"), by and among ABL, Expert and Lehrhoff as Borrowers, Archbrook Laguna Holdings LLC ("***Holdings***"), Archbrook Laguna West LLC ("***ABL West***"), Chimerica Global Logistics LLC and Archbrook Laguna New York ("***ABL New York***"), as Guarantors, GE Capital as Pre-Petition Lender and administrative agent (the "***Pre-Petition Agent***"), and the other Pre-Petition Lenders as parties thereto;

(f)  authorizing the Debtors to grant, as of the Petition Date and as further described below, certain adequate protection to (i) Bank of America, N.A. ("***BofA***") under and in connection with that certain Loan Agreement dated as of December 31, 2008 between ABL and BofA (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "***BofA Facility***") and (ii) General Electric Capital Corporation acting

through its Corporate Finance Core Leasing Division ("**CLD**") under and in connection with that certain Master Lease Agreement dated as of December 9, 2005 between ABL (acting under its former name, BDI-Laguna, Inc.) and CLD (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**CLD Financing Facility**");

(g)     vacating the automatic stay imposed by § 362 solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the DIP Orders;

(h)     authorizing the Debtors, at any time prior to the entry of the Final Order, to borrow under the DIP Facility for the purposes of (i) repaying the Discretionary Overadvances (as defined in the Pre-Petition Credit Agreement) outstanding as of the Petition Date under the Pre-Petition Credit Facility (the "**Pre-Petition Discretionary Overadvances**") until all such Pre-Petition Discretionary Overadvances are indefeasibly repaid in full in cash and (ii) funding the operations of the Debtors' businesses, paying certain transaction fees and expenses and other costs and expenses of administration of the Cases, all subject to, and in accordance with, the DIP Loan Documents, this Interim Order and the Approved Budget (as defined below);

(i)     scheduling a final hearing (the "**Final Hearing**") to be held before this Court to consider entry of the Final Order approving (i) the DIP Facility as set forth in the DIP Credit Agreement in the aggregate principal amount of $50,000,000, to be used by the Debtors for the purpose of (1) indefeasibly repaying in full in cash any Pre-Petition Credit Obligations that remain outstanding as of the date of entry of the Final Order and (2) otherwise funding the operations of the Debtors' businesses and paying other costs and expenses of administration of the Cases in accordance with the DIP Loan Documents, the Final Order and the Approved Budget and (ii) the grant of adequate protection to the Pre-Petition Agent, the Pre-Petition Lenders, BofA and CLD all on a final basis as set forth in the DIP Motion; and

(j)     waiving any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Interim Order.

## CONCISE STATEMENT OF MATERIAL TERMS

6.     Material provisions of the DIP Credit Agreement are set forth at the following sections of the DIP Credit Agreement and/or the Interim Order, pursuant to Bankruptcy Rules 4001(c)(1)(B)(i)-(xi) (relating to obtaining credit), Bankruptcy Rule 4001(b)(1)(B)(i)-(iv)

(relating to the use of cash collateral), and the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules") 4001-2(a)-(i) (relating to the use of cash collateral and obtaining credit):[4]

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Borrowers**<br>*BR 4001(c)(1)(B)* | ArchBrook Laguna LLC and Lehrhoff ABL LLC. |
| **Guarantors**<br>*BR 4001(c)(1)(B)* | ArchBrook Laguna Holdings LLC, ArchBrook Laguna West LLC, ArchBrook New York LLC and Expert Warehouse LLC. |
| **DIP Lenders**<br>*BR 4001(c)(1)(B)* | GE Capital Commercial Services, Inc., Bank of America, National Association and PNC Bank, National Association. |
| **DIP Agent**<br>*BR 4001(c)(1)(B)* | GE Capital Commercial Services, Inc. |
| **Joint Liability**<br>*LBR 4001-2(a)(14)* | Each of the Debtors is either a Borrower or a Guarantor under the DIP Credit Agreement. **DIP Credit Agreement, at Preamble, § 1.17.** |
| **Entities with Interest in Cash Collateral**<br>*BR 4001(c)(1)(B)(i)* | Each of the Prepetition Lenders, Bank of America N.A., and General Electric Capital Corporation acting through its Corporate Finance Core Leasing Division. |
| **DIP Facility**<br>*BR 4001(c)(1)(B),*<br>*LBR 4001-2(a)(1)* | The Debtors seek authority to use Cash Collateral of the Prepetition Lenders in accordance with the terms of the Interim Order and the Budget.<br><br>The Debtors also seek to borrow an aggregate of $50,000,000 under the DIP Facility. **Interim Order, at ¶ 2; DIP Credit Agreement, at § 1.1(a).** |
| **Maturity**<br>*BR 4001(c)(1)(B)* | 90 days from Closing Date, provided that such date may be extended for an additional thirty (30) days by the Borrowers with consent of the Agent and the Lenders if, not less than three (3) Business Days prior to the then-current Scheduled Commitment Termination Date, Borrower Representative, on behalf of Borrowers, shall deliver a certificate (i) certifying that no Default or Event of Default has occurred and is continuing and (ii) attaching a DIP Budget covering such extension period, in form and substance satisfactory to the Agent, and demonstrating pro forma compliance with such DIP Budget through the extension period. **DIP Credit Agreement definition of "Scheduled Commitment Termination Date".** |

---

[4] This concise statement is qualified in its entirety by reference to the applicable provisions of the Interim Order and the DIP Credit Agreement, as applicable. To the extent there is any inconsistency between this concise statement and the terms of the Interim Order or DIP Credit Agreement, the provisions of the Interim Order or DIP Credit Agreement, as applicable, shall govern.

| | |
|---|---|
| **Fees**<br>*BR 4001(c)(1)(B)*<br>*LBR 4001-2(a)(3)* | Unused Line Fee:  1.0% per annum, payable monthly on the difference between the aggregate Revolving Loan Commitments under the DIP Facility and the average daily balance outstanding of the aggregate Revolving Loans.<br><br>Administration Fee:  $100,000, payable to the DIP Agent at closing.<br><br>Upfront Facility Fee:  Equal to 1.0% of the DIP Lenders' aggregate commitments under the DIP Facility, in each case payable upon the closing date under the DIP Facility.<br><br>**Interim Order, at ¶ 23(a); DIP Credit Agreement at § 1.9.** |
| **Interest Rate**<br>*BR 4001(c)(1)(B)*<br>*LBR 4001-2(a)(3)* | Borrowers shall pay interest to Agent, for the ratable benefit of Lenders on the outstanding principal balance from time to time of the Revolving Credit Advances, in arrears on each applicable Interest Payment Date, at a rate equal to the Prime Rate plus 3.75% per annum.  Interest shall accrue on each Revolving Credit Advance from (and including) the day that such Revolving Credit Advance is made or deemed made and shall accrue thereafter on the principal balance of such Revolving Credit Advance that is outstanding from time to time until (but excluding) the date that such Revolving Credit Advance is repaid; provided that any Revolving Credit Advance that is repaid on the same day that it is made or deemed made shall, subject to Section 1.5(e), accrue interest for one day.  **DIP Credit Agreement, at § 1.5(a).** |
| **Default Interest**<br>*BR 4001(c)(1)(B)*<br>*LBR 4001-2(a)(3)* | So long as any Default or Event of Default shall have occurred and be continuing, the interest rates applicable to the Revolving Loans and the Letter of Credit Fees shall be increased by two percentage points (2.00%) per annum above the rates of interest or the rate of such Fees otherwise applicable.  **DIP Credit Agreement at § 1.5(d).** |

| | |
|---|---|
| **Prepayments**<br>*LBR 4001(2)(a)(13)* | <u>Voluntary Prepayments</u>. Borrowers may at any time on at least three (3) days' prior written notice by Borrower Representative to Agent (i) prepay any outstanding Revolving Credit Advance and (ii) permanently reduce (but not terminate) the Revolving Loan Commitments; provided that (A) any such prepayments or reductions shall be in a minimum amount of $1,000,000 and integral multiples of $250,000 in excess of such amount, (B) all of the Revolving Loan Commitments shall be reduced on a pro rata basis, and (C) after giving effect to such reductions, Borrowers shall be in compliance with Section 1.3(b). In addition, Borrowers may at any time on at least five (5) days' prior written notice by Borrower Representative to Agent terminate the Revolving Loan Commitments; provided that upon such termination, all Revolving Loans and other Obligations shall be immediately due and payable in full and all Letter of Credit Obligations shall be cash collateralized or otherwise satisfied in accordance with Annex B to the DIP Credit Agreement. **DIP Credit Agreement, at § 1.3(a).**<br><br><u>Mandatory Prepayments</u>. If at any time the aggregate outstanding balance of the Revolving Loans and any Reserves then in effect exceeds the lesser of (A) the Revolving Loan Commitments as then in effect and (B) the amount permitted under the Interim Order or the Final Order, as the case may be, Borrowers shall immediately prepay the aggregate outstanding Revolving Credit Advances to the extent required to eliminate such excess. If any such excess remains after repayment in full of the aggregate outstanding Revolving Credit Advances, Borrowers shall provide cash collateral for the Letter of Credit Obligations in the manner set forth in Annex B to the extent required to eliminate such excess. **DIP Credit Agreement, at § 1.3(b).** |
| **Roll Up of Indebtedness**<br>*LBR 4001-2(a)(7)* | The DIP Facility contemplates the payment of the Pre-Petition Discretionary Overadvances following entry of the Interim Order and, upon entry of the Final Order, payment of the remaining balance of the Pre-Petition Credit Facility. **Interim Order, at ¶ 2(e); DIP Credit Agreement at § 1.1(a)(i).** |
| **Cross-Collateralization**<br>*LBR 4001-2(a)(6)* | The proceeds of the Pre-Petition Collateral are used, among other things, to permanently reduce the Pre-Petition Credit Obligations until indefeasibly paid in full in cash. **Interim Order, at ¶ 2(g); DIP Credit Agreement, at § 1.3(c).** |
| **Budget**<br>*BR 4001(c)(1)(B)* | So long as the Debtors are operating using cash collateral and commitments remain outstanding under the DIP Facility, the Debtors must operate within the 8-week budget, to be updated at the end of the first 8-week period and converted to a 13-week budget. **DIP Credit Agreement, Annex E.** |
| **Conditions to Borrowing**<br>*BR 4001(c)(1)(B)*<br>*LBR 4001-2(a)(2)* | Among the conditions for borrowing under the DIP Facility is entry of an order substantially in the form of the Interim Order. **Interim Order, at ¶ 2(h); DIP Credit Agreement, at § 2.1, 2.2.** |

| | |
|---|---|
| **Liens and Priorities**<br>*BR 4001(c)(1)(B)(i)*<br>*BR 4001(c)(1)(b)(xi)*<br>*LBR 4001-2(a)(4)* | Liens:  The Debtors grant the following as collateral securing all DIP Facility obligations, subject to the Carve-Out:<br><br>• Liens on Unencumbered Property, including Avoidance Actions. Pursuant to § 364(c)(2), a first priority Lien on all unencumbered DIP Collateral, including proceeds of Avoidance Actions, *provided*, *however*, that proceeds of Avoidance Actions shall be the last DIP Collateral used to repay the DIP Obligations.<br><br>• Junior Liens.  Pursuant to § 364(c)(3), a junior Lien on all DIP Collateral that is subject to the BofA Senior Replacement Liens, the CLD Senior Replacement Liens and any Permitted Prior Lien (whether existing immediately prior to the Petition Date or perfected on or after the Petition Date pursuant to § 546(b).<br><br>• Priming Liens.  Pursuant to § 364(d), a first priority senior priming Lien on all DIP Collateral (including Cash Collateral), senior in all respects to (x) the Pre-Petition First Priority Liens and (y) except for the Permitted Prior Liens, any other liens in favor of any other person or entity, including all Liens junior to the Pre-Petition First Priority Liens (the "Primed Liens"); *provided*, *however*, that the Liens described in this clause shall be subject and subordinate to the Carve-Out and the Prepetition Senior Permitted Prior Liens.<br><br>• Future Property.  The DIP collateral includes, all property and assets of the Debtors and their estates, real and personal, tangible and intangible, including all causes of action (subject to the limitation noted below), whether owned as of the Petition Date or after acquired or arising, and regardless of where located or by whomsoever held, and whether now owned or in which the Debtors have any interest or hereafter acquired or in which the Debtors obtain an interest.<br><br>Priorities:  Obligations under the DIP Facility constitute superpriority administrative expenses in the Debtors' chapter 11 cases and shall be senior to the Prepetition Debt Obligations.  **Interim Order at ¶ 2(i), (j) and (l).** |
| **Adequate Protection**<br>*BR 4001(c)(1)(B)(ii)*<br>*LBR 4001-2(a)(4)* | Additionally, the DIP Facility contemplates the provision of adequate protection to the Prepetition Lenders in the form of, among other things, (i) replacement liens granted to the Prepetition Agent, for the benefit of the Prepetition Lenders; (ii) a super priority claim ranking junior to the claims of the DIP Lenders and the DIP Agent; (iii) payment of professional fees and expenses of the Prepetition Agent and the Prepetition Lenders; and (iv) cash payment in arrears on the first business day of each month of interest due under the Pre-Petition Credit Agreement.  Interim Order, at ¶ 4.  Furthermore, so long as balances remain outstanding under the BofA Facility and the CLD Financing Facility, BofA and CLD will each receive adequate protection in the form of the payment of any proceeds on their respective collateral and replacement liens junior in right to the DIP Liens and the First Lien Replacement Liens.  Interim Order, at ¶ 5, 6. |

| | |
|---|---|
| **Carve-Out**<br>*LBR 4001-2(a)(5)* | Equal to the sum of: (a) the amount of Debtors' Professional Fees incurred before the delivery of a Carve-Out Trigger Notice that are ultimately allowed by final order of the Bankruptcy Court, but solely to the extent the same are incurred in accordance with Schedule 1 to the DIP Budget on a cumulative basis by professional, (b) the amount of Committee Professional Fees incurred before the delivery of a Carve-Out Trigger Notice that are ultimately allowed by final order of the Bankruptcy Court, but solely to the extent the same are incurred in accordance with Schedule 1 to the DIP Budget on a cumulative basis by professional, (c) all allowed and unpaid Professional Fees that are incurred from and after the delivery of a Carve-Out Trigger Notice in an aggregate amount not in excess of $500,000; and (d) the payment of fees pursuant to 28 U.S.C. § 1930(a).<br>**Interim Order, at ¶ 10(a); DIP Credit Agreement, definition of "Carve-Out."** |
| **Covenants**<br>*BR 4001(c)(1)(B*<br>*LBR 4001-2(a)(8)* | The loan documentation contains affirmative, negative, and reporting covenants customary for financings of this type and other covenants appropriate to this specific transaction as agreed to by the Debtors and the DIP Lenders (which will be applicable to the Loan Parties and their subsidiaries).  **DIP Credit Agreement, at Articles 4, 5 and 6.**<br><br>Paragraph 9 of the Interim Order establishes a defined period within which any challenges to the claims and liens of the Prepetition Agent and the Prepetition Lenders must be asserted.  Additionally the Interim Order contains acknowledgements by the Debtors of the amount outstanding under, and the validity of the liens securing, the Pre-Petition Credit Facility.  Interim Order, at ¶ D.  The Debtors further agreed not to file any plan that does not provide for the payment in full of the DIP Facility, nor to permit any liens senior or *pari passu* to the DIP Liens.  **DIP Credit Agreement, at § 6.7, 6.22.** |
| **Limitations on Funding**<br>*LBR 4001-2(a)(9)* | The DIP Credit Agreement limits the use of the proceeds of Cash Collateral and DIP Facility to pursue claims against the Prepetition Agent or Prepetition Lenders, and permitting such funds to be used only in connection with the investigation of such claims up to a cap of $25,000.  **Interim Order, at ¶ 10(e); DIP Credit Agreement, at § 5.16.** |
| **Events of Default**<br>*BR 4001(c)(1)(B)*<br>*LBR 4001-2(a)(10)* | The DIP Credit Agreement contains usual and customary events of default for a postpetition credit facility of this type.  **DIP Credit Agreement, at § 8.1.** |
| **Change of Control**<br>*LBR 4001-2(a)(11)* | The occurrence of a "Change of Control," as defined in the DIP Credit Agreement, constitutes an Event of Default under the DIP Facility.  **DIP Credit Agreement, at § 8.1(l).** |

| | |
|---|---|
| **Sale Milestones**<br>*LBR 4001-(a)(12)* | The Debtors are required to meet the following deadlines relating to the proposed sale of substantially all of the Debtors' assets:<br><br>• Petition Date (PD)—the Debtors shall file the Bidding Procedures Motion.<br><br>• PD+15 days—the Debtors shall obtain entry of the Bidding Procedures Order.<br><br>• PD+35 days—the Debtors shall conduct an auction in accordance with the Bidding Procedures Order<br><br>• PD+40 days—the Debtors shall obtain entry of the Sale Approval Order.<br><br>• PD+45 days—the Debtors shall consummate the transactions approved in the Sale Approval Order.<br><br>**Interim Order, at Exhibit B; DIP Agreement at § 5.13.** |
| **Plan Milestones**<br>*BR 4001(c)(1)(b)(vi)* | None. |
| **Plan-related Waivers**<br>*BR 4001(c)(1)(B)(v)* | An Event of Default occurs under the DIP Credit Agreement if, among other things, any Debtor seeks authority to obtain additional financing under sections 364(c) or (d) of the Bankruptcy Code, or if any party seeks to terminate the Debtors' exclusive periods under section 1121 of the Bankruptcy Code. **DIP Credit Agreement, at § 8.1(p).** |
| **Automatic Stay**<br>*BR 4001(c)(1)(B)(iv)* | Relief from the automatic stay is also sought to permit the effectuation of the provisions of the Interim Order. **Interim Order, at ¶ 8.**<br><br>Subject to 7 business days' prior notice to Debtors and certain other parties, the automatic stay is vacated to permit the exercise of remedies by the DIP Lenders and/or the DIP Agent. **Interim Order, at ¶ 20(b).** |
| **Funding of Nondebtors**<br>*LBR 4001-2(a)(15)* | Not applicable. |
| **Waiver as to Lien Perfection**<br>*BR 4001(c)(1)(B)(vii)* | The Interim Order is deemed sufficient and conclusive evidence of the validity, enforceability, perfection and priority of the DIP Liens and the Adequate Protection Replacement Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or (b) taking any other action to validate or perfect the DIP Liens and the Adequate Protection Replacement Liens. **Interim Order, at ¶ 8.** |
| **Debtor Stipulations**<br>*BR 4001(c)(1)(B)(iii)* | The Debtors make certain stipulations as to the amount, validity, perfection, priority, enforceability and nonavoidability (under the Bankruptcy Code or otherwise) of the Pre-Petition Credit Facility, the BofA Facility and the CLD Financing Facility and the security interests in and liens on the collateral securing such debt. **Interim Order, at ¶ D.** |

| | |
|---|---|
| **Release of Causes of Action**<br>*BR 4001(c)(1)(B)(viii)* | The Debtors release each of the DIP Agent and the DIP Lenders from all claims and causes of action arising out of or relating to the DIP Credit Agreement, the Financing Orders and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing; provided that nothing herein shall be deemed to be a release of Agent or any Lender from its obligations under the Loan Documents, provided further, that nothing contained herein shall be deemed to limit or modify the rights granted to third parties under the Financing Orders. **DIP Credit Agreement, at § 1.21.** |
| **Indemnification**<br>*BR 4001(c)(1)(B)(ix)* | Each Credit Party that is a signatory hereto shall jointly and severally indemnify and hold harmless each of Agent, Lenders and their respective Affiliates, and each such Person's respective officers, directors, members, managers, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith. **DIP Credit Agreement, at § 1.13.** |
| **Waiver of § 506(c) Rights**<br>*BR 4001(c)(1)(B)(x)* | Subject to the entry of the Final Order, no costs or expenses of administration shall be charged against or recovered from or against any of the DIP Lenders, the Pre-Petition Lenders, the DIP Collateral, the Pre-Petition Collateral or the Cash Collateral pursuant to § 506(c) or otherwise. **Interim Order, at ¶ 13.** |

### Jurisdiction and Venue

7.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.     Pursuant to 28 U.S.C. §§ 157 and 1334 and Standing Order M-61 of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.), the Court has jurisdiction to consider and grant the relief requested herein.  A proceeding to consider and grant such relief is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background**

9.     On July 8, 2011 (the ***"Petition Date"***), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.   The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to §§ 1107(a) and 1108.   Contemporaneously herewith, the Debtors have filed a motion seeking joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

10.     Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to these chapter 11 filings is contained in the *Declaration of Daniel J. Boverman Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Pleadings* (the "***Boverman Declaration***") filed contemporaneously herewith.

**Outstanding Prepetition Indebtedness**

11.     As of the Petition Date, the instruments evidencing the Debtors' significant indebtedness are as described below.

**A.     The Senior Credit Facility**

12.     Pursuant to the Pre-Petition Credit Agreement, the Pre-Petition Agent and Pre-Petition Lenders extended loans to, and issued letters of credit for the account of, the Debtors from time to time in connection with the Pre-Petition Credit Facility.   All obligations of the Debtors arising under the Pre-Petition Credit Facility (including the "Obligations" as defined in the Pre-Petition Credit Agreement) shall collectively be referred to herein as the "***Pre-Petition Credit Obligations***."

13.     As of the Petition Date, the Debtors were truly and justly indebted to the Pre-Petition Agent and the Pre-Petition Lenders pursuant to the Pre-Petition Credit Documents, without defense, counterclaim or offset of any kind, in respect of loans made and letters of credit

issued by the Pre-Petition Agent and the Pre-Petition Lenders in the aggregate principal amount of approximately $36,907,752.85 (including the Pre-Petition Discretionary Overadvances), *plus* all accrued and unpaid interest thereon and any additional fees and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the Pre-Petition Credit Documents) now or hereafter due under the Pre-Petition Credit Agreement and the other Pre-Petition Credit Documents (the "***Pre-Petition Indebtedness***").

14.     Pursuant to the Pre-Petition Credit Documents, the Debtors granted to the Pre-Petition Agent, for the benefit of itself and the Pre-Petition Lenders, to secure the Pre-Petition Credit Obligations, a first-priority security interest in and continuing lien (the "***Pre-Petition First Priority Liens***") on all or substantially all of the Debtors' assets and property (which for the avoidance of doubt includes Cash Collateral and the "Collateral" as defined in the Pre-Petition Credit Agreement) and all proceeds, products, accessions, rents and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "***Pre-Petition Collateral***").

15.     The Pre-Petition First Priority Liens are subject and subordinate in all respects only to (i) the DIP Liens, (ii) the Carve-Out (as defined below) and (iii) (a) valid, perfected and unavoidable Permitted Encumbrances (as defined in the Pre-Petition Credit Agreement) permitted under the Pre-Petition Credit Documents (the "***Pre-Petition Permitted Encumbrances***")[4], (b) the BofA First Priority Liens (as defined below) solely on the BofA Priority Collateral (as defined below) and (c) the CLD First Priority Liens (as defined below and,

---

[4] For purposes of this Interim Order, Pre-Petition Permitted Encumbrances shall include any liens that were valid, senior, prior and perfected under applicable law as of the Petition Date. Nothing herein shall constitute a finding or ruling by this Court that any such Pre-Petition Permitted Encumbrances are valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtors, the Pre-Petition Agent, the Pre-Petition Lenders, the DIP Agent, the DIP Lenders and any Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such Pre-Petition Permitted Encumbrances and/or security interests.

together with the Pre-Petition Permitted Encumbrances and the BofA First Priority Liens, the "**Permitted Prior Liens**") solely on the CLD Priority Collateral (as defined below).

**B.      Other Prepetition Secured Lenders**

16.      Prior to the Petition Date, the Debtors (a) granted to BofA, pursuant to the BofA Facility, a first priority security interest in and continuing lien on (the "**BofA First Priority Lien**") certain assets of ABL (the "**BofA Priority Collateral**") and (b) granted to CLD, pursuant to the CLD Financing Facility, a first priority security interest in and continuing lien on (the "**CLD First Priority Lien**") certain assets of ABL (the "**CLD Priority Collateral**") and a second priority subordinate security interest in and lien upon substantially all of the assets of ABL (the "**CLD Second Priority Lien**," and together with the CLD First Priority Lien, the "**CLD Security Interests**").

**C.      Intercreditor Agreements**

17.      The Pre-Petition Agent is party to (a) those certain Subordination Agreements, dated as of December 31, 2008 by and between the Pre-Petition Agent and BofA (the "**BofA Intercreditor Agreements**"), which govern the respective rights, obligations and priorities of the Pre-Petition Agent and BofA with respect to their relative interests in the BofA Priority Collateral and certain other matters, (b) that certain Second Amended and Restated Intercreditor Agreement, dated as of December 22, 2010 by and between the Pre-Petition Agent and CLD (the "**CLD Intercreditor Agreement**"), which governs the respective rights, obligations and priorities of the Pre-Petition Lenders and CLD with respect to their relative interests in the CLD Priority Collateral, the other assets of ABL and certain other matters (c) that certain Second Amended and Restated Subordination Agreement, dated as of December 22, 2010 by and between the Pre-Petition Agent and Toshiba American Information Systems, Inc. ("**Toshiba**") (the "**Toshiba Subordination Agreement**"), which subordinates Toshiba's security interests in the goods sold

by Toshiba to the Debtors to the Pre-Petition First Liens and (d) that certain Amended and Restated Shareholder Subordination Agreement, dated as of December 22, 2010 (the "**Shareholder Subordination Agreement**") by and between the Pre-Petition Agent, the Borrowers, Holdings and ABL West as Guarantors, and BDI Laguna Holdings, Inc. ("**Laguna Holdings**") as holder of the preferred membership interests in Holdings, pursuant to which Laguna Holdings subordinated all of its interests and rights to payment in any assets of the Borrowers or the Guarantors to the Pre-Petition First Priority Liens. Each of the BofA Intercreditor Agreements, the CLD Intercreditor Agreement the Toshiba Subordination Agreement and the Shareholder Subordination Agreement is a "subordination agreement" for purposes of § 510(a) and is enforceable on its terms.

**D.     Determination of the Amount of the Debtors' Prepetition Indebtedness**

18.     As of July 8, 2011, the total amount of the outstanding Prepetition Indebtedness was approximately $36,907,752.85. Another approximately $383,333 was outstanding under the BofA Facility, and approximately $39,000 was outstanding under the CLD Financing Facility.

**Debtors' Proposed DIP Facility**

**E.     Need for Postpetition Financing**

19.     As described more fully in the Boverman Declaration, the Debtors are currently in the midst of a liquidity crisis brought on by a series of recent events. The Debtors do not have sufficient availability under the Prepetition Loan Agreement to cover their operating expenses and require additional funds to meet their obligations to existing vendors and customers.

20.     The Debtors have, with the assistance of their financial advisors, Macquarie Capital (USA) Inc. ("**Macquarie**"), analyzed their cash needs in an effort to determine what is necessary to maintain their operations in chapter 11 and worked towards a successful

reorganization. In undertaking this analysis, the Debtors and their advisors have considered the impact of the current economic outlook on the Debtors' near-term projected financial performance. The Debtors also conferred with individuals in the Debtors' operational and management teams to understand key business metrics in both the near and long term.

21.     As part of the Debtors' recent financial analysis and projections, the Debtors developed a 13-week cash flow forecast, which takes into account anticipated cash receipts and disbursements during that time. This forecast considers a number of factors, including the impact of a bankruptcy filing, material cash disbursements, required vendor payments, cash flows and the cost materials. That forecast has since been modified into an 8-week cash flow forecast, which the Debtors have proposed to the proposed DIP Lenders as the first Approved Budget (as defined below).

22.     The Debtors rely primarily on the revolving credit facility provided under the Prepetition Credit Agreement to meet their cash needs, and the filing of these chapter 11 cases has made the need for such financing even greater. Absent approval of the DIP Facility and authorization for the Debtors' to use Cash Collateral, the Debtors' current financial projections indicate that the Debtors' current cash on hand and cash generated from their operations will be insufficient to, among other things, continue operating their businesses, maintain relationships with vendors, suppliers and customers, pay employee wages in the ordinary course and satisfy other operational needs during the pendency of these chapter 11 cases—all of which are necessary to preserve the Debtors' going-concern values. Without access to the DIP Facility and the immediate use of Cash Collateral, the Debtors will have no unencumbered cash available to continue their operations and make the necessary capital expenditures that are critical to their success. As such, the Debtors would be forced to curtail or even terminate their business

operations to the material detriment of all parties in interest in these chapter 11 cases. Thus, the Debtors need to ensure that working capital is available now.

23. Moreover, as described in more detail in the Boverman Declaration and the motion filed contemporaneously herewith for approval of certain bid procedures for an auction and sale process, the Debtors seek to maximize the value of their estates in this chapter 11 case through a competitive auction process. The Debtors believe that the conduct of such a competitive auction process will best maximize both the value of their businesses and the recoveries of the Debtors' creditors. The proposed postpetition financing gives the Debtors the opportunity to maintain nearly-normal business operations while they attempt to sell their businesses and/or their assets to interested parties. For this reason, the Debtors submit that the proposed postpetition financing is in the best interests of all creditor constituencies.

**F.** **The Debtors' Efforts to Obtain Postpetition Financing**

24. Prior to the Petition Date, and as set forth in the Boverman Declaration, the Debtors explored all practicable avenues to obtain the DIP Facility on the best possible terms. Among other things, the Debtors and Macquarie surveyed various sources of postpetition financing to ensure sufficient liquidity to fund the Debtors' operations in chapter 11, including both the Prepetition Lenders and unrelated third parties. In exploring those options, the Debtors recognized that the obligations owed to the Prepetition Lenders are secured by substantially all of the Debtors' assets, such that either (i) the liens of the Prepetition Lenders would have to be primed to obtain postpetition financing, or (ii) the Debtors would have to find a postpetition lender willing to extend credit secured by liens junior to the existing liens of the Prepetition Lenders.

25. After diligence and an extensive review of their alternatives, the Debtors determined it was in their best interests to solicit DIP proposals from all potential lender parties.

To that end, in the weeks preceding the filing, Macquarie contacted approximately 17 potential lenders, including the Prepetition Lenders, to ascertain the terms on which any of them would be willing to extend postpetition financing to the Debtors. Of those parties contacted by Macquarie, only four were willing to sign nondisclosure agreements and receive additional information about the Debtors; however, none were willing to extend postpetition financing secured only by junior liens to the liens securing the Prepetition Indebtedness, nor were any willing to provide a sufficiently large postpetition facility to repay the Prepetition Indebtedness in full. Given the Debtors' view that a priming fight with the Prepetition Lenders would be expensive, time-consuming and counterproductive, the Debtors concluded that their only feasible option for postpetition financing lay with the Prepetition Lenders (as proposed DIP Lenders).

26.     Ultimately, the proposed DIP Lenders were the only parties willing to provide the Debtors with the needed postpetition financing. Thereafter, the Debtors conducted several diligence meetings and held various calls with the proposed DIP Lenders. In tandem with this process, the Debtors began intensive and arm's length negotiations with the proposed DIP Lenders over the terms of the DIP Credit Agreement, which culminated in an agreement with the DIP Lenders to provide the DIP Facility in an aggregate principal amount of up to $50,000,000. During the negotiations, the Debtors, with the assistance of their advisors, went to great lengths under difficult circumstances to achieve the best deal possible for themselves and their constituents.

27.     As described above, the terms of the DIP Facility were extensively negotiated at arm's length and reflect the most advantageous terms (including availability, pricing, fees and covenant flexibility) available to the Debtors in this credit market. The Debtors have been unable to find alternative or better financing without the proposed priming liens from other

sources. Based on these factors, and in light of the fair and thorough negotiation process undertaken by the Debtors, the DIP Facility is the only feasible financing option for the Debtors and is in the best interests of the Debtors' estates.

**G. Implementation of the DIP Credit Agreement**

28. The Debtors and the DIP Lenders engaged in extensive, good faith, arm's-length negotiations with respect to the terms and conditions of the proposed DIP Facility. These negotiations culminated in agreement on terms for the proposed DIP Facility. Significantly, the DIP Credit Agreement allows the Debtors to borrow under the DIP Facility on an interim basis pending this Court's entry of the Final Order, which will allow the Debtors to cure the outstanding overadvance under the Pre-Petition Credit Facility and meet their immediate administrative obligations in the initial weeks of the case.

29. The Debtors and the DIP Lenders have agreed upon an initial budget for the 8-week period beginning on the Closing Date (as defined in the DIP Credit Agreement), which budget may be updated from time to time and will be replaced, after eight weeks, with a rolling 13-week budget (collectively, including the initial budget, the "***Approved Budget***"). The Debtors believe that this Approved Budget, which must be in form and substance acceptable to the DIP Lenders in their sole discretion, is achievable and will allow the Debtors to operate without the accrual of unpaid administrative expenses.

<u>**Supporting Authority**</u>

30. The continued viability of the Debtors' businesses and the success of the Debtors' reorganization efforts hinges upon obtaining access to financing. Absent access to financing, the Debtors will not be able to operate their businesses for the duration of these chapter 11 cases. At this time, the Debtors request authorization to borrow up to the full amount available under the

DIP Credit Agreement on an interim basis and to use such proceeds to fund their operations and repay the Pre-Petition Discretionary Overadvances. Approval of the DIP Credit Agreement will allow the Debtors to remain operational, including paying their current and ongoing working capital and operating expenses (*e.g.* postpetition wages, salaries, and utility and vendor costs).

31.     The Debtors have not otherwise been able to procure sufficient financing (i) in the form of unsecured credit allowable under § 503(b)(l); (ii) solely as an administrative expense under § 364(a) or (b); or (iii) solely in exchange for the grant of a superpriority administrative expense claim pursuant to § 364(c). In fact, the proposed financing under the DIP Credit Agreement was the only viable financing option presented to the Debtors and their advisors. Thus, based on the foregoing and for the reasons set forth below, the Debtors submit that they have satisfied the requirements to access postpetition financing on a superpriority, secured basis pursuant to § 364.

## H.     Financing Under § 364

32.     Pursuant to § 364(c), a court may authorize a debtor to incur debt that is (i) entitled to a superpriority administrative expense status; (ii) secured by a lien on otherwise unencumbered property; or (iii) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, on an administrative expense priority or secured solely by junior liens on the debtor's assets. *See* 11 U.S.C. § 364(c); *see also In re Barbara K. Enters, Inc.*, No. 08-11474 2008 WL 2439649, at *8 (Bankr. S.D.N.Y. June 16, 2008) (In order for a debtor to obtain postpetition secured credit under § 364, the debtor must prove that it was unable to reasonably obtain secured credit elsewhere…); *Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

33. Additionally, § 364(d)(1) provides that a court may authorize a debtor to incur postpetition debt on a senior or "priming" basis if (i) the debtor is unable to obtain credit otherwise and (ii) there is "adequate protection" of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. *See* 11 U.S.C. § 364(d)(1).

34. Courts in this and other jurisdictions have fashioned certain guidelines in applying these statutory requirements. Generally, courts use a holistic approach to evaluating superpriority postpetition financing agreements. As one court noted—

> Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and . . . the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.

*In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *see also In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441-442 (Bankr. S.D.N.Y. 2010).

35. More specifically, in evaluating a debtor's proposed postpetition financing, courts consider whether the postpetition financing (i) is necessary to preserve the assets of the estate and is necessary, essential and appropriate for continued operation of the debtor's business; (ii) is in the best interests of the debtor's creditors and estates; (iii) is an exercise of a debtor's sound and reasonable business judgment; (iv) was negotiated in good faith and at arm's length between the debtor, on the one hand, and the agents and the lenders on the other; and (v) contains terms that are fair, reasonable and adequate given the circumstances of the debtor and the proposed postpetition lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 879-881 (Bankr. W.D. Mo. 2003) *cited in Transcript of Record at* 733:3-7, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr.

S.D.N.Y. Mar. 5, 2009); *In re Barbara K. Enters., Inc.*, 2008 WL 2439649, at *10; *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990).

36.     For the reasons set forth below, the Debtors submit that entry into the DIP Facility satisfies each of these factors.

## I.     Entry into the DIP Facility is a Sound Exercise of the Debtors' Reasonable Business Judgment

37.     A debtor's decision to enter into a postpetition lending facility under § 364 is governed by the business judgment standard. *See, e.g.*, *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under § 364 must reflect a debtor's business judgment); *Barbara K. Enters.*, 2008 WL 2439649, at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment").

38.     Generally, the business judgment standard requires that, absent evidence to the contrary, a debtor in possession is afforded discretion to act with regard to business planning activities. *See In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted).

39.     Specifically, to determine whether the business judgment standard is met, a court is "'required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06-11202, 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del., Aug. 15, 2007) (quoting *In re Exide Techs.*, 340 B.R. 222, 239

(Bankr. D. Del. 2006)); *In re Brooklyn Hosp. Ctr.*, 341 B.R. 405, 410 (Bankr. E.D.N.Y. 2006) (the business judgment rule "'is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the Company'") *quoting Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.").

40.     The Debtors' decision to enter into the proposed DIP Credit Agreement indisputably satisfies this standard, as it represents the culmination of an intense process targeted at procuring the best available financing under very difficult circumstances. Ultimately, there simply is no available alternative to the proposed DIP Facility. The DIP Lenders are the only lenders willing to lend on the timeline and terms necessitated by the Debtors' current liquidity position. Further, having identified the DIP Lenders as the Debtors' sole source for postpetition financing, the Debtors negotiated the DIP Credit Agreement with the DIP Lenders extensively and at arm's length.

41.     Entry into the DIP Credit Agreement and related documents and securing financing thereunder is absolutely necessary to the preservation of estate assets and is in the best interest of the Debtors' creditors and all parties in interest. Given the Debtors' significantly constrained liquidity, the DIP Facility is of critical importance to operating the Debtors' businesses and preserving going concern value. Accordingly, the Debtors submit that their entry

into the DIP Facility and execution of the DIP Credit Agreement and other related agreements represents a sound exercise of the Debtors' business judgment.

42.     Like other procurement and distribution companies, the Debtors' businesses require access to a reliable and substantial source of liquidity to continue normal business operations, maintain business relationships with vendors, suppliers, and customers, pay employees and satisfy other working capital and operational needs—each of which is vital to preserving and maintaining the Debtors' going concern value.  Currently, available and projected Cash Collateral is insufficient to meet these needs.  The inability to make these capital expenditures, meet payments to vendors, pay employees and satisfy customers would impair, if not destroy, the value of the Debtors' businesses.  In short, without access to liquidity, the Debtors would be compelled to shut their doors and liquidate the remaining assets in piecemeal fashion to the detriment of all parties in interest.

43.     Moreover, the Debtors' access to the DIP Facility will help to maintain existing operations and thereby preserve the going concern value of the Debtors' businesses, thereby providing a potentially greater recovery to creditors than would be realized if the Debtors were forced to cease operations immediately and engage in a piecemeal liquidation.  Accordingly, the Debtors submit that the availability of credit under the DIP Facility is necessary to preserve and enhance the value of their estates for the benefit of all stakeholders in these chapter 11 cases.

44.     For these reasons, the Debtors submit that entry into the DIP Credit Agreement is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets and is an exercise of the Debtors' sound and reasonable business judgment.

**J.      The DIP Facility is the Only Source of Funding Available to the Debtors**

45.     It is well-recognized in this jurisdiction and others that the appropriateness of a proposed postpetition financing facility must be considered in light of current market conditions.

*See, e.g., Transcript of Record at 734-35:24-1, In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009) (recognizing "the terms that are now available for DIP facilities in the current economic environment aren't as desirable" as they have been in the past); *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co. Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit from every possible lender before determining such credit is unavailable). Indeed, courts often recognize that where there are few lenders likely willing and able to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989*); See also, In re 495 Cent. Park Ave. Corp.,* 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (the Bankruptcy Code "does not require the debtor to seek alternate financing from every possible lender"). This is especially true when time is of the essence. *In re Reading Tube Indus*., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). Rather, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under §§ 364(a) and (b). *See Snowshoe*, 789 F.2d at 1088; *see also In re Utah 7000, L.L.C.*, No. 08-21869, 2008 WL 2654919, at *2 (Bankr. D. Utah July 3, 2008); *Shaw Indus., Inc v. First Nat'l Bank of PA (In re Shaw Indus., Inc.)*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) (where debtor made efforts by contacting "numerous" lenders and was unable to obtain credit without a priming lien, it had met its burden under Bankruptcy Code § 364(d)); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 899-900 (Bankr. N.D. Ohio 1992).

46.    Though the current market for financing may be improving, it is still strained as the global economy recovers from the recent credit crisis. Simply put, because of current economic conditions, there is no ready market for any financing, including debtor in possession

financing or otherwise and provisions once considered "extraordinary" in debtor in possession financing arrangements have, for the time being, become standard. *See, e.g.*, *Lyondell*, Tr. at 740:4-6 ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now."); Transcript of Record 123:17-25, 123:1, *In re Chemtura Corp.*, No, 09-11233 (REG) (Bankr. S.D.N.Y. Mar. 20, 2009) [Docket No. 66] (J. Gonzalez noting support for finding that a postpetition credit facility with roll-up provision was the only funding available to meet the Debtors' needs at that time).

47.     Unfortunately, the Debtors have run out of time. The only liquidity available at this time is that afforded by the DIP Facility. Accordingly, the Debtors submit that the terms of the DIP Credit Agreement are the only terms available to the Debtors.

**K.      The Terms of the DIP Facility are Fair, Reasonable and Appropriate**

48.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland*, 294 B.R. at 886; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co.* (*In re Ellingsen MacLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986), *aff'd*, 834 F.2d 599 (6th Cir. 1987) (recognizing a debtor may have to enter into hard bargains to acquire funds for its reorganization).

*The Scope of the Carve-Out is Appropriate*

49.     The proposed DIP Facility subjects the security interests and administrative expense claims of the DIP Lenders to the Carve-Out. Such carve outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See In re Barbara K. Enters., Inc.*, *WL 2439649, at *8 (citing Ames Dept. Stores*, 115 B.R. at 40). The DIP Facility does not directly or indirectly

deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *See id.*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of the case by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

### The Payment of Fees to the DIP Lenders is Appropriate

50.     The various fees and charges to be paid to the DIP Agent and the DIP Lenders, as described in the overview of the proposed DIP Facility and provided for in Section 1.9 of the DIP Credit Agreement, are reasonable and appropriate under the circumstances. Courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in § 364. *See Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) (approving financing facility pursuant to § 364 that included a lender "enhancement fee").

51.     Among the other fees that the Debtors are required to pay pursuant to the DIP Credit Agreement are the following: (i) a $100,000 adminstration fee, payable to the DIP Agent, and (ii) an upfront facility fee equal to 1.0% of the DIP Lenders' aggregate commitments under the DIP Facility, in each case payable upon the closing date under the DIP Facility. In addition, the DIP Lenders will charge a 1.0% unused line fee on the difference between the aggregate Revolving Loan Commitments under the DIP Facility and the average daily balance outstanding of the aggregate Revolving Loans.

52. The Debtors believe that the requested fees are reasonable, and further submit that the DIP Lenders' request that these fees be paid in full at closing is a reasonable one, as the DIP Lenders face the possibility that another lender or lender group could offer the Debtors a more attractive proposal between the time of the interim hearing and the final hearing. Furthermore, the Debtors were simply unable to secure posIpetition financing from the DIP Lender without this provision.

### *The Pay-Down of the Prepetition Indebtedness is Warranted Under the Circumstances*

53. The Debtors' use of the DIP Facility proceeds to pay down the Prepetition Indebtedness is appropriate as an exercise of the Debtors' sound business judgment. The Debtors were unable to secure postpetition financing without agreeing to pay down a portion of the Prepetition Indebtedness, as the DIP Lenders required such a pay-down as a condition to providing the DIP Facility and were unwilling to extend the necessary postpetition financing to the Debtors absent this provision.

54. The Debtors carefully considered the terms of the proposed pay-down and the scope and validity of the Prepetition Lenders' secured claims (and any associated causes of action). Based on that analysis, the Debtors determined that the pay-down is appropriate under the circumstances and provides the only opportunity to continue their business operations. In addition, because the Pre-Petition Credit Facility is a "pure" asset based revolving credit facility that was designed to ensure that the Pre-Petition Lenders remain oversecured at all times, the proposed roll-up of the Pre-Petition Credit Facility into the DIP Facility will not substantially improve the position of the Pre-Petition Lenders at the expense of other creditors. Rather, it will help facilitate a seamless transition from the Pre-Petition Credit Facility to the DIP Facility without putting further pressure on the Debtors' ability to access the necessary liquidity. In all

events, however, the Court's power under Local Bankr. R. 4001-2(k)(3) is expressly preserved to unwind the roll-up in the event of a timely and successful challenge to the validity, enforceability, extent, perfection or priority of the Pre-Petition Lenders' claims and liens, or a determination that the Pre-Petition Credit Facility was in fact undersecured as of the Petition Date such that the Pre-Petition Lenders were unduly advantaged.

55. Courts in this jurisdiction have permitted the payment of prepetition secured debt in limited circumstances similar to those here. *See, e.g.*, *In re Chemtura Corp.*, No. 0911233 (REG) (Bankr. S.D.N.Y. April 29, 2009) [Docket No. 281] (approving dollar-for-dollar roll up of $86.5 million of prepetition secured indebtedness); *In re Lyondell Chemical Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Mar. 1, 2009) [Docket No. 1002] (approving a dollar-for-dollar roll up of $3.25 billion of a prepetition secured debt facility); *In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. Feb. 6, 2009) [Docket No. 148] (approving the payment of $79.5 million of prepetition secured indebtedness); *In re Lenox Sales, Inc.*, No. 08-14679 (ALG) (Bankr. S.D.N.Y. Dec. 16, 2008) [Docket No. 129] (approving payment of $72.1 million in prepetition secured indebtedness).

## L.     The DIP Facility is Entitled to the Protections of § 364(e)

56. Pursuant to § 364(e), any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under § 364 shall not affect the validity of that debt incurred or priority of lien granted as long as the entity that extended credit "extended such credit in good faith." *See* 11 U.S.C. § 364(e).

57. Courts generally hold that "good faith" in the context of postpetition financing, consistent with the Uniform Commercial Code, means honesty in fact in the conduct or transaction concerned. *See Unsecured Creditors' Committee v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)).

Additionally, good faith is measured with respect to the good faith of the lender as contrasted to that of the borrower. Transcript of Record at 736:24-25, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009). Moreover, a lender's desire to ensure that it is repaid, to make money on interest and fees and to protect prepetition positions are understandable and acceptable motivations for a postpetition lender in negotiating a deal. *Id.* at 737:10-14.

58.     As explained in detail herein, the terms of the DIP Facility were negotiated in good faith and at arm's length between the Debtors, the DIP Agent and the DIP Lenders, and the DIP Facility has been and will be extended by the DIP Lenders in good faith. No consideration is being provided to any party to, or guarantor of, obligations arising under the DIP Facility, other than as set forth herein. Moreover, the DIP Facility has been extended in express reliance upon the protections offered by § 364(e), and the DIP Lenders should be entitled to the full protection of § 364(e) in the event that the Interim Order or Final Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

## M.     The Debtors' Proposed Grant of Adequate Protection is Appropriate

59.     The DIP Facility contemplates providing the DIP Lenders with priming liens (albeit consensual) on the Prepetition Indebtedness pursuant to § 364(d); accordingly, the Debtors are required to show that the interests of the Prepetition Lenders are adequately protected as required by §§ 361, 363 and 364. Additionally, pursuant to § 363(c), the Debtors may only use cash collateral of the Prepetition Lenders subject to the consent of those parties or the grant of adequate protection. 11 U.S.C. § 363(c)(2).

60.     What constitutes adequate protection is decided on a case-by-case basis and adequate protection can come in various forms, including payment of adequate protection fees, payment of interest, granting of replacement liens and administrative claims. *In re Mosello*, 195

B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case") (internal quote marks and citation omitted); *see also (In re Realty Sw. Assocs.)*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted); *Suntrust Bank v. Den-Mark Constr., Inc.*, 406 B.R. 683, 694 (E.D.N.C. 2009) (the concept of adequate protection is "susceptible to differing applications over a wide range of factual situations").

    (a)    In the instant case, the Debtors propose the following as adequate protection of the Pre-Petition Lenders' interests:

        (i)    The Debtors shall provide the Prepetition Agent and the Prepetition Lenders replacement liens on the DIP Collateral, subject only to the DIP Liens, the Permitted Prior Liens, the BofA Senior Replacement Liens, the CLD Replacement Liens and the Carve-Out.

        (ii)    To the extent of any diminution in value of the pre-petition interests of the Pre-Petition Lenders in the Pre-Petition Collateral, the Pre-Petition Lenders shall be allowed super-priority administrative claims, pursuant to § 507(b), junior only to the DIP Super-Priority Claims and the Carve-Out to the extent provided herein and in the DIP Loan Documents and payable from and having recourse to all of the DIP Collateral; *provided*, *however*, that the Pre-Petition Lenders shall not receive or retain any payments, property or other amounts in respect of the First Lien Super-Priority Claims unless and until (x) all DIP Obligations have been indefeasibly paid in full in cash and (y) all credit commitments under the DIP Loan Documents have been irrevocably terminated. Subject to the relative priorities set forth above, the First Lien Super-Priority Claims against each Debtor shall be against each Debtor on a joint and several basis.

(iii)    The Pre-Petition Agent and Pre-Petition Lenders shall receive current cash payment of fees and expenses due from time to time under the Pre-Petition Credit Agreement, including the reimbursement of reasonable fees and expenses of counsel, financial advisors and other professionals of the Pre-Petition Agent, without regard to the amounts set forth with respect thereto in the Approved Budget.

(iv)    The Pre-Petition Agent and Pre-Petition Lenders shall receive current cash payment of interest due under the Pre-Petition Credit Agreement, in arrears on the first business day of each month at the default rate of interest as set forth in the Pre-Petition Credit Agreement.

(v)    All proceeds from Pre-Petition Collateral any amounts held or collected on account of the Pre-Petition Collateral, and all payments and collections received by the Debtors on account of business activities conducted by the Debtors prior to the Petition Date shall be applied as set forth in paragraph 2(g) of the Interim Order.

(b)    In addition, the Debtors propose the following as adequate protection of BofA's interests:

(i)    After entry of this Interim Order, BofA will be entitled to receive all proceeds of the BofA Priority Collateral, which proceeds shall be applied to the BofA Facility until the BofA Facility is repaid in full.

(ii)    To the extent of any diminution in value of BofA's pre-petition interest in the BofA Priority Collateral, BofA is hereby granted, subject to the terms and conditions set forth below, pursuant to §§ 361, 363(e) and 364, replacement Liens on the BofA Priority Collateral (the "***BofA Senior Replacement Liens***"), which shall be subject only to the Carve-Out and senior to the DIP Liens, the First Lien Replacement Liens and the Pre-Petition First Priority Liens, solely in respect of the BofA Priority Collateral.

(c)    Finally, the Debtors propose the following as adequate protection of CLD's interests:

(i)    CLD will be entitled to receive all proceeds of the CLD Priority Collateral, which proceeds shall be applied to the CLD Financing Facility until the CLD Financing Facility is repaid in full.

(ii) To the extent of any diminution in value of CLD's pre-petition interest in the CLD Priority Collateral and in the assets of ABL, CLD is hereby granted, subject to the terms and conditions set forth below, pursuant to §§ 361, 363(e) and 364, (i) replacement liens on the CLD Priority Collateral (the "**CLD Senior Replacement Liens**"), which shall be subject only to the Carve-Out and senior to the DIP Liens, the First Lien Replacement Liens and the Pre-Petition First Priority Liens solely in respect of the CLD Priority Collateral and (ii) replacement liens on all of the assets of ABL, which shall be subject and subordinate only to the DIP Liens, the First Lien Replacement Liens, the Pre-Petition First Priority Liens, the Carve-Out, and any Pre-Petition Permitted Encumbrances (the "**CLD Junior Replacement Liens**," and, together with the First Lien Replacement Lien, the BofA Senior Replacement Liens and the CLD Senior Replacement Liens, the "**Adequate Protection Replacement Liens**").

61. The Debtors believe that the proposed adequate protection is necessary and appropriate to ensure that the Debtors can continue to use the cash collateral and access liquidity under the DIP Facility. Accordingly, the adequate protection proposed herein and in the DIP Orders is fair and reasonable and is sufficient to satisfy the requirements of §§ 363(c) and 364(d) .

62. As noted above, the Prepetition Agent, on behalf of the Prepetition Lenders, is being granted, as part of the Adequate Protection Obligations, liens on the DIP Collateral. When a debtor proposes a priming lien, it is appropriate to grant adequate protection in the form of additional liens to compensate the pre-petition secured creditor "to the extent…in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361(2); *see In re Metaldyne Corp.*, No. 09-13412 (MG) (Bankr. S.D.N.Y. June 23, 2009) [Docket Nos. 294 & 296]; *Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group)*, 16 F.3d 552, 564 (3d Cir. 1994) (to justify priming liens of a secured creditor, the creditor must be granted some additional form of protection to compensate them for loss of value resulting from subordination of the lien). Thus, when analyzing whether a creditor is adequately protected in

connection with financing on a priming basis, the court must view both the "preservation in the value of the collateral, as well as the decrease of the creditor's interest in the collateral due to the priming lien." *In re Fontainebleau Las Vegas Holdings, LLC*, 2010 WL 2774828 (S.D. Fla. July 14, 2010).

63.     To establish that the grant of the additional lien adequately protects a secured creditor, the value of the additional lien must be at least equal to the "difference between the value of the creditor's liens on the property and the value of such liens after being primed." *In re Plabell Rubber Products, Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).   In most cases, this means that the debtors must offer the creditor a lien on additional collateral worth equal to or in excess of the amount of the priming lien.  *See, e.g., Desert Fire Prot. v. Fontainebleau Las Vegas Holdings, LLC (In re Fontainebleau Las Vegas Holdings, LLC)*, 434 B.R. 716, 752-753 (S.D. Fla. 2010) (noting that in order to provide adequate protection, the debtors must offer the creditor a lien on property worth equal to or in excess of to decrease in value of creditors interest, or to the amount of the priming lien); *In re Metaldyne Corp.*, No. 09-13212 (MG) (Bankr. S.D.N.Y.) [Docket No. 294] at p.8 (finding that, where the pre-petition lenders' liens on the cash collateral were being primed by the DIP Lender's liens, which had a value of almost $20 million, the lenders had to be protected to at least the amount that the DIP lenders' liens diminished the creditors' interest in the debtor's property, or $20 million).

## N.     Modification of the Automatic Stay is Appropriate

64.     Paragraph 20 of the proposed Interim Order provides that the automatic stay imposed under § 362(a) is hereby lifted to, among other things, permit the Debtors to grant various superpriority liens and claims as well as adequate protection liens, perform various obligations, incur various liabilities, permit the exercise of remedies by the DIP Agent following a default under the DIP Facility and to allow the DIP Agent and the DIP Lenders to file and

record financing statements, mortgages or other instruments to provide notice and evidence the grant and perfection of the Liens.

65.     Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.   Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Credit Agreement and the proposed DIP Orders.

### REQUEST FOR APPROVAL ON AN INTERIM BASIS

66.     Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P.  4001(c)(2).

67.     Similarly, to the extent the Debtors are seeking authority to sell, use or otherwise incur an obligation regarding property of their estates, Bankruptcy Rule 6003 provides that the Court may only grant such relief to the extent it is necessary to avoid immediate and irreparable harm.  FED. R. BANKR. P. 6003(b).

68.     In examining requests for interim relief under the immediate and irreparable harm standard, courts apply the same business judgment standard applicable to other business decisions.  *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 (Bankr. S.D.N.Y. 1990); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985).  After the 15-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the

debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. See *Ames Dep't Stores* at 36.

69.     Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis.  As described in detail above and in the Boverman Declaration, the Debtors need to obtain access to liquidity under the DIP Facility in order to, among other things, continue the operation of their businesses, maintain business relationships with vendors, suppliers and customers, make payroll, make capital expenditures, and satisfy other working capital and operational needs.  Funding each of these expenditures is necessary to the Debtors' ability to preserve and maintain their going-concern values for the benefit of all parties in interest.

70.     Absent access to liquidity under the DIP Facility and authorization to use Cash Collateral, the Debtors' trade creditors almost certainly will cease to provide goods and services to the Debtors on credit, the Debtors will be unable to pay their payroll and other direct operating expenses or to obtain goods and services needed to run their business in the ordinary course.  The availability to the Debtors of sufficient working capital and liquidity is vital to the confidence of the Debtors' employees, major suppliers, and to the preservation and maintenance of the value of the Debtors' estates.

71.     The crucial importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances.  *See, e.g.*, *In re Chemtura Corp.*, No. 0911233 (REG) (Bankr. S.D.N.Y. March 20, 2009) [Docket No. 58] (order approving postpetition financing on an interim basis); *In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. Jan. 13, 2009) [Docket No. 46] (same); *In re Lyondell Chemical Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8,

2009) [Docket No. 79] (same); *In re Lenox Sales, Inc.*, No. 08-14679 (ALG) (S.D.N.Y. Nov. 25, 2008) [Docket No. 34] (same); *In re Wellman, Inc.*, No. 08-10595 (SMB) (S.D.N.Y. Feb. 27, 2008) [Docket No. 60] (same).

72.     Accordingly, the Debtors believe that, under the circumstances, entry of the Interim Order is necessary to prevent immediate and irreparable harm to the estates and therefore is warranted under the requirements of Bankruptcy Rule 4001(c)(2).

## REQUEST FOR FINAL HEARING

73.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date that is no longer than 30 days from the entry of the Interim Order as a final hearing for consideration of entry of the Final Order.[5]

74.     The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the Notice Parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## REQUEST FOR WAIVER OF STAY

75.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this DIP motion.  Pursuant to Bankruptcy Rule 6004(h), "a[n] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of ten (10) days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Facility is essential to prevent irreparable damage to the Debtors' operations, value and ability to

---

[5] The Debtors note that Section 8.1(p)(iii) of the DIP Credit Agreement requires that the Final Order is entered no later than 35 days after the Petition Date.

reorganize. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 10-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## **MOTION PRACTICE**

76. This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this motion. Moreover, in addition to all entities otherwise entitled to receive notice, the Debtors have given notice of this motion to all entities believed to have or be claiming an interest in the subject matter of the proposed order or who, it is believed, otherwise would be affected by the proposed order. Accordingly, the Debtors submit that this motion satisfies Local Rule 9013-1.

## **NOTICE**

77. The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Declaration Concerning List of the Debtors' 30 Largest Unsecured Claims on an Consolidated Basis filed pursuant to Bankruptcy Rule 1007(d); (c) GE Capital Commercial Services, Inc., as administrative agent under the Debtors' prepetition credit facility and debtor in possession credit facility, (d) Latham & Watkins LLP, as counsel to GE Capital Commercial Services, Inc.; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; and (g) the United States Attorney for the Southern District of New York. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## **NO PRIOR REQUEST**

78. No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE the Debtors respectfully request entry of an order, substantially similar to the proposed form of order attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

New York, New York
Dated: July 8, 2011

*/s/ Ira S. Dizengoff*

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Michael P. Cooley
Alexis Freeman

*Proposed Counsel to the Debtors and Debtors in Possession*

## Exhibit A

## Interim Order

**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Archbrook Laguna Holdings LLC ., *et al.*,[1] | ) | Case No. 11-13292 ( ) |
|  | ) |  |
| Debtors. | ) | Joint Administration Requested |
|  | ) |  |

**INTERIM ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION
SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 364, AND (B) TO
UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (II) GRANTING
LIENS AND SUPER-PRIORITY CLAIMS; (III) GRANTING ADEQUATE
PROTECTION TO PRE-PETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§
361, 362, 363 AND 364; AND (IV) SCHEDULING A FINAL
HEARING PURSUANT TO BANKRUPTCY RULE 4001**

Archbrook Laguna LLC ("ABL") and Lehrhoff ABL LLC ("*Lehrhoff*," and, together

with ABL, the "*Borrowers*") and certain of their affiliates, each as a debtor and debtor-in-

possession (collectively, the "*Debtors*") in the above captioned chapter 11 cases (collectively, the

"*Cases*") having filed a motion, dated July 8, 2011 (the "*Motion*") requesting entry of an order

pursuant to sections 105, 361, 362, 363, 364, and 507 of chapter 11 of title 11 of the United

States Code (as amended, the "*Bankruptcy Code*"), Rules 2002, 4001, 6004 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), and the Local Bankruptcy

Rules for the Southern District of New York (the "*Local Rules*") seeking, among other things:

(i)     authorization for the Borrowers to obtain post-petition financing (the "***DIP***

***Facility***"), and for certain of the Borrowers' affiliates and each subsidiary of the Borrower that is

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number, are: ArchBrook Laguna LLC (6166); ArchBrook Laguna Holdings LLC (6156); Chimerica Global Logistics LLC (3745); ArchBrook Laguna West LLC (9631); Lehrhoff ABL LLC; Expert Warehouse LLC (4487); and ArchBrook Laguna New York LLC (5385).

party to the DIP Credit Agreement (as defined below) (collectively, the "***Guarantors***"), to guaranty the Borrowers' obligations in connection with the DIP Facility, up to the aggregate principal amount of $50,000,000 from GE Capital Commercial Services, Inc. ("***GE Capital***"), acting as administrative agent (in such capacity, the "***DIP Agent***"), for itself and certain other lenders (collectively, including GE Capital, the "***DIP Lenders***");

(ii)     approval of the terms of, and authorization for the Debtors to execute and perform under, that certain Senior Super-Priority Debtor-In-Possession Credit Agreement, dated as of July [__], 2011, substantially in the form attached as Exhibit B to the Motion  (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "***DIP Credit Agreement***"),[2] and the other Loan Documents (as defined in the DIP Credit Agreement and, together with the DIP Credit Agreement, the "***DIP Loan Documents***") and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(iii)     authorization for the Debtors to grant (x) to the DIP Agent, for the benefit of itself and the other DIP Lenders, the DIP Liens (as defined below) on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, which DIP Liens shall be senior to the Primed Liens (as defined below) but shall be junior to any Permitted Prior Liens and (y) to the DIP Lenders, pursuant to section 364(c)(1) of the Bankruptcy Code, super-priority administrative claims having recourse to all pre-petition and post-petition property of the Debtors' estates, now owned or hereafter acquired, including, solely upon entry of the Final Order (as defined below), proceeds ("***Avoidance Action Proceeds***") of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy

---

[2]     Unless otherwise specified, all capitalized terms used herein without definition shall have the respective meanings given such terms in the DIP Credit Agreement.

Code or similar state law ("**Avoidance Actions**"), whether received by judgment, settlement or otherwise, and any Debtors' rights under section 506(c) of the Bankruptcy Code and the proceeds thereof;

(iv) authorization for the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "**Cash Collateral**"), including Cash Collateral in which the Pre-Petition Lenders (as defined below) and/or the DIP Lenders have a lien or other interest, in each case whether existing as of the Petition Date (as defined below), arising pursuant to this Interim Order or otherwise, which Cash Collateral, along with any proceeds of Pre-Petition Collateral (as defined below), shall be used after entry of the Interim Order for purposes of repaying outstanding Pre-Petition Credit Obligations;

(v) authorization for the Debtors to grant, as of the Petition Date and as further described below, certain adequate protection to each lender (collectively, the "**Pre-Petition Lenders**") under a senior secured revolving asset based credit facility (the "**Pre-Petition Credit Facility**") pursuant to that certain Second Amended and Restated Credit Agreement, dated as of December 22, 2010 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Pre-Petition Credit Agreement**" and, together with all other loan and security documents executed in connection therewith, the "**Pre-Petition Credit Documents**"), by and among ABL, Lehrhoff and Expert Warehouse LLC, as borrowers, Archbrook Laguna Holdings LLC ("**Holdings**"), Archbrook Laguna West LLC ("**ABL West**"), Chimerica Global Logistics LLC and Archbrook Laguna New York as Guarantors, GE Capital as Pre-Petition Lender and administrative agent (the "**Pre-Petition Agent**"), and the other Pre-Petition Lenders as parties thereto;

(vi)     authorization for the Debtors to grant, as of the Petition Date and as further described below, certain adequate protection to (i) Bank of America N.A. ("**BofA**") under and in connection with that certain Loan Agreement dated as of December 31, 2008 between ABL and BofA (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**BofA Facility**") and (ii) General Electric Capital Corporation acting through its Corporate Finance Core Leasing Division ("**CLD**") under and in connection with that certain Master Lease Agreement dated as of December 9, 2005 between ABL (acting under its former name, BDI-Laguna, Inc.) and CLD (as the same may be amended, restated, supplemented or otherwise modified from time to time, and together with the security documents thereto, the "**CLD Financing Facility**");

(vii)    to vacate the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order and subject in all respects to the Debtors' rights under paragraph 20 herein;

(viii)   authorization for the Debtors, at any time prior to the entry of the Final Order, to borrow under the DIP Facility for the purposes of (a) repaying the Discretionary Overadvances (as defined in the Pre-Petition Credit Agreement) outstanding as of the Petition Date under the Pre-Petition Credit Facility (the "**Pre-Petition Discretionary Overadvances**") until all such Pre-Petition Discretionary Overadvances are indefeasibly repaid in full in cash and (b) funding the operations of the Debtors' businesses, paying certain transaction fees and expenses and other costs and expenses of administration of the Cases, all subject to, and in accordance with, the DIP Loan Documents, this Interim Order and the Approved Budget (as defined below);

(ix)     the scheduling of a final hearing (the "***Final Hearing***") to be held before this Court to consider entry of a final order (the "***Final Order***") approving (a) the DIP Facility as set forth in the DIP Credit Agreement in the aggregate principal amount of $50,000,000, to be used by the Debtors for the purpose of (1) indefeasibly repaying in full in cash any Pre-Petition Credit Obligations that remain outstanding as of the date of entry of the Final Order and (2) otherwise funding the operations of the Debtors' businesses and paying other costs and expenses of administration of the Cases in accordance with the DIP Loan Documents, the Final Order and the Approved Budget and (b) the grant of adequate protection to the Pre-Petition Agent, the Pre-Petition Lenders, BofA and CLD all on a final basis as set forth in the DIP Motion; and

(x)     waiver of any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Interim Order.

Having considered the Motion, the DIP Credit Agreement, the *Declaration of Daniel J. Boverman, Interim Chief Financial Officer, In Support of First Day Pleadings* (the "***Boverman Declaration***"), and the evidence submitted or proffered at the hearing held and concluded before this Court on July [_], 2011 (the "***Interim Hearing***"); and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d) and 9014 and all applicable Local Rules, notice of the Motion and the Interim Hearing having been provided in a sufficient manner; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and all parties in interest, and is essential for maximizing the value of the Debtors' businesses and assets for the benefit of the Debtors' creditors and all parties in interests; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED,[3] that:**

A.    **Petition Date**.  On July 8, 2011, (the "*Petition Date*"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (this "*Court*").  The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No statutory committee of unsecured creditors (to the extent any such committee is appointed, the "*Committee*"), trustee, or examiner has been appointed in the Cases.

B.    **Jurisdiction and Venue**.  This Court has core jurisdiction over the Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014.

C.    **Notice**.  The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, on July [__], 2011, to certain parties in interest, including: (a) the Office of the United States Trustee for the Southern District of New York, (b) the entities listed on the *Declaration Concerning List of the Debtors' 20 Largest Unsecured Claims on a Consolidated Basis*, (c) GE Capital, as administrative agent under the Pre-Petition Credit Facility and the DIP Facility, (d) Latham & Watkins, LLP, as counsel to GE Capital, (e) BofA, (f) CLD,

---

[3]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

(g) the Internal Revenue Service (h) the Securities and Exchange Commission and (i) the United States Attorney for the Southern District of New York. Under the circumstances, such notice of the DIP Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rule 4001(b), (c) and (d) and the Local Rules.

D. **Debtors' Stipulations Regarding the Pre-Petition Credit Facilities**. Without prejudice to the rights of parties in interest to the extent set forth in paragraph 9 below, the Debtors admit, stipulate, acknowledge and agree (paragraphs D(i) through D(x) hereof shall be referred to herein collectively as the "***Debtors' Stipulations***") as follows:

(i) Pre-Petition Credit Facility. Pursuant to the Pre-Petition Credit Agreement, the Pre-Petition Agent and Pre-Petition Lenders extended loans to, and issued letters of credit for the account of, the Debtors from time to time in connection with the Pre-Petition Credit Facility. All obligations of the Debtors arising under the Pre-Petition Credit Facility (including the "Obligations" as defined in the Pre-Petition Credit Agreement) shall collectively be referred to herein as the "***Pre-Petition Credit Obligations***."

(ii) Pre-Petition Indebtedness. As of the Petition Date, the Debtors were truly and justly indebted to the Pre-Petition Agent and the Pre-Petition Lenders pursuant to the Pre-Petition Credit Documents, without defense, counterclaim or offset of any kind, in respect of loans made and letters of credit issued by the Pre-Petition Agent and the Pre-Petition Lenders in the aggregate principal amount of not less than $36,907,752.85 (including the Pre-Petition Discretionary Overadvances), *plus* all accrued and unpaid interest thereon and any additional fees and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the Pre-Petition Credit Documents)

now or hereafter due under the Pre-Petition Credit Agreement and the other Pre-Petition Credit Documents (the "**Pre-Petition Indebtedness**").

(iii)    <u>Pre-Petition First Priority Liens and Collateral</u>.    Pursuant to the Pre-Petition Credit Documents, the Debtors granted to the Pre-Petition Agent, for the benefit of itself and the Pre-Petition Lenders, to secure the Pre-Petition Credit Obligations, a first-priority security interest in and continuing lien (the "**Pre-Petition First Priority Liens**") on all or substantially all of the Debtors' assets and property (which for the avoidance of doubt includes Cash Collateral and the "Collateral" as defined in the Pre-Petition Credit Agreement) and all proceeds, products, accessions, rents and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "**Pre-Petition Collateral**").    As of the Petition Date, the Pre-Petition First Priority Liens (a) are valid, binding, enforceable, and perfected liens, (b) were granted to, or for the benefit of, the Pre-Petition Lenders for fair consideration and reasonably equivalent value and (c) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein).    The Pre-Petition First Priority Liens are subject and subordinate in all respects only to (A) the DIP Liens, (B) the Carve-Out (as defined below) and (C) (1) valid, senior, prior, perfected and unavoidable Permitted Encumbrances (as defined in the Pre-Petition Credit Agreement) permitted under the Pre-Petition Credit Documents (the "**Pre-Petition Permitted Encumbrances**"),[4] (2) the BofA First Priority Liens (as defined below) solely on the BofA Priority Collateral (as defined below) and (3) the CLD First Priority Liens (as defined below and, together with the Pre-Petition Permitted Encumbrances and the BofA First Priority

---

[4] For purposes of this Interim Order, Pre-Petition Permitted Encumbrances shall include any liens that were valid, senior, prior and perfected under applicable law as of the Petition Date.  Nothing herein shall constitute a finding or ruling by this Court that any such Pre-Petition Permitted Encumbrances are valid, senior, enforceable, prior, perfected or non-avoidable.  Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtors, the Pre-Petition Agent, the Pre-Petition Lenders, the DIP Agent, the DIP Lenders and any Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such Pre-Petition Permitted Encumbrances and/or security interests.

Liens, the "***Permitted Prior Liens***") solely on the CLD Priority Collateral (as defined below). The Pre-Petition Credit Obligations and the Pre-Petition Credit Documents constitute legal, valid and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Pre-Petition Credit Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code).  No setoffs, recoupments, offsets, defenses or counterclaims to any of the Pre-Petition Credit Obligations exist and no portion of the Pre-Petition Credit Obligations or any payments made to any or all of the Pre-Petition Agent or the Pre-Petition Lenders is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  Each of the Guaranties continues in full force and effect notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Agent or DIP Lenders to the Debtors pursuant to the terms of this Interim Order or the DIP Loan Documents.  As of the Petition Date, the value of the Pre-Petition Collateral securing the Pre-Petition Indebtedness exceeded the amount of the Pre-Petition Indebtedness, and accordingly, the claims of the Pre-Petition Lenders on account of the Pre-Petition Indebtedness are allowed secured claims within the meaning of Section 506 of the Bankruptcy Code in an amount not less than the amount set forth in paragraph D(ii) of this Interim Order.

(iv)     <u>Cash Collateral</u>.  The Debtors represent that all of the Debtors' cash, including the cash in its deposit accounts, wherever located, whether original collateral or proceeds of other Pre-Petition Collateral, constitutes the Cash Collateral of the Pre-Petition Agent and the Pre-Petition Lenders.

(v)    <u>BofA and CLD Financing Facilities</u>.    Prior to the Petition Date, the Debtors (a) granted to BofA, pursuant to the BofA Facility, a first priority security interest in and continuing lien on (the "***BofA First Priority Lien***") certain assets of ABL (the "***BofA Priority Collateral***") and (b) granted to CLD, pursuant to the CLD Financing Facility, a first priority security interest in and continuing lien on (the "***CLD First Priority Lien***") certain assets of ABL (the "***CLD Priority Collateral***") and a second priority subordinate security interest in and lien upon substantially all of the assets of ABL (the "***CLD Second Priority Lien***," and together with the CLD First Priority Lien, the "***CLD Security Interests***").    As of the Petition Date, (a) the BofA First Priority Lien and the CLD First Priority Lien are valid, binding, enforceable, and perfected Liens and (b) the BofA First Priority Lien and the CLD Security Interests were granted to, or for the benefit of, BofA or CLD, as applicable, for fair consideration and reasonably equivalent value and are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein).    The BofA First Priority Lien and the CLD First Priority Lien are subject and subordinate in all respects only to (A) the Carve-Out (as defined below) and (B) any valid, perfected and unavoidable liens permitted under the BofA Facility or the CLD Financing Facility, as applicable.    The CLD Second Priority Lien is subject and subordinate in all respects only to (A) the DIP Liens, (B) the Carve-Out, (C) the Adequate Protection Replacement Liens, (D) the Pre-Petition First Priority Liens, (E) the Pre-Petition Permitted Encumbrances and (F) any valid, perfected and unavoidable liens permitted under the CLD Financing Facility.    The obligations under the BofA Facility and the CLD Financing Facility constitute legal, valid and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the BofA  Facility or the CLD Financing Facility, as applicable (other than in respect of the stay of

enforcement arising from section 362 of the Bankruptcy Code). No setoffs, recoupments, offsets, defenses or counterclaims to any of the obligations under the BofA Facility or the CLD Financing Facility exist and no portion of the obligations or any payments made to BofA or CLD is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(vi) <u>Intercreditor Agreements</u>. The Pre-Petition Agent is party to (a) that certain Subordination Agreement, dated as of December 31, 2008 by and between the Pre-Petition Agent and BofA (the "***BofA Intercreditor Agreement***"), which governs the respective rights, obligations and priorities of the Pre-Petition Agent and BofA with respect to their relative interests in the BofA Priority Collateral and certain other matters, (b) that certain Second Amended and Restated Intercreditor Agreement, dated as of December 22, 2010 by and between the Pre-Petition Agent and CLD (the "***CLD Intercreditor Agreement***"), which governs the respective rights, obligations and priorities of the Pre-Petition Lenders and CLD with respect to their relative interests in the CLD Priority Collateral, the other assets of ABL and certain other matters, (c) that certain Second Amended and Restated Subordination Agreement, dated as of December 22, 2010 by and between the Pre-Petition Agent and Toshiba American Information Systems, Inc. ("***Toshiba***") (the "***Toshiba Subordination Agreement***"), which subordinates Toshiba's security interests in the goods sold by Toshiba to the Debtors to the Pre-Petition First Liens and (d) that certain Amended and Restated Shareholder Subordination Agreement, dated as of December 22, 2010 (the "***Shareholder Subordination Agreement***") by and between the Pre-Petition Agent, the borrowers under the Pre-Petition Credit Facility, Holdings and ABL West as Guarantors, and BDI Laguna Holdings, Inc. ("***Laguna Holdings***") as holder of the preferred

stock of Holdings, pursuant to which Laguna Holdings subordinated all of its interests and rights to payment in any assets of the Borrowers or the Guarantors to the Pre-Petition First Priority Liens. Each of the BofA Intercreditor Agreement, the CLD Intercreditor Agreement, the Toshiba Subordination Agreement and the Shareholder Subordination Agreement is a "subordination agreement" for purposes of section 510(a) of the Bankruptcy Code and is enforceable on its terms.

(vii) <u>Release of Claims</u>. Subject to the reservation of rights set forth in paragraph 9 below, each Debtor and its estate shall be deemed to have forever waived, discharged, and released the Pre-Petition Agent, the Pre-Petition Lenders, BofA and CLD, together with their respective affiliates, agents, attorneys, financial advisors, consultants, officers, directors, and employees (all of the foregoing, collectively, the "***Pre-Petition Secured Party Releasees***") of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, setoff, recoupment, or other offset rights against any and all of the Pre-Petition Secured Party Releasees, whether arising at law or in equity, with respect to the Pre-Petition Credit Obligations, the Pre-Petition First Priority Liens, the BofA First Priority Lien, the obligations owing under the BofA Facility, the CLD Security Interests and the obligations owing under the CLD Financing Facility, including (a) any recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code, or under any other similar provisions of applicable state or federal law, and (b) any right or basis to challenge or object to the amount, validity, characterization or enforceability of the Pre-Petition Credit Obligations, the obligations owing under the BofA Facility, or the obligations owing under the CLD Financing Facility, or the validity, characterization, enforceability,

priority, or non-avoidability of the Pre-Petition First Priority Liens, the BofA First Priority Lien and the CLD Security Interests.

E. **Findings Regarding the DIP Facility**.

(i) <u>Need for Post-Petition Financing</u>. The Debtors have an immediate need to obtain the DIP Facility and use Cash Collateral to, among other things, permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, and to satisfy other working capital and operational needs, and to facilitate the orderly liquidation of the Debtors' businesses through one or more sales of substantially all of the Debtors' assets. The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facility is vital to maximizing the value of the Debtors' assets and businesses for the benefit of the Debtors' creditors and parties in interest.

(ii) <u>No Credit Available on More Favorable Terms</u>. As set forth in the Motion and in the Boverman Declaration, the Debtors have been and continue to be unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Loan Documents. The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without (i) granting to the DIP Lenders the rights, remedies, privileges, benefits and protections provided herein and in the DIP Loan Documents, including the DIP Liens and the DIP Super-Priority Claims (as defined below), (ii) allowing certain of the Pre-Petition Lenders to provide the DIP Facility on the terms set forth herein and in the DIP Loan Documents (all of the foregoing described in clauses (i) and (ii) above, including the DIP Liens

and the DIP Super-Priority Claims, collectively, the "***DIP Protections***"), and (iii) providing the Pre-Petition Agent, the Pre-Petition Lenders, BofA and CLD the adequate protection more fully described in paragraphs 4 through 6 below.

(iii)  Application of Proceeds of Collateral.  As a condition to the entry into the DIP Loan Documents, the extension of credit under the DIP Facility and the authorization to use Cash Collateral and other Pre-Petition Collateral, the Debtors have agreed that, as of and commencing on the date of entry of this Interim Order, the Debtors shall apply Cash Collateral, the proceeds of Pre-Petition Collateral and the proceeds of the DIP Facility as set forth in paragraph 2 below.  Payment of the Pre-Petition Discretionary Overadvances and the Pre-Petition Credit Obligations in accordance with this Interim Order is necessary as the Pre-Petition Agent and the Pre-Petition Lenders will not otherwise consent to the use of their Cash Collateral and other Pre-Petition Collateral or the subordination of their liens to the Carve-Out and to the DIP Liens.  Such payment will not prejudice the Debtors or their estates because, among other things, payment of such amounts is subject to the rights of this Court and parties in interest under paragraph 9 of this Interim Order.

F.  **Adequate Protection for, and Good Faith of, the Pre-Petition Agent and Pre-Petition Lenders**.  The Pre-Petition Agent and Pre-Petition Lenders have negotiated in good faith regarding the Debtors' use of the Pre-Petition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses.  The Pre-Petition Agent and the Pre-Petition Lenders have agreed to permit the Debtors to use the Pre-Petition Collateral, including the Cash Collateral, subject to the terms and conditions set forth herein, including the protections afforded a party acting in "good faith" under section 364(e) of the Bankruptcy Code.  In addition, the DIP Facility contemplated hereby provides for a priming

of the Pre-Petition First Priority Liens pursuant to section 364(d) of the Bankruptcy Code. The Pre-Petition Agent and the Pre-Petition Lenders are entitled to the adequate protection as set forth herein pursuant to sections 361, 362, 363, 364 and 507(b) of the Bankruptcy Code for the diminution in value of the Pre-Petition Collateral. Based on the Motion and on the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and the use of the Cash Collateral contemplated hereby are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the Pre-Petition Agent's and Pre-Petition Lenders' consent thereto.

G. **Limited Consent**. The consent of the Pre-Petition Agent, the Pre-Petition Lenders and CLD to the priming of their liens by the DIP Liens is limited to the DIP Facility presently before this Court, with GE Capital as DIP Agent, and shall not, and shall not be deemed to, extend to any other post-petition financing or to any modified version of this DIP Facility with any party other than GE Capital as DIP Agent. Nothing in this Interim Order, including any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of any of the Pre-Petition Agent, the Pre-Petition Lenders, BofA or CLD are or will be adequately protected with respect to any non-consensual use of Cash Collateral or non-consensual priming of the Pre-Petition First Priority Liens, the BofA First Priority Lien or the CLD Security Interests.

H. **Section 552**. In light of the subordination of their liens and super-priority administrative claims (i) in the case of the DIP Lenders, to the Carve-Out, the Permitted Prior Liens, the BofA Senior Replacement Liens (as defined below) and the CLD Senior Replacement Liens (as defined below), and (ii) in the case of the Pre-Petition Lenders, the Carve-Out, the DIP

16

Liens, the Permitted Prior Liens, the BofA Senior Replacement Liens and the CLD Senior Replacement Liens, each of the DIP Lenders and the Pre-Petition Lenders is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply.

I.    **Business Judgment and Good Faith Pursuant to section 364(e)**.

(i)    The DIP Lenders have indicated a willingness to provide post-petition secured financing pursuant to the DIP Facility to the Debtors in accordance with the DIP Loan Documents and this Interim Order.

(ii)    The terms and conditions of the DIP Facility pursuant to the DIP Loan Documents and this Interim Order, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

(iii)    The DIP Facility and DIP Loan Documents were negotiated in good faith and at arm's length among the Debtors, the DIP Agent and the DIP Lenders with the assistance and counsel of their respective advisors, and all of the DIP Obligations shall be deemed to have been extended by the DIP Lenders and their affiliates for valid business purposes and uses and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Liens, the DIP Super-Priority Claims and the other DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event this Interim Order or any other order or any provision hereof or thereof is vacated, reversed, amended or modified, on appeal or otherwise.

J.     **Relief Essential; Best Interest**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2) and the Local Rules.  Absent granting the relief set forth in this Interim Order, the Debtors' businesses, assets and estates will be immediately and irreparably harmed. Consummation of the DIP Facility and authorization of the use of Cash Collateral in accordance with this Interim Order and the DIP Loan Documents is therefore in the best interests of the Debtors' estates and consistent with their fiduciary duties.

**NOW, THEREFORE**, on the Motion and the record before this Court with respect to the Motion, and with the consent or non-objection of the Debtors, the Pre-Petition Agent, the Pre-Petition Lenders, BofA, CLD, the DIP Agent and the DIP Lenders to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.     **Motion Granted**.  The Motion is granted in accordance with the terms and conditions set forth in this Interim Order and the DIP Loan Documents.  This Interim Order shall become effective immediately upon its entry.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are denied and overruled.

2.     **DIP Loan Documents and DIP Protections**.

(a)     Approval of DIP Loan Documents.  The Debtors are expressly and immediately authorized to establish the DIP Facility, to execute, deliver and perform under the DIP Loan Documents and to incur the DIP Obligations (as defined below) in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and to execute, deliver and perform under all other instruments, certificates, agreements and documents which

may be required or necessary for the performance by the applicable Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in, and provided for by, this Interim Order and the DIP Loan Documents. The Debtors are hereby authorized, and, upon execution of the DIP Credit Agreement, directed, to do and perform all acts and pay the principal, interest, fees, expenses and other amounts described in the DIP Loan Documents as such become due pursuant to the DIP Loan Documents and this Interim Order, including all closing fees, administrative fees, letter of credit fees, commitment fees and reasonable attorneys', financial advisors', and accountants' fees, and disbursements arising under the DIP Loan Documents and this Interim Order, which amounts shall not be subject to further approval of this Court and shall be non-refundable; provided, however, that the payment of the fees and expenses of the Lender Professionals (as defined below) incurred after the Closing Date shall be subject to the provisions of paragraph 23(a). Upon their execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the applicable Debtors enforceable against such Debtors in accordance with their terms. Each Responsible Officer of a Debtor acting singly is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive of their respective authority to act in the name of and on behalf of the Debtors.

(b)     DIP Obligations.   For purposes of this Interim Order, the term "*DIP Obligations*" shall mean all amounts owing under the DIP Credit Agreement and other DIP Loan Documents (including all "Obligations" as defined in the DIP Credit Agreement and letters of credit outstanding under the Pre-Petition Credit Facility as of the Petition Date, which letters of credit shall be deemed issued under the DIP Facility) and shall include the principal of, interest on and fees, costs, expenses and other charges owing in respect of, such amounts (including any

reasonable attorneys', accountants', financial advisors' and other fees, costs and expenses that are chargeable or reimbursable under the DIP Loan Documents), and any obligations in respect of indemnity and reimbursement claims, whether contingent or otherwise.

(c)     _Authorization to Incur DIP Obligations_.   To enable the Debtors to continue to operate their businesses, during the period from the entry of this Interim Order through and including the date of entry of the Final Order (the "***Interim Period***"), subject to the terms and conditions of this Interim Order, the DIP Loan Documents and the Approved Budget, the Debtors are hereby authorized to borrow under and pursuant to the terms of the DIP Facility in an aggregate outstanding principal amount not to exceed $50,000,000.  All DIP Obligations shall be unconditionally guaranteed by the Guarantors, as further provided in the DIP Loan Documents.  Following the expiration of the Interim Period, the Debtors' authority to request further borrowings under the DIP Facility and use further Cash Collateral will be governed by the terms of the Final Order (if entered) and the DIP Loan Documents.

(d)     _Approved Budget_.  Attached hereto as _Exhibit A_ is an 8-week cash flow budget (as such budget may be subsequently amended, modified or supplemented with the approval of the DIP Agent and the DIP Lenders pursuant to the DIP Credit Agreement, the "***Initial Approved Budget***") which reflects, on a line-item basis, the Debtors' projected cash receipts and disbursements, unused availability under the DIP Facility and unrestricted cash on hand.  For the ninth week of the Cases, the Debtors shall deliver to the DIP Agent a 13-week cash flow budget in form and substance acceptable to the DIP Agent and the DIP Lenders (the "***Interim Approved Budget***") without further notice, motion or application to, order of, or hearing before this Court, supplementing and replacing the Initial Approved Budget commencing from the end of the eighth week through and including thirteen weeks thereafter; _provided_ that

unless and until the DIP Agent and the DIP Lenders have approved such Interim Approved Budget, the Debtors shall still be subject to and be governed by the terms of the Initial Approved Budget and none of the DIP Agent, Pre-Petition Agent, DIP Lenders and Pre-Petition Lenders shall have any obligation to fund to such 13-week budget or permit the use of Cash Collateral with respect thereto. On a weekly basis thereafter, the Debtors shall deliver to the DIP Agent an updated "rolling" 13-week cash flow budget in form and substance satisfactory to the DIP Agent and the DIP Lenders (each such updated budget, a "**Supplemental Approved Budget**") without further notice, motion or application to, order of, or hearing before this Court, supplementing and replacing the Interim Approved Budget or a Supplemental Approved Budget, as applicable, then in effect commencing from the end of the previous week through and including thirteen weeks thereafter; provided that unless and until the DIP Agent and the DIP Lenders have approved of such updated budget, the Debtors shall still be subject to and be governed by the terms of the Interim Approved Budget or Supplemental Approved Budget, as applicable, then in effect and none of the DIP Agent, Pre-Petition Agent, DIP Lenders and Pre-Petition Lenders shall have any obligation to fund to such updated "rolling budget" or permit the use of Cash Collateral with respect thereto. The aggregate, without duplication, of all items in the Initial Approved Budget, the Interim Approved Budget and any Supplemental Approved Budgets shall constitute an "**Approved Budget**."

(e)     Interest, Fees, Costs and Expenses. The DIP Obligations shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Interim Order and the DIP Loan Documents, in each case without further notice, motion or application to, order of, or hearing before, this Court. Subject to the provisions of paragraph 23(a) of this Order, as applicable, the Debtors shall pay all fees, costs,

expenses (including reasonable and documented legal and other professional fees and expenses of the DIP Agent) and other charges payable under the terms of the DIP Loan Documents without regard to the amounts set forth with respect thereto in the Approved Budget. All such fees, costs, expenses and disbursements, whether incurred, paid or required to be paid pre-petition or post-petition, are hereby affirmed, ratified, authorized and payable (and any funds held by the DIP Agent and/or its professionals as of the Petition Date for payment of such fees, costs, expenses and disbursements may be applied for payment) as contemplated in this Interim Order and the DIP Loan Documents filed with the Court, and shall be non-refundable.

(f) <u>Use of DIP Facility Proceeds</u>. Subject to the terms and conditions contained in this Interim Order and the DIP Loan Documents, from and after the Petition Date, the Debtors are authorized to use borrowings under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Loan Documents and subject to and in accordance with the Approved Budget. Prior to entry of the Final Order, the Debtors shall be permitted to use the proceeds of the DIP Facility solely (i) to repay the Pre-Petition Discretionary Overadvances until all such Pre-Petition Discretionary Overadvances shall be indefeasibly paid in full in cash, (ii) as provided in the motions, orders and requests for relief filed by the Debtors during the Cases (including such motions, orders and requests for relief filed on the Petition Date), each of which shall be in form and substance acceptable to the DIP Agent prior to the request for such relief and (iii) as otherwise provided in this Interim Order or in the DIP Loan Documents and subject to, and in accordance with, the Approved Budget. Upon entry of the Final Order, the Debtors shall be permitted to use the proceeds of the DIP Facility solely (i) to repay any Pre-Petition Credit Obligations that remain outstanding on the date of entry of the Final Order until all such Pre-Petition Credit Obligations have been indefeasibly repaid in full in

cash and (ii) to fund the Cases and the businesses of the Debtors, subject to, and in accordance with, the Final Order, the DIP Loan Documents and the Approved Budget.

(g)     <u>Application of Collateral Proceeds</u>.  Subject to the Carve-Out, and as a condition to the entry into the DIP Loan Documents, the extension of credit under the DIP Facility and the authorization to use Cash Collateral, the Debtors have agreed that proceeds of Pre-Petition Collateral, any amounts held or collected on account of Pre-Petition Collateral, and all payments and collections received by the Debtors on account of business activities conducted by the Debtors prior to the Petition Date shall be applied as follows:

(i)     Prior to the Termination Declaration Date, <u>first</u>, to repay the Pre-Petition Credit Obligations on a dollar-for-dollar basis until the Pre-Petition Credit Obligations are indefeasibly paid in full in cash and <u>second</u>, to reduce the DIP Obligations then due and owing in accordance with the DIP Loan Documents and this Interim Order.

(ii)     Upon the occurrence of the Termination Declaration Date, and at all times upon receipt of payments in connection with a sale or disposition of DIP Collateral outside the ordinary course of business:  <u>first</u>, to permanently reduce the DIP Obligations and all other obligations owing to the DIP Agent and/or the DIP Lenders until indefeasibly paid in full in cash and cash collateralize, obtain back to back and/or cancel all outstanding letters of credit issued or deemed issued under the DIP Loan Documents in accordance with the DIP Loan Documents and this Interim Order; <u>second</u>, to permanently reduce the Pre-Petition Credit Obligations until indefeasibly paid in full in cash, and, <u>third</u>, to the Debtors' estates.  Following the Termination Declaration Date prior to application of proceeds in the immediately preceding sentence funds sufficient to fund the Carve-Out shall first be wired to the Debtors.  The Debtors shall hold these funds in an interest-bearing account in trust for the benefit of parties claiming under the Carve-Out, and upon satisfaction of all such claims any remaining funds shall be returned to the DIP Agent for application in accordance with this paragraph 2(g).

For the avoidance of doubt, to the extent any application of Pre-Petition Collateral, any amounts held or collected on account of Pre-Petition Collateral, and all payments and collections received by the Debtors on account of business activities conducted by the Debtors prior to the Petition Date to the Pre-Petition Discretionary Overadvances or the Pre-Petition Credit Obligations is avoided, disallowed, set aside or otherwise invalidated, in whole or in part, in any judicial

proceeding or otherwise, then such Pre-Petition Discretionary Overadvances or Pre-Petition Credit Obligations shall be reinstated in full force and effect and all guarantees and security in respect thereof shall be restored.

(h)     Conditions Precedent.  The DIP Lenders shall have no obligation to make any DIP Loan during the Interim Period unless and until all conditions precedent to the making of any such DIP Loan under the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the DIP Agent and/or the Requisite Lenders in accordance with the DIP Loan Documents and this Interim Order.

(i)     DIP Liens.  As security for the DIP Obligations, the following security interests and liens, which shall, immediately and without any further action, be valid, binding, permanent, fully perfected, continuing, enforceable and non-avoidable upon the date the Court enters this Interim Order (the "*DIP Liens*"), are hereby granted by the Debtors to the DIP Agent for its own benefit and the ratable benefit of the DIP Lenders on substantially all of the property of the Debtors, now existing or hereinafter acquired, including all Cash Collateral, cash and cash equivalents (whether maintained with the DIP Agent or otherwise), and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title**,** letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock of subsidiaries, tax and other refunds, insurance proceeds, commercial tort claims, rights under section 506(c) of the Bankruptcy Code (solely

upon entry of the Final Order), Avoidance Action Proceeds (solely upon entry of the Final

Order), all other collateral and all other "property of the estate" (within the meaning of the

Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible or mixed, and all

rents, products, substitutions, accessions, profits, replacements and cash and non-cash proceeds

of all of the foregoing (all of the foregoing collateral collectively referred to as the "***DIP***

***Collateral***," and together with the Pre-Petition Collateral, the "***Collateral***,"):

> (I)      pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, binding, continuing, enforceable and non-avoidable first priority Lien on all unencumbered DIP Collateral, including proceeds of Avoidance Actions, provided, however, that proceeds of Avoidance Actions shall be the last DIP Collateral used to repay the DIP Obligations;

> (II)     pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected, binding, continuing, enforceable and non-avoidable junior Lien on all DIP Collateral that is subject to the BofA Senior Replacement Liens, the CLD Senior Replacement Liens and any Permitted Prior Lien (whether existing immediately prior to the Petition Date or perfected on or after the Petition Date pursuant to section 546(b) of the Bankruptcy Code);

> (III)    pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected, binding, continuing, enforceable and non-avoidable first priority senior priming Lien on all DIP Collateral of the Debtors (including Cash Collateral) that is senior in all respects to (x) the Pre-Petition First Priority Liens and (y) except for the Permitted Prior Liens, any other liens in favor of any other person or entity, including all Liens junior to the Pre-Petition First Priority Liens (the "***Primed Liens***"), which Primed Liens, together with any Liens granted on or after the Petition Date to provide adequate protection in respect of any of the Primed Liens, shall be primed by and made subject and subordinate to the DIP Liens; provided, however, that the Liens described in this clause (III) shall be subject and subordinate to the Carve-Out and the Permitted Prior Liens.

> (j)      DIP Lien Priority.  Notwithstanding anything to the contrary contained in

this Interim Order or the other DIP Loan Documents, for the avoidance of doubt, the DIP Liens

granted to the DIP Agent for the ratable benefit of the DIP Lenders shall in each and every case

be first priority senior Liens that (i) are subject only to the BofA Senior Replacement Liens, the

CLD Senior Replacement Liens, the Permitted Prior Liens and, to the extent provided in the

provisions of this Interim Order and the DIP Loan Documents, shall also be subject to the Carve-

Out, and (ii) except as provided in clause (i) of this paragraph 2(j), are senior to all pre-petition and post-petition Liens of any other person or entity (including the Primed Liens and the Adequate Protection Replacement Liens (as defined below)).  The DIP Liens and the DIP Super-Priority Claims (as defined below) (A) shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with any intercompany or affiliate Liens of the Debtors, and (C) shall be valid and enforceable against any trustee or any other estate representative appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "***Successor Case***"), and/or upon the dismissal of any of the Cases.  Except as otherwise expressly permitted by this Interim Order or the DIP Loan Documents, no claim or Lien having a priority superior to or *pari passu* with those granted by this Interim Order with respect to the DIP Obligations shall be granted or allowed until (x) all DIP Obligations have been indefeasibly paid in full in cash and (y) all commitments under the DIP Loan Documents have been irrevocably terminated.

(k)    Enforceable Obligations.  The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the applicable Debtors, which DIP Obligations shall be enforceable against such Debtors, their estates and any successors thereto (including any trustee or other estate representative in any Successor Case), and their creditors, in accordance with their terms.  No obligation, payment, transfer or grant of security under the DIP Credit Agreement, the other DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, 547, 548 or 549 of the Bankruptcy Code or

under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise) counterclaim, cross-claim, defense or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

(l)     Super-Priority Administrative Claim Status.  In addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, all of the DIP Obligations shall constitute allowed super-priority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve-Out, over all other administrative expense claims, adequate protection and other diminution claims (including the First Lien Super-Priority Claims (as defined below)), unsecured claims and all other claims against the applicable Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503, 506(c) (subject to the entry of the Final Order), 507, 546, 726, 1113 and 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment (the "***DIP Super-Priority Claims***").  The DIP Super-Priority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof.  Other than as provided in the DIP Credit Agreement and this Interim Order with respect to the Carve-Out, no costs or expenses of administration, including professional fees allowed and payable under

sections 328, 330, 331 and 503 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no administrative priority claims or other priority claims are, or will be, senior to, prior to or *pari passu* with the DIP Liens and the DIP Super-Priority Claims or the DIP Obligations, or with any other claims of the DIP Lenders arising hereunder.

3.     **Authorization to Use Cash Collateral**.  Subject to the terms and conditions of this Interim Order, the Debtors are authorized, pursuant to section 363 of the Bankruptcy Code, to use the Cash Collateral for a period of time from the date hereof until the earliest to occur of (i) the termination of the commitments under the DIP Facility or the acceleration of the DIP Obligations as set forth in the DIP Credit Agreement, (ii) the date that this Interim Order ceases to be in full force and effect, (iii) immediately upon delivery of written notice to the Debtors by the DIP Agent of any breach or default by the Debtors of the terms and provisions of this Interim Order, which breach or default has not been cured by the Debtors or waived in a manner consistent with the terms and conditions of the DIP Credit Agreement; (iv) immediately upon delivery of written notice to the Debtors by the DIP Agent of an Event of Default under the DIP Credit Agreement, which Event of Default has not been cured by the Debtors or waived in a manner consistent with the terms and conditions of the DIP Credit Agreement; (v) the conversion of any of the Cases to a chapter 7 case; or (vi) appointment of a trustee or examiner with expanded powers.  Each Debtor shall be prohibited from using Cash Collateral except in accordance with the terms and conditions of this Interim Order, the DIP Loan Documents and the Approved Budget, and nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside of the ordinary course of business or any Debtor's use of

any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the Final Order or the DIP Loan Documents.

4.      **Adequate Protection for Pre-Petition Lenders**.  In consideration for the use of Cash Collateral, the consent of the Pre-Petition Lenders to the entry of this Interim Order and the priming of the Pre-Petition Lenders' liens, claims and interests in the Pre-Petition Collateral (including Cash Collateral) from and after the Petition Date, the Pre-Petition Lenders collectively shall receive the following adequate protection (collectively, the "***First Lien Adequate Protection***"):

(a)      Replacement Liens.  To the extent of any diminution in value of the pre-petition interests of the Pre-Petition Lenders in the Pre-Petition Collateral, the Pre-Petition Lenders are hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e) and 364 of the Bankruptcy Code, replacement Liens upon all of the DIP Collateral (the "***First Lien Replacement Liens***"), which First Lien Replacement Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Permitted Prior Liens, the BofA Senior Replacement Liens, the CLD Senior Replacement Liens, and the Carve-Out, to the extent expressly provided in the DIP Loan Documents and this Interim Order.

(b)      Super-Priority Claims.  To the extent of any diminution in value of the pre-petition interests of the Pre-Petition Lenders in the Pre-Petition Collateral, the Pre-Petition Lenders are hereby granted allowed super-priority administrative claims (such adequate protection super-priority claims, the "***First Lien Super-Priority Claims***"), pursuant to section 507(b) of the Bankruptcy Code, junior only to the DIP Super-Priority Claims and the Carve-Out to the extent provided herein and in the DIP Loan Documents and payable from and having recourse to all of the DIP Collateral; provided, however, that the Pre-Petition Lenders shall not

receive or retain any payments, property or other amounts in respect of the First Lien Super-Priority Claims unless and until (x) all DIP Obligations have been indefeasibly paid in full in cash and (y) all credit commitments under the DIP Loan Documents have been irrevocably terminated. Subject to the relative priorities set forth above, the First Lien Super-Priority Claims against each Debtor shall be against each Debtor on a joint and several basis.

(c) <u>Professional Fees</u>. Without limiting any rights of the Pre-Petition Agent and the Pre-Petition Lenders under section 506(b) of the Bankruptcy Code which are hereby preserved, the Pre-Petition Agent and Pre-Petition Lenders shall receive current cash payment of fees and expenses due from time to time under the Pre-Petition Credit Agreement, including the reimbursement of reasonable fees and expenses of counsel, financial advisors and other professionals of the Pre-Petition Agent, without regard to the amounts set forth with respect thereto in the Approved Budget. Except as set forth in paragraph 23 below, none of the fees, costs and expenses incurred by professionals engaged by the Pre-Petition Agent and the Pre-Petition Lenders shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.

(d) <u>Interest Payments</u>. The Pre-Petition Agent and Pre-Petition Lenders shall receive current cash payment of interest due under the Pre-Petition Credit Agreement, in arrears on the first business day of each month at the default rate of interest as set forth in the Pre-Petition Credit Agreement.

(e) <u>Current Payment of Proceeds from Pre-Petition Collateral</u>. As additional adequate protection, all proceeds from Pre-Petition Collateral, any amounts held or collected on account of Pre-Petition Collateral, and all payments and collections received by the Debtor on

account of business activities conducted by the Debtors prior to the Petition Date shall be applied as set forth in paragraph 2(g) of this Interim Order.

(f) _Right to Seek Additional Adequate Protection_. Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Pre-Petition Lenders. However, the Pre-Petition Agent and/or any Pre-Petition Lender may request Court approval for additional or alternative adequate protection, without prejudice to any objection of the Debtors or any other party in interest to the grant of any additional or alternative adequate protection; _provided_ that any such additional or alternative adequate protection shall at all times be subordinate and junior to the claims and Liens of the DIP Lenders granted under this Interim Order and the DIP Loan Documents.

5. **Adequate Protection for BofA**. In consideration for the consent of BofA to the entry of this Interim Order and the Debtors' use of Cash Collateral, BofA shall receive the following adequate protection (collectively referred to as the "***BofA Adequate Protection***"):

(a) _Payments from BofA Priority Collateral_. After entry of this Interim Order, BofA will be entitled to receive all proceeds of the BofA Priority Collateral, which proceeds shall be applied to the BofA Facility until the BofA Facility is repaid in full.

(b) _BofA Replacement Liens_. To the extent of any diminution in value of BofA's pre-petition interest in the BofA Priority Collateral, BofA is hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e) and 364 of the Bankruptcy Code, replacement Liens on the BofA Priority Collateral (the "***BofA Senior Replacement Liens***"), which shall be subject only to the Carve-Out and senior to the DIP Liens,

the First Lien Replacement Liens and the Pre-Petition First Priority Liens, solely in respect of the BofA Priority Collateral.

(c)     Additional Adequate Protection and BofA Intercreditor Agreement.  BofA shall be entitled to seek approval for additional or alternative adequate protection, without prejudice to any objection of the Debtors or any other party in interest to the grant of any additional or alternative adequate protection; provided that the rights of BofA shall at all times be subject to the terms and conditions of the BofA Intercreditor Agreement, which shall remain in full force and effect.  Any and all funds or other consideration received under the BofA Facility shall be governed by the terms of the BofA Intercreditor Agreement.

6.     **Adequate Protection for CLD**.  In consideration for the entry of this Interim Order, the priming of the CLD Second Priority Lien and the consent of CLD to the Debtors' use of Cash Collateral, CLD shall receive the following adequate protection (collectively, the "***CLD Adequate Protection***," and, together with the First Lien Adequate Protection and the BofA Adequate Protection, the "***Adequate Protection***"):

(a)     Payments from CLD Priority Collateral.  CLD will be entitled to receive all proceeds of the CLD Priority Collateral, which proceeds shall be applied to the CLD Financing Facility until the CLD Financing Facility is repaid in full.

(b)     CLD Replacement Liens.  To the extent of any diminution in value of CLD's pre-petition interest in the CLD Priority Collateral and in the assets of ABL, CLD is hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e) and 364 of the Bankruptcy Code, (i) replacement liens on the CLD Priority Collateral (the "***CLD Senior Replacement Liens***"), which shall be subject only to the Carve-Out and senior to the DIP Liens, the First Lien Replacement Liens and the Pre-Petition First Priority Liens solely

in respect of the CLD Priority Collateral and (ii) replacement liens on all of the assets of ABL, which shall be subject and subordinate only to the DIP Liens, the First Lien Replacement Liens, the Pre-Petition First Priority Liens, the Carve-Out, and any Pre-Petition Permitted Encumbrances (the "*CLD Junior Replacement Liens*," and, together with the First Lien Replacement Lien, the BofA Senior Replacement Liens and the CLD Senior Replacement Liens, the "*Adequate Protection Replacement Liens*").

(c)     Additional Adequate Protection and CLD Intercreditor Agreement.  CLD shall be entitled to seek approval for additional or alternative adequate protection, without prejudice to any objection of the Debtors or any other party in interest to the grant of any additional or alternative adequate protection; provided that the rights of CLD shall at all times be subject to the terms and conditions of the CLD Intercreditor Agreement, which shall remain in full force and effect.  Any and all funds or other consideration received under the CLD Financing Facility shall be governed by the terms of the CLD Intercreditor Agreement.

7.     **Consent to Priming and Adequate Protection**.  The Pre-Petition Agent, the Pre-Petition Lenders, BofA and CLD consent and/or do not object to the Adequate Protection and the priming provided for herein; provided, however, that such consent of the Pre-Petition Agent and the Pre-Petition Lenders to the priming of their Pre-Petition First Priority Liens, the use of Cash Collateral, and the sufficiency of the Adequate Protection provided for herein is expressly conditioned upon the entry of this Interim Order and such consent shall not be deemed to extend to any other replacement financing or debtor-in-possession financing other than the DIP Facility provided under the DIP Loan Documents.

8.     **Automatic Post-Petition Lien Perfection**.  This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection and priority of the DIP Liens

and the Adequate Protection Replacement Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or (b) taking any other action to validate or perfect the DIP Liens and the Adequate Protection Replacement Liens or to entitle the DIP Liens and the Adequate Protection Replacement Liens to the priorities granted herein. Notwithstanding the foregoing, each of the DIP Agent, the Pre-Petition Agent, BofA and CLD (in the case of the Pre-Petition Agent, BofA and CLD, solely with respect to the Adequate Protection Replacement Liens) may, each in their sole discretion, file financing statements, mortgages, security agreements, notices of Liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time and on the Petition Date. The applicable Debtors shall execute and deliver to the DIP Agent, the Pre-Petition Agent, BofA and CLD, as applicable, all such financing statements, mortgages, notices and other documents as such parties may reasonably request to evidence and confirm the contemplated priority of, the DIP Liens and the Adequate Protection Replacement Liens, as applicable, granted pursuant hereto. Without limiting the foregoing, each of the DIP Agent, the Pre-Petition Agent, BofA and CLD, each in its discretion, may file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order.  Subject to the entry of the Final Order, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational

document, or other instrument or agreement that requires the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the Liens on such leasehold interests or other applicable Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Lenders in accordance with the terms of the DIP Loan Documents and this Interim Order. To the extent that the Pre-Petition Agent is the secured party under any account control agreements, listed as loss payee under any of the Debtors' insurance policies or is the secured party under any Pre-Petition Credit Document, the DIP Agent shall also be deemed to be the secured party under such account control agreements, loss payee under the Debtors' insurance policies and the secured party under each such Pre-Petition Credit Document, shall have all rights and powers attendant to that position (including rights of enforcement) and shall act in that capacity and distribute any proceeds recovered or received in accordance with the DIP Loan Documents and this Interim Order. The Pre-Petition Agent shall serve as agent for the DIP Agent for purposes of perfecting their respective Liens on all DIP Collateral that is of a type such that perfection of a Lien therein may be accomplished only by possession or control by a secured party.

9. **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**.

(a) The Debtors' Stipulations shall be binding upon the Debtors in all circumstances. The Debtors' Stipulations shall be binding upon all other parties in interest, including any Committee, unless (a) on or before the earliest of (A) 75 days after entry of the

Interim Order, (B) 60 days after the formation of a Committee and (C) three (3) days prior to the date of the hearing to approve any sale of the Debtors' assets under section 363 of the Bankruptcy Code or otherwise (such time period shall be referred to as the "***Challenge Period***," and the date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period, shall be referred to as the "***Challenge Period Termination Date***"), such Committee or other party in interest other than the Debtors obtains the authority to commence and commences, or a chapter 7 trustee commences in any Successor Case, prior to the expiration of the Challenge Period (as defined below), a contested matter or adversary proceeding (x) challenging or otherwise objecting to any part of the Debtors' Stipulations, or (y) against any or all of the Pre-Petition Agent and/or the Pre-Petition Lenders challenging any aspect of the Pre-Petition Indebtedness, or the actions or inactions of any of the Pre-Petition Agent or the Pre-Petition Lenders arising out of or related to the Pre-Petition Indebtedness, including any claim against the Pre-Petition Agent or any Pre-Petition Lender in the nature of "lender liability" causes of action, setoff, avoidance, counterclaim or defense to the Pre-Petition Indebtedness (including but not limited to those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against the Pre-Petition Agent or any Pre-Petition Lender) (the objections, challenges, actions and claims referenced in clauses (x) and (y), collectively, the "***Claims and Defenses***") and (b) this Court rules in favor of the plaintiff in any such timely and properly commenced contested matter or adversary proceeding; <u>provided</u>, that as to the Debtors, for themselves and not their estates, all such Claims and Defenses are irrevocably waived and relinquished as of the Petition Date. Until the Challenge Period Termination Date, any party in interest, including the Committee, may assert any Claims and Defenses. If no Claims and Defenses have been timely

asserted in any such adversary proceeding or contested matter, then, upon the Challenge Period Termination Date, and for all purposes in these Cases and any Successor Case, (i) no payments made to the Pre-Petition Agent and the Pre-Petition Lenders pursuant to this Interim Order or otherwise shall be subject to counterclaim, set-off, subordination, recharacterization, defense or avoidance, (ii) any and all such Claims and Defenses by any party in interest shall be deemed to be forever released, waived and barred, (iii) the Pre-Petition Indebtedness shall be deemed to be an allowed claim, and (iv) the Debtors' Stipulations, including the release provisions therein, shall be binding on all creditors and parties in interest, including any Committee and any subsequent trustee of the Debtors' estates in these Cases or in any Successor Case. Notwithstanding the foregoing, to the extent any Claims and Defenses are timely asserted in any such adversary proceeding or contested matter, (i) the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any party in interest, including any Committee or any subsequent trustee of the Debtors' estates in these Cases or in any Successor Case from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such adversary proceeding or contested matter, and (ii) any portion of the Debtors' Stipulations or other provision in clauses (i) through (iv) in the immediately preceding sentence that is the subject of a timely filed Claim and Defense shall become binding and preclusive on any Committee (and any subsequent trustee of the Debtors' estates in these Cases or any Successor Case) and or any other party in interest to the extent set forth in any order of the Court resolving such Claim and Defense. Nothing in this Interim Order vests or confers on any person or entity, including any Committee, standing or authority to pursue any

cause of action belonging to any or all of the Debtors or their estates, including any Claim and Defense or other claim against the Pre-Petition Agent, the DIP Agent, any Pre-Petition Lender or any DIP Lender, and the Pre-Petition Agent, the DIP Agent, Pre-Petition Lenders and DIP Lenders reserve all rights to challenge and object to such standing or authority.

(b)     The Court reserves the right, after notice and a hearing, to unwind any payments made to the Pre-Petition Agent or the Pre-Petition Lenders in the event that (i) any Claims or Defenses brought within the Challenge Period are found to have successfully challenged the validity, enforceability, extent, perfection or priority of any of the Pre-Petition Agent's or the Pre-Petition Lenders' claims and/or Liens or (ii) a determination is made that the claims of the Pre-Petition Agent and the Pre-Petition Lenders in respect of the Pre-Petition Indebtedness were undersecured as of the Petition Date and the payments made on account of the Pre-Petition Indebtedness after the Petition Date unduly advantaged the Pre-Petition Agent and the Pre-Petition Lenders.  For the avoidance of doubt, to the extent the Court unwinds any payments to the Pre-Petition Agent or the Pre-Petition Lenders as set forth in the preceding sentence, then the Pre-Petition Credit Obligations in respect of which such payments were made shall be reinstated in full force and effect and all guarantees and security in respect thereof shall be restored.

10.     **Carve-Out**.  Subject to the terms and conditions contained in this paragraph 10, each of the DIP Liens, DIP Super-Priority Claims, Pre-Petition First Priority Liens, BofA First Priority Lien, CLD Security Interests, Adequate Protection Replacement Liens and First Lien Super-Priority Claims shall be subject and subordinate in all respects to payment of the Carve-Out (as defined below):

(a)     For purposes of this Interim Order, "***Carve-Out***" means an amount equal to (i) the unpaid fees and expenses of retained professionals of the Debtors (the "***Debtor Professionals***," and such fees, the "***Debtor Professional Fees***") incurred before the delivery of a Carve-Out Trigger Notice (as defined below) that are ultimately allowed by final order of the Court (whether such Debtor Professional Fees are allowed before or after the delivery of a Carve-Out Trigger Notice), but solely to the extent the same are incurred in accordance with Schedule 1 to the Approved Budget on a cumulative basis with respect to each Debtor Professional, (ii) the amount of unpaid fees and expenses of professionals retained by the Committee (the "***Committee Professionals***," and such fees, the "***Committee Professional Fees***") incurred before the delivery of a Carve-Out Trigger Notice that are ultimately allowed by final order of the Court (whether such Committee Professional Fees are allowed before or after the delivery of a Carve-Out Trigger Notice), but solely to the extent the same are incurred in accordance with Schedule 1 to the Approved Budget on an cumulative basis with respect to each Committee Professional, (iii) all allowed and unpaid Debtor Professional Fees and Committee Professional Fees that are incurred from and after the delivery of a Carve-Out Trigger Notice in an aggregate amount not in excess of $500,000, (iv) all fees payable pursuant to 28 U.S.C. § 1930(a) and (v) all fees due the Clerk of the Court.  The amount set forth in clause (iii) in the preceding sentence is referred to herein as the "***Carve-Out Cap***."  Following the delivery of a Carve-Out Trigger Notice, the Debtor Professional Fees and the Committee Professional Fees shall be paid <u>first</u> from retainers held by such professionals, which shall reduce the Carve-Out Cap on a dollar-for-dollar basis before such Debtor Professional Fees and Committee Professional Fees may be paid from encumbered funds.

(b)     The term "***Carve-Out Trigger Notice***" shall mean a written notice delivered by the DIP Agent to the Debtors' lead counsel, the U.S. Trustee, and lead counsel to any Committee appointed in these Cases, which notice may be delivered at any time following the occurrence and during the continuation of any Event of Default under the DIP Loan Documents or this Interim Order, expressly stating that the Carve-Out is invoked.

(c)     So long as no Carve-Out Trigger Notice has been delivered to the Debtors, the Debtors are authorized to use advances under the DIP Facility, subject to the DIP Loan Documents and this Interim Order and in accordance with and limited to the amounts set forth on Schedule 1 to the Approved Budget, on a cumulative basis by Debtor Professional or Committee Professional, as applicable, to pay such compensation and expense reimbursements of the Debtor Professionals and the Committee Professionals as may be awarded by the Court.

(d)     The DIP Agent shall be entitled to establish and maintain reserves against borrowing availability under the DIP Facility on account of the Carve-Out in accordance with the terms of the DIP Credit Agreement.

(e)     No portion of the Carve-Out, DIP Collateral, Pre-Petition Collateral, Cash Collateral or any proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of, (i) the Liens or claims of any or all of DIP Agent and/or the DIP Lenders, or the initiation or prosecution of any claim or cause of action against any or all of DIP Agent or the DIP Lenders, including any claim under Chapter 5 of the Bankruptcy Code or (ii) any claims or causes of actions (including any claims or causes of action under Chapter 5 of the Bankruptcy Code) against any or all of the Pre-Petition Agent and the Pre-Petition Lenders, their respective affiliates, agents, attorneys, financial advisors, consultants, officers, directors and employees, including formal discovery

proceedings in anticipation thereof, and/or challenging any Lien or claim of any or all of the Pre-Petition Agent and the Pre-Petition Lenders, or asserting any other lender liability or other claim or cause of action against any of the Pre-Petition Agent and the Pre-Petition Lenders. The foregoing notwithstanding, no more than $25,000, in the aggregate, of the Carve-Out, DIP Collateral, Pre-Petition Collateral, Cash Collateral  or any proceeds of the DIP Facility may be used by the Committee, or any representative of the estate, to investigate the claims and liens of the Pre-Petition Agent, the Pre-Petition Lenders or any other agents and lenders under the Pre-Petition Credit Agreement.

(f)     Furthermore, none of the Carve-Out, DIP Collateral, Pre-Petition Collateral, Cash Collateral or any proceeds of the DIP Facility shall be used to prevent, hinder or delay the DIP Lenders or the DIP Agent from enforcing or realizing upon the DIP Collateral once a Default or Event of Default has been determined by the Court to have occurred and to be continuing under the DIP Loan Documents or this Interim Order.  For the avoidance of doubt, the foregoing shall not operate to prevent the payment of the Debtor Professional Fees to the extent otherwise payable in accordance with the terms of the DIP Loan Documents and the Approved Budget.

(g)     Nothing herein shall be construed as consent to the allowance of any Debtor Professional Fees, Committee Professional Fees or the professional fees or expenses of any unofficial committee or any other party in interest, or shall affect the right of the DIP Agent, any DIP Lender, the Pre-Petition Agent or any Pre-Petition Lender to object to the allowance and payment of such fees and expenses.

(h)     The DIP Agent, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Lenders, BofA and CLD shall not be responsible for the direct payment or reimbursement of any

Debtor Professional Fees or Committee Professional Fees incurred in these Cases or any Successor Case. Nothing in this Interim Order or otherwise shall be construed (i) to obligate the DIP Agent, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Lenders, BofA or CLD in any way to pay compensation or to reimburse expenses of any of the Debtor Professionals or the Committee Professionals or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; (ii) to increase the Carve-Out if the actual Debtor Professional Fees or Committee Professional Fees are higher than reflected in the Approved Budget; or (iii) as consent to the allowance of any Debtor Professional Fees or Committee Professional Fees. Any funding of the Carve-Out shall be added to and made a part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.

11. **Credit Bid**. The Pre-Petition Agent shall have the unqualified right to credit bid up to the full amount of any Pre-Petition Indebtedness in any sale of the Pre-Petition Collateral, under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code. The Debtors, on behalf of themselves and their estates, stipulate and agree that any sale of all or part of the Collateral that does not include an unqualified right to credit bid up to the full amount of the Pre-Petition Indebtedness would mean that the Pre-Petition Agent and the Pre-Petition Lenders will not receive the indubitable equivalent of their claims and interests.

12. **DIP Credit Bid.** The DIP Agent shall have the unqualified right to credit bid the DIP Obligations under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or

disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code.

13.     **Waiver of Section 506(c) Claims**.  Subject to the entry of the Final Order, as a further condition of the DIP Facility, any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Loan Documents (and their consent to the payment of the Carve-Out to the extent provided herein) and the consent of the Pre-Petition Lenders to the Debtors' use of Cash Collateral as provided herein, no costs or expenses of administration of the Cases or any Successor Case shall be charged against or recovered from or against any or all of the DIP Lenders, the Pre-Petition Lenders, the DIP Collateral, the Pre-Petition Collateral, and the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Agent or the Pre-Petition Agent, as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Lenders and the Pre-Petition Lenders.

14.     **Discharge Waiver**.  The Debtors expressly stipulate, and the Court finds and adjudicates that, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of sections 524 and/or 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash on or before the effective date of a confirmed plan of reorganization.  The Debtors shall not support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full in cash, on the effective date of such plan of reorganization or such sale, of all DIP Obligations and the cancellation, backing or cash collateralization of all letters of credit issued or deemed issued under the DIP Loan Documents.

15.    **Protection of DIP Lenders' Rights**.

(a)    Unless the DIP Agent and the Requisite Lenders shall have provided their prior written consent or all DIP Obligations have been indefeasibly paid in full in cash, there shall not be entered in these proceedings or in any Successor Case any order which authorizes (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral or that is entitled to administrative priority status, in each case which is superior to or *pari passu* with the DIP Liens, DIP Super-Priority Claims and other DIP Protections granted pursuant to this Interim Order; or (ii) the use of DIP proceeds for any purpose other than as permitted in accordance with the Approved Budget, the DIP Loan Documents and this Interim Order.

(b)    The Debtors (and/or their legal and financial advisors in the case of clauses (ii) through (iv) below) will (i) maintain books, records and accounts to the extent and as required by the DIP Loan Documents, (ii) reasonably cooperate, consult with, and provide to the DIP Agent and the Pre-Petition Agent all such information as required or allowed under the DIP Loan Documents or the provisions of this Interim Order, (iii) permit representatives of the DIP Agent and the Pre-Petition Agent such rights to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of the Debtors' respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and accounts with their respective officers, employees and independent public accountants as and to the extent required by the DIP Loan Documents, and (iv) permit the DIP Agent and the Pre-Petition Agent and their respective representatives to consult with the Debtors' management and advisors on

matters concerning the general status of the Debtors' businesses, financial condition and operations.

16. **Proceeds of Subsequent Financing**. Without limiting the provisions and protections of paragraph 15 above, if at any time prior to the indefeasible payment in full in cash of all DIP Obligations, the Debtors' estates, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d) or any other provision of the Bankruptcy Code in violation of the DIP Loan Documents or this Interim Order, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Agent until indefeasible payment in full in cash of the DIP Obligations.

17. **Cash Collection**. From and after the date of the entry of this Interim Order, collections and proceeds of any DIP Collateral or Pre-Petition Collateral, and all Cash Collateral shall be swept daily either directly into an account or accounts (the "*Cash Collection Accounts*") under the sole dominion and control of the DIP Agent in accordance with the DIP Loan Documents and this Interim Order or otherwise pursuant to a structure acceptable to the DIP Agent. The blocked account control agreements in place under the Pre-Petition Credit Documents are deemed amended so as to effectively grant "control" (within the meaning of the Uniform Commercial Code) to the DIP Agent for the benefit of the DIP Lenders over all accounts subject thereto, including the Cash Collection Accounts, and so as to perfect the DIP Lenders' liens on and interests in such accounts. Unless otherwise agreed to by the DIP Agent, the Debtors shall maintain no accounts except those specifically identified in any order of the Court approving the Debtors' cash management system (the "*Cash Management Order*"). The Debtors and the financial institutions where the Debtors' Cash Collection Accounts are

maintained (including those accounts identified in any Cash Management Order), are authorized and directed to remit funds in such Cash Collection Accounts upon receipt of any direction to that effect from the DIP Agent.

18.     **Disposition of DIP Collateral**.   The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral without the prior written consent of the DIP Agent and the Requisite Lenders (and no such consent shall be implied from any other action, inaction or acquiescence by any DIP Secured Party or any order of this Court), except for (a) as permitted in the DIP Loan Documents and this Interim Order and (b) approved by the Court to the extent required under applicable bankruptcy law.

19.     **Events of Default**. The following shall constitute an event of default under this Interim Order, unless waived in writing by the DIP Agent and the Requisite Lenders under the DIP Loan Documents (the "***Events of Default***"):

(a)     The occurrence of an "Event of Default" under the DIP Credit Agreement, as set forth therein.

(b)     The Debtors' failure to perform the obligations (the "***Sale Milestones***") as set forth on and when required by <u>Exhibit B</u> attached hereto.

(c)     Any other breach or default by any of the Debtors of the terms and provisions of this Interim Order.

20.     **Rights and Remedies Upon Event of Default**.

(a)     Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Agent may, and at the written direction of the Requisite Lenders shall, (i)(1) declare all DIP Obligations to be immediately due and payable, (2) declare the termination, reduction or restriction of any further commitment to extend credit to the Debtors, to the extent

any such commitment remains, and (3) terminate the DIP Facility and any other DIP Loan Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; and (ii) declare a termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral (any such declaration shall be made to the Debtors, the Committee and the U.S. Trustee, and shall be referred to herein as a "*Termination Declaration*" and the date which is the earliest to occur of any such Termination Declaration being herein referred to as the "*Termination Declaration Date*").

    (b)  In addition to the remedies described above and other customary remedies, seven (7) days following the Termination Declaration Date, the DIP Agent shall have relief from the automatic stay and may foreclose on all or any portion of the DIP Collateral, collect accounts receivable and apply the proceeds thereof to the DIP Obligations, occupy the Debtors' premises to sell or otherwise dispose of the DIP Collateral or otherwise exercise remedies against the DIP Collateral permitted by applicable non-bankruptcy law.  During such seven (7) day period, the Debtors and any Committee shall be entitled to an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred.  Unless the Court at such hearing determines that an Event of Default has not occurred and is not continuing, the automatic stay, as to the DIP Lenders and DIP Agent, shall automatically terminate at the end of such seven (7) business day period, without further notice or order.  Notwithstanding the foregoing, nothing herein shall preclude the DIP Agent from seeking an order from the Court authorizing the DIP Agent to exercise any enforcement rights or remedies with respect to the DIP Collateral on less than seven (7) days' notice.

(c)    All proceeds realized in connection with the exercise of the rights and remedies of the DIP Lenders shall be turned over to the DIP Agent for application to the DIP Obligations under, and in accordance with the provisions of, the DIP Loan Documents and this Interim Order until indefeasible payment in full in cash of the DIP Obligations.

(d)    Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Agent or the other DIP Lenders contained in this Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, upon reasonable prior written notice to the Debtors and any landlord, lienholder, licensor or other third party owner of any leased or licensed premises or intellectual property that an Event of Default has occurred and is continuing, the DIP Agent (i) may, unless otherwise provided in any separate agreement by and between the applicable landlord or licensor and the DIP Agent, enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a Lien of any third party and which are used by Debtors in their businesses, in all cases without interference from lienholders or licensors thereunder, provided, however, that the DIP Agent, on behalf of the DIP Lenders, shall pay only rent and additional rent, fees, royalties or other obligations of the Debtors that first arise after the written notice referenced above from the DIP Agent and that are payable during the period of such occupancy or use by such DIP Agent calculated on a *per diem* basis.  Nothing herein shall require the Debtors, the DIP Agent or the other DIP Lenders to assume any lease or license under section

365(a) of the Bankruptcy Code as a precondition to the rights afforded to the DIP Agent and the other DIP Lenders in this paragraph 20(d).

(e)     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of this Interim Order and the DIP Loan Documents as necessary to (i) permit the Debtors to grant the Adequate Protection Replacement Liens and the DIP Liens and to incur all liabilities and obligations to the Pre-Petition Lenders, the DIP Lenders, BofA and CLD under the DIP Loan Documents, the DIP Facility and this Interim Order, (ii) authorize the DIP Lenders, the Pre-Petition Lenders, BofA and CLD to retain and apply payments hereunder, and (iii) as otherwise necessary to implement and effectuate the provisions of this Interim Order.

21.     **Proofs of Claim**.  The Pre-Petition Agent shall be authorized (but not required) to file a master proof of claim against the Debtors (the "***Master Proof of Claim***") on behalf of itself and the other Pre-Petition Lenders on account of their pre-petition claims arising under the Pre-Petition Loan Documents, and the Pre-Petition Agent shall not be required to file a verified statement pursuant to Bankruptcy Rule 2019.  The Debtors' Stipulations in paragraph D herein shall be deemed to constitute a timely filed proof of claim of the Pre-Petition Agent and each Pre-Petition Lender.  If the Pre-Petition Agent so files a Master Proof of Claim against the Debtors, the Pre-Petition Agent and each Pre-Petition Lender, as the case may be, and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against the Debtors arising under the Pre-Petition Credit Documents, and the claims of the Pre-Petition Agent and each Pre-Petition Lender, as the case may be, and each of their respective successors and assigns, named in the Master Proof of Claim shall be allowed or disallowed as if such entity had filed a separate

proof of claim in each Case in the amount set forth opposite each name listed in the Master Proof of Claim. The Pre-Petition Agent, shall further be authorized to amend its Master Proof of Claim from time to time to, among other things, reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from any transfer of such claims. The provisions set forth in this paragraph 21 and any Master Proof of Claim filed pursuant to the terms hereof are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party in interest or their respective successors in interest, including the rights of the Pre-Petition Agent and each Pre-Petition Lender as the holder of a claim against the Debtors under applicable law, and the numerosity requirements set forth in section 1126 of the Bankruptcy Code.

22. **Preservation of Rights Granted under the Interim Order**.

(a) <u>No Non-Consensual Modification or Extension of Interim Order</u>. Unless all DIP Obligations shall have been indefeasibly paid in full in cash, the Debtors shall not seek, and it shall constitute an Event of Default, if there is entered (i) an order amending, supplementing, extending or otherwise modifying this Interim Order or (ii) an order converting or dismissing any of the Cases, in each case, without the prior written consent of the DIP Agent, which consent shall not be implied by any other action, inaction or acquiescence.

(b) <u>Dismissal</u>. If any order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) to the fullest extent permitted by law that (i) the DIP Protections and the Adequate Protection shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations have been indefeasibly paid in full in cash and all Adequate Protection has been indefeasibly paid in full in

cash or otherwise satisfied in full (and that all DIP Protections and the Adequate Protection shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Protections and the Adequate Protection.

(c)     <u>Modification of Interim Order</u>.  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed by a subsequent order of this Court or any other court, the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Lenders shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and no such reversal, modification, vacatur or stay shall affect (i) the validity, priority or enforceability of any DIP Protections and the Adequate Protection granted or incurred prior to the actual receipt of written notice by the DIP Agent or the Pre-Petition Agent, as the case may be, of the effective date of such reversal, modification, vacatur or stay or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations and the Adequate Protection.  Notwithstanding any such reversal, modification, vacatur or stay, any use of Cash Collateral or any DIP Obligations or Adequate Protection incurred or granted by the Debtors prior to the actual receipt of written notice by the DIP Agent or the Pre-Petition Agent, as applicable, of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lenders and the Pre-Petition Lenders shall be entitled to all of the DIP Protections and the Adequate Protection, as the case may be, and all other rights, remedies, Liens, priorities, privileges,

protections and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the DIP Loan Documents with respect to all uses of Cash Collateral and all DIP Obligations and Adequate Protection.

(d) <u>Survival of Interim Order</u>. The provisions of this Interim Order and the DIP Loan Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections, the Adequate Protection, and all other rights, remedies, liens, priorities, privileges, protections and benefits granted to any or all of the DIP Agent, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Lenders, BofA and CLD shall survive, and shall not be modified, impaired or discharged by, the entry of any order confirming any plan of reorganization in any Case, converting any Case to a case under chapter 7, dismissing any Case, withdrawal of the reference as to any Case or any Successor Case or providing for abstention from handling or retaining of jurisdiction of any Case in this Court, or terminating the joint administration of these Cases or by any other act or omission. The terms and provisions of this Interim Order, including all of the DIP Protections, Adequate Protection and all other rights, remedies, liens, priorities, privileges, protections and benefits granted to any or all of the DIP Lenders, the Pre-Petition Lenders, BofA and CLD, shall continue in full force and effect notwithstanding the entry of any such order, and such DIP Protections and Adequate Protection shall continue in these proceedings and in any Successor Case, and shall maintain their respective priorities as provided by this Interim Order.

23. **Other Rights and Obligations**.

(a) <u>Expenses</u>. As provided in the DIP Loan Documents, the Debtors will pay all reasonable expenses incurred by the DIP Agent and the DIP Lenders (including the reasonable fees and disbursements of all counsel for the DIP Agent and any internal or third-

party appraisers, consultants, financial advisors and auditors advising the DIP Agent) in connection with the preparation, execution, delivery, administration and enforcement of the DIP Loan Documents, this Interim Order, any Final Order and any other agreements, instruments, pleadings or other documents prepared or reviewed in connection with any of the foregoing, without regard to the amounts set forth with respect thereto in the Approved Budget, whether or not any or all of the transactions contemplated hereby or by the DIP Loan Documents are consummated. Payment of such fees shall not be subject to allowance by this Court. Professionals for the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Lenders (collectively, the "*Lender Professionals*") shall not be required to comply with the U.S. Trustee fee guidelines or submit invoices to the Court, U.S. Trustee, any Committee or any other party-in-interest absent further court order. Copies of summary invoices submitted to the Debtors by such Lender Professionals shall be forwarded by the Debtors to the U.S. Trustee, counsel for any Committee, and such other parties as the Court may direct. The invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses (without limiting the right of the various professionals to redact privileged, confidential, or sensitive information). If the Debtors, U.S. Trustee or any Committee objects to the reasonableness of the fees and expenses of any Lender Professional and cannot resolve such objection within ten (10) days of receipt of such invoices, the objecting party shall file with the Court and serve on such Lender Professional an objection (the "*Fee Objection*") limited to the issue of reasonableness of such fees and expenses. The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order the undisputed fees, costs and expenses reflected on any invoice to which a Fee Objection has been timely filed.

(b)     Binding Effect.    Subject to paragraph 9 above, the provisions of this Interim Order, including all findings herein, and the DIP Loan Documents shall be binding upon all parties in interest in these Cases, including the DIP Lenders, the Pre-Petition Lenders, BofA, CLD, any Committee and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, any examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), whether in any of the Cases, in any Successor Case, or upon dismissal of any such Case or Successor Case; provided, however, that the DIP Lenders and the Pre-Petition Lenders shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estates of the Debtors in any Case or Successor Case.

(c)     No Waiver.    Neither the failure of the Pre-Petition Agent or the Pre-Petition Lenders to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Pre-Petition Credit Documents or otherwise (or any delay in seeking or exercising same), nor the failure of the DIP Agent or the DIP Lenders to seek relief or otherwise exercise their respective rights and remedies under this Interim Order, the DIP Loan Documents or otherwise (or any delay in seeking or exercising same), shall constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise.  Except as expressly provided herein, nothing contained in this Interim Order (including the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to the Pre-Petition Agent, any Pre-Petition Lender, the DIP Agent or any DIP Lender, including rights of a party to a swap agreement, securities contract, commodity contract, forward contract or

repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion). Except as prohibited by this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, the ability of the Pre-Petition Agent, the Pre-Petition Lenders, the DIP Agent or the DIP Lenders under the Bankruptcy Code or under non-bankruptcy law to (i) request conversion of the Cases to cases under Chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any chapter 11 plan or plans with respect to any of the Debtors, or (iii) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Lenders, respectively. Except to the extent otherwise expressly provided in this Interim Order, neither the commencement of the Cases nor the entry of this Interim Order shall limit or otherwise modify the rights and remedies of the Pre-Petition Agent or the Pre-Petition Lenders with respect to non-Debtor entities or their respective assets, whether such rights and remedies arise under the Pre-Petition Credit Documents, applicable law, or equity.

(d)     No Third Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary. In determining to make any loan (whether under the DIP Credit Agreement or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Lenders shall not (i) be deemed to be in control of the operations of the Debtors, or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates.

(e)     No Marshaling.  Except as provided in this Interim Order or in the DIP Loan Documents, none of the DIP Agent, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Lenders, BofA  or CLD shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral, as applicable.

(f)     Amendments.    The Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement or waive any provision of the DIP Loan Documents in accordance with the provisions thereof, unless such amendment, modification, supplement or waiver (i) increases the interest rate (other than as a result of the imposition of the default rate), (ii) increases the aggregate lending commitments of all of the DIP Lenders in respect of the DIP Facility, (iii) changes the Scheduled Commitment Termination Date, or (iv) adds or amends (in any respect unfavorable to the Debtors) any Event of Default.  No waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by on behalf of all the Debtors and the DIP Agent (after having obtained the requisite approval required under the DIP Loan Documents) and, except as provided herein, approved by this Court.

(g)     Inconsistency.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

(h)     Enforceability.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule or Local Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this

Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

(i) <u>Headings</u>. Paragraph headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

24. **<u>Final Hearing</u>**.

(a) The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for _____, 2011, at _____ (prevailing Eastern time) at the United States Bankruptcy Court for the Southern District of New York. The proposed Final Order shall be substantially the same as the Interim Order except that those provisions in the Interim Order that are subject to the entry of the Final Order shall be included in the Final Order without such qualification. If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

(b) <u>Final Hearing Notice</u>. On or before July [__], 2011 the Debtors shall serve, by United States mail, first-class postage prepaid (such service constituting adequate notice of the Final Hearing), (i) notice of the entry of this Interim Order and of the Final Hearing (the "***Final Hearing Notice***") and (ii) a copy of this Interim Order, on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court no later than July [__], 2011, which objections shall be served so that the

same are received on or before such date by: (a) counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLO, One Bryant Park, New York, New York 10036, Attn: Ira S. Dizengoff (idizengoff@akingump.com) and Michael P. Cooley (mcooley@akingump.com); (b) counsel for the DIP Agent and the Pre-Petition Agent, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, Attn: Roger G. Schwartz (roger.schwartz@lw.com) and Jude M. Gorman (jude.gorman@lw.com); (c) counsel to any Committee; and (d) the Office of the United States Trustee for the Southern District of New York.

25. **Retention of Jurisdiction**. The Bankruptcy Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

New York, New York
Date: _____, 2011

_____
UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT A**

**Initial Approved Budget**

# DIP Budget

| | Pre Petition | Post Petition | | | | | | | | Post Petition | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 5 Week Total | 8 Week Total |
| **Period ending:** | 7/8/11 | 7/10/11 | 7/17/11 | 7/24/11 | 7/31/11 | 8/7/11 | 8/14/11 | 8/21/11 | 8/28/11 | | |
| Sale of eligible inventory | $ - | $ - | $ 3,828,000 | $ 6,466,000 | $ 6,846,000 | $ 10,301,000 | $ 5,377,000 | $ 6,352,000 | $ 5,702,000 | $ 27,441,000 | $ 44,872,000 |
| Sale of ineligible Inventory | | | 1,000,000 | 850,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 2,850,000 | 4,350,000 |
| Total Sales | | - | 4,828,000 | 7,316,000 | 7,346,000 | 10,801,000 | 5,877,000 | 6,852,000 | 6,202,000 | 30,291,000 | 49,222,000 |
| | | | | | | | | | | | |
| **Cash Receipts:** | | | | | | | | | | | |
| A/R Collections | | | 6,195,000 | 6,996,000 | 8,737,250 | 7,427,600 | 7,772,500 | 7,034,700 | 6,720,400 | 29,355,850 | 50,883,450 |
| Other Cash Inflows (debt, asset sales, etc.) | | | | | 250,000 | | | | | 250,000 | 250,000 |
| Total Cash Receipts | | - | 6,195,000 | 6,996,000 | 8,987,250 | 7,427,600 | 7,772,500 | 7,034,700 | 6,720,400 | 29,605,850 | 51,133,450 |
| | | | | | | | | | | | |
| **Cash Disbursements:** | | | | | | | | | | | |
| Payments to Vendors | | | 4,475,972 | 5,410,000 | 4,615,500 | 5,000,000 | 5,165,115 | 5,000,000 | 1,124,402 | 19,501,472 | 30,790,990 |
| Vendor Deposits | | | 1,175,000 | | | | | | | 1,175,000 | 1,175,000 |
| Utility Deposits | | | 48,500 | | | | | | | 48,500 | 48,500 |
| First Day Motions (including freight) | | | 1,700,000 | | | | | | | 1,700,000 | 1,700,000 |
| [1] Key Employee Incentive Plan | | | | | | | | | 900,000 | - | 900,000 |
| Other | | | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 200,000 | 350,000 |
| Payroll, Taxes and Benefits | | | 158,065 | 946,713 | | 749,565 | | 829,466 | | 1,854,343 | 2,683,809 |
| Freight | | | 168,980 | 256,060 | 257,110 | 378,035 | 205,695 | 239,820 | 217,070 | 1,060,185 | 1,722,770 |
| SG&A | | | 630,033 | 15,512 | 1,233,853 | 15,512 | 15,512 | 15,512 | 871,938 | 1,894,910 | 2,797,873 |
| Total Operating Disbursements | | - | 8,406,550 | 6,678,286 | 6,156,463 | 6,193,112 | 5,436,322 | 6,134,799 | 3,163,410 | 27,434,411 | 42,168,942 |
| | | | | | | | | | | | |
| Capital Expenditures | | - | - | - | - | - | - | - | - | - | - |
| DIP Fees | | | 500,000 | | | | | | | 500,000 | 500,000 |
| Restructuring Fees | | 129,600 | 94,100 | 89,600 | 89,600 | 2,159,000 | 94,600 | 86,600 | 2,400,519 | 2,561,900 | 5,143,619 |
| Principal and Interest (Excluding Revolver Principal) | | 53,588 | 53,799 | 57,694 | 58,170 | 55,939 | 57,784 | 56,012 | 55,366 | 279,190 | 448,352 |
| Total Non-operating Disbursements | | 183,188 | 647,899 | 147,294 | 147,770 | 2,214,939 | 152,384 | 142,612 | 2,455,885 | 3,341,090 | 6,091,971 |
| | | | | | | | | | | | |
| Total Disbursements | | 183,188 | 9,054,449 | 6,825,580 | 6,304,233 | 8,408,051 | 5,588,706 | 6,277,410 | 5,619,296 | 30,775,501 | 48,260,913 |
| | | | | | | | | | | | |
| **Net Cash Flow** | | $ (183,188) | $ (2,859,449) | $ 170,420 | $ 2,683,017 | $ (980,451) | $ 2,183,794 | $ 757,290 | $ 1,101,104 | $ (1,169,651) | $ 2,872,537 |
| | | | | | | | | | | | |
| DIP, Beginning | $ - | $ - | $ 183,188 | $ 9,237,637 | $ 16,063,217 | $ 22,367,450 | $ 30,775,501 | $ 36,364,207 | $ 37,984,291 | $ - | $ - |
| Plus: Disbursements | | 183,188 | 9,054,449 | 6,825,580 | 6,304,233 | 8,408,051 | 5,588,706 | 6,277,410 | 5,619,296 | 30,775,501 | 48,260,913 |
| Less: Cash Receipts when Revolver is paid down | | - | - | - | - | - | - | (4,657,327) | (6,720,400) | - | (11,377,727) |
| DIP, Ending | - | 183,188 | 9,237,637 | 16,063,217 | 22,367,450 | 30,775,501 | 36,364,207 | 37,984,291 | 36,883,186 | 30,775,501 | 36,883,186 |
| | | | | | | | | | | | |
| Revolver, Beginning (Excludes L/Cs) | 39,755,723 | 39,755,723 | 39,755,723 | 33,560,723 | 26,564,723 | 17,577,473 | 10,149,873 | 2,377,373 | - | 39,755,723 | 39,755,723 |
| Less: Cash Receipts | - | - | (6,195,000) | (6,996,000) | (8,987,250) | (7,427,600) | (7,772,500) | (2,377,373) | - | (29,605,850) | (39,755,723) |
| Revolver, Ending (Excludes L/Cs) | 39,755,723 | 39,755,723 | 33,560,723 | 26,564,723 | 17,577,473 | 10,149,873 | 2,377,373 | - | - | 10,149,873 | |
| | | | | | | | | | | | |
| **Total Borrowings** | $ 39,755,723 | $ 39,938,911 | $ 42,798,360 | $ 42,627,940 | $ 39,944,923 | $ 40,925,374 | $ 38,741,580 | $ 37,984,291 | $ 36,883,186 | $ 1,169,651 | $ (2,872,537) |

[1] The Key Employee Incentive Plan is subject to court and lender approval.

# DIP Budget

| | Pre Petition | Post Petition | | | | | | | | Post Petition | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 5 Week | 8 Week |
| *Period ending:* | 7/8/11 | 7/10/11 | 7/17/11 | 7/24/11 | 7/31/11 | 8/7/11 | 8/14/11 | 8/21/11 | 8/28/11 | Total | Total |

## Schedule 1

**Professional Fees Schedule**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HW | | 129,600 | 94,100 | 89,600 | 89,600 | 97,600 | 94,600 | 86,600 | 86,600 | 500,500 | 768,300 |
| AG | | 255,780 | 255,780 | 255,780 | 255,780 | 255,780 | 131,473 | 131,473 | 131,473 | 1,278,900 | 1,673,319 |
| GCG | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 50,000 | 80,000 |
| Mac | | - | - | 150,000 | - | - | - | 150,000 | - | 150,000 | 300,000 |
| FTI | | 39,500 | 39,500 | 39,500 | 39,500 | 39,500 | 39,500 | 39,500 | 39,500 | 197,500 | 316,000 |
| Latham | | 39,500 | 39,500 | 39,500 | 39,500 | 39,500 | 39,500 | 39,500 | 39,500 | 197,500 | 316,000 |
| UCC Professionals | | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 187,500 | 300,000 |
| Completion Fee 1 | | - | - | - | - | - | - | - | 1,250,000 | - | 1,250,000 |
| Completion Fee 2 | | - | - | - | - | - | - | - | 400,000 | - | 400,000 |
| Less Retainers | | - | - | - | - | - | - | - | (260,000) | - | (260,000) |
| | | 511,880 | 476,380 | 621,880 | 471,880 | 479,880 | 352,573 | 494,573 | 1,734,573 | 2,561,900 | 5,143,619 |
| **Timing:** | | | | | | | | | | | |
| HW | | 129,600 | 94,100 | 89,600 | 89,600 | 97,600 | 94,600 | 86,600 | 486,600 | 500,500 | 1,168,300 |
| Other | | - | - | - | - | 2,061,400 | - | - | 2,173,919 | 2,061,400 | 4,235,319 |
| Less Retainers | | - | - | - | - | - | - | - | (260,000) | - | (260,000) |
| Cash Flow Timing | | 129,600 | 94,100 | 89,600 | 89,600 | 2,159,000 | 94,600 | 86,600 | 2,400,519 | 2,561,900 | 5,143,619 |
| | | | | | | | | | | | |
| *Paid* | | *129,600* | *94,100* | *89,600* | *89,600* | *2,159,000* | *94,600* | *86,600* | *2,400,519* | *2,561,900* | *5,143,619* |
| *Paid Cumulative* | | *129,600* | *223,700* | *313,300* | *402,900* | *2,561,900* | *2,656,500* | *2,743,100* | *5,143,619* | | |
| | | | | | | | | | | | |
| *Incurred* | | *511,880* | *476,380* | *621,880* | *471,880* | *479,880* | *352,573* | *494,573* | *1,734,573* | *2,561,900* | *5,143,619* |
| *Incurred Cumulative* | | *511,880* | *988,260* | *1,610,140* | *2,082,020* | *2,561,900* | *2,914,473* | *3,409,046* | *5,143,619* | | |
| | | | | | | | | | | | |
| *Incurred Not Paid* | | *382,280* | *382,280* | *532,280* | *382,280* | *(1,679,120)* | *257,973* | *407,973* | *(665,946)* | | |
| *Incurred Not Paid Cumulative* | | *382,280* | *764,560* | *1,296,840* | *1,679,120* | *-* | *257,973* | *665,946* | *-* | | |

# **EXHIBIT B**

**Sale Milestones**

## Sale Milestones

1) On the Petition Date, the Debtors shall file and properly serve a motion, in form and substance satisfactory to the DIP Agent, the Requisite Lenders and the Pre-Petition Agent (the "***Bidding Procedures Motion***") seeking Bankruptcy Court approval of bidding procedures acceptable to the DIP Agent in its sole discretion for the sale of all or substantially all of the Debtors' assets pursuant to one or more sales, whether such sale is a going concern sale of the Debtors' business, a piecemeal sale of the Debtors' assets or a liquidation, in each case pursuant to section 363 and section 365 of the Bankruptcy Code. The terms of such sale or liquidation shall be acceptable to the DIP Agent, the Requisite Lenders and the Pre-Petition Agent in their sole discretion.

2) Within fifteen (15) days after the Petition Date, the Bankruptcy Court shall have entered a sales procedures order (the "***Bidding Procedures Order***") approving the bidding procedures contained in the Bidding Procedures Motion, which Bidding Procedures Order shall be acceptable to the DIP Agent, the Requisite Lenders and the Pre-Petition Agent in their sole discretion.

3) Within thirty-five (35) days after the Petition Date, unless the DIP Agent, the Requisite Lenders and the Pre-Petition Agent agree otherwise, the Debtors shall hold and complete an auction in accordance with the provisions of the Bidding Procedures Order and shall have selected for approval by the Bankruptcy Court at a sale hearing to be held in accordance with the Bidding Procedures Order, the highest and otherwise best bid(s) for the Debtors' assets made by any bidder at the auction, whether such bid(s) be for the purchase of the Debtors' business as a going concern, the liquidation of the Debtors' assets or the piecemeal sale of the Debtors assets (any such highest and otherwise best bid(s), a "***Winning Bid***"). The Winning Bid shall be acceptable to the DIP Agent, the Requisite Lenders and the Pre-Petition Agent in their sole discretion.

4) Within forty (40) days after the Petition Date, unless the DIP Agent, the Requisite Lenders and the Pre-Petition Agent agree otherwise, the Bankruptcy Court shall have entered one or more orders (the "***Sale Approval Order***") approving each Winning Bid, the transaction or transactions (each, an "***Approved Transaction***") and the terms and conditions of the Approved Transaction, which Sale Approval Order and Approved Transaction shall be in form and substance acceptable to the DIP Agent, the Requisite Lenders and the Pre-Petition Agent in their sole discretion.

5) On or before the date that is forty-five (45) days after the Petition Date, in the event the Approved Transaction is (i) a liquidation, the Debtors shall have executed all of the agency and other documents necessary to effectuate such a liquidation, and the liquidation shall have commenced or (ii) a sale, the Debtors shall have executed all purchase agreements and all other relevant documents in connection with the sale and the sale shall have been consummated. The documents required to be executed in each of the foregoing clauses (i) and (ii) shall be in form and substance acceptable to the DIP Agent, the Requisite Lenders and the Pre-Petition Agent in their sole discretion.

## Exhibit B

## DIP Credit Agreement

**SENIOR, SUPER-PRIORITY DEBTOR-IN-POSSESSION**
**CREDIT AGREEMENT**


Dated as of July [__], 2011

among

**ARCHBROOK LAGUNA LLC,**

**LEHRHOFF ABL LLC**, **AS DEBTORS-IN-POSSESSION**

as Borrowers,

**ARCHBROOK LAGUNA HOLDINGS LLC,**

**ARCHBROOK LAGUNA WEST LLC,**

**EXPERT WAREHOUSE LLC,**

**ARCHBROOK LAGUNA NEW YORK LLC**, **AND**

**CHIMERICA GLOBAL LOGISTICS LLC, AS DEBTORS-IN-POSSESSION**

as Credit Parties,

**THE LENDERS SIGNATORY HERETO FROM TIME TO TIME,**

as Lenders,

and

**GE CAPITAL COMMERCIAL SERVICES, INC.,**

as Agent and Lender

**GE CAPITAL MARKETS, INC.**

as Lead Arranger

# TABLE OF CONTENTS

1. **AMOUNT AND TERMS OF CREDIT** .......................................................................... 2
   1.1  Credit Facilities .......................................................................................... 2
   1.2  Letters of Credit ......................................................................................... 4
   1.3  Prepayments ............................................................................................... 4
   1.4  Use of Proceeds .......................................................................................... 5
   1.5  Interest and Applicable Margins ................................................................. 5
   1.6  [Reserved] .................................................................................................. 6
   1.7  [Reserved] .................................................................................................. 6
   1.8  Cash Management Systems ......................................................................... 6
   1.9  Fees ............................................................................................................ 7
   1.10 Receipt of Payments .................................................................................. 7
   1.11 Application and Allocation of Payments ..................................................... 7
   1.12 Loan Account and Accounting .................................................................... 8
   1.13 Indemnity ................................................................................................... 9
   1.14 Access ........................................................................................................ 9
   1.15 Taxes ........................................................................................................ 10
   1.16 Capital Adequacy; Increased Costs; Illegality .......................................... 11
   1.17 Single Loan ............................................................................................... 13
   1.18 Super-Priority Nature of Obligations and Agent's Liens ........................... 13
   1.19 Payment of Obligations ............................................................................ 13
   1.20 [Reserved] ................................................................................................ 13
   1.21 Release ..................................................................................................... 13
   1.22 Waiver of any Priming Rights ................................................................... 14

2. **CONDITIONS PRECEDENT** ................................................................................. 14
   2.1  Conditions to the Initial Loans ................................................................. 14
   2.2  Further Conditions to Each Loan .............................................................. 15

3. **REPRESENTATIONS AND WARRANTIES** ........................................................ 16
   3.1  Legal Existence; Compliance with Law ..................................................... 17
   3.2  Executive Offices, Collateral Locations, FEIN ......................................... 17
   3.3  Legal Power, Authorization, Enforceable Obligations ............................... 17
   3.4  DIP Budget ............................................................................................... 18
   3.5  Material Adverse Effect ............................................................................ 18
   3.6  Ownership of Property; Liens .................................................................... 18
   3.7  Labor Matters ........................................................................................... 19
   3.8  Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness ........... 19
   3.9  Government Regulation ............................................................................. 20
   3.10 Margin Regulations .................................................................................. 20
   3.11 Taxes ........................................................................................................ 20
   3.12 ERISA ...................................................................................................... 21
   3.13 No Litigation ............................................................................................ 22

| | | |
|---|---|---|
| 3.14 | Brokers | 22 |
| 3.15 | Intellectual Property | 22 |
| 3.16 | Full Disclosure | 22 |
| 3.17 | Environmental Matters | 23 |
| 3.18 | Insurance | 23 |
| 3.19 | Deposit and Disbursement Accounts | 23 |
| 3.20 | Government Contracts | 24 |
| 3.21 | [Reserved] | 24 |
| 3.22 | Material Agreements and Other Documents | 24 |
| 3.23 | [Reserved] | 24 |
| 3.24 | [Reserved] | 24 |
| 3.25 | Status of ArchBrook Holdings, ABL West, Chimerica, Expert and ABL NY | 24 |
| 3.26 | Patriot Act, Etc | 24 |
| 3.27 | OFAC | 24 |
| 3.28 | Security Interests | 25 |
| 3.29 | Bankruptcy Matters | 25 |

**4. FINANCIAL STATEMENTS AND INFORMATION .......................................... 26**

| | | |
|---|---|---|
| 4.1 | Reports and Notices | 26 |
| 4.2 | Communication with Accountants | 26 |

**5. AFFIRMATIVE COVENANTS .......................................................................... 26**

| | | |
|---|---|---|
| 5.1 | Maintenance of Existence and Conduct of Business | 26 |
| 5.2 | Payment of Charges | 27 |
| 5.3 | Books and Records | 27 |
| 5.4 | Insurance; Damage to or Destruction of Collateral | 27 |
| 5.5 | Compliance with Laws | 30 |
| 5.6 | Supplemental Disclosure | 31 |
| 5.7 | Intellectual Property | 31 |
| 5.8 | Environmental Matters | 31 |
| 5.9 | [Reserved] | 32 |
| 5.10 | [Reserved] | 32 |
| 5.11 | Further Assurances | 32 |
| 5.12 | Additional Subsidiaries | 32 |
| 5.13 | Compliance with Milestones | 33 |
| 5.14 | Cooperation with Advisors | 34 |
| 5.15 | Chief Restructuring Officer; Financial Advisor; M&A Advisor | 34 |
| 5.16 | Use of Proceeds | 34 |
| 5.17 | Financing Orders, Final Order | 35 |
| 5.18 | Opposition to Motions | 35 |

**6. NEGATIVE COVENANTS ................................................................................ 35**

| | | |
|---|---|---|
| 6.1 | Mergers, Subsidiaries, Etc | 35 |
| 6.2 | Investments; Loans and Advances | 35 |
| 6.3 | Indebtedness | 36 |
| 6.4 | Employee Loans and Affiliate Transactions | 36 |

| | | | |
|---|---|---|---|
| | 6.5 | Capital Structure and Business | 37 |
| | 6.6 | Guaranteed Indebtedness | 37 |
| | 6.7 | Liens | 38 |
| | 6.8 | Sale of Stock and Assets | 38 |
| | 6.9 | ERISA | 39 |
| | 6.10 | Variance | 39 |
| | 6.11 | Hazardous Materials | 40 |
| | 6.12 | Sale-Leasebacks | 40 |
| | 6.13 | Cancellation of Indebtedness | 40 |
| | 6.14 | Restricted Payments | 40 |
| | 6.15 | Change of Corporate Name or Location; Change of Fiscal Year | 40 |
| | 6.16 | No Impairment of Intercompany Transfers | 41 |
| | 6.17 | No Speculative Transactions | 41 |
| | 6.18 | Leases; Real Estate Purchases | 41 |
| | 6.19 | Changes Relating to Subordinated Debt | 41 |
| | 6.20 | Credit Parties Other than Borrowers | 41 |
| | 6.21 | Pre-Petition Indebtedness | 41 |
| | 6.22 | Bankruptcy Provisions | 41 |
| | 6.23 | Compliance with DIP Budget | 42 |
| | 6.24 | Inventory Purchases | 42 |
| **7.** | **TERM** | | **42** |
| | 7.1 | Termination | 42 |
| | 7.2 | Survival of Obligations Upon Termination of Financing Arrangements | 42 |
| **8.** | **EVENTS OF DEFAULT; RIGHTS AND REMEDIES** | | **42** |
| | 8.1 | Events of Default | 42 |
| | 8.2 | Remedies | 46 |
| | 8.3 | Waivers by Credit Parties | 47 |
| **9.** | **ASSIGNMENT AND PARTICIPATIONS; APPOINTMENT OF AGENT** | | **47** |
| | 9.1 | Assignment and Participations | 47 |
| | 9.2 | Appointment of Agent | 50 |
| | 9.3 | Agent's Reliance, Etc | 51 |
| | 9.4 | GE Capital and Affiliates | 51 |
| | 9.5 | Lender Credit Decision | 51 |
| | 9.6 | Indemnification | 52 |
| | 9.7 | Successor Agent | 52 |
| | 9.8 | Setoff and Sharing of Payments | 53 |
| | 9.9 | Revolving Credit Advances; Payments; Non-Funding Lenders; Information; Actions in Concert | 53 |
| **10.** | **SUCCESSORS AND ASSIGNS** | | **55** |
| | 10.1 | Successors and Assigns | 55 |

**11.  MISCELLANEOUS**.................................................................................................**56**

    11.1   Complete Agreement; Modification of Agreement.................................56
    11.2   Amendments and Waivers.......................................................................56
    11.3   Fees and Expenses..................................................................................57
    11.4   No Waiver...............................................................................................59
    11.5   Remedies................................................................................................59
    11.6   Severability............................................................................................59
    11.7   Conflict of Terms...................................................................................59
    11.8   Confidentiality.......................................................................................59
    11.9   GOVERNING LAW ..............................................................................60
    11.10  Notices...................................................................................................61
    11.11  Section Titles.........................................................................................62
    11.12  Counterparts...........................................................................................62
    11.13  WAIVER OF JURY TRIAL ..................................................................62
    11.14  Press Releases and Related Matters.......................................................62
    11.15  Reinstatement........................................................................................63
    11.16  Advice of Counsel.................................................................................63
    11.17  No Strict Construction...........................................................................63
    11.18  Electronic Transmissions.......................................................................63
    11.19  Parties Including Trustees; Bankruptcy Court Proceedings ...................64

**12.  CROSS-GUARANTY** ...........................................................................................**64**

    12.1   Cross-Guaranty.......................................................................................64
    12.2   Waivers by Borrowers............................................................................65
    12.3   Benefit of Guaranty...............................................................................65
    12.4   Subordination of Subrogation, Etc .......................................................65
    12.5   Election of Remedies.............................................................................66
    12.6   Limitation ..............................................................................................66
    12.7   Contribution with Respect to Guaranty Obligations .............................66
    12.8   Liability Cumulative.............................................................................67

# INDEX OF APPENDICES

| | | |
|---|---|---|
| Annex A (Recitals) | - | Definitions |
| Annex B (Section 1.2) | - | Letters of Credit |
| Annex C (Section 1.8) | - | Cash Management System |
| Annex D (Section 2.1(a)) | - | Closing Checklist |
| Annex E (Section 4.1(a)) | - | Financial Statements -- Reporting |
| Annex F (Section 4.1(b)) | - | Collateral Reports |
| Annex G (Section 6.10) | - | Accounting Terms |
| Annex H (Section 9.9(a)) | - | Lenders' Wire Transfer Information |
| Annex I (Section 11.10) | - | Notice Addresses |
| Annex J (from Annex A Revolving Loan Commitment definition) | - | Revolving Loan Commitments as of Closing Date |
| | | |
| Exhibit 1.1(a)(i) | - | Form of Notice of Revolving Credit Advance |
| Exhibit 1.1(a)(ii) | - | Form of Daily Report |
| Exhibit 1.1(a)(iii) | - | Revolving Note |
| Exhibit 4.1(b) | - | Form of Collateral Certificate |
| Exhibit 9.1(a) | - | Form of Assignment Agreement |
| Exhibit 9.2 | - | Form of Interim Order |
| | | |
| Schedule  1.1 | - | Agent's Representatives |
| Disclosure Schedule  3.1 | - | Type of Entity; State of Organization |
| Disclosure Schedule  3.6 | - | Real Estate and Leases |
| Disclosure Schedule  3.7 | - | Labor Matters |
| Disclosure Schedule  3.8 | - | Ventures, Subsidiaries and Affiliates; Outstanding Stock; Options, Warrants, Etc. |
| Disclosure Schedule  3.11 | - | Tax Matters |
| Disclosure Schedule  3.12 | - | ERISA Plans |
| Disclosure Schedule  3.13 | - | Litigation |
| Disclosure Schedule  3.15 | - | Intellectual Property |

Disclosure Schedule  3.17    -            Hazardous Materials

Disclosure Schedule  3.18    -            Insurance

Disclosure Schedule  3.19    -            Deposit and Disbursement Accounts

Disclosure Schedule  3.20    -            Government Contracts

Disclosure Schedule  3.22    -            Material Agreements

Disclosure Schedule  6.3     -            Indebtedness

Disclosure Schedule  6.6     -            Guaranteed Indebtedness

Disclosure Schedule 6.7      -            Existing Liens

**THIS SENIOR, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT** (this "**Agreement**"), dated as of July [__], 2011, among **ARCHBROOK LAGUNA LLC**, a Nevada limited liability company, as debtor-in-possession ("**ABL**"), **LEHRHOFF ABL LLC**, a Nevada limited liability company, as debtor-in-possession ("**Lehrhoff**" and together with ABL, the "**Borrowers**" and individually a "**Borrower**"), **ARCHBROOK LAGUNA HOLDINGS LLC**, a Nevada limited liability company, as debtor-in-possession ("**ArchBrook Holdings**"), **ARCHBROOK LAGUNA WEST LLC**, a Nevada limited liability company, as debtor-in-possession ("**ABL West**"); **EXPERT WAREHOUSE LLC**, a Nevada limited liability company, as debtor-in-possession ("**Expert**"), **CHIMERICA GLOBAL LOGISTICS LLC,** a Wyoming limited liability company, as debtor-in-possession ("**Chimerica**"), **ARCHBROOK LAGUNA NEW YORK LLC**, a New York limited liability company, as debtor-in-possession ("**ABL NY**"), **GE CAPITAL COMMERCIAL SERVICES, INC.**, a North Carolina corporation (in its individual capacity, "**GE Capital**"), for itself, as Lender, and as administrative agent for Lenders ("**Agent**"); and the other Lenders parties hereto from time to time.

## RECITALS

**WHEREAS**, on July 8, 2011 (the "**Petition Date**"), ArchBrook Holdings, ABL West, Chimerica, ABL NY, the Borrowers (collectively, the "**Debtors**") commenced Chapter 11 Case Nos. [_____] through [_____], as administratively consolidated at Chapter 11 Case No. [_____] (collectively, the "**Chapter 11 Case**") by filing separate voluntary petitions for reorganization under Chapter 11, 11 U.S.C. §§101 et seq. (the "**Bankruptcy Code**"), with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, from and after the Petition Date, Borrowers and the Guarantors each continue to operate their business and manage their properties as a debtor and a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, prior to the Petition Date, the Prior Lenders provided financing to the Borrowers pursuant to that certain Second Amended and Restated Credit Agreement, dated as of December 22, 2010, among the Borrowers, Expert, the guarantors party thereto, the Prior Lenders and GE Capital as administrative agent for the Prior Lenders (as amended, modified or supplemented through the Petition Date, the "**Pre-Petition Credit Agreement**");

**WHEREAS**, Borrowers have requested that Lenders provide a first priority senior secured, super-priority debtor-in-possession credit facility to Borrowers of up to $50,000,000[1] in aggregate principal amount to fund the working capital requirements and other financial needs of the Debtors during the pendency of the Chapter 11 Case, including a "roll-up" of all the existing outstanding loans and liabilities under the Pre-Petition Credit Agreement;

---

[1]        Subject to review of revised DIP budget.

-1-

**WHEREAS**, ArchBrook Holdings is the direct parent company of ABL and the indirect majority owner of Expert and is willing to guarantee all of the obligations of Borrowers to Agent and Lenders under this Agreement and the other Loan Documents; and

**WHEREAS**, ABL West, Expert and ABL NY are Subsidiaries of ABL and are willing to guarantee all of the obligations of Borrowers to Agent and Lenders under the Loan Documents; and

**WHEREAS**, Borrowers, ArchBrook Holdings, ABL West, Chimerica, Expert and ABL NY have agreed to secure all of their obligations under the Loan Documents by granting to Agent, for the benefit of Agent and Lenders, a security interest in and lien upon all or substantially all of their existing and after-acquired personal and real property (including all of the Stock of the Borrowers, ABL West, Chimerica, Expert and ABL NY); and

**WHEREAS**, (a) capitalized terms used in this Agreement shall have the meanings ascribed to them in Annex A; (b) for purposes of this Agreement and the other Loan Documents, the rules of construction set forth in Annex A shall govern; (c) all Annexes, Schedules, Exhibits and other attachments (collectively, "**Appendices**") hereto, or expressly identified to this Agreement, are incorporated herein by reference, and taken together with this Agreement, shall constitute but a single agreement; and (d) these Recitals shall be construed as part of this Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto agree as follows:

## 1. AMOUNT AND TERMS OF CREDIT

1.1  Credit Facilities.

(a)  Revolving Credit Facility.

(i)  Subject to the terms and conditions hereof, each Lender agrees to make available to Borrowers from time to time until the Commitment Termination Date its Pro Rata Share of advances (each, a "**Revolving Credit Advance**"); provided, that (A) upon entry of the Interim Order and until entry of the Final Order, subject to the satisfaction of the conditions precedent to borrowing set forth herein, the Borrowers shall be entitled to borrow all amounts available under this Agreement, including, but not limited to an amount sufficient to meet the Borrowers' working capital and other needs pending the final hearing as set forth in the Interim DIP Budget plus an amount sufficient to repay the Discretionary Overadvances (as defined in the Pre-Petition Credit Agreement) then outstanding (the "**Pre-Petition Discretionary Overadvances**") (such aggregate amount, the "**Interim Order Commitment Amount**"); and (B) upon the entry of the Final Order, the Borrowers shall be entitled to borrow all amounts available under this Agreement, including, but not limited to, amounts sufficient to pay any amounts then remaining outstanding on the Pre-Petition Credit Agreement, subject to the terms and conditions contained herein (including, without limitation, satisfaction of the conditions precedent to borrowing set forth herein and reserves established by the Agent in its discretion in

respect of the Carve-Out or otherwise) or as may otherwise be limited by the Final Order. The Pro Rata Share of the Revolving Loan of any Lender shall not at any time exceed its separate Revolving Loan Commitment. The obligations of each Lender hereunder shall be several and not joint. Until the Commitment Termination Date, Borrowers may borrow, repay and reborrow under this Section 1.1(a); provided that all Revolving Credit Advances shall be made consistent with the DIP Budget, subject to (i) the conditions precedent set forth herein being satisfied or waived and (ii) Reserves imposed by Agent in its good faith credit judgment as provided herein, and Agent shall give Borrower Representative notice of such Reserves accompanied by an explanation of such action. Each Revolving Credit Advance shall be made on notice by Borrower Representative on behalf of the applicable Borrower to Agent at the address specified in Disclosure Schedule (1.1). Any such notice must be given no later than 1:00 p.m. (New York time) on the Business Day of the proposed Revolving Credit Advance. Each such notice (a "**Notice of Revolving Credit Advance**") must be given in writing (by telecopy, overnight courier or by posting to http://www.gemyaccounts.com) substantially in the form of Exhibit 1.1(a)(i) or any on-line form acceptable to Agent, and shall include the information required in such Exhibit and such other information as may be required by Agent. The entire unpaid balance of the aggregate Revolving Loans and all other non-contingent Obligations shall be immediately due and payable in full in immediately available funds on the Commitment Termination Date.

(ii)     Upon any Lender's request each Borrower shall execute and deliver to such Lender a promissory note to evidence the Revolving Credit Advances made by that Lender, together with interest thereon as prescribed in Section 1.5. Each such promissory note shall be in the principal amount of the Revolving Loan Commitment of the applicable Lender, dated the Closing Date and substantially in the form of Exhibit 1.1(a)(iii) (each a "**Revolving Note**" and, collectively, the "**Revolving Notes**"). Each Revolving Note shall represent the obligation of the applicable Borrower to pay the amount of the applicable Lender's Revolving Loan Commitment or, if less, such Lender's Pro Rata Share of the aggregate unpaid principal amount of all Revolving Credit Advances to such Borrower together with interest thereon as prescribed in Section 1.5. The entire unpaid balance of the aggregate Revolving Loan and all other non-contingent Obligations shall be immediately due and payable in full in immediately available funds on the Commitment Termination Date.

(b)     Reliance on Notices; Appointment of Borrower Representative. Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any Notice of Revolving Credit Advance or similar notice believed by Agent to be genuine. Agent may assume that each Person executing and delivering any notice in accordance herewith was duly authorized, unless Agent or any of its representatives having direct involvement with the transactions contemplated by this Agreement has actual knowledge to the contrary. Each Borrower hereby designates ABL as its representative and agent on its behalf for the purposes of issuing a Notice of Revolving Credit Advance or similar notice, giving instructions with respect to the disbursement of the proceeds of the Revolving Loans, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or Borrowers under the Loan Documents. Borrower Representative hereby accepts such appointment. Agent and each Lender may regard any notice or other communication pursuant to any Loan Document from Borrower Representative as a notice or communication from all

Borrowers, and may give any notice or communication required or permitted to be given to any Borrower or Borrowers hereunder to Borrower Representative on behalf of such Borrower or Borrowers. Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

1.2     Letters of Credit. The Existing Letters of Credit shall be deemed to have been issued hereunder on the Closing Date (and shall not be deemed Indebtedness under the Pre-Petition Credit Agreement for purposes of this Agreement), and no request for issuance thereof need be made. No additional requests for Letters of Credit may be made hereunder, and Lenders shall have no obligation to incur, or purchase participations in, any new Letter of Credit Obligations in respect of each Borrower.

1.3     Prepayments.

(a)     Voluntary Prepayments; Reductions in Revolving Loan Commitments. Borrowers may at any time on at least three (3) days' prior written notice by Borrower Representative to Agent (i) prepay any outstanding Revolving Credit Advance and (ii) permanently reduce (but not terminate) the Revolving Loan Commitments; provided that (A) any such prepayments or reductions shall be in a minimum amount of $1,000,000 and integral multiples of $250,000 in excess of such amount, (B) all of the Revolving Loan Commitments shall be reduced on a pro rata basis, and (C) after giving effect to such reductions, Borrowers shall be in compliance with Section 1.3(b). In addition, Borrowers may at any time on at least five (5) days' prior written notice by Borrower Representative to Agent terminate the Revolving Loan Commitments; provided that upon such termination, all Revolving Loans and other Obligations shall be immediately due and payable in full and all Letter of Credit Obligations shall be cash collateralized or otherwise satisfied in accordance with Annex B hereto. Upon any such reduction or termination of the Revolving Loan Commitments, each Borrower's right to request Revolving Credit Advances or request that Letter of Credit Obligations be incurred on its behalf shall simultaneously be permanently reduced or terminated, as the case may be.

(b)     Mandatory Prepayments. If at any time the aggregate outstanding balance of the Revolving Loans and any Reserves then in effect exceeds the lesser of (A) the Revolving Loan Commitments as then in effect and (B) the amount permitted under the Interim Order or the Final Order, as the case may be, Borrowers shall immediately prepay the aggregate outstanding Revolving Credit Advances to the extent required to eliminate such excess. If any such excess remains after repayment in full of the aggregate outstanding Revolving Credit Advances, Borrowers shall provide cash collateral for the Letter of Credit Obligations in the manner set forth in Annex B to the extent required to eliminate such excess.

(c)     Application of Collections and Asset Sales. Subject to Section 1.11, (i) upon the entry of the Interim Order and prior to the Termination Declaration Date, all collections of the Credit Parties with respect to Collateral (other than funds not required to be deposited into a deposit account subject to a Control Agreement in accordance with Section 1.8), including, without limitation, insurance or condemnation proceeds and any proceeds from any Disposition

of Collateral, in each case, in the ordinary course of business or otherwise (collectively, "**Collections**") shall be applied <u>first</u> solely in respect of cash on hand immediately prior to the filing of the Chapter 11 Case and Collections related to activities of the Debtors prior to the filing of the Chapter 11 Case, to repay the Pre-Petition Revolving Credit Obligations on a dollar-for-dollar basis until indefeasibly repaid in full in cash, <u>second</u> to pay Obligations in respect of any costs or expense reimbursements, fees or indemnities then due to the Lenders or the Agent, <u>third</u> to pay accrued interest in respect of the Revolving Loans; and <u>fourth</u>, to repay the outstanding principal balance of the Revolving Loans and (ii) upon the Termination Declaration Date and at all times with respect to Collections (other than in the ordinary course of business) with respect to the Collateral related to activities of the Debtors after the filing of the Chapter 11 Case, <u>first</u> to permanently reduce the Obligations and all other obligations then due and owing to the Lenders or the Agent until indefeasibly paid in full in cash and to cash collateralize, obtain back to back letters of credit with respect to and/or cancel all outstanding Letters of Credit, <u>second</u>, to permanently reduce the Pre-Petition Revolving Credit Obligations until indefeasibly repaid in full in cash and <u>third</u>, to the Borrowers. Following the Termination Declaration Date and prior to application of proceeds in the immediately preceding sentence, funds sufficient to fund the Carve-Out shall first be wired to the Borrowers. The Borrowers shall hold these funds in an interest-bearing account in trust for the benefit of parties claiming under the Carve-Out, and upon satisfaction of all such claims any remaining funds shall be returned to the Agent for application in accordance with the above.

  1.4 <u>Use of Proceeds</u>. Borrowers shall use the proceeds of the Revolving Loans and the Letters of Credit in accordance with <u>Section 5.16</u>.

  1.5 <u>Interest and Applicable Margins</u>.

   (a) Borrowers shall pay interest to Agent, for the ratable benefit of Lenders on the outstanding principal balance from time to time of the Revolving Credit Advances, in arrears on each applicable Interest Payment Date, at a rate equal to Prime Rate plus 3.75% per annum. Interest shall accrue on each Revolving Credit Advance from (and including) the day that such Revolving Credit Advance is made or deemed made and shall accrue thereafter on the principal balance of such Revolving Credit Advance that is outstanding from time to time until (but excluding) the date that such Revolving Credit Advance is repaid; provided that any Revolving Credit Advance that is repaid on the same day that it is made or deemed made shall, subject to <u>Section 1.5(e)</u>, accrue interest for one day.

   (b) If any payment of principal, interest, Fees or other amounts on or in respect of any Revolving Loan or Commitment becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

   (c) All computations of Fees calculated on a per annum basis and interest shall be made by Agent on the basis of a three hundred and sixty (360)-day year, in each case for the actual number of days occurring in the period for which such interest and Fees are payable (including the first day of such period but excluding the last day thereof). Each determination

by Agent of an interest rate and Fees hereunder shall be final, binding and conclusive on Borrowers, absent manifest error.

(d)     So long as any Default or Event of Default shall have occurred and be continuing under Section 8.1, the interest rates applicable to the Revolving Loans and the Letter of Credit Fees shall be increased by two percentage points (2.00%) per annum above the rates of interest or the rate of such Fees otherwise applicable hereunder ("**Default Rate**"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations. Interest and Letter of Credit Fees at the Default Rate shall accrue from the initial date of such Default or Event of Default until that Default or Event of Default is cured or waived and shall be payable upon demand.

(e)     Notwithstanding anything to the contrary set forth in this Section 1.5, if a court of competent jurisdiction determines in a final order that the rate of interest or any Fee payable hereunder exceeds the highest rate of interest permissible under law (the "**Maximum Lawful Rate**"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest or such Fee payable hereunder shall be equal to the Maximum Lawful Rate; provided, however, that if at any time thereafter the rate of interest or such Fee payable hereunder is less than the Maximum Lawful Rate, Borrowers shall continue to pay interest or such Fee hereunder at the Maximum Lawful Rate until such time as the total interest or such Fee received by Agent, on behalf of Lenders, is equal to the total interest or Fee that would have been received had the interest rate or such Fee payable hereunder been (but for the operation of this paragraph) the interest rate or Fee payable since the Closing Date as otherwise provided in this Agreement. Thereafter, interest or such Fee hereunder shall be paid at the rate(s) of interest or Fee and in the manner provided in this Agreement, unless and until the rate of interest again exceeds the Maximum Lawful Rate, and at that time this Section 1.5(e) shall again apply. In no event shall the total interest or Fee received by any Lender pursuant to the terms hereof exceed the amount that such Lender could lawfully have received had the interest or Fee due hereunder been calculated for the full term hereof at the Maximum Lawful Rate. If the Maximum Lawful Rate is calculated pursuant to this Section 1.5(e), such interest or Fee shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made. If, notwithstanding the provisions of this Section 1.5(e), a court of competent jurisdiction shall finally determine that a Lender has received interest or Fee hereunder in excess of the Maximum Lawful Rate, Agent shall, to the extent permitted by applicable law, promptly apply such excess in the order specified in Section 1.3 or Section 1.11 (as applicable) and thereafter shall refund any excess to Borrowers or as a court of competent jurisdiction may otherwise order.

1.6     [Reserved].

1.7     [Reserved].

1.8     Cash Management Systems. Subject to entry of the First Day Orders by the Bankruptcy Court, on or prior to the Closing Date, Borrowers will establish and will maintain until the Termination Date, the cash management systems described in Annex C (the "**Cash Management Systems**").

1.9     Fees.

(a)     The Borrowers shall pay, or cause to be paid, on the Closing Date to Agent or its Affiliates all fees described in the GE Capital Fee Letter.

(b)     As additional compensation for the Lenders, the Borrowers shall pay to Agent, for the ratable benefit of such Lenders, in arrears, on the first Business Day of each calendar month but prior to the Commitment Termination Date and on the Commitment Termination Date, a Fee for Borrowers' non-use of available funds in an amount equal to one percent (1.00%) per annum calculated on the basis of a three hundred sixty (360) day year for actual days elapsed, including the first day but excluding the last day) multiplied by the positive difference between (x) the aggregate Revolving Loan Commitments (as they may be reduced from time to time) and (y) the average for the period of the daily closing balance of the aggregate Revolving Loans outstanding during the period for which such Fee is due.

(c)     Each Borrower shall pay to Agent, for the ratable benefit of Lenders, the Letter of Credit Fee for any Letters of Credit issued for such Borrower as provided in Annex B.

(d)     The Borrowers shall reimburse Agent, or cause Agent to be reimbursed, for all out-of-pocket costs and expenses incurred by Agent in connection with Agent's appraisals permitted under Section 1.14 hereof; provided, however, that so long as no Default or Event of Default shall have occurred and be continuing, Agent shall not be entitled to be reimbursed for more than one (1) such appraisal in any calendar year commencing after the Closing Date. Borrowers shall pay such costs and expenses no later than thirty (30) days after Borrower Representative's receipt of a written invoice from Agent setting forth such costs and expenses in reasonable detail.  If not paid within such 30-day period, such costs and expenses shall be charged against the Revolving Loan.  All appraisals shall be performed by appraisers retained by the Agent.

1.10     Receipt of Payments.  Borrowers shall make each payment under this Agreement not later than 2:00 p.m. (New York time) on the day when due in immediately available funds in Dollars to the Collection Account.  Solely for purposes of computing interest and Fees as of any date, all payments shall be deemed received on the first Business Day following the Business Day on which immediately available funds therefor are received in the Collection Account prior to 2:00 p.m. New York time.  Payments received after 2:00 p.m. New York time on any Business Day or on a day that is not a Business Day shall be deemed to have been received on the following Business Day.

1.11     Application and Allocation of Payments.

(a)     All Collections shall be applied as provided in Section 1.3(c).  All payments and prepayments applied to a particular Revolving Loan shall be applied ratably to the portion thereof held by each Lender as determined by its Pro Rata Share. As to each other payment, and as to all payments made and any proceeds of Collateral received by the Agent or any Lender when a Default or Event of Default shall have occurred and be continuing, the Carve-Out Trigger Notice shall have been delivered or following the Commitment Termination Date, each Borrower hereby irrevocably waives the right to direct the application of any and all

payments received from or on behalf of such Borrower, and each Borrower hereby irrevocably agrees that such payments and proceeds of Collateral shall be applied to amounts then due and payable in the following order: (1) to Fees and Agent's expenses reimbursable hereunder; (2) to interest on the Revolving Loans, ratably in proportion to the interest accrued as to each Revolving Loan; (3) to principal payments on the Revolving Loans and to provide cash collateral for Letter of Credit Obligations in the manner described in Annex B, ratably to the aggregate, combined principal balance of the Revolving Loans and outstanding Letter of Credit Obligations; and (4) to all other Obligations, including expenses of Lenders to the extent reimbursable under Section 11.3. Notwithstanding the foregoing, no Professional Fees accrued after the delivery by the Agent of a Carve-Out Trigger Notice to the Borrower may be paid with the proceeds of Collateral until such Professional Fees have been paid from retainers held by such professionals, which such payment from retainers shall reduce the Carve-Out Cap on a dollar for dollar basis.

(b)     Agent is authorized to, and at its sole election may, charge to the Revolving Loan balance on behalf of each Borrower and cause to be paid all Fees, expenses, Charges, costs (including insurance premiums in accordance with Section 5.4(a)) and interest owing by Borrowers under this Agreement or any of the other Loan Documents if and to the extent Borrowers fail to promptly pay any such amounts as and when due, even if the amount of such charges is not set forth in the DIP Budget or would cause the aggregate balance of all Revolving Loans to exceed the Revolving Loan Commitment at such time. At Agent's option and to the extent permitted by law, any charges so made shall constitute part of the Revolving Loan.

1.12   Loan Account and Accounting. Agent shall maintain loan accounts (the "**Loan Accounts**") on its books for each Borrower to record: all Revolving Credit Advances and Letter of Credit Obligations made to or incurred by such Borrower, all payments made by Borrowers, and all other debits and credits as provided in this Agreement with respect to the Revolving Loans or any other Obligations. All entries in the Loan Accounts shall be made in accordance with Agent's customary accounting practices as in effect from time to time. The balance in the Loan Accounts, as recorded on Agent's most recent printout or other written statement, shall, absent manifest error, be presumptive evidence of the amounts due and owing to Agent and Lenders by Borrowers; provided, that any failure to so record or any error in so recording shall not limit or otherwise affect any Borrower's duty to pay the Obligations. Agent shall deliver to Borrower Representative (including by means of posting to http://www.gemyaccounts.com), within five (5) Business Days following the end of each month, a monthly accounting of transactions with respect to the Revolving Loans setting forth the balance of each Borrower's Loan Account for the immediately preceding month. Unless Borrower Representative notifies Agent in writing of any objection to any such accounting (specifically describing the basis for such objection), within thirty (30) days after the date thereof (which, if posted to http://www.gemyaccounts.com, shall be within thirty (30) days after the Effective Date of Posting thereof), each and every such accounting shall be presumptive evidence of all matters reflected therein. Only those items expressly objected to in such notice shall be deemed to be disputed by Borrowers.

1.13   <u>Indemnity</u>.

(a)     Each Credit Party that is a signatory hereto shall jointly and severally indemnify and hold harmless each of Agent, Lenders and their respective Affiliates, and each such Person's respective officers, directors, members, managers, employees, attorneys, agents and representatives (each, an "**Indemnified Person**"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal without regard to the amounts set forth with respect thereto in the DIP Budget) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith (collectively, "**Indemnified Liabilities**"); provided that no such Credit Party shall be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results from that Indemnified Person's gross negligence or willful misconduct. NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY LOAN DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER. The indemnities and payment obligations in this <u>Section 1.13(a)</u> shall survive the Termination Date and the termination of this Agreement.

1.14   <u>Access</u>. Each Credit Party that is a party hereto shall, during normal business hours, from time to time upon one (1) Business Day's prior notice as frequently as Agent reasonably determines to be appropriate: (a) provide Agent and any of its officers, employees and agents access to its properties, facilities, advisors and employees (including officers) of each Credit Party and to the Collateral, (b) permit Agent, and any of its officers, employees, and agents, to inspect, audit and make extracts from any Credit Party's books and records, and (c) permit Agent, and its officers, employees, agents and appraisers, to inspect, review, appraise, evaluate and make test verifications and counts of the Accounts, Inventory and other Collateral of any Credit Party. If a Default or Event of Default shall have occurred and be continuing or if access is necessary to preserve or protect the Collateral as determined by Agent in its good faith credit judgment, each such Credit Party shall provide such access to Agent and to each Lender at all times and without advance notice. Furthermore, so long as any Event of Default shall have occurred and be continuing, Borrowers shall use their best effort to provide Agent and each Lender with access to their suppliers and customers. Each Credit Party shall make available to Agent and its counsel, as quickly as is possible under the circumstances, originals or copies of all books and records that Agent may reasonably request. Each Credit Party shall deliver any document or instrument necessary for Agent, as it may from time to time reasonably request, to obtain records from any service bureau or other Person that maintains records for such Credit Party, and shall maintain duplicate records or supporting documentation on media, including computer tapes and discs owned by such Credit Party. Agent will give Lenders at least five (5)

days' prior written notice of regularly scheduled audits, inspections and appraisals. Representatives of other Lenders may accompany Agent's representatives on regularly scheduled audits, inspections and appraisals at no charge to Borrowers.

1.15  Taxes.

(a)  Any and all payments by each Borrower hereunder (including any payments made pursuant to Section 12) or under the Revolving Notes shall be made, in accordance with this Section 1.15, free and clear of and without deduction for any and all present or future Taxes. If any Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder (including any sum payable pursuant to Section 12) or under the Revolving Notes, (i) the sum payable shall be increased as much as shall be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 1.15) Agent or Lenders, as applicable, receive an amount equal to the sum they would have received had no such deductions been made, (ii) such Borrower shall make such deductions, and (iii) such Borrower shall pay the full amount deducted to the relevant taxing or other authority in accordance with applicable law. Within thirty (30) days after the date of any payment of such Taxes, Borrower Representative shall furnish to Agent and each Lender affected by this Section 1.15 the original or a certified copy of a receipt evidencing payment thereof. Except as otherwise provided in Section 1.15(e), Agent or Lenders, as applicable, shall not be obligated to return or refund any amounts received pursuant to this Section.

(b)  Each Credit Party that is a signatory hereto shall jointly and severally indemnify and, within ten (10) days of demand therefor, pay Agent and each Lender for the full amount of Taxes (including any Taxes imposed by any jurisdiction on amounts payable under this Section 1.15) paid by Agent or such Lender, as appropriate, and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally asserted.

(c)  Each Lender organized under the laws of a jurisdiction outside the United States (each, a "**Foreign Lender**") as to which payments to be made under this Agreement or under the Revolving Notes are exempt from United States withholding tax under an applicable statute or tax treaty shall provide to Borrower Representative and Agent a properly completed and executed IRS Form W-8ECI or Form W-8BEN or other applicable form, certificate or document prescribed by the IRS or the United States certifying as to such Foreign Lender's entitlement to such exemption (each, a "**Certificate of Exemption**") prior to becoming a Lender, or upon the expiration of any Certificate of Exemption previously provided by such Lender, or upon any change of the applicable lending office of such Lender that renders such Certificate of Exemption invalid, or upon the occurrence of any other event requiring a change in such Certificate of Exemption, or at such other time as may be reasonably required by Borrowers. Any foreign Person that seeks to become a Lender under this Agreement shall provide a Certificate of Exemption to Borrower Representative and Agent prior to becoming a Lender hereunder. No foreign Person may become a Lender hereunder if such Person fails to so deliver two (2) copies of a Certificate of Exemption in advance of becoming a Lender. Borrowers shall not be obligated to pay any amounts pursuant to Section 1.15(a) or (b) to any Foreign Lender if at such time such Foreign Lender has not complied with the requirements of this Section 1.15(c).

(d)     Each Lender and Agent shall use commercially reasonable efforts to avoid or minimize amounts which might otherwise be payable by Borrowers pursuant to this Section 1.15, except to the extent such Lender or Agent determines that such efforts would be disadvantageous to such Lender or Agent, as determined by such Lender or Agent in its respective sole discretion and which determination, if made in good faith, shall be binding and conclusive on all parties hereto.

(e)     To the extent that the payment of Agent's or any Lender's Taxes by Borrowers hereunder gives rise from time to time to a Tax Benefit (as defined below) to such Agent or Lender in any jurisdiction other than the jurisdiction which imposed such Taxes, such Agent or Lender (as the case may be) shall pay to Borrowers the amount of each such Tax Benefit so recognized or received by it.  The amount of each Tax Benefit and, therefore, payment to Borrowers will be determined from time to time by the relevant Agent or Lender in its sole discretion, which determination shall be binding and conclusive on all parties hereto in the absence of manifest error.  Each such payment will be due and payable by such Agent or Lender to Borrowers within a reasonable time after the filing of the tax return in which such Tax Benefit is recognized or, in the case of any tax refund, after the tax refund is received; provided, however, if at any time thereafter such Agent or Lender is required to rescind such Tax Benefit or such Tax Benefit is otherwise disallowed or nullified, Borrowers shall promptly, after notice thereof from such Agent or Lender, repay to such Agent or Lender the amount of such Tax Benefit previously paid to it which has been rescinded, disallowed or nullified.  For purposes hereof, the term "**Tax Benefit**" shall mean the amount by which Agent's or any Lender's liability for any Taxes for the taxable period in question is reduced below what would have been payable had the Borrowers not been required to pay such Agent's or Lender's Taxes hereunder.

(f)     Each assignee of a Lender's interest in this Agreement shall be bound by this Section 1.15, so that such assignee will have all of the obligations and provide all of the forms and statements and all indemnities, representations and warranties required to be given under this Section 1.15.

(g)     The indemnities and payment obligations in this Section 1.15 shall survive the Termination Date.

1.16    Capital Adequacy; Increased Costs; Illegality.

(a)     If any Lender shall have determined that the adoption after the date hereof of any law, treaty, governmental (or quasi-governmental) rule, regulation, guideline or order regarding capital adequacy, reserve requirements or similar requirements or compliance by any Lender with any request or directive regarding capital adequacy, reserve requirements or similar requirements (whether or not having the force of law), in each case, adopted after the Closing Date, from any central bank or other Governmental Authority increases or would have the effect of increasing the amount of capital, reserves or other funds required to be maintained by such Lender and thereby reducing the rate of return on such Lender's capital as a consequence of its obligations hereunder, then Borrowers shall from time to time within ten (10) days after demand by such Lender (with a copy of such demand to Agent) pay to Agent, for the account of such Lender, additional amounts sufficient to compensate such Lender for such reduction; provided that the Borrowers shall not be obligated to pay such additional amount under this

Section 1.16(a) to the extent such reduction occurred more than ninety (90) days prior to the date of such Lender's demand for such additional amount. A certificate as to the amount of that reduction and showing in reasonable detail the basis of the computation thereof submitted by such Lender to Borrower Representative and to Agent shall, absent manifest error, be final, conclusive and binding for all purposes.

(b)     If, due to either (i) the introduction of or any change in any law or regulation (or any change in the interpretation thereof) or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in each case adopted after the Closing Date, there shall be any increase in the cost to any Lender of agreeing to make or making, funding or maintaining any Revolving Loan, then Borrowers shall from time to time, within ten (10) days after demand by such Lender (with a copy of such demand to Agent), pay to Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost; provided that the Borrowers shall not be obligated to pay such additional amount under this Section 1.16(b) to the extent such increased cost was incurred more than ninety (90) days prior to the date of such Lender's demand for such additional amount. A certificate as to the amount of such increased cost and showing in reasonable detail the basis for the computation thereof, submitted to Borrower Representative and to Agent by such Lender, shall be conclusive and binding on Borrowers for all purposes, absent manifest error. Each Lender agrees that, as promptly as practicable after it becomes aware of any circumstances referred to above which would result in any such increased cost, the affected Lender shall, to the extent not inconsistent with such Lender's internal policies of general application, use reasonable commercial efforts to minimize costs and expenses incurred by it and payable to it by Borrowers pursuant to this Section 1.16(b).

(c)     [Reserved].

(d)     Within thirty (30) days after receipt by Borrower Representative of written notice and demand from any Lender (an "**Affected Lender**") for payment of additional amounts or increased costs as provided in Sections 1.15(a), 1.16(a) or 1.16(b), Borrower Representative may, at its option, notify Agent and such Affected Lender of its intention to replace the Affected Lender. So long as no Default or Event of Default has occurred and is continuing, Borrower Representative may obtain, at Borrowers' expense, a replacement Lender ("**Replacement Lender**") for the Affected Lender, which Replacement Lender must be reasonably satisfactory to Agent and the Borrower Representative. Agent agrees to cooperate with the Borrower Representative in identifying potential Replacement Lenders, but Agent shall be under no obligation to Borrowers to obtain a Replacement Lender. If Borrowers obtain a Replacement Lender within ninety (90) days following notice of their intention to do so, the Affected Lender must sell and assign its Revolving Loans and Revolving Loan Commitments to such Replacement Lender for an amount equal to the principal balance of all Revolving Loans held by the Affected Lender and all accrued interest and Fees with respect thereto through the date of such sale; provided that Borrowers shall have reimbursed such Affected Lender for the additional amounts or increased costs and any other Obligations that such Affected Lender is entitled to receive reimbursement of under this Agreement through the date of such sale and assignment. Notwithstanding the foregoing, Borrowers shall not have the right to obtain a Replacement Lender if the Affected Lender rescinds its demand for increased costs or additional amounts within fifteen (15) days following its receipt of Borrowers' notice of intention to replace

such Affected Lender. Furthermore, if Borrowers give a notice of intention to replace and do not so replace such Affected Lender within ninety (90) days thereafter, Borrowers' rights under this Section 1.16(d) with respect to such Affected Lender's demand for payment of such additional amounts or increased costs shall terminate and Borrowers shall promptly pay all increased costs or additional amounts demanded by such Affected Lender pursuant to Sections 1.15(a), 1.16(a) and 1.16(b).

1.17    Single Loan.  All Revolving Loans to each Borrower and all of the other Obligations of each Borrower arising under this Agreement and the other Loan Documents shall constitute one general, joint and several obligation of that Borrower secured, until the Termination Date, by all of the Collateral.

1.18    Super-Priority Nature of Obligations and Agent's Liens.  Except as set forth herein or in the Financing Orders, as applicable, no other claim having a priority superior or pari passu to that granted to Agent and Lenders by the Financing Orders, shall be granted or approved while any Obligations or commitment under this Agreement remain outstanding.  Except for the Carve-Out, no costs or expenses of administration shall be imposed against Agent, Lenders or any of the Collateral or any of the Pre-Petition Agent and Prior Lenders under the Pre-Petition Credit Agreement or the Collateral (as defined in the Pre-Petition Credit Agreement) under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and the Credit Parties hereby waive for themselves and on behalf of each of their estates in bankruptcy, any and all rights under sections 105, 506(c) (upon entry of the Financing Orders) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Agent or the Lenders or the Pre-Petition Agent or the Prior Lenders under the Pre-Petition Credit Agreement.

1.19    Payment of Obligations.  Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lenders shall be entitled to immediate payment in cash in immediately available funds of such Obligations without further application to or order of the Bankruptcy Court.

1.20    [Reserved].

1.21    Release.  The Credit Parties hereby acknowledge effective upon entry of the Final Order and to the extent permitted by the Financing Orders, that the Credit Parties have no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Credit Parties' liability to repay Agent or any Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from Agent or any Lender.  The Credit Parties, in their own right, on behalf of each of their bankruptcy estates and on behalf of all their successors, assigns, Subsidiaries, Guarantors and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "**Releasing Parties**"), hereby fully, finally and forever release and discharge Agent, Lenders, Pre-Petition Agent and Prior Lenders and all of Agent's, Lenders', Pre-Petition Agent's and Prior Lenders' past and present officers, directors, agents, attorneys, assigns, heirs, parents, subsidiaries, and each person acting for or on behalf of any of them (collectively, the "**Released Parties**") of and from any and all past and present actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences,

amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Financing Orders and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing; provided that nothing herein shall be deemed to be a release of Agent or any Lender from its obligations under the Loan Documents, provided further, that nothing contained herein shall be deemed to limit or modify the rights granted to third parties under the Financing Orders.

1.22    Waiver of any Priming Rights.   Upon the Closing Date, and to the extent permitted by the Financing Orders, and on behalf of itself and its estate, and for so long as any Obligations shall be outstanding, Borrowers hereby irrevocably waive any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations without the consent of Agent (which consent shall be provided in writing solely to the extent that the Borrowers' request has been provided in writing).

## 2.    CONDITIONS PRECEDENT

2.1    Conditions to the Initial Loans.   No Lender shall be obligated hereunder to make any Revolving Loan or incur any Letter of Credit Obligations on the Closing Date, or to take, fulfill, or perform any other action hereunder, until the following conditions have been satisfied or provided for in a manner satisfactory to Agent in Agent's sole discretion, or waived in writing by Agent and Lenders:

(a)    Credit Agreement; Loan Documents.   This Agreement or counterparts hereof shall have been duly executed by, and delivered to, Borrowers, each other Credit Party signatory hereto, Agent and Lenders; and Agent shall have received such documents, instruments and agreements as Agent shall request in connection with the transactions contemplated by this Agreement and the other Loan Documents, including all those listed in the Closing Checklist attached hereto as Annex D, each in form and substance reasonably satisfactory to Agent.

(b)    [Reserved].

(c)    Petition Date.   The Petition Date shall have occurred.

(d)    Bidding Procedures Motion.   The Debtors shall have filed and served the Bidding Procedures Motion.

(e)     Payment of Fees.  The Borrowers shall have paid, or caused to be paid, the Fees required to be paid on the Closing Date in the respective amounts specified in Section 1.9, and shall have reimbursed Agent and the Lenders for all fees, costs and expenses of closing presented as of the Closing Date for which Borrowers are liable.

(f)     Corporate Structure; Capital Structure; Other Indebtedness.  The corporate and capital structure of each Credit Party, the terms and conditions of all Material Contracts and all Indebtedness of each Credit Party and the charters, by-laws and other governing documents of each Credit Party, in each case shall be acceptable to Agent in its sole discretion.

(g)     Financial Information.  Each of the Lenders shall have received financial information reasonably requested by it.

(h)     Chapter 11 Case Administration.  Entry by the Bankruptcy Court of the Interim Order, by no later than five (5) days after the Petition Date.

(i)     First Day Orders and Motions.   All first day motions described on Schedule A-1 that are filed in the Chapter 11 Case and all related orders entered by the Bankruptcy Court shall have been delivered to Agent on or prior to the Petition Date, and shall be in form and substance satisfactory to Agent and its counsel.

(j)     Interim DIP Budget.  The Credit Parties shall have delivered the Interim DIP Budget to Agent on or prior to the Petition Date.

2.2     Further Conditions to Each Loan.  Except as otherwise expressly provided herein, no Lender shall be obligated hereunder to fund any Revolving Credit Advance or incur any Letter of Credit Obligation, if, as of the date thereof:

(a)     such Revolving Credit Advance shall violate any applicable requirement of law, or shall be enjoined, temporarily, preliminarily or permanently;

(b)     any representation or warranty by any Credit Party contained herein or in any other Loan Document is untrue or incorrect as of such date (i) as stated as to any such representation or warranty which contains any applicable materiality limitations and (ii) in all material respects as to any other such representation or warranty, except in either case to the extent that such representation or warranty expressly relates to an earlier date and except for changes therein expressly permitted or expressly contemplated by any of the Loan Documents;

(c)     any event or circumstance having a Material Adverse Effect since the Petition Date has occurred;

(d)     after giving effect to any Revolving Credit Advance (or the incurrence of any Letter of Credit Obligations), the outstanding principal amount of the aggregate Revolving Loan would exceed the lesser of (A) the Maximum Amount and (B) the amount permitted under the Interim Order or the Final Order, as the case may be;

(e)　　any Default or Event of Default has occurred and is continuing or would result after giving effect to any Revolving Credit Advance (or the incurrence of any Letter of Credit Obligations); or

(f)　　at the time of any such Revolving Credit Advance or the incurrence of any Letter of Credit Obligation, (i) if such Revolving Credit Advance or the incurrence of such Letter of Credit Obligation is prior to the entry and effectiveness of the Final Order, the Interim Order has not been signed and entered by the Bankruptcy Court or is not in full force and effect or has been terminated or expired or is the subject of any motion to reconsider, motion for a stay pending appeal, appeal or stay pending appeal, and the date of such Revolving Credit Advance is more than thirty (30) days from the Petition Date, and (ii) if such Revolving Credit Advance is after the entry and effectiveness of the Final Order, the Final Order is not in full force and effect or has terminated or expired or is the subject of any motion to reconsider, motion for a stay pending appeal, appeal or stay pending appeal;

(g)　　at the time of such Revolving Credit Advance or the incurrence of such Letter of Credit Obligation, the proposed use of proceeds of such Revolving Credit Advance or the incurrence of such Letter of Credit Obligation is not consistent with the DIP Budget together with any variance permitted under Section 6.10 in effect at such time;

(h)　　Agent shall not have a first priority perfected security interest in the Collateral except for Permitted Encumbrances;

(i)　　there shall be any motion pending to permit any administrative expense against any Credit Party to have administrative priority equal to or superior to the priority of Agent and the Lenders in respect of the Obligations; and

(j)　　the Excess Availability as set forth in the Daily Report shall not be less than (i) at any time during the first eight weeks after the Petition Date, $(7,500,000), and (ii) for any period after the eighth week after the Petition Date, an amount to be approved by the Agent and the Lenders in connection with their approval of the DIP Budget.

The request and acceptance by any Borrower of the proceeds of any Revolving Credit Advance or the incurrence of any Letter of Credit Obligations, as the case may be, shall be deemed to constitute, as of the date of such request or acceptance, (i) a representation and warranty by Borrowers that the conditions in this Section 2.2 have been satisfied and (ii) a reaffirmation by Borrowers of the cross-guaranty provisions set forth in Section 12 and of the granting and continuance of Agent's Liens, on behalf of itself and Lenders, pursuant to the Collateral Documents.

## 3.　　REPRESENTATIONS AND WARRANTIES

To induce Lenders to make the Revolving Loans and to incur Letter of Credit Obligations, the Credit Parties executing this Agreement, jointly and severally, make the following representations and warranties to Agent and each Lender with respect to all Credit Parties, each and all of which shall survive the execution and delivery of this Agreement.

3.1    <u>Legal Existence; Compliance with Law</u>.  Each Credit Party (a) is a corporation, limited liability company, limited partnership or other legal entity duly organized, validly existing and in good standing (other than ABL West and Chimerica) under the laws of its respective jurisdiction of incorporation or organization set forth in <u>Disclosure Schedule (3.1)</u>; (b) is duly qualified to conduct business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified would not result in a Material Adverse Effect; (c) upon entry of each of the Financing Orders by the Bankruptcy Court, has the requisite power and authority and the legal right to own, pledge, mortgage or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now, heretofore and proposed to be conducted; (d) subject to specific representations set forth in this Agreement regarding ERISA, Environmental Laws, tax and other laws and the Disclosure Schedules applicable thereto and upon entry of each of the Financing Orders by the Bankruptcy Court, has all material licenses, permits, consents or approvals from or by, and has made all material filings with, and has given all material notices to, all Governmental Authorities having jurisdiction, to the extent required for such ownership, operation and conduct; (e) is in compliance with its charter and bylaws or partnership, operating agreement, or other governing document, as applicable; and (f) subject to specific representations set forth in this Agreement regarding ERISA, Environmental Laws, tax and other laws and the Disclosure Schedules applicable thereto, is in compliance with all applicable provisions of law, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

3.2    <u>Executive Offices, Collateral Locations, FEIN</u>.  As of the Closing Date, the current location of each Domestic Credit Party's chief executive office, principal place of business and all premises at which any Collateral is located are set forth in Schedule III to the Security Agreement executed by such Domestic Credit Party and none of such locations have changed within the four (4) months preceding the Closing Date.  During the five (5) years preceding the Closing Date, except as set forth on Schedule III to the Security Agreement executed by such Domestic Credit Party, no Domestic Credit Party has been known as or used any corporate, fictitious or trade name.  In addition, <u>Schedule III</u> to the Security Agreement lists the federal employer identification number and organizational number (if any) of each Domestic Credit Party that is a party thereto.

3.3    <u>Legal Power, Authorization, Enforceable Obligations</u>.  Subject to the entry of the Financing Orders by the Bankruptcy Court, and except as set forth on Schedule 3.3, the execution, delivery and performance by each Domestic Credit Party of the Loan Documents to which it is a party and the creation of all Liens provided for therein: (a) are within such Person's corporate, company or partnership power; (b) have been duly authorized by all necessary corporate, company or partnership member or shareholder action on its part; (c) do not contravene any provision of such Person's partnership agreement, operating agreement, charter or bylaws as applicable; (d) do not violate any law or regulation, or any order or decree of any court or Governmental Authority; (e) do not conflict with or result in the breach or termination of, constitute a default under or accelerate or permit the acceleration of any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which such Person is a party or by which such Person or any of its property is bound; (f) do not result in the creation or imposition of any Lien upon any of the property of such Person other than those in

favor of Agent, on behalf of itself and Lenders, pursuant to the Loan Documents; and (g) do not require the consent or approval of any Governmental Authority or any other Person, which have not been duly obtained, made or complied with on or prior to the Closing Date. Subject to the entry of the Financing Orders by the Bankruptcy Court, each of the Loan Documents shall be duly executed and delivered by each Domestic Credit Party that is a party thereto and each such Loan Document shall constitute a legal, valid and binding obligation of such Domestic Credit Party enforceable against it in accordance with its terms.

3.4     <u>DIP Budget</u>.  The projections in the DIP Budget delivered on the date hereof and attached hereto as <u>Disclosure Schedule 3.4(b)</u> were believed by the Credit Parties at the time furnished to be reasonable, were prepared in good faith by the Credit Parties, and were based on assumptions, methods and tests stated therein which were believed by the Credit Parties to be reasonable at the time prepared and upon information believed by the Credit Parties to have been accurate based upon the information available to the Credit Parties at the time such projections were prepared, and ArchBrook Holdings is not aware of any facts or information that would lead it to believe that such projections are incorrect or misleading in any material respect.


3.5     <u>Material Adverse Effect</u>.  Between December 31, 2010 and the Closing Date: (a) no Credit Party has incurred any obligations, contingent or non-contingent liabilities, liabilities for Charges, long-term leases or unusual forward or long-term commitments that, alone or in the aggregate, could reasonably be expected to have a Material Adverse Effect, (b) no contract, lease or other agreement or instrument has been entered into by any Credit Party or has become binding upon any Credit Party's assets and no law or regulation applicable to any Credit Party has been adopted which, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect, (c) no Credit Party is in default and to the best of Borrowers' knowledge no third party is in default under any Material Contract, lease or other agreement or instrument, that alone or in the aggregate could reasonably be expected to have a Material Adverse Effect; and (d) no event has occurred, that alone or together with other events, could reasonably be expected to have a Material Adverse Effect.

3.6     <u>Ownership of Property; Liens</u>.  As of the Closing Date, the real estate ("**Real Estate**") listed in <u>Disclosure Schedule (3.6)</u> constitutes all of the real property owned, leased, subleased, or used by any Credit Party.  Each Credit Party owns good and marketable fee simple title to all of its owned Real Estate, and valid and marketable leasehold interests in all of its leased Real Estate, all as described on <u>Disclosure Schedule (3.6)</u>, and copies of all such leases or a summary of terms thereof reasonably satisfactory to Agent have been delivered to Agent. <u>Disclosure Schedule (3.6)</u> further describes any Real Estate with respect to which any Credit Party is a lessor, sublessor or assignor as of the Closing Date.  Each Credit Party also has good and marketable title to, or valid leasehold interests in, all of its personal property and assets.  As of the Closing Date, none of the properties and assets of any Credit Party are subject to any Liens other than Permitted Encumbrances, and there are no facts, circumstances or conditions known to any Credit Party that may result in any Liens (including Liens arising under Environmental Laws) other than Permitted Encumbrances.  Each Credit Party has received all deeds, assignments, waivers, consents, nondisturbance and attornment or similar agreements, bills of sale and other documents, and has duly effected all recordings, filings and other actions necessary to establish, protect and perfect such Credit Party's right, title and interest in and to all

such Real Estate and other properties and assets. <u>Disclosure Schedule (3.6)</u> also describes any purchase options, rights of first refusal or other similar contractual rights pertaining to any Real Estate. As of the Closing Date, no portion of any Credit Party's Real Estate has suffered any material damage by fire or other casualty loss that has not heretofore been repaired and restored in all material respects to its original condition or otherwise remedied. As of the Closing Date, all material permits required to have been issued or appropriate to enable the Real Estate to be lawfully occupied and used for all of the purposes for which it is currently occupied and used have been lawfully issued and are in full force and effect. The Liens granted to Agent, on behalf of itself and the Lenders, pursuant to the Collateral Documents will at all times be fully perfected first priority Liens in and to the Collateral described therein (other than with respect to motor vehicles to the extent Agent has elected not to have its Lien noted on the certificate of title for such motor vehicles), subject, as to priority, only to Permitted Encumbrances.

3.7 <u>Labor Matters</u>. As of the Closing Date (a) no strikes or other material labor disputes against any Credit Party are pending or, to any Credit Party's knowledge, threatened; (b) hours worked by and payment made to employees of each Credit Party comply in all material respects with the Fair Labor Standards Act and each other federal, state, local or foreign law applicable to such matters; (c) all payments due from any Credit Party for employee health and welfare insurance have been paid or accrued as a liability on the books of such Credit Party; (d) except as set forth in <u>Disclosure Schedule (3.7)</u>, no Credit Party is a party to or bound by any collective bargaining agreement, management agreement, consulting agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement (and true and complete copies of any agreements described on <u>Disclosure Schedule (3.7)</u> have been delivered to Agent); (e) there is no organizing activity involving any Credit Party pending or, to any Credit Party's knowledge, threatened by any labor union or group of employees; (f) there are no representation proceedings pending or, to any Credit Party's knowledge, threatened with the National Labor Relations Board, and no labor organization or group of employees of any Credit Party has made a pending demand for recognition; and (g) except as set forth in <u>Disclosure Schedule (3.7)</u>, there are no material complaints or charges against any Credit Party pending or, to the knowledge of any Credit Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment by any Credit Party of any individual.

3.8 <u>Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness</u>. Except as set forth in <u>Disclosure Schedule (3.8)</u>, as of the Closing Date, no Credit Party has any Subsidiaries, is engaged in any joint venture or partnership with any other Person, or is an Affiliate of any other Person (other than a Credit Party). As of the Closing Date, all of the issued and outstanding Stock of each Credit Party is owned by each of the Stockholders and in the amounts set forth in <u>Disclosure Schedule (3.8)</u>. Except as set forth in <u>Disclosure Schedule (3.8)</u>, there are no outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Credit Party may be required to issue, sell, repurchase or redeem any of its Stock or other equity securities or any Stock or other equity securities of its Subsidiaries. All outstanding Indebtedness and Guaranteed Indebtedness of each Credit Party as of the Closing Date (except for the Obligations) is described in <u>Section 6.3</u> (including <u>Disclosure Schedule (6.3)</u>). None of the Credit Parties other than Borrowers has any Accounts, Inventory or

other material assets (except Stock of their Subsidiaries) or any Indebtedness or Guaranteed Indebtedness (except the Obligations).

      3.9    <u>Government Regulation</u>.  No Credit Party is an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, a company required to be registered as an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.  No Credit Party is subject to regulation under the Public Utility Holding Company Act of 1935, as amended, the Federal Power Act, or any other federal or state statute that restricts or limits its ability to incur Indebtedness or to perform its obligations hereunder. The making of the Revolving Loans by Lenders to Borrowers, the incurrence of the Letter of Credit Obligations, the application of the proceeds thereof and repayment thereof will not violate any provision of any such statute or any rule, regulation or order issued by the Securities and Exchange Commission.

      3.10    <u>Margin Regulations</u>.  No Credit Party is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" as such terms are defined in Regulation U of the Federal Reserve Board as now and from time to time hereafter in effect (such securities being referred to herein as "**Margin Stock**").  No Credit Party owns any Margin Stock, and none of the proceeds of the Revolving Loans or other extensions of credit under this Agreement will be used, directly or indirectly, for the purpose of purchasing or carrying any Margin Stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any Margin Stock or for any other purpose that might cause any of the Revolving Loans or other extensions of credit under this Agreement to be considered a "purpose credit" within the meaning of Regulations T, U or X of the Federal Reserve Board.  No Credit Party will take or permit to be taken any action that might cause any Loan Document to violate any regulation of the Federal Reserve Board.

      3.11    <u>Taxes</u>.  Except with respect to any taxes, fees or other charges, the nonpayment of which is permitted by the Bankruptcy Code, all tax returns, reports and statements, including information returns, required by any Governmental Authority to be filed by any Credit Party have been filed with the appropriate Governmental Authority and all Charges have been paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof (or any such fine, penalty, interest, late charge or loss has been paid), excluding Charges or other amounts being contested in accordance with <u>Section 5.2(b)</u>.  Except with respect to any taxes, fees or other charges, the nonpayment of which is permitted by the Bankruptcy code, proper and accurate amounts have been withheld by each Credit Party from its respective employees for all periods in compliance in all material respects with all applicable federal, state, local and foreign laws and such withholdings have been timely paid to the respective Governmental Authorities.  <u>Disclosure Schedule (3.11)</u> sets forth as of the Closing Date those taxable years for which any Credit Party's tax returns are currently being audited by the IRS or any other applicable Governmental Authority, and any assessments or threatened assessments in connection with such audit, or otherwise currently outstanding.  Except as described in <u>Disclosure Schedule (3.11)</u>, no Credit Party has executed or filed with the IRS or any other Governmental Authority any agreement or other document extending, or having the effect of extending, the period for assessment or collection of any Charges.  None of the Credit Parties nor any of their respective predecessors is liable for any Charges: (a) under any

agreement (including any tax sharing agreements) or (b) to each Credit Party's knowledge, as a transferee. As of the Closing Date, no Credit Party has agreed or been requested to make any adjustment under IRC Section 481(a), by reason of a change in accounting method or otherwise, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

3.12    ERISA.

(a)    Disclosure Schedule (3.12) lists (i) all ERISA Affiliates and (ii) all Plans and separately identifies all Pension Plans, including Title IV Plans, Multiemployer Plans, ESOPs and Welfare Plans, including all Retiree Welfare Plans. Copies of all such listed Plans, together with a copy of the latest Form IRS/DOL 5500-series form for each such Plan have been delivered to Agent. Except with respect to Multiemployer Plans, each Qualified Plan has been determined by the IRS to qualify under Section 401 of the IRC, and the trusts created thereunder have been determined to be exempt from tax under the provisions of Section 501 of the IRC, and nothing has occurred that would cause the loss of such qualification or tax-exempt status. Each Plan is in compliance in all material respects with the applicable provisions of ERISA and the IRC, including the timely filing of all reports required under the IRC or ERISA, including the statement required by 29 CFR Section 2520.104-23. Neither any Credit Party nor ERISA Affiliate has failed to make any contribution or pay any amount due as required by either Section 412 of the IRC or Section 302 of ERISA or the terms of any such Plan. Neither any Credit Party nor ERISA Affiliate has engaged in a "prohibited transaction," as defined in Section 406 of ERISA and Section 4975 of the IRC, in connection with any Plan, that would subject any Credit Party to a material tax on prohibited transactions imposed by Section 502(i) of ERISA or Section 4975 of the IRC.

(b)    Except as set forth in Disclosure Schedule (3.12): (i) no Title IV Plan has any Unfunded Pension Liability; (ii) no ERISA Event or event described in Section 4062(e) of ERISA with respect to any Title IV Plan has occurred or is reasonably expected to occur; (iii) there are no pending, or to the knowledge of any Credit Party, threatened claims (other than claims for benefits in the normal course), sanctions, actions or lawsuits, asserted or instituted against any Plan or any Person as fiduciary or sponsor of any Plan; (iv) no Credit Party or ERISA Affiliate has incurred or reasonably expects to incur any liability as a result of a complete or partial withdrawal from a Multiemployer Plan; (v) within the last five (5) years no Title IV Plan of any Credit Party or ERISA Affiliate has been terminated, whether or not in a "standard termination" as that term is used in Section 4041(b)(1) of ERISA, nor has any Title IV Plan of any Credit Party or any ERISA Affiliate (determined at any time within the past five (5) years) with Unfunded Pension Liabilities been transferred outside of the "controlled group" (within the meaning of Section 4001(a)(14) of ERISA) of any Credit Party or ERISA Affiliate (determined at such time); (vi) except in the case of any ESOP, Stock of all Credit Parties and their ERISA Affiliates makes up, in the aggregate, no more than ten percent (10%) of fair market value of the assets of any Plan measured on the basis of fair market value as of the latest valuation date of any Plan; and (vii) no liability under any Title IV Plan has been satisfied with the purchase of a contract from an insurance company that is not rated AAA by the Standard & Poor's Corporation or an equivalent rating by another nationally recognized rating agency.

3.13    No Litigation.  Except with respect to the Chapter 11 Case, and litigation that is stayed by the commencement of the Chapter 11 Case, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of any Credit Party, threatened against any Credit Party, before any Governmental Authority or before any arbitrator or panel of arbitrators (collectively, "**Litigation**"), (a) that challenges any Credit Party's right or power to enter into or perform any of its obligations under the Loan Documents to which it is a party, or the validity or enforceability of any Loan Document or any action taken thereunder, or (b) which has a reasonable risk of an adverse outcome and which, if successful, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Except as set forth on Disclosure Schedule (3.13), as of the Closing Date there is no Litigation pending or, to any Credit Party's knowledge, threatened, that seeks damages in excess of $250,000 or injunctive relief against, or alleges criminal misconduct of, any Credit Party.

3.14    Brokers.  No broker or finder acting on behalf of any Credit Party or Affiliate thereof brought about the obtaining, making or closing of the Revolving Loans, Letter of Credit Obligations and no Credit Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

3.15    Intellectual Property.  As of the Closing Date, each Credit Party owns or has rights to use all material Intellectual Property necessary to continue to conduct its business as now or heretofore conducted by it or proposed to be conducted by it, and each Patent, Trademark, Copyright and License is listed, together with application or registration numbers, as applicable, in Disclosure Schedule (3.15).  Each Credit Party conducts its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any material respect.  Except as set forth in Disclosure Schedule (3.15), no Credit Party is aware of any material infringement claim by any other Person with respect to any Intellectual Property of any Credit Party.

3.16    Full Disclosure.  No information contained in this Agreement, any of the other Loan Documents, Financial Statements or Collateral Reports or other written reports from time to time delivered hereunder or any written statement furnished by or on behalf of any Credit Party to Agent or any Lender pursuant to the terms of this Agreement contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.  The DIP Budget and other projections from time to time delivered hereunder by or on behalf of any Credit Party are or will be based upon the estimates and assumptions stated therein, all of which such Credit Party believed at the time of delivery to be reasonable and fair in light of current conditions and current facts known to Borrowers as of such delivery date, and reflect such Credit Party's good faith and reasonable estimates of the future financial performance of such Credit Party and of the other information projected therein for the period set forth therein (it being understood that such financial information as it relates to future events is not to be viewed as fact and that actual results may differ materially or immaterially from those set forth in the DIP Budget).  Between December 31, 2010 and the Closing Date no Credit Party has made a Restricted Payment prohibited by Section 6.14.  Other than the commencement of the Chapter 11 Case, there is no contingent liability or fact that could reasonably be expected to have a Material Adverse Effect which has not been set forth in a footnote included in the Financial Statements or a Schedule hereto.

3.17    Environmental Matters.

(a)    Except as set forth in Disclosure Schedule (3.17), as of the Closing Date: (i) the Real Estate is free of contamination from any Hazardous Material except for such contamination that would not adversely impact the value or marketability of such Real Estate and that would not result in Environmental Liabilities that could reasonably be expected to exceed $200,000; (ii) no Credit Party has caused or suffered to occur any Release of Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate; (iii) the Credit Parties are and have been in compliance with all Environmental Laws, except for such noncompliance which would not result in Environmental Liabilities which could reasonably be expected to exceed $200,000; (iv) the Credit Parties have obtained, and are in compliance with, all Environmental Permits required by Environmental Laws for the operations of their respective businesses as presently conducted or as proposed to be conducted, except where the failure to so obtain or comply with such Environmental Permits would not result in Environmental Liabilities that could reasonably be expected to exceed $200,000, and all such Environmental Permits are valid, uncontested and in good standing; (v) no Credit Party is involved in operations or knows of any facts, circumstances or conditions, including any Releases of Hazardous Materials, that are likely to result in any Environmental Liabilities of such Credit Party which could reasonably be expected to exceed $200,000, and no Credit Party has permitted any current or former tenant or occupant of the Real Estate to engage in any such operations; (vi) there is no Litigation arising under or related to any Environmental Laws, Environmental Permits or Hazardous Material that seeks damages, penalties, fines, costs or expenses in excess of $200,000 or injunctive relief against, or that alleges criminal misconduct by, any Credit Party; (vii) no notice has been received by any Credit Party identifying it as a "potentially responsible party" or requesting information under CERCLA or analogous state statutes, and to the knowledge of the Credit Parties, there are no facts, circumstances or conditions that may result in any Credit Party being identified as a "potentially responsible party" under CERCLA or analogous state statutes; and (viii) the Credit Parties have provided to Agent copies of all existing environmental reports, reviews and audits in respect of any Real Estate and all written information pertaining to actual or potential Environmental Liabilities, in each case as prepared by or at the instruction of, or otherwise in the possession of, any Credit Party.

(b)    Each Credit Party hereby acknowledges and agrees that the Agent and the Lenders (i) are not now, and have not ever been, in control of any of the Real Estate or any Credit Party's affairs, and (ii) do not have the capacity through the provisions of the Loan Documents or otherwise to influence any Credit Party's conduct with respect to the ownership, operation or management of any of its Real Estate or compliance with Environmental Laws or Environmental Permits.

3.18    Insurance.  Disclosure Schedule (3.18) lists all insurance policies of any nature maintained, as of the Closing Date, for current occurrences by each Credit Party, as well as a summary of the terms of each such policy.

3.19    Deposit and Disbursement Accounts.  Disclosure Schedule (3.19) lists all banks and other financial institutions at which any Credit Party maintains deposit or other accounts as of the Closing Date, including any Disbursement Account, and such Schedule correctly identifies

the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

3.20    Government Contracts.  Except as set forth in Disclosure Schedule (3.20), as of the Closing Date, no Credit Party is a party to any contract or agreement with any Governmental Authority and no Credit Party's Accounts are subject to the Federal Assignment of Claims Act (31 U.S.C. Section 3727) or any similar state or local laws.

3.21    [Reserved].

3.22    Material Agreements and Other Documents.  As of the Closing Date, each Credit Party has provided to Agent or its counsel, on behalf of Lenders, accurate and complete copies (or summaries) of all of the following agreements or documents to which it is subject and each of which is listed in Disclosure Schedule (3.22):  supply agreements and purchase agreements not terminable by such Credit Party within 60 days following written notice issued by such Credit Party and involving transactions in excess of $50,000,000 per annum; leases of Equipment having a remaining term of one year or longer and requiring aggregate rental and other payments in excess of $250,000 per annum;  licenses and permits held by the Credit Parties, the absence of which could be reasonably likely to have a Material Adverse Effect;  instruments and documents evidencing any Indebtedness or Guaranteed Indebtedness of such Credit Party and any Lien granted by such Credit Party with respect thereto; and instruments and agreements evidencing the issuance of any equity securities, warrants, rights or options to purchase equity securities of such Credit Party.

3.23    [Reserved].

3.24    [Reserved].

3.25    Status of ArchBrook Holdings, ABL West, Chimerica, Expert and ABL NY.  None of ArchBrook Holdings, ABL West, Chimerica or ABL NY engages in any business or has any Indebtedness or any other liabilities (except in connection with its corporate formation and maintenance of its corporate existence and this Agreement and any guarantees described on Schedule 6.6).  Expert does not engage in any business or have any Indebtedness or any other liabilities (other than in the ordinary course and consistent with the wind-down of its business).

3.26    Patriot Act, Etc.  Each Credit Party is in compliance with (a) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001.  No part of the proceeds of the Revolving Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

3.27    OFAC.  No Credit Party (a) is a person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23,

2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (b) engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such person in any manner violative of Section 2, or (c) is a person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order.

3.28    Security Interests.  Upon the entry of and subject to the terms of the Financing Orders, each Collateral Document creates in favor of Agent, for the benefit of Agent and the Lenders, a legal, valid and enforceable security interest in the Collateral secured thereby.  To the extent governed by the Code, upon the entry of and subject to the terms of the Financing Orders and the filing of the UCC financing statements described in paragraph D of Annex D and, upon the recording of the Intellectual Property Security Agreement in the United States Patent and Trademark Office and the United States Copyright Office, as applicable, such security interests in and Liens on the Collateral granted thereby that may be perfected by such aforementioned filings or recordings shall be perfected, first priority security interests (subject, as to priority, only to the Carve-Out and the Permitted Liens that, as a matter of law (including, without limitation, the priority rules of the Code), and no further recordings or filings are or will be required in connection with the creation, perfection or enforcement of such security interests and Liens, other than (i) the filing of continuation statements in accordance with applicable law, (ii) the recording of the Collateral Assignments for Security pursuant to the Intellectual Property Security Agreement in the United States Patent and Trademark Office and the United States Copyright Office, as applicable, with respect to after-acquired U.S. patent, trademark and copyright applications and registrations and (iii) the recordation of appropriate evidence of the security interest in the appropriate foreign registry with respect to all foreign intellectual property.

3.29    Bankruptcy Matters.

(a)    The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and proper notice for (x) the motion seeking approval of the Loan Documents and the Financing Orders, (y) the hearing for the approval of the Interim Order and (z) the hearing for the approval of the Final Order has been given. Borrowers shall give, on a timely basis as specified in the Financing Orders, all notices required to be given to all parties specified in the Financing Orders.

(b)    After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Case having priority over all administrative expense claims and unsecured claims against Borrowers now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 326, 330, 331, 503(b), 507(a), 507(b), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject, as to priority only, to the Carve-Out.

(c)     After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject to the terms of the Financing Orders.

(d)     The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed, modified or amended.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court, subject to the terms of the Loan Documents.

## 4.     FINANCIAL STATEMENTS AND INFORMATION

4.1     Reports and Notices.

(a)     Each Credit Party executing this Agreement hereby agrees that from and after the Closing Date and until the Termination Date, it shall deliver the Financial Statements, notices, and other documents and information at the times, to the Persons and in the manner set forth in Annex E.

(b)     Each Credit Party executing this Agreement hereby agrees that, from and after the Closing Date and until the Termination Date, it shall deliver to Agent or to Agent and Lenders, as required, the Collateral Reports at the times, to the Persons and in the manner set forth in Annex F.

4.2     Communication with Accountants.  Each Credit Party executing this Agreement authorizes (a) Agent and (b) so long as any Default or Event of Default has occurred and is continuing, each Lender, to communicate directly with its independent certified public accountants and shall instruct and authorize those accountants and advisors to disclose and make available to Agent and each Lender any and all Financial Statements and other supporting financial documents, schedules and information relating to any Credit Party (including copies of any issued management letters) with respect to the business, financial condition and other affairs of any Credit Party.

## 5.     AFFIRMATIVE COVENANTS

Each Credit Party executing this Credit Agreement jointly and severally agrees as to all Credit Parties that from and after the date hereof and until the Termination Date:

5.1     Maintenance of Existence and Conduct of Business.  Subject to Section 6.1 hereof, each Credit Party shall:  (i) do or cause to be done all things necessary to preserve and keep in full force and effect its corporate, limited liability or partnership existence as applicable

and its material rights and franchises; (ii) continue to conduct its business substantially as now conducted or as otherwise permitted hereunder and in accordance with the terms of its charter, by-laws or other constitutive documents; (iii) subject to the terms and conditions of Section 5.13 and Section 6.8, at all times maintain, preserve and protect all of its assets and properties used or useful in the conduct of its business (including all material Licenses, permits, charters and registrations) and keep the same in good repair, working order and condition in all material respects (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices; and (iv) transact business only in such corporate and trade names as are set forth in Schedule III to the Security Agreement.

5.2     Payment of Charges.

(a)     Subject to Section 5.2(b), each Credit Party shall pay and discharge or cause to be paid and discharged promptly all Charges payable by it, including (i) Charges imposed upon it, its income and profits, or any of its property (real, personal or mixed) and all Charges with respect to tax, social security and unemployment withholding with respect to its employees, (ii) lawful claims for labor, materials, supplies and services or otherwise, and (iii) all storage or rental charges payable to warehousemen or bailees, in each case, before any thereof shall become past due. Notwithstanding the foregoing, Borrowers shall not be required to pay any taxes, fees or other charges, the nonpayment of which is permitted by the Bankruptcy Code.

(b)     Each Credit Party may in good faith contest, by appropriate proceedings, the validity or amount of any Charges, Taxes or claims described in Section 5.2(a); provided that (i) adequate reserves with respect to such contest are maintained on the books of such Credit Party, in accordance with GAAP; (ii) such contest is maintained and prosecuted continuously and with reasonable diligence, (iii) no Lien shall be imposed to secure payment of such Charges (other than payments to warehousemen and/or bailees) that is superior to any of the Agent's Liens securing the Obligations unless such contest is maintained and prosecuted continuously and with reasonable diligence and operates to suspend collection or enforcement of such Charges; (iv) none of the Collateral becomes subject to forfeiture or loss as a result of such contest; (v) such Credit Party shall promptly pay or discharge such contested Charges, Taxes or claims and all additional charges, interest, penalties and expenses, if any, and shall deliver to Agent evidence reasonably acceptable to Agent of such compliance, payment or discharge, if such contest is terminated or discontinued adversely to such Credit Party or the conditions set forth in this Section 5.2(b) are no longer met; and (vi) Agent has not advised Borrowers in writing that Agent in good faith believes that nonpayment or nondischarge thereof could, individually or in the aggregate, have or result in a Material Adverse Effect.

5.3     Books and Records.  Each Credit Party shall keep adequate books and records with respect to its business activities in which proper entries, reflecting all financial transactions, are made in accordance with GAAP and on a basis consistent with the Financial Statements referred to in Section 3.4(a).

5.4     Insurance; Damage to or Destruction of Collateral.

(a)     Coverage.  Without limiting any of the other obligations or liabilities of the Credit Parties under this Agreement, the Credit Parties shall, during the term of this Agreement, carry and maintain, at their own expense, at least the minimum insurance coverage set forth in this Section 5.4.  If any Credit Party at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required in this Section 5.4, or to pay all premiums relating thereto, Agent may at any time or times thereafter obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto that Agent deems advisable.  Agent shall have no obligation to obtain insurance for any Credit Party or pay any premiums therefor.  By doing so, Agent shall not be deemed to have waived any Default or Event of Default arising from any Credit Party's failure to maintain such insurance or pay any premiums therefor.  All sums so disbursed, including reasonable attorneys' fees, court costs and other charges related thereto, shall be payable on demand by Borrowers to Agent and shall be additional Obligations hereunder secured by the Collateral.  All insurance carried pursuant to this Section 5.4 shall be placed with such insurers having a minimum A.M. Best rating of "A" (or as may be otherwise agreed by the Agent) and be in such form, with terms, conditions, limits and deductibles as shall be reasonably acceptable to Agent.  Subject to Section 5.4(e), the insurance required to be carried and maintained by the Credit Parties hereunder shall be the following:

(i)     All Risk Property Insurance.  The Credit Parties shall maintain, all risk property insurance covering against physical loss or damage, including fire and extended coverage, collapse, flood, earth movement and comprehensive boiler and machinery coverage (including electrical malfunction and mechanical breakdown).  Coverage shall be written on a replacement cost basis in an amount reasonably acceptable to Agent.  Such insurance policy shall contain an agreed amount endorsement waiving any coinsurance penalty and shall include expediting expense coverage; and,

(ii)     [Reserved]

(iii)     Comprehensive or Commercial General Liability Insurance.  The Credit Parties shall maintain comprehensive general liability insurance written on an occurrence basis with a limit of not less than $1,000,000.  Such coverage shall include premises/operations, broad form contractual liability, independent contractors, products/completed operations, property damage and personal injury liability.  Such insurance shall not contain an exclusion for punitive or exemplary damages where insurable by law; and,

(iv)     Workers' Compensation/Employer's Liability Insurance.  The Credit Parties shall maintain (i) Workers' Compensation insurance in accordance with statutory provisions covering accidental injury, illness or death of an employee of the Credit Parties while at work or in the scope of his employment with the Credit Parties and (ii) Employer's Liability in an amount not less than $1,000,000.  Such coverage shall not contain any occupational disease exclusions; and,

(v)     Automobile Liability Insurance.  The Credit Parties shall maintain Automobile Liability insurance covering owned, non-owned, leased, hired or borrowed vehicles against bodily injury or property damage. Such coverage shall have a limit of not less than $1,000,000; and,

(vi)  Excess/Umbrella Liability Insurance.  The Credit Parties shall maintain excess or umbrella liability insurance written on an occurrence basis in an amount not less than $10,000,000 providing coverage limits in excess of the insurance limits required under subsection (a)(iii), subsection (a)(iv) (with respect to employer's liability only) and subsection (a)(v).  Such insurance shall follow from the primary insurances and provide coverage in case of exhaustion of underlying limits and/or aggregates. Such insurance shall not contain an exclusion for punitive or exemplary damages where insurable under law.

(b)  Endorsements.  The Credit Parties shall cause all insurance policies carried and maintained in accordance with this Section 5.4 to be endorsed as follows:

(i)  Agent and Lenders shall be additional insureds, with Agent as loss payee, with respect to property policies described in subsection (a)(i).  Agent and Lenders shall be additional insureds with respect to liability policies described in subsections (a)(iii), (a)(iv) (to the extent allowed by applicable law), (a)(v) and (a)(vi). It shall be understood that any obligation imposed upon the Credit Parties, including the obligation to pay premiums, shall be the sole obligation of the Credit Parties and not that of the Agent and Lenders; and,

(ii)  With respect to property policies described in subsection (a)(i), the interests of the Agent and Lenders shall not be invalidated by any action or inaction of the Credit Parties or any other person, and shall insure the Agent and Lenders regardless of any breach or violation by the Credit Parties or any other person, of any warranties, declarations or conditions of such policies; and,

(iii)  Inasmuch as the liability policies are written to cover more than one insured, all terms conditions, insuring agreements and endorsements, with the exception of the limits of liability, shall operate in the same manner as if there were a separate policy covering each insured; and,

(iv)  The insurers thereunder shall waive all rights of subrogation against Agent and Lenders any right of setoff or counterclaim and any other right to deduction, whether by attachment or otherwise; and,

(v)  Such insurance shall be primary without right of contribution of any other insurance carried by or on behalf of Agent and Lenders; and,

(vi)  If such insurance is canceled for any reason whatsoever, including nonpayment of premium, or any changes are initiated by the Credit Parties or the carrier which adversely affect the interests of the Agent and Lenders, such cancellation or change shall not be effective as to the Agent and Lenders until 30 days (ten (10) days in the case of non-payment of premium) after receipt by Agent of written notice sent by registered mail from such insurer.

(c)  Certifications.  On or before the Closing Date, the Borrower Representative shall provide to the Agent a certification from each insurer or by an authorized representative of each insurer. Such certification shall identify the underwriters, the type of insurance, the limits, deductibles, and term thereof and shall specifically list the special provisions delineated in Section 5.4(b) above for such insurance required under Section 5.4(a).

(d)     <u>Insurance Report</u>.  Concurrently with the furnishing of all certificates referred to in this <u>Section 5.4</u> and at least annually thereafter, the Borrower Representative shall furnish the Agent with a statement from an independent insurance broker, reasonably acceptable to the Agent, stating that all premiums then due have been paid and that, in the opinion of such broker, the insurance then maintained by the Credit Parties is in accordance with this <u>Section 5.4</u>. Such broker shall also confirm to the Agent that the endorsements in <u>Section 5.4(b)</u>, above, have been or shall soon be, endorsed to the Credit Parties' relevant insurance policies.

(e)     <u>Change in Risk Profile</u>.  Agent reserves the right at any time upon any change in any Credit Party's risk profile (including any change in the product mix maintained by any Credit Party or any laws affecting the potential liability of such Credit Party) to require additional forms and limits of insurance to, in Agent's reasonable opinion, adequately protect both Agent's and Lenders' interests in all or any portion of the Collateral, and Agent shall give the Borrower Representative written notice of each such additional requirement and the reasons therefor.

(f)     <u>General</u>.  Upon request, the Borrower Representative shall furnish the Agent with copies of all insurance policies, binders and cover notes or other evidence of such insurance.  Notwithstanding anything to the contrary herein, no provision of this <u>Section 5.4</u> or any provision of this Agreement shall impose on the Agent any duty or obligation to verify the existence or adequacy of the insurance coverage maintained by the Credit Parties, nor shall the Agent be responsible for any representations or warranties made by or on behalf of the Credit Parties to any insurance broker, company or underwriter.  Agent, at its sole option, may obtain such insurance if not provided by the Credit Parties and in such event, each Credit Party shall reimburse the Agent upon demand for the cost thereof, together with interest thereon in accordance with the terms and conditions of <u>Section 1.11(b)</u>

(g)     <u>Claims; Loss or Destruction of Collateral</u>.  Each Domestic Credit Party irrevocably makes, constitutes and appoints Agent (and all officers, employees or agents designated by Agent), so long as any Default or Event of Default shall have occurred and be continuing or the anticipated insurance proceeds exceed $500,000, as such Credit Party's true and lawful agent and attorney-in-fact for the purpose of making, settling and adjusting claims under all "All Risk" policies of insurance, endorsing the name of such Credit Party on any check or other item of payment for the proceeds of such "All Risk" policies of insurance and for making all determinations and decisions with respect to such "All Risk" policies of insurance. Agent shall not have any duty to exercise any rights or powers granted to it pursuant to the foregoing power-of-attorney.  Borrowers shall promptly notify Agent of any loss, damage, or destruction to the Collateral in the amount of $500,000 or more, whether or not covered by such insurance.  All Net Cash Proceeds of any claim under such insurance shall be applied to the Obligations if and to the extent provided in <u>Section 1.3(c)</u>.

5.5     <u>Compliance with Laws</u>.  Each Credit Party shall comply with all federal, state, local and foreign laws and regulations applicable to it, including those relating to licensing, ERISA and labor matters and Environmental Laws and Environmental Permits, except to the extent that the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.6     Supplemental Disclosure.  From time to time as may be reasonably requested by Agent, the Credit Parties shall supplement each Disclosure Schedule hereto, or any representation herein or in any other Loan Document, with respect to any matter hereafter arising which, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in such Disclosure Schedule or as an exception to such representation or which is necessary to correct any information in such Disclosure Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Disclosure Schedule, such Disclosure Schedule shall be appropriately marked to show the changes made therein); provided that (a) no such supplement to any such Disclosure Schedule or representation shall amend, supplement or otherwise modify any Disclosure Schedule or representation, or be deemed a waiver of any Default or Event of Default resulting from the matters disclosed therein, except as consented to by Agent and Requisite Lenders in writing; and (b) no supplement shall be required or permitted as to representations and warranties that relate solely to the Closing Date.

5.7     Intellectual Property.  Each Credit Party will conduct its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any material respect.

5.8     Environmental Matters.  Each Credit Party shall and shall cause each Person within its control to: (a) conduct its operations and keep and maintain its Real Estate in compliance with all Environmental Laws and Environmental Permits other than noncompliance that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect; (b) implement any and all investigation, remediation, removal and response actions that are appropriate and necessary to comply with Environmental Laws and Environmental Permits pertaining to the presence, generation, treatment, storage, use, disposal, transportation or Release of any Hazardous Material on, at, in, under, above, to, from or about any of its Real Estate; (c) notify Agent promptly after such Credit Party becomes aware of any violation of Environmental Laws or Environmental Permits or any Release on, at, in, under, above, to, from or about any Real Estate that is reasonably likely to result in Environmental Liabilities in excess of $200,000; and (d) promptly forward to Agent a copy of any order, notice, request for information or any communication or report received by such Credit Party in connection with any such violation or Release or any other matter relating to any Environmental Laws or Environmental Permits that could reasonably be expected to result in Environmental Liabilities in excess of $200,000, in each case whether or not the Environmental Protection Agency or any Governmental Authority has taken or threatened any action in connection with any such violation, Release or other matter.  If at any time there is a violation of any Environmental Laws or Environmental Permits by any Credit Party or any Environmental Liability arising thereunder, or a Release of Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, that, in each case, could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, then each Credit Party shall, upon Agent's written request (i) cause the performance of such environmental audits including subsurface sampling of soil and groundwater, and preparation of such environmental reports, at Borrowers' expense, as Agent may from time to time reasonably request, which shall be conducted by reputable environmental consulting firms reasonably acceptable to Agent and shall be in form and substance reasonably acceptable to Agent, and (ii) permit Agent or its representatives to have access to all Real Estate for the purpose of conducting such

environmental audits and testing as Agent deems appropriate, including subsurface sampling of soil and groundwater.  Borrowers shall reimburse Agent for the costs of such audits and tests and the same will constitute a part of the Obligations secured hereunder.

5.9     [Reserved].

5.10    [Reserved].

5.11    Further Assurances.  Each Credit Party executing this Agreement agrees that it shall and shall cause each other Credit Party to, at the Credit Parties' expense and upon request of Agent, duly execute and deliver, or cause to be duly executed and delivered, to Agent such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of Agent to carry out more effectively the provisions and purposes of this Agreement or any other Loan Document.

5.12    Additional Subsidiaries.

(a)     Promptly (and in any event within fifteen (15) days) after the formation or acquisition of any Domestic Subsidiary of ArchBrook Holdings, ArchBrook Holdings shall cause to be executed and delivered, (i) by such new Domestic Subsidiary, a Subsidiary Guaranty pursuant to which such Domestic Subsidiary shall guarantee the payment and performance of all of the Obligations, (ii) by such new Domestic Subsidiary, an Acknowledgement to the Security Agreement in the form of Exhibit B to the Security Agreement and pursuant to which Agent for the benefit of itself and the Lenders shall be granted a first priority (subject to Permitted Encumbrances) and perfected security interest in all Collateral (as defined in the Security Agreement) of such Domestic Subsidiary to secure the Obligations, (iii) by such new Domestic Subsidiary if it owns any Intellectual Property that is registered with the United States Patent and Trademark Office or the United States Copyright Office, an Intellectual Property Security Agreement in form and substance reasonably satisfactory to Agent and pursuant to which Agent for the benefit of itself and the Lenders shall be granted a first priority (subject to Permitted Encumbrances) and perfected security in all of such Intellectual Property to secure the Obligations, (iv) by the Domestic Credit Party that is such Domestic Subsidiary's direct parent company, a Pledge Agreement substantially in the form of the Pledge Agreement delivered on the Closing Date (or otherwise in form and substance reasonably satisfactory to Agent) and pursuant to which all of the Stock of such new Domestic Subsidiary owned by each such parent company shall be pledged to Agent for the benefit of itself and the Lenders on a first priority and perfected basis to secure the Obligations, and (v) by the Credit Parties, such other related documents (including closing certificates, legal opinions and other similar documents) as Agent may reasonably request, all in form and substance reasonably satisfactory to Agent.

(b)     Promptly (and in any event within fifteen (15) days) after the creation or acquisition of any first-tier Foreign Subsidiary by any Domestic Credit Party, the Credit Parties shall cause to be executed and delivered by such Domestic Credit Party a Pledge Agreement substantially in the form of the Pledge Agreement delivered on the Closing Date (or otherwise in form and substance reasonably satisfactory to Agent) and pursuant to which sixty-five percent (65%) of the Stock of such new Foreign Subsidiary shall be pledged to Agent for the benefit of itself and the Lenders to secure the Obligations.

5.13     Compliance with Milestones.  Unless otherwise waived by the Agent and the Requisite Lenders in their sole and absolute discretion, each Credit Party shall take all actions necessary to achieve the Milestones set forth below by the dates specified (which dates may be extended (i) by no more than five (5) days with the consent of the Agent and the Requisite Lenders in their sole discretion or (ii) by more than five (5) days with the consent of the Agent and the Lenders in their sole discretion).

(a)     On the Petition Date, the filing and proper serving of a motion, in form and substance satisfactory to the Agent, the Requisite Lenders and the Pre-Petition Agent (the "**Bidding Procedures Motion**"), seeking Bankruptcy Court approval of bidding procedures acceptable to the Agent in its sole discretion in connection with the sale of all or substantially all of the Debtors' assets pursuant to one or more sales, whether such sale is a going concern sale of the Debtors' business, a piecemeal sale of the Debtors' assets or a liquidation, in each case pursuant to Section 363 and Section 365 of the Bankruptcy Code. The terms of such sale or liquidation shall be acceptable to the Agent, the Requisite Lenders and the Pre-Petition Agent in their sole discretion;

(b)     Within fifteen (15) days after the Petition Date, entry of a Bankruptcy Court sales procedures order (the "**Bidding Procedures Order**") approving the bidding procedures contained in the Bidding Procedures Motion, which shall be in form and substance satisfactory to the Agent, the Requisite Lenders and the Pre-Petition Agent in their sole discretion;

(c)     Within thirty-five (35) days after the Petition Date, unless the Agent, the Requisite Lenders and the Pre-Petition Agent agree otherwise, the Debtors shall hold and complete an auction in accordance with the provisions of the Bidding Procedures Order at which the Debtors shall select for approval by the Bankruptcy Court at a sale hearing to be held in accordance with the Bidding Procedures Order, the highest and otherwise best bid or bids for the Debtors' assets made by any bidder at the auction, whether such bid or bids are for the purchase of the Debtors' business as a going concern, the liquidation of the Debtors' assets or the piecemeal sale of the Debtors assets (any such highest and otherwise best bid, a "**Winning Bid**" and all such highest and otherwise best bids, "**Winning Bids**") and all of which Winning Bids shall be acceptable to the Agent, the Requisite Lenders and the Pre-Petition Agent in their sole discretion;

(d)     Within forty (40) days after the Petition Date, unless the Agent, the Requisite Lenders and the Pre-Petition Agent agree otherwise, the Bankruptcy Court shall have entered one or more orders (each such order, the "**Sale Approval Order**" and all such orders, the "**Sale Approval Orders**") approving each Winning Bid, the transaction or transactions (each an "**Approved Transaction**") and the terms and conditions of each Approved Transaction, which Sale Approval Orders and Approved Transactions shall be in form and substance acceptable to the Agent, the Requisite Lenders and the Pre-Petition Agent in their sole discretion; and

(e)     On or before the date that is forty-five (45) days after the Petition Date, in the event any Approved Transaction is (i) a liquidation, the Debtors shall have executed all of the agency and other documents necessary to effectuate such a liquidation, and the liquidation shall have commenced or (ii) a sale, the Debtors shall have executed all purchase agreements and all

other relevant documents in connection with the sale and the sale shall have been consummated. The documents required to be executed in each of the foregoing clauses (i) and (ii) shall be in form and substance acceptable to the Agent, the Requisite Lenders and the Pre-Petition Agent in their sole discretion.

5.14    Cooperation with Advisors.  Each of the Credit Parties will use commercially reasonable efforts to provide full cooperation and assistance to Advisors hired by or at the discretion of Agent and the Lenders (or their counsel) to enable such Advisors to perform the services for which they are engaged including full and direct access to information (including historical information) and personnel, including regularly scheduled meetings, and access to other internal meetings regarding strategic planning, cash and liquidity management operations and restructuring activities.

5.15    Chief Restructuring Officer; Financial Advisor; M&A Advisor.  Borrowers and the other Credit Parties shall continue to retain at all times (i) the services of Stephen Gawrylewski/Hawkwood Consulting, Inc. as Chief Restructuring Officer (the "**Chief Restructuring Officer**") with at least as much responsibility and authority as exists with respect to such role in relation to the Borrowers and the other Credit Parties on the Closing Date, (ii) the services of Macquarie Capital (USA) Inc. as financial advisor in connection with the Chapter 11 Case (the "**Financial Advisor**"), and (iii) Macquarie Capital (USA) Inc. as its advisor in connection with the sale of all or substantially all of the assets of the Credit Parties pursuant to Section 363 of the Bankruptcy Code (the "**M&A Advisor**").  The Credit Parties shall be permitted to replace the Chief Restructuring Officer, the Financial Advisor or the M&A Advisor with any another advisor acceptable to Agent, and shall be permitted a period a time (not to exceed 10 Business Days) to file an application with the Bankruptcy Court to employ such replacement advisor.

5.16    Use of Proceeds.  Borrowers shall utilize the proceeds of the Revolving Loans for working capital and for other general corporate purposes in a manner consistent in all material respects with the DIP Budget, together with any variance permitted under Section 6.10, for payment of (a) post-petition operating expenses and other working capital and financing requirements of Borrowers subject to the DIP Budget, (b) certain transaction fees, costs and expenses, (c) certain other costs and expenses incurred in the administration of the Chapter 11 Case, and (d) amounts owed pursuant to the Pre-Petition Credit Agreement to the extent consistent with the DIP Budget.  Borrowers shall not be permitted to use the proceeds of the Revolving Loans: (a) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type challenging (i) liens or claims of any or all of Agent and/or the Lenders, or the initiation or prosecution of any claim or cause of action against any or all of Agent or the Lenders, including any claim under Chapter 5 of the Bankruptcy Code or (ii) any claims or causes of actions (including any claims or causes of action under Chapter 5 of the Bankruptcy Code) against any or all of Pre-Petition Agent and the Prior Lenders, their respective advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof, and/or challenging any lien or claim of any or all of Pre-Petition Agent and the Prior Lenders, or asserting any other lender liability or other claim or cause of action against any of Pre-Petition Agent and the Prior Lenders; provided, that, no more than $25,000 in the aggregate, of the amounts set forth in the DIP Budget, the Carve-Out, any cash collateral, Revolving Loans, or other Collateral proceeds may be used by the Committee, or any representative of the estate, to

investigate, but not prosecute any challenge to, the claims and/or liens of Pre-Petition Agent, the Prior Lenders or any holders of the BofA First Priority Lien or the CLD First Priority Lien or (b) to finance in any way any attempts to prevent, hinder or otherwise delay the exercise by any Lender or Agent of any enforcement or realization upon the Collateral once a Default or Event of Default has been determined by the Bankruptcy Court to have occurred and be continuing under the Loan Documents (for the avoidance of doubt, the preceding clause shall not operate to prevent the payment of the Debtor Professional Fees to the extent otherwise payable pursuant to the Loan Documents (including the DIP Budget)).

5.17    <u>Financing Orders, Final Order</u>.  The Financing Orders shall contain findings and conclusions with respect to, among other things, the validity and amount of the lenders under the Pre-Petition Credit Agreement claims and the validity, priority and perfection of their pre-petition liens.  The Final Order shall provide for the payment in full in cash of all outstanding Pre-Petition Revolving Credit Obligations on the date the Final Order is entered.

5.18    <u>Opposition to Motions</u>.  The Borrowers shall promptly and diligently oppose all motions filed by Persons in the Bankruptcy Court to lift the stay on the Collateral (other than motions filed by Agent and the Lenders relating to the Revolving Loans and the Agreement), all motions filed by Persons in the Bankruptcy Court to terminate the exclusive ability of the Debtors to file a plan of reorganization, and all other motions filed by Persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a Material Adverse Effect on Agent or any Lender or any Collateral.

## 6.    NEGATIVE COVENANTS

Each Credit Party executing this Agreement jointly and severally agrees as to all Credit Parties that from and after the date hereof until the Termination Date:

6.1    <u>Mergers, Subsidiaries, Etc</u>.  No Credit Party shall directly or indirectly, by operation of law or otherwise, (a) form any Subsidiary unless the Credit Parties and such Subsidiary comply with all applicable requirements of <u>Section 5.12</u>, (b) acquire any Subsidiary, or (c) merge with, consolidate with, acquire all or substantially all of the assets or Stock of, or otherwise combine with or acquire, any Person.

6.2    <u>Investments; Loans and Advances</u>.  Except as otherwise expressly permitted by this <u>Section 6</u>, no Credit Party shall make or permit to exist any investment in, or make, accrue or permit to exist loans or advances of money to, any Person, through the direct or indirect lending of money, holding of securities or otherwise, except that: (a) Borrowers may hold investments comprised of notes payable, or stock or other securities issued by Account Debtors to any Borrower pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business; and (b) each Credit Party may maintain its existing investments in its Subsidiaries as of the Closing Date and in its Subsidiaries formed thereafter in accordance with <u>Section 6.1(a)</u> and may make loans or advances to its Subsidiaries and to other Credit Parties after the Closing Date to the extent permitted under <u>Section 6.3</u>.

6.3    Indebtedness.

(a)    No Credit Party shall create, incur, assume or permit to exist any Indebtedness, except (without duplication) (i) Indebtedness (whether incurred before or after the Closing Date) in an aggregate principal amount not to exceed $6,000,000 at any time outstanding that is secured by purchase money security interests and Capitalized Leases permitted in Section 6.7(c) and refinancings thereof or amendments or modifications thereto that do not have the effect of increasing the principal amount thereof or changing the maturity or amortization thereof (other than to extend the same) and that are otherwise on terms and conditions no less favorable to any Credit Party, Agent or any Lender, as reasonably determined by Agent, than the terms of the Indebtedness being refinanced, amended or modified, (ii) the Revolving Loans and the other Obligations, (iii) any other existing Indebtedness that is outstanding as of the Closing Date and is described in Disclosure Schedule (6.3) and refinancings thereof or amendments or modifications thereto that do not have the effect of increasing the principal amount thereof or changing the maturity or amortization thereof (other than to extend the same) and that are otherwise on terms and conditions no less favorable to any Credit Party, Agent or any Lender, as reasonably determined by Agent, than the terms of the Indebtedness being refinanced, amended or modified, (iv) Subordinated Party Debt, (v) any Guaranteed Indebtedness to the extent permitted by Section 6.6, (vi) Indebtedness consisting of intercompany loans and advances made by any Borrower to any other Borrower; provided that, (A) each Borrower shall have executed and delivered to each other Borrower a demand note (the "**Intercompany Note**") to evidence any such intercompany Indebtedness owing at any time by such Borrower which Intercompany Notes shall be in form and substance reasonably satisfactory to Agent and shall be pledged and delivered to Agent pursuant to the applicable Pledge Agreement or Security Agreement as additional collateral security for the Obligations and (B) each Borrower shall record all intercompany transactions on its books and records in a manner that is consistent with the Credit Parties' current accounting practices for such intercompany loans and advances; and (vii) the loans and other obligations under the Pre-Petition Credit Agreement.

(b)    No Credit Party shall, directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness prior to its scheduled maturity, other than (i) the Obligations; (ii) Indebtedness (other than the Obligations) secured by a Permitted Encumbrance if the asset securing such Indebtedness has been sold or otherwise disposed of in accordance with Section 6.8(b); (iii) Indebtedness permitted by Sections 6.3(a)(i) and (iii) upon any refinancing thereof in accordance with Sections 6.3(a)(i) and (iii) (as applicable); and (iv) Indebtedness permitted under Sections 6.3(a)(vi) and (vii).

(c)    Notwithstanding the foregoing, and except for the Carve-Out, no Indebtedness permitted under this Section 6.3 shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or pari passu with the super priority administrative expense claims of Agent and the Lenders as set forth herein and in the Financing Orders.

6.4    Employee Loans and Affiliate Transactions.

(a)    Except to the extent otherwise expressly permitted in this Section 6 with respect to Affiliates and except as otherwise described in any Disclosure Schedule, no Credit Party shall enter into or be a party to any transaction with any other Credit Party or any Affiliate thereof except in the ordinary course of and pursuant to the reasonable requirements of such Credit Party's business and upon fair and reasonable terms that are no less favorable to such Credit Party than would be obtained in a comparable arm's length transaction with a Person not an Affiliate of such Credit Party.

(b)    Except to the extent consistent with the DIP Budget, no Credit Party shall enter into any lending or borrowing transaction with any employees of any Credit Party, except loans to a Credit Party's employees on an arm's length basis consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes; provided that the interest rate charged on such transaction need not be on an arm's length basis.

6.5    Capital Structure and Business.  Except as otherwise expressly permitted by this Section 6, no Credit Party shall (a) make any changes in any of its business objectives, purposes or operations which could reasonably be expected to in any way materially and adversely affect the repayment of the Revolving Loans or any of the other Obligations or could reasonably be expected to have or result in a Material Adverse Effect, (b) except pursuant to a transaction permitted under Section 6.1(a) make any change in its capital structure as described in Disclosure Schedule (3.8), including the issuance or sale of any shares of Stock, warrants or other securities convertible into Stock or any revision of the terms of its outstanding Stock (other than Excluded Stock Issuances), (c) amend its charter, operating agreement, bylaws or other constituent documents in a manner that would adversely affect Agent or Lenders or such Credit Party's duty or ability to repay the Obligations or (d) amend the terms of the ArchBrook Preferred Stock.  Nothing in this Agreement shall prevent or limit (i) any increase or decrease in the capital account of any member of any limited liability company or (ii) any issuance or cancellation of membership units of any such company, in each case pursuant to such company's operating agreement as then in effect and so long as any action described in clause (i) or (ii) of this sentence does not result in the making of a Restricted Payment except to the extent permitted by the terms and conditions of Section 6.14.

6.6    Guaranteed Indebtedness.  No Credit Party shall create, incur, assume or permit to exist any Guaranteed Indebtedness except (a) by endorsement of instruments or items of payment for deposit to a deposit account of any Credit Party, (b) for Guaranteed Indebtedness incurred for the benefit of any other Credit Party if the primary obligation is expressly permitted by this Agreement, provided that if the payment of such primary obligations is subordinated to the payment of the Obligations, then the payment of such Guaranteed Indebtedness shall be subordinated to the payment of the Obligations on the same basis that such primary obligations are so subordinated, (c) customary indemnification obligations incurred in connection with Dispositions permitted hereunder, (d) those incurred in the ordinary course of business of such Credit Party with respect to surety and appeal bonds, performance and return-of-money bonds and other similar obligations of such Credit Party up to $200,000 in the aggregate for all Credit Parties combined, (e) the guaranties referred to on Disclosure Schedule 6.6 (Guaranteed Indebtedness) and (f) the Guaranties.

6.7　Liens.  No Credit Party shall create, incur, assume or permit to exist any Lien on or with respect to its Accounts or any of its other properties or assets (whether now owned or hereafter acquired) except for (a) Permitted Encumbrances;  (b) Liens in existence on the Petition Date and summarized on Disclosure Schedule (6.7) and securing the Indebtedness described on Disclosure Schedule (6.3) and refinancings thereof or amendments or modifications thereto that do not have the effect of increasing the principal amount thereof or changing the maturity or amortization thereof (other than to extend the same) and that are otherwise on terms and conditions no less favorable to any Credit Party, Agent or any Lender, as reasonably determined by Agent, than the terms of the Indebtedness being refinanced, amended or modified; (c) Liens created before or after the date hereof by conditional sale or other title retention agreements (including Capitalized Leases) or in connection with purchase money Indebtedness with respect to Equipment and Fixtures acquired by any Credit Party in the ordinary course of business involving the incurrence of Indebtedness permitted under Section 6.3(a)(i) (provided that such Liens attach only to the assets subject to such Indebtedness and such Indebtedness is incurred within 20 days following such purchase and does not exceed the lesser of the purchase price or the fair market value at the time of purchase of the subject assets); and (d) Liens on other Inventory of any Borrower and the Proceeds thereof granted by such Borrower to the vendor of such Inventory to secure the unpaid purchase price thereof, so long as such vendor is acceptable to the Agent and such Liens are subject to the provisions of a lien subordination agreement in form and substance satisfactory in all respects to the Agent. In addition, no Credit Party shall become a party to any agreement, note, indenture or instrument, or take any other action, which would prohibit the creation of a Lien on any of its properties or other assets in favor of Agent, on behalf of itself and Lenders, as additional collateral for the Obligations, except operating leases, Capitalized Leases or Licenses which prohibit Liens upon the assets that are subject thereto. The prohibition provided for in this Section 6.7 specifically includes, without limitation, any effort by Borrowers, the Committee or any other party-in-interest in any Chapter 11 Case to prime or create pari passu Liens to any Liens of Agent or the Lenders (other than for the Carve-Out) irrespective of whether such claims or interest may be "adequately protected".

6.8　Sale of Stock and Assets.  Except as otherwise expressly permitted by Section 5.13 and this Section 6, no Credit Party shall sell, transfer, convey, assign or otherwise dispose of any of its properties or other assets, including the Stock of any of its Subsidiaries (whether in a public or a private offering or otherwise) or any of its Accounts, other than (a) the sale of Inventory or the use of Cash and Cash Equivalents, in each case in the ordinary course of business (it being hereby understood and agreed that, with respect to sales of Inventory in excess of $250,000, ordinary course of business shall mean that the sale is for a purchase price that is at least 90% of cost (unless otherwise consented to by the Agent or its Advisors)) (b) the sale, transfer, conveyance or other disposition by a Credit Party of Equipment, Fixtures or Real Estate that are obsolete or no longer used in such Credit Party's business and having a sale price not exceeding $500,000 in any single transaction or $1,000,000 in the aggregate in any Fiscal Year for all Credit Parties combined; and (c) transfers of assets between and among Borrowers.  With respect to any disposition of assets or other properties permitted pursuant to clause (b) above, subject to the Borrowers making any mandatory prepayment of the Obligations required under Section 1.3(b), Agent agrees on reasonable prior written notice to release its Lien on such assets or other properties in order to permit the applicable Credit Party to effect such disposition and shall execute and deliver to Borrowers for filing or authorize the filing by Borrowers, in each such case, at Borrowers' expense, such appropriate UCC termination statements and other

releases as reasonably requested by Borrowers. In furtherance of the foregoing and in connection with any sale of Inventory for a purchase price that is less than cost, the Credit Parties shall consult with the Agent and its Advisors in a manner consistent with its practices immediately prior to the Petition Date and provide all information reasonably requested by the Agent or its Advisors relating to any such sales.

6.9     ERISA.  No Credit Party shall, or shall cause or permit any ERISA Affiliate to, cause or permit to occur an event that could result in the imposition of a Lien under Section 412 of the IRC or Section 302 or 4068 of ERISA or cause or permit to occur an ERISA Event to the extent such ERISA Event could reasonably be expected to have, individually or in the aggregate for all such events, a Material Adverse Effect.

6.10     Variance.  The Credit Parties shall not breach or fail to comply with any of the following covenants:

(a)     The aggregate cumulative disbursements (excluding debt service, Professional Fees and Capital Expenditures) by the Credit Parties after the Petition Date (i) for the week ended July 10, 2011 shall not exceed 110% of the aggregate cumulative amount budgeted for such week pursuant to the DIP Budget. (ii) for the two weeks ended July 17, 2011 shall not exceed 110% of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget, (iii) for the three weeks ended July 24, 2011 shall not exceed 105% of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget and (iv) for the four weeks ended July 31, 2011 and for any four-week period set forth in the DIP Budget thereafter (measured on a rolling 4-week basis) shall not exceed 105%, in each case, of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget.

(b)     The aggregate cumulative collections by the Credit Parties after the Petition Date (i) for the week ended July 10, 2011 shall not be less than 90% of the aggregate cumulative amount budgeted for such week pursuant to the DIP Budget. (ii) for the two weeks ended July 17, 2011 shall not be less than 90% of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget, (iii) for the three weeks ended July 24, 2011 shall not be less than 95% of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget and (iv) for the four weeks ended July 31, 2011 and for any four-week period set forth in the DIP Budget thereafter (measured on a rolling 4-week basis) shall not be less than 95%, in each case, of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget.

(c)     The aggregate cumulative sales by the Credit Parties after the Petition Date (i) for the week ended July 10, 2011 shall not be less than 90% of the aggregate cumulative amount budgeted for such week pursuant to the DIP Budget. (ii) for the two weeks ended July 17, 2011 shall not be less than 90% of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget, (iii) for the three weeks ended July 24, 2011 shall not be less than 95% of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget and (iv) for the four weeks ended July 31, 2011 and for any four-week period set forth in the DIP Budget thereafter (measured on a rolling 4-week basis)

shall not be less than 95%, in each case, of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the DIP Budget.

(d)     Each of the covenants set forth above shall be tested on the Tuesday of each week prior to the Termination Date for the one, two, three or four-week period, as applicable, ending on the Sunday immediately prior to such test date.

6.11    <u>Hazardous Materials</u>.  No Credit Party shall cause or permit a Release of any Hazardous Material on, at, in, under, above, to, from or about any of the Real Estate where such Release would (a) violate in any respect, or form the basis for any Environmental Liabilities under, any Environmental Laws or Environmental Permits or (b) otherwise adversely impact the value or marketability of any of the Real Estate or any of the Collateral, other than such Releases, violations or Environmental Liabilities that could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

6.12    <u>Sale-Leasebacks</u>.  No Credit Party shall engage in any sale-leaseback, synthetic lease or similar transaction involving any of its assets.

6.13    <u>Cancellation of Indebtedness</u>.  No Credit Party shall cancel any claim or debt owing to it, except for reasonable consideration negotiated on an arm's length basis and in the ordinary course of its business consistent with past practices.

6.14    <u>Restricted Payments</u>.  No Credit Party shall make any Restricted Payment, except (a) advances of Intercompany Loans and payments of principal of and interest on Intercompany Loans, in each case to the extent permitted by <u>Section 6.3(a)(vi)</u>, (b) dividends and distributions by Subsidiaries of any Borrower paid to such Borrower and (c) Permitted Overhead Distributions in accordance with the DIP Budget.

6.15    <u>Change of Corporate Name or Location; Change of Fiscal Year</u>.  No Domestic Credit Party shall (a) change its name as it appears in official filings in the state of its incorporation or other organization, (b) change its chief executive office, principal place of business, corporate offices or warehouses or locations at which Collateral is held or stored, or the location of its records concerning the Collateral, in each case, other than to locations specified on <u>Disclosure Schedule (3.6)</u> (except as contemplated by the proposed relocation of the warehouse facilities in Reno, Nevada), (c) change the type of entity it is, (d) change its organization identification number, if any, issued by its state of incorporation or other organization, (d) terminate, amend, amend and restate, supplement or otherwise modify its certificate of organization (or equivalent formation document) or operating agreement (or equivalent governing document), or (f) change its state of incorporation or organization or incorporate or organize in any additional jurisdictions.  Without limiting the foregoing, no Domestic Credit Party shall change its name, identity or organizational structure in any manner that might make any financing or continuation statement filed in connection herewith seriously misleading within the meaning of Section 9-507 of the Code or any other then applicable provision of the Code except upon prior written notice to Agent and after Agent's written acknowledgment that any reasonable action requested by Agent in connection therewith, including to continue the perfection of any Liens in favor of Agent, on behalf of itself and the Lenders, in any Collateral, has been completed or taken.  No Credit Party shall change its Fiscal Year.

6.16    No Impairment of Intercompany Transfers.  No Credit Party shall directly or indirectly enter into or become bound by any agreement, instrument, indenture or other obligation (other than the Loan Documents) that could directly or indirectly restrict, prohibit or require the consent of any Person with respect to the payment of dividends or distributions or the making or repayment of intercompany loans by a Subsidiary of any Credit Party to any Credit Party or between Credit Parties.

6.17    No Speculative Transactions.  No Credit Party shall engage in any transaction involving commodity options, futures contracts or similar transactions, except solely to hedge against fluctuations in the prices of commodities owned or purchased by it and the values of foreign currencies receivable or payable by it and interest swaps, caps or collars.

6.18    Leases; Real Estate Purchases.  No Credit Party shall enter into any operating lease for Equipment or Real Estate, if the aggregate of all such operating lease payments payable in any year by the Credit Parties on a consolidated basis would exceed $500,000; provided that, if consented to in writing by the Agent in its sole discretion, the Credit Parties may enter into any operating lease for computer hardware and software if the aggregate of all such operating lease payments payable in any year by the Credit Parties on a consolidated basis shall not exceed $1,000,000.  No Credit Party shall purchase a fee simple ownership interest in Real Estate with an aggregate purchase price in excess of $1,000,000.

6.19    Changes Relating to Subordinated Debt.  No Credit Party shall amend, modify, supplement, extend, renew, replace or restate the terms of any of the Subordinated Debt (or any indenture or agreement in connection therewith) or permit the refinancing any such Indebtedness.

6.20    Credit Parties Other than Borrowers.  Neither ArchBrook Holdings, ABL West, Chimerica nor ABL NY shall engage in any trade or business, or own any Accounts, Inventory or other material assets (other than Stock of their Subsidiaries) or incur any Indebtedness or Guaranteed Indebtedness (other than with respect to (i) the Obligations, (ii) intercompany Indebtedness permitted pursuant to Section 6.3(a)(vii) and (iii) any Guaranteed Indebtedness permitted under Section 6.6 (e)).

6.21    Pre-Petition Indebtedness.  The Credit Parties shall not make any adequate protection payments on account of any Pre-Petition Indebtedness other than as expressly permitted by the DIP Budget or the Financing Orders.

6.22    Bankruptcy Provisions.  Except as otherwise agreed to by the Agent (which consent shall be provided in writing solely to the extent that the Borrowers' request has been provided in writing), no Credit Party shall and no Credit Party shall suffer or permit any of its Subsidiaries to: (a) file or approve a plan of reorganization or liquidation (unless the Obligations have been indefeasibly paid in full in cash); (b) seek or consummate a sale of assets under Section 363(b) of the Bankruptcy Code without the consent of the Agent; (c) except for the Carve-Out, incur administrative expense claims pari passu with or senior to Obligations incurred hereunder; (d) seek confirmation of a plan of reorganization under which Pre-Petition Collateral is sold other than pursuant to Section 1129(b)(2)(A)(ii) of the Bankruptcy Code; (e) seek or consent to any modification, stay, vacation or amendment with respect to (i) any order made on

the Petition Date (which order and motions in respect thereof shall be acceptable in form and substance to the Agent), (ii) the Interim Order or (iii) the Final Order; (f) make cash expenditures on account of claims incurred (i) by critical vendors prior to the Petition Date or (ii) pursuant to Section 503(b)(9) of the Bankruptcy Code or (g) seek or consent to any order seeking authority to take action prohibited by the Loan Documents.

6.23 <u>Compliance with DIP Budget</u>. No Credit Party shall and no Credit Party shall suffer or permit any of its Subsidiaries to make any cash disbursement that is not contemplated by the most recently approved DIP Budget (after giving effect to any permitted variance pursuant to <u>Section 6.10(a)</u>) or in the supporting schedules provided to Agent in connection therewith.

6.24 <u>Inventory Purchases</u>. No Credit Party shall and no Credit Party shall suffer or permit any of its Subsidiaries to purchase, enter into an agreement to purchase, or make any expenditures to acquire any additional Inventory or Goods unless such Credit Party has provided to Agent or its Advisors, as soon as practicable prior to entering into such agreement or making such purchase or expenditure and in any event at least one (1) day prior to such purchase or expenditure, either (i) a final and agreed sales order for the same Inventory or Goods, or (ii) information on the buyers or potential buyers of such Inventory or Goods.

## 7. TERM

7.1 <u>Termination</u>. The financing arrangements contemplated hereby shall be in effect until the Commitment Termination Date, and the Revolving Loans and all other Obligations (other than contingent indemnification obligations not yet due and payable) shall be automatically due and payable in full on such date.

7.2 <u>Survival of Obligations Upon Termination of Financing Arrangements</u>. Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the obligations, duties and liabilities of the Credit Parties or the rights of Agent and Lenders relating to any unpaid portion of the Revolving Loans or any other Obligations, due or not due, liquidated, contingent or unliquidated, or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Commitment Termination Date. Except as otherwise expressly provided herein or in any other Loan Document, all undertakings, agreements, covenants, warranties and representations of or binding upon the Credit Parties, and all rights of Agent and each Lender, all as contained in the Loan Documents, shall not terminate or expire, but rather shall survive any such termination or cancellation and shall continue in full force and effect until the Termination Date; <u>provided</u> that in all events the provisions of <u>Section 11</u>, the payment obligations under <u>Sections 1.15</u> and <u>1.16</u>, and the indemnities contained in the Loan Documents shall survive the Termination Date.

## 8. EVENTS OF DEFAULT; RIGHTS AND REMEDIES

8.1 <u>Events of Default</u>. Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion to, hearing before, or order of the

Bankruptcy Court, or any notice to any Credit Party, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "**Event of Default**" hereunder:

(a)     Any Borrower (i) fails to make any payment of principal of, or interest on, or Fees owing in respect of, the Revolving Loans or any of the other Obligations when due and payable, or (ii) fails to pay or reimburse Agent or Lenders for any expense reimbursable hereunder or under any other Loan Document within ten (10) days following Agent's demand for such reimbursement or payment of expenses.

(b)     Any Credit Party fails or neglects to perform, keep or observe any of the provisions of <u>Sections 1.4</u>, <u>1.8</u>, <u>1.14</u>, <u>1,18</u>, <u>5.4</u>, <u>5.12</u>, <u>5.13</u> or <u>6</u>, or any of the provisions set forth in <u>Annexes C</u> or <u>G</u>, respectively.

(c)     Any Borrower fails or neglects to perform, keep or observe any of the provisions of <u>Section 4</u> or any provisions set forth in <u>Annex E</u> or <u>F</u>, respectively.

(d)     Any Credit Party fails or neglects to perform, keep or observe any other provision of this Agreement or of any of the other Loan Documents (other than any provision embodied in or covered by any other clause of <u>this Section 8.1</u>) and the same shall remain unremedied for twenty (20) days or more after the earlier of (1) the date on which any Borrower obtains knowledge of the same or (2) the date on which Agent delivers notice of the same to Borrower Representative.

(e)     A default or breach occurs under any other agreement, document or instrument to which any Credit Party is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness or Guaranteed Indebtedness (other than the Obligations) of any Credit Party (including (x) undrawn committed or available amounts and (y) amounts owing to all creditors under any combined or syndicated credit arrangements) incurred or entered into after the Petition Date, or (ii) causes, or permits any holder of such Indebtedness or Guaranteed Indebtedness incurred or entered into after the Petition Date or a trustee to cause, such Indebtedness or Guaranteed Indebtedness or a portion thereof to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, or cash collateral in respect thereof to be demanded, in each case, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

(f)     (i) Any representation or warranty herein or in any Loan Document or in any written statement, report, financial statement or certificate made or delivered to Agent or any Lender by any Credit Party is untrue or incorrect in any material respect as of the date when made or deemed made.

(g)     Assets of any of the Credit Parties with a fair market value of $500,000 or more in the aggregate for all such Credit Parties are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Credit Party and such condition continues for thirty (30) days or more.

(h)     Any Material Contract is terminated or rejected by the counterparty thereto without the Agent's and its Advisors consent (such consent not to be unreasonably withheld).

(i)     [Reserved].

(j)     A final judgment or judgments, orders or awards (or any settlement of any claim that, if breached, could result in a judgment, order or award) for the payment of money in excess of $250,000 in the aggregate at any time are outstanding against one or more of the Credit Parties (but only to the extent not covered by insurance meeting the requirements of Section 5.4 and as to which the insurer has confirmed coverage of such judgments, awards or settlements in writing) and the same shall not, within fifteen (15) days after the entry thereof, have been discharged or execution thereof stayed or bonded pending appeal, or such judgments, awards or settlements are not discharged or satisfied prior to the expiration of any such stay.

(k)     Any material provision of any Loan Document shall for any reason cease to be valid and binding on and enforceable against the applicable Credit Parties in accordance with its terms (or any Credit Party shall challenge the enforceability against it of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid and binding on and enforceable against it in accordance with its terms), or any security interest created under any Loan Document shall cease to be a valid and perfected first priority security interest (except as otherwise permitted herein or therein) in any of the Collateral purported to be covered thereby or the Guaranties shall be invalid.

(l)     Any Change of Control occurs.

(m)     [Reserved].

(n)     [Reserved].

(o)     [Reserved].

(p)     The occurrence of any of the following in the Chapter 11 Case:

(i)     the bringing of a motion by any Credit Party, or the entry of an order or ruling (which has not been withdrawn, dismissed or reversed): (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Liens and the Carve-Out upon or affecting any Collateral; (C) dismissing all or an portion of the Chapter 11 Case or conversion of all or any portion of the Chapter 11 Case to a Chapter 7 case; (D) to appoint a Chapter 11 trustee in the Chapter 11 Case; (E) approving any other superpriority claim senior to or pari passu with the superpriority claims of the Agent and he Lenders; (F) to modify this Agreement, the Interim Order or the Final Order; (G) to appoint an examiner in the Chapter 11 Case having enlarged powers (beyond those set forth under Section 1106(a)(3) and (4) of the Bankruptcy Code) or (H) providing relief from the automatic stay for the benefit of any other secured creditor with respect to any Collateral, in each case without the consent of the Agent and the Requisite Lenders;

(ii)　　the Interim Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification or amendment, without the prior written consent of the Agent and the Requisite Lenders;

(iii)　　the Final Order is not entered on or before the date that is 35 days after the entry of the Interim Order;

(iv)　　the Final Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification or amendment, without the prior written consent of the Agent and the Requisite Lenders;

(v)　　the payment by a Credit Party of, or application by any Credit Party for authority to pay by a Credit Party, any Pre-Petition claim without Agent's prior written consent unless such payment is otherwise permitted by the DIP Budget or an order from the Bankruptcy Court;

(vi)　　the commencement of any action against Agent or any Lender or against the Pre-Petition Agent or any Prior Lender by or on behalf of any Debtor or any of its Affiliates, officers or employees;

(vii)　　the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against Agent, any Lender or any of the Collateral or against the Pre-Petition Agent, any Prior Lender or any Collateral (as defined in the Pre-Petition Credit Agreement);

(viii)　　the failure of any Credit Party to perform any of its obligations under the Interim Order or the Final Order;

(ix)　　the filing of any plan of reorganization or related disclosure statement  or any direct or indirect amendment to such plan or disclosure statement, or the entry of an order confirming any such plan of reorganization or approving any such disclosure statement or approving any such amendment, in each case that either fails to provide for indefeasible payment in full in cash of the Obligations (and termination of all Revolving Loan Commitments) or treats the claims of Agent and Lenders in any manner to which they do not consent in their discretion;

(x)　　any Credit Party supports, without Agent's and the Requisite Lenders' consent, the sale of all or substantially all of the assets of the Credit Parties through a sale under Section 363(b) of the Bankruptcy Code, or the entry of a sale order with respect to any such sale, that is not conditioned upon and fails to provide for the indefeasible payment in full in cash of the Obligations (and termination of all Revolving Loan Commitments);

(xi)　　the sale, without Agent's and the Requisite Lenders' consent, of all or substantially all of the assets of the Credit Parties through a sale under Section 363(b) of the Bankruptcy Code that is not conditioned upon and fails to provide for indefeasible payment in full in cash of the Obligations (and termination of all Revolving Loan Commitments);

(xii)   any termination or modification of the exclusivity periods set forth in Section 1121 of the Bankruptcy Code;

(xiii)   failure to retain Gawrylewski/Hawkwood Consulting, Inc. as Chief Restructuring Officer or such other Chief Restructuring Officer satisfactory to the Agent on terms and conditions satisfactory to the Agent;

(xiv)   failure to retain Macquarie Capital (USA) Inc. as Financial Advisor or such other investment banker satisfactory to the Agent on terms and conditions satisfactory to the Agent; and

(xv)   the marshalling of all or any portion of the Collateral.

8.2   <u>Remedies</u>.   Notwithstanding the provisions of Section 362 of the Bankruptcy Code, but in any event subject to the terms of the Financing Orders, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court:

(a)   If any Event of Default has occurred and is continuing, Agent may (and at the written request of the Requisite Lenders shall) (i) declare all or any portion of the Revolving Loan Commitment of each Lender to make Revolving Loans to be terminated, whereupon such Revolving Loan Commitments shall forthwith be terminated without affecting the Obligations or the Liens securing the Obligations, (ii) declare all or any portion of the unpaid principal amount of all outstanding Revolving Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable; without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Credit Party, and/or (iii) declare a termination, reduction or restriction on the ability of the Debtors to use any cash collateral (any such declaration shall be made to the Debtors, the Committee and the United States Trustee, and shall be referred to herein as a "**Termination Declaration**" and the date which is the earliest to occur of any such Termination Declaration being herein referred to as the "**Termination Declaration Date**"). Except as otherwise provided in <u>Section 1.5(d)</u>, if any Default or Event of Default shall have occurred and be continuing, Agent may (and at the written request of Requisite Lenders shall), without notice except as otherwise expressly provided herein, increase the rate of interest applicable to the Revolving Loans and the Letter of Credit Fees to the Default Rate.

(b)   If any Event of Default has occurred and is continuing, Agent may (and at the written request of the Requisite Lenders shall): (i) direct any or all of the Credit Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to Agent pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Credit Party to assume and assign any lease or executory contract included in the Collateral to Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code); (ii) enter onto the premises of any Credit Party in connection with an orderly liquidation of the Collateral; or (iii) exercise any rights and remedies provided to Agent under the Loan Documents or at law or equity, including all remedies provided under the Code and, pursuant to the Interim Order or the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Agent and the Lenders to exercise their remedies under this Agreement and the Loan Documents, without

further notice, application or motion to, hearing before, or order from, the Bankruptcy Court, provided, however, notwithstanding anything to the contrary contained herein, Agent shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of and the Credit Party in the Collateral only upon seven (7) days prior written notice to such Credit Party and counsel approved by the Bankruptcy Court for the Committee.

8.3     Waivers by Credit Parties.  Except as otherwise provided for in this Agreement or by applicable law, each Credit Party waives (including for purposes of Section 12): (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Agent on which any Credit Party may in any way be liable, and hereby ratifies and confirms whatever Agent may do in this regard, (b) all rights to notice and a hearing prior to Agent's taking possession or control of, or to Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Agent to exercise any of its remedies, and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

## 9.     ASSIGNMENT AND PARTICIPATIONS; APPOINTMENT OF AGENT

9.1     Assignment and Participations.

(a)     Subject to the terms of this Section 9.1, any Lender may make an assignment to a Qualified Assignee of, or sell participations in, at any time or times, such Lender's interest in the Loan Documents, Revolving Loans, Letter of Credit Obligations and its Revolving Loan Commitment or any portion thereof or interest therein, including such Lender's rights, title, interests, remedies, powers or duties thereunder.  Any assignment by a Lender shall: (i) require the consent of Agent (which consent shall not be unreasonably withheld or delayed with respect to a Qualified Assignee) and the execution of an assignment agreement (an "**Assignment Agreement**") substantially in the form attached hereto as Exhibit 9.1(a) and otherwise in form and substance reasonably satisfactory to, and acknowledged by, Agent; (ii) be conditioned on such assignee Lender representing to the assigning Lender, the Credit Parties and Agent that it is purchasing the Revolving Loans to be assigned to it for its own account, for investment purposes and not with a view to the distribution thereof; (iii) after giving effect to any such partial assignment, the assignee Lender shall have a Revolving Loan Commitment in an amount at least equal to $5,000,000 and the assigning Lender shall have retained a Revolving Loan Commitment in an amount at least equal to $5,000,000; (iv) include a payment to Agent of an assignment fee of $3,500; and (v) so long as no Event of Default has occurred and is continuing, require the consent of Borrower Representative, which shall not be unreasonably withheld or delayed; provided that no such consent shall be required for an assignment to a Qualified Assignee.  In the case of an assignment by a Lender under this Section 9.1, the assignee shall have, to the extent of such assignment, the same rights, benefits and obligations as all other Lenders hereunder.  The assigning Lender shall be relieved of its obligations hereunder with respect to its Revolving Loan Commitment or assigned portion thereof from and after the date of such assignment.  Each Borrower hereby acknowledges and agrees that any assignment shall give rise to a direct obligation of Borrowers to the assignee and that the assignee shall be

considered to be a "Lender". In all instances, each Lender's liability to make Revolving Loans hereunder shall be several and not joint and shall be limited to such Lender's Revolving Loan Commitment. In the event Agent or any Lender assigns or otherwise transfers all or any part of the Obligations, Agent or any such Lender shall so notify Borrowers and Borrowers shall, upon the request of Agent or such Lender, execute new Revolving Notes in exchange for the Revolving Notes, if any, being assigned. Notwithstanding the foregoing provisions of this Section 9.1(a), any Lender may at any time pledge the Obligations held by it and such Lender's rights under this Agreement and the other Loan Documents to a Federal Reserve Bank, and any Lender that is an investment fund may assign the Obligations held by it and such Lender's rights under this Agreement and the other Loan Documents to another investment fund managed by the same investment advisor; provided that no such pledge to a Federal Reserve Bank shall release such Lender from, or otherwise adversely affect, such Lender's obligations hereunder or under any other Loan Document.

(b) Any sale by a Lender of a participation interest in all or any part of its Revolving Loans and Revolving Loan Commitments shall be made with the understanding that all amounts payable by Borrowers hereunder shall be determined as if that Lender had not sold such participation, and that the holder of any such participation shall not be entitled to require such Lender to take or omit to take any action hereunder except actions directly affecting (i) any reduction in the principal amount of, or interest rate or Fees payable with respect to, any Revolving Loan in which such holder participates, (ii) any extension of the scheduled amortization of the principal amount of any Revolving Loan in which such holder participates or the final maturity date thereof, and (iii) any release of all or substantially all of the Collateral (other than in accordance with the terms of this Agreement, the Collateral Documents or the other Loan Documents). Solely for purposes of Sections 1.13, 1.15, 1.16 and 9.8, each Borrower acknowledges and agrees that a participation shall give rise to a direct obligation of Borrowers to the participant and the participant shall be considered to be a "Lender"; provided that no Borrower shall be obligated to pay any greater amount under any of such sections to such participant than such Borrower otherwise would be obligated under such sections to pay to such participant's selling Lender; and provided further that if the participant would be a Foreign Lender if it were a Lender, it shall not be entitled to the benefits of Section 1.15 unless the Borrowers are notified of the participation sold and such participant agrees, for the benefit of the Borrowers, to comply, and does so comply, with Section 1.15 as though it were a Lender. Except as set forth in the preceding sentence no Borrower or Credit Party shall have any obligation or duty to any participant. Neither Agent nor any Lender (other than the Lender selling a participation) shall have any duty to any participant and the Credit Parties may continue to deal solely with the Lender selling a participation as if no such sale had occurred.

(c) Except as expressly provided in this Section 9.1, no Lender shall, as between Borrowers and that Lender, or Agent and that Lender, be relieved of any of its obligations hereunder as a result of any sale, assignment, transfer or negotiation of, or granting of participation in, all or any part of the Revolving Loans, the Revolving Notes or other Obligations owed to such Lender.

(d) Each Credit Party executing this Agreement shall assist any Lender permitted to sell assignments or participations under this Section 9.1 as reasonably required to enable the assigning or selling Lender to effect any such assignment or participation, including

the execution and delivery of any and all agreements, notes and other documents and instruments as shall be requested and, if requested by Agent, the preparation of informational materials for, and the participation of management in meetings with, potential assignees or participants. Each Credit Party executing this Agreement shall certify the correctness, completeness and accuracy of all descriptions of the Credit Parties and their respective affairs contained in any selling materials provided by them and all other information provided by them and included in such materials. Notwithstanding anything in this Agreement to the contrary, no Credit Party shall be obligated to incur any out-of-pocket costs in connection with its compliance with any of the requirements of this Section 9.1(d).

(e) Any Lender may furnish any information concerning Credit Parties in the possession of such Lender from time to time to assignees and participants (including prospective assignees and participants); provided that prior thereto such Lender shall obtain from such assignees or participants confidentiality covenants substantially equivalent to those contained in Section 11.8.

(f) So long as no Event of Default has occurred and is continuing, no Lender shall assign or sell participations in any portion of its Revolving Loans or Revolving Loan Commitment to a potential Lender or participant, if, as of the date of the proposed assignment or sale, the assignee Lender or participant would be subject to capital adequacy or similar requirements under Section 1.16(a), increased costs under Section 1.16(b) or withholding taxes in accordance with Section 1.15(a).

(g) Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**"), may grant to a special purpose funding vehicle (an "**SPC**"), identified as such in writing by the Granting Lender to Agent and Borrowers, the option to provide to Borrowers all or any part of any Revolving Loans that such Granting Lender would otherwise be obligated to make to Borrowers pursuant to this Agreement; provided that (i) nothing in this Section 9.1(g) shall constitute a commitment by any SPC to make any Revolving Loan; and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Revolving Loan, the Granting Lender shall be obligated to make such Revolving Loan pursuant to the terms hereof. The making of a Revolving Loan by an SPC hereunder shall utilize the Revolving Loan Commitment of the Granting Lender to the same extent, and as if, such Revolving Loan were made by such Granting Lender. No SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). Any SPC may (i) with notice to, but without the prior written consent of, Borrowers and Agent assign all or a portion of its interests in any Revolving Loans to the Granting Lender or to any financial institutions (consented to by Borrowers and Agent) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Revolving Loans and (ii) disclose on a confidential basis any non-public information relating to its Revolving Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC. This Section 9.1(g) may not be amended without the prior written consent of each Granting Lender, all or any of whose Revolving Loans are being funded by an SPC at the time of such amendment. For the avoidance of doubt, the Granting Lender shall for all purposes, including without limitation, the approval of any amendment or waiver of any provision of any Loan Document or the obligation to pay any amount otherwise payable by the Granting Lender under

the Loan Documents, continue to be the Lender of record hereunder. Each Lender and each assignee that becomes a Lender hereunder, and each Person that becomes a participant hereunder, severally represents and warrants to the Credit Parties that either (a) no part of the assets used to fund any of the Revolving Loans or to acquire any of the Revolving Loans or any participation interest therein constitutes assets of any "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to Part 4 of Title 1 of ERISA or any "plan" within the meaning of Section 4975(c)(1) of the IRC that is subject to Section 4975 of the IRC or (b) neither its funding of any of the Revolving Loans nor its acquisition of any of the Revolving Loans or any participation interest therein will constitute a non-exempt prohibited transaction under Section 4975(e) of the IRC or Section 406 of ERISA.

9.2     Appointment of Agent.  GE Capital is hereby appointed to act on behalf of all Lenders as Agent under this Agreement and the other Loan Documents.  The provisions of this Section 9.2 are solely for the benefit of Agent and Lenders and no Credit Party nor any other Person shall have any rights as a third party beneficiary of any of the provisions hereof.  In performing its functions and duties under this Agreement and the other Loan Documents, Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Credit Party or any other Person.  Agent shall have no duties or responsibilities except for those expressly set forth in this Agreement and the other Loan Documents.  The duties of Agent shall be mechanical and administrative in nature and Agent shall not have, or be deemed to have, by reason of this Agreement, any other Loan Document or otherwise a fiduciary relationship in respect of any Lender.  Except as expressly set forth in this Agreement and the other Loan Documents, Agent shall not have any duty to disclose, and shall not be liable for failure to disclose, any information relating to any Credit Party or any of their respective Subsidiaries or any Account Debtor that is communicated to or obtained by GE Capital or any of its Affiliates in any capacity.  Neither Agent nor any of its Affiliates nor any of their respective officers, directors, employees, agents or representatives shall be liable to any Lender for any action taken or omitted to be taken by it hereunder or under any other Loan Document, or in connection herewith or therewith, except for damages caused by its or their own gross negligence or willful misconduct.

If Agent shall request instructions from Requisite Lenders or all affected Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, then Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from Requisite Lenders or all affected Lenders, as the case may be, and Agent shall not incur liability to any Person by reason of so refraining.  Agent shall be fully justified in failing or refusing to take any action hereunder or under any other Loan Document (a) if such action would, in the opinion of Agent, be contrary to law or the terms of this Agreement or any other Loan Document, (b) if such action would, in the opinion of Agent, expose Agent to Environmental Liabilities or (c) if Agent shall not first be indemnified to its satisfaction against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of Requisite Lenders or all affected Lenders, as applicable. Without limiting the generality of the foregoing, each Lender hereby authorizes Agent and the Requisite Lenders to

consent, on behalf of each Lender, to an Interim Order substantially in the form attached as Exhibit 9.2, and a Final Order.

9.3     **Agent's Reliance, Etc.**  Neither Agent nor any of its Affiliates nor any of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement or the other Loan Documents, except for damages caused by its or their own gross negligence or willful misconduct.  Without limiting the generality of the foregoing, Agent:  (a) may treat the payee of any Revolving Note as the holder thereof until Agent receives written notice of the assignment or transfer thereof signed by such payee and in form satisfactory to Agent; (b) may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts; (c) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations made in or in connection with this Agreement or the other Loan Documents; (d) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Credit Party or to inspect the Collateral (including the books and records) of any Credit Party; (e) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (f) shall incur no liability under or in respect of this Agreement or the other Loan Documents by acting upon any notice, consent, certificate or other instrument or writing (which may be by telecopy, telegram, electronic mail, cable or telex) believed by it to be genuine and signed or sent by the proper party or parties.

9.4     **GE Capital and Affiliates**.  With respect to its Revolving Loan Commitment hereunder, GE Capital shall have the same rights and powers under this Agreement and the other Loan Documents as any other Lender and may exercise the same as though it were not Agent; and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include GE Capital in its individual capacity.  GE Capital and its Affiliates may lend money to, invest in, and generally engage in any kind of business with, any Credit Party, any of their Affiliates and any Person who may do business with or own securities of any Credit Party or any such Affiliate, all as if GE Capital were not Agent and without any duty to account therefor to Lenders.  GE Capital and its Affiliates may accept fees and other consideration from any Credit Party for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

9.5     **Lender Credit Decision**.  Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender and based on the Financial Statements referred to in Section 3.4(a) and such other documents and information as it has deemed appropriate, made its own credit and financial analysis of the Credit Parties and its own decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.  Each Lender acknowledges the potential conflict of interest

of each other Lender as a result of Lenders holding disproportionate interests in the Revolving Loans, and expressly consents to, and waives any claim based upon, such conflict of interest.

9.6     <u>Indemnification</u>.  Lenders agree to indemnify Agent (to the extent not reimbursed by the Credit Parties and without limiting the obligations of the Credit Parties hereunder), ratably according to their respective Pro Rata Shares, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against Agent in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by Agent in connection therewith; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Indemnified Person's gross negligence or willful misconduct. Without limiting the foregoing, each Lender agrees to reimburse Agent promptly upon demand for its ratable share of any out-of-pocket expenses (including reasonable counsel fees) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement and each other Loan Document, to the extent that Agent is not reimbursed for such expenses by Credit Parties.

9.7     <u>Successor Agent</u>.  Agent may resign at any time by giving not less than 30 days' prior written notice thereof to Lenders and Borrower Representative.  Upon such resignation, the Requisite Lenders shall have the right to appoint a successor Agent.  If no successor Agent shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within thirty (30) days after the resigning Agent's giving notice of resignation, then the resigning Agent may, on behalf of Lenders, appoint a successor Agent, which shall be a Lender, if a Lender is willing to accept such appointment, or otherwise shall be a commercial bank or financial institution or a subsidiary of a commercial bank or financial institution if such commercial bank or financial institution is organized under the laws of the United States of America or of any State thereof and has a combined capital and surplus of at least $300,000,000. If no successor Agent has been appointed pursuant to the foregoing, within thirty (30) days after the date such notice of resignation was given by the resigning Agent, such resignation shall become effective and the Requisite Lenders shall thereafter perform all the duties of Agent hereunder until such time, if any, as the Requisite Lenders appoint a successor Agent as provided above.  Any successor Agent appointed by Requisite Lenders hereunder shall be subject to the approval of Borrower Representative, such approval not to be unreasonably withheld or delayed; provided that such approval shall not be required if a Default or an Event of Default has occurred and is continuing.  Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor Agent shall succeed to and become vested with all the rights, powers, privileges and duties of the resigning Agent.  Upon the earlier of the acceptance of any appointment as Agent hereunder by a successor Agent or the effective date of the resigning Agent's resignation, the resigning Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents, except that any indemnity rights or other rights in favor of such resigning Agent shall continue.  After any resigning Agent's resignation hereunder, the provisions of this <u>Section 9</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was acting as Agent under this Agreement and the other Loan Documents.

9.8    Setoff and Sharing of Payments.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default and subject to Section 9.9(f), each Lender and each holder of any Revolving Note is hereby authorized at any time or from time to time, without notice to any Credit Party or to any other Person, any such notice being hereby expressly waived, to offset and to appropriate and to apply any and all balances held by it at any of its offices for the account of any Credit Party (regardless of whether such balances are then due to Borrowers) and any other properties or assets at any time held or owing by that Lender or that holder to or for the credit or for the account of any Credit Party against and on account of any of the Obligations and which are not paid when due.  Any Lender or holder of any note exercising a right to offset or otherwise receiving any payment on account of the Obligations in excess of its Pro Rata Share thereof shall purchase for Cash (and the other Lenders or holders shall sell) such participations in each such other Lender's or holder's Pro Rata Share of the Obligations as would be necessary to cause such Lender to share the amount so set off or otherwise received with each other Lender or holder in accordance with their respective Pro Rata Shares (other than offset rights exercised by any Lender with respect to Sections 1.13, 1.15 or 1.16).  Each Credit Party executing this Agreement agrees, to the fullest extent permitted by law, that (a) any Lender or holder may exercise its right to offset with respect to amounts in excess of its Pro Rata Share of the Obligations and may sell participations in such amounts so offset to other Lenders and holders and (b) any Lender or holder so purchasing a participation in the Revolving Loans made or other Obligations held by other Lenders or holders may exercise all rights of offset, bankers' lien, counterclaim or similar rights with respect to such participation as fully as if such Lender or holder were a direct holder of the Revolving Loans and the other Obligations in the amount of such participation.  Notwithstanding the foregoing, if all or any portion of the offset amount or payment otherwise received is thereafter recovered from the Lender that has exercised the right of offset, the purchase of participations by that Lender shall be rescinded and the purchase price restored without interest.

9.9    Revolving Credit Advances; Payments; Non-Funding Lenders; Information; Actions in Concert.

(a)    Revolving Credit Advances; Payments.

(i)    Agent shall notify Lenders, promptly after receipt of a Notice of Revolving Credit Advance and in any event prior to 1:00 p.m. (New York time) on the date such Notice of Revolving Credit Advance is received, by telecopy, telephone or other similar form of transmission.  Each Lender shall make the amount of such Lender's Pro Rata Share of such Revolving Credit Advance available to Agent in same day funds by wire transfer to Agent's account as set forth in Annex H not later than 3:00 p.m. (New York time) on the requested funding date.  After receipt of such wire transfers (or, in the Agent's sole discretion, before receipt of such wire transfers), subject to the terms hereof, Agent shall make the requested Revolving Credit Advance to the Borrower Representative on behalf of all Borrowers.  All payments by each Lender shall be made without setoff, counterclaim or deduction of any kind.

(ii)    On the 2nd Business Day of each calendar week or more frequently at Agent's election (each, a "**Settlement Date**"), Agent shall advise each Lender by telephone, electronic mail or telecopy of the amount of such Lender's Pro Rata Share of

principal, interest and Fees paid for the benefit of Lenders with respect to each applicable Revolving Loan. Provided that a Lender has funded all payments or Revolving Credit Advances required to be made by it and has purchased all participations required to be purchased by it under this Agreement and the other Loan Documents as of such Settlement Date, Agent shall pay to such Lender such Lender's Pro Rata Share of principal, interest and Fees paid by Borrowers since the previous Settlement Date for the benefit of such Lender on the Revolving Loans held by it. To the extent that any Lender (a "**Non-Funding Lender**") has failed to fund all such payments and Revolving Credit Advances or failed to fund the purchase of all such participations, Agent shall be entitled to set off the funding short-fall against that Non-Funding Lender's Pro Rata Share of all payments received from Borrowers. Such payments shall be made by wire transfer to such Lender's account (as specified by such Lender in Annex H or the applicable Assignment Agreement) not later than 2:00 p.m. (New York time) on the next Business Day following each Settlement Date.

(b)     <u>Availability of Lender's Pro Rata Share</u>. Agent may assume that each Lender will make its Pro Rata Share of each Revolving Credit Advance available to Agent on each funding date. If such Pro Rata Share is not, in fact, paid to Agent by such Lender when due, Agent will be entitled to recover such amount on demand from such Lender without setoff, counterclaim or deduction of any kind. If any Lender fails to pay the amount of its Pro Rata Share forthwith upon Agent's demand, Agent shall promptly notify Borrower Representative and Borrowers shall immediately repay such amount to Agent. Nothing in this <u>Section 9.9(b)</u> or elsewhere in this Agreement or the other Loan Documents shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Revolving Loan Commitments hereunder or to prejudice any rights that Borrowers may have against any Lender as a result of any default by such Lender hereunder. To the extent that Agent advances funds to any Borrower on behalf of any Lender and is not reimbursed therefor on the same Business Day as such Revolving Credit Advance is made, Agent shall be entitled to retain for its account all interest accrued on such Revolving Credit Advance until reimbursed by the applicable Lender.

(c)     <u>Return of Payments</u>.

(i)     If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from Borrowers and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind.

(ii)     If Agent determines at any time that any amount received by Agent under this Agreement must be returned to any Borrower or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, Agent will not be required to distribute any portion thereof to any Lender. In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to any Borrower or such other Person, without setoff, counterclaim or deduction of any kind.

(d)     Non-Funding Lenders.  The failure of any Non-Funding Lender to make any Revolving Credit Advance or to make any payment required by it hereunder or to be made or purchased by it on the date specified therefor shall not relieve any other Lender (each such other Lender, an "**Other Lender**") of its obligations to make such Revolving Credit Advance or purchase such participation on such date, but neither any Other Lender nor Agent shall be responsible for the failure of any Non-Funding Lender to make a Revolving Credit Advance, purchase a participation or make any other payment required hereunder.   Notwithstanding anything set forth herein to the contrary, a Non-Funding Lender shall not (i) have any voting or consent rights under or with respect to any Loan Document, (ii) constitute a "Lender" (or be included in the calculation of "Requisite Lenders" hereunder) for any voting or consent rights under or with respect to any Loan Document, or (iii) be entitled to receive any Fees under Section 1.9 for the time it is a Non-Funding Lender.  At Borrower Representative's request, Agent or a Person reasonably acceptable to Agent and Borrower Representative shall have the right with Agent's consent and in Agent's sole discretion (but shall have no obligation) to purchase from any Non-Funding Lender, and each Non-Funding Lender agrees that it shall, at Agent's request, sell and assign to Agent or such Person, all of the Revolving Loans and the Revolving Loan Commitment of that Non-Funding Lender for an amount equal to the principal balance of all Revolving Loans held by such Non-Funding Lender and all accrued interest and fees with respect thereto through the date of sale, such purchase and sale to be consummated pursuant to an executed Assignment Agreement.

(e)     Dissemination of Information.   Agent shall use reasonable efforts to provide Lenders with any notice of Default or Event of Default received by Agent from, or delivered by Agent to, any Credit Party, with notice of any Event of Default of which Agent has actually become aware and with notice of any action taken by Agent following any Event of Default; provided that Agent shall not be liable to any Lender for any failure to do so, except to the extent that such failure is attributable to Agent's gross negligence or willful misconduct. Lenders acknowledge that Borrowers are required to provide Financial Statements and Collateral Reports to Lenders in accordance with Annexes E and F hereto and agree that Agent shall have no duty to provide the same to Lenders.

(f)     Actions in Concert.   Anything in this Agreement to the contrary notwithstanding, each Lender hereby agrees with each other Lender that no Lender shall take any action to protect or enforce its rights arising out of this Agreement or the Revolving Notes (including exercising any rights of setoff) without first obtaining the prior written consent of Agent and Requisite Lenders, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the Revolving Notes shall be taken in concert and at the direction or with the consent of Agent or Requisite Lenders.


10.     **SUCCESSORS AND ASSIGNS**

10.1     Successors and Assigns.  This Agreement and the other Loan Documents shall be binding on and shall inure to the benefit of each Credit Party, Agent, Lenders and their respective successors and permitted assigns (including, in the case of any Credit Party, a debtor-in-possession on behalf of such Credit Party), except as otherwise provided herein or therein.  No Credit Party may assign, transfer, hypothecate or otherwise convey its rights, benefits,

obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of Agent and Lenders. Any such purported assignment, transfer, hypothecation or other conveyance by any Credit Party without the prior express written consent of Agent and Lenders shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Credit Party, Agent and Lenders with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

## 11.   MISCELLANEOUS

11.1   <u>Complete Agreement; Modification of Agreement</u>.   The Loan Documents constitute the complete agreement between the parties with respect to the subject matter thereof and may not be modified, altered or amended except as set forth in <u>Section 11.2</u> below. Any letter of interest, expense letter, commitment letter, or fee letter or confidentiality agreement, if any, between any Credit Party and Agent or any Lender or any of their respective Affiliates, predating this Agreement and relating to a financing of substantially similar form, purpose or effect shall be superseded by this Agreement.

11.2   <u>Amendments and Waivers</u>.

(a)   Except for actions expressly permitted to be taken by Agent, no amendment, modification, termination or waiver of any provision of this Agreement or any other Loan Document, or any consent to any departure by any Credit Party therefrom, shall in any event be effective unless the same shall be in writing and signed by Agent and Borrowers, and by Requisite Lenders, or all affected Lenders, as applicable. Except as set forth in clauses (b) and (c) below, all such amendments, modifications, terminations or waivers requiring the consent of any Lenders shall require the written consent of Requisite Lenders.

(b)   No amendment, modification, termination or waiver shall be effective, unless the same shall be in writing and signed by Agent and each Lender directly affected thereby, to: (i) increase the principal amount of any Lender's Revolving Loan Commitment (which action shall be deemed to directly affect all Lenders); (ii) reduce the principal of, rate of interest on or Fees payable with respect to any Revolving Loan or Letter of Credit Obligations of any affected Lender; (iii) extend the Scheduled Commitment Termination Date or final maturity date of the principal amount of any Revolving Loan of any affected Lender; (iv) waive, forgive, defer, extend or postpone any payment of interest or Fees as to any affected Lender; (v) release any Guaranty or, except as otherwise permitted herein or in the other Loan Documents, release, or permit any Credit Party to sell or otherwise dispose of, any Collateral with a value exceeding $10,000,000 in the aggregate (which action shall be deemed to directly affect all Lenders); (vi) change the percentage of the Revolving Loan Commitments or of the aggregate unpaid principal amount of the Revolving Loans that shall be required for Lenders or any of them to take any action hereunder; and (vii) amend or waive this <u>Section 11.2</u> or the definition of the term "Requisite Lenders" insofar as such definitions affect the substance of this <u>Section 11.2</u>. Furthermore, no amendment, modification, termination or waiver affecting the rights or duties of Agent or L/C Issuer under this Agreement or any other Loan Document shall be effective unless

in writing and signed by Agent or L/C Issuer, as the case may be, in addition to Lenders required hereinabove to take such action. Each amendment, modification, termination or waiver shall be effective only in the specific instance and for the specific purpose for which it was given. No amendment, modification, termination or waiver shall be required for Agent to take additional Collateral for the Obligations pursuant to any Loan Document so long as Agent's Liens on such additional Collateral secure all of the Obligations. No amendment, modification, termination or waiver of any provision of any Revolving Note shall be effective without the written concurrence of the holder of that Revolving Note. No notice to or demand on any Credit Party in any case shall entitle such Credit Party or any other Credit Party to any other or further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this <u>Section 11.2</u> shall be binding upon each holder of the Revolving Notes at the time outstanding and each future holder of the Revolving Notes.

(c) If, in connection with any proposed amendment, modification, waiver or termination (a "**Proposed Change**"):

(i) requiring the consent of all affected Lenders, the consent of Requisite Lenders is obtained, but the consent of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in this clause (i) and in clauses (ii), (iii) and (iv) below being referred to as a "**Non-Consenting Lender**"), or

(ii) requiring the consent of Requisite Lenders, the consent of Lenders holding more than 50% of the aggregate Revolving Loan Commitments (or if the Revolving Loan Commitments have been terminated, more than 50% of the aggregate principal amount of the Revolving Loans) is obtained, but the consent of Requisite Lenders is not obtained,

then, so long as Agent is not a Non-Consenting Lender, at Borrower Representative's request, Agent or a Person reasonably acceptable to Agent (and, if no Event of Default has occurred and is then continuing, acceptable to Borrower Representative) shall have the right with Agent's consent and in Agent's sole discretion (but shall have no obligation) to purchase from each Non-Consenting Lender, and each Non-Consenting Lenders agrees that it shall, upon Agent's request, sell and assign to Agent or such Person, all of the Revolving Loans, Revolving Loan Commitment of such Non-Consenting Lenders for an amount equal to the principal balance of all such held by such Non-Consenting Lender and all accrued interest and Fees with respect thereto through the date of sale, such purchase and sale to be consummated pursuant to an executed Assignment Agreement.

(d) Upon payment in full in cash and performance of all of the Obligations (other than contingent indemnification Obligations not yet due and payable), termination of the Revolving Loan Commitments, and if no suits, actions, proceedings or claims are pending or threatened against any Indemnified Person asserting any damages, losses or liabilities that are Indemnified Liabilities, Agent shall deliver to Borrowers termination statements, mortgage releases and other documents necessary or appropriate to evidence the termination of the Liens securing payment of the Obligations.

11.3 <u>Fees and Expenses</u>. Subject to any applicable limitations expressly set forth in <u>Section 1.9(d)</u>, Borrowers shall reimburse Agent and Lenders for all fees, costs and expenses

(including the reasonable fees and expenses of its attorneys, advisors, consultants, appraisers and auditors) incurred in connection with the negotiation and preparation of the Loan Documents, the Interim Order, the Final Order, and any other documents prepared in connection herewith or in connection with the Chapter 11 Case, and incurred in connection with:

(a)     the negotiation, preparation and filing and/or recordation of the Loan Documents, the Interim Order, the Final Order, and any other documents prepared in connection herewith or in connection with the Chapter 11 Case and consummation of the transactions contemplated hereby and thereby;

(b)     any litigation, contest, dispute, suit, proceeding or action (whether instituted by Agent, any Lender, any Borrower or any other Person and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the Loan Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against any or all of the Borrowers or any other Person that may be obligated to Agent by virtue of the Loan Documents; including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Revolving Loans during the pendency of one or more Events of Default; provided that no Person shall be entitled to reimbursement under this clause (c) in respect of any litigation, contest, dispute, suit, proceeding or action to the extent any of the foregoing results from such Person's gross negligence or willful misconduct;

(c)     any attempt to enforce any remedies of Agent against any or all of the Credit Parties or any other Person that may be obligated to Agent or any Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Revolving Loans during the pendency of one or more Events of Default;

(d)     any work-out or restructuring of the Revolving Loans during the pendency of one or more Defaults or Events of Default;

(e)     all of the reasonable out-of-pocket fees and expenses of the Advisors in connection with the preparation, reproduction, delivery and review of pleadings, documents and reports related to the Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, attendance at meetings, court hearings or conferences related to the Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, and general monitoring of the Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code; or

(f)     efforts to (i) monitor the Revolving Loans or any of the other Obligations, (ii) evaluate, observe or assess any of the Credit Parties or their respective affairs, and (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral, in each case in this clause (f), in accordance with the provisions of the Loan Documents;

including, as to each of clauses (a) through (f) above, all reasonable attorneys' and other professional and service providers' fees arising from such services and other advice, assistance or other representation, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this <u>Section 11.3</u>, all of which shall be payable, on demand, by Borrowers to Agent. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram or telecopy charges; secretarial overtime charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.

11.4    <u>No Waiver</u>.  Agent's or any Lender's failure, at any time or times, to require strict performance by the Credit Parties of any provision of this Agreement or any other Loan Document shall not waive, affect or diminish any right of Agent or such Lender thereafter to demand strict compliance and performance herewith or therewith.  Any suspension or waiver of an Event of Default shall not suspend, waive or affect any other Event of Default whether the same is prior or subsequent thereto and whether the same or of a different type.  Subject to the provisions of <u>Section 11.2</u>, none of the undertakings, agreements, warranties, covenants and representations of any Credit Party contained in this Agreement or any of the other Loan Documents and no Default or Event of Default by any Credit Party shall be deemed to have been suspended or waived by Agent or any Lender, unless such waiver or suspension is by an instrument in writing signed by an officer of or other authorized employee of Agent and the applicable required Lenders, and directed to Borrowers specifying such suspension or waiver.

11.5    <u>Remedies</u>.  Agent's and Lenders' rights and remedies under this Agreement and the Financing Orders shall be cumulative and nonexclusive of any other rights and remedies that Agent or any Lender may have under any other agreement, including the other Loan Documents, by operation of law or otherwise.  Recourse to the Collateral shall not be required.

11.6    <u>Severability</u>.  Wherever possible, each provision of this Agreement and the other Loan Documents shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement or any other Loan Document shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement or such other Loan Document.

11.7    <u>Conflict of Terms</u>.  Except as otherwise provided in this Agreement or any of the other Loan Documents by specific reference to the applicable provisions of this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in any of the other Loan Documents, the provision contained in this Agreement shall govern and control, except as otherwise provided in the Financing Orders.

11.8    <u>Confidentiality</u>.  Agent and each Lender agree to use commercially reasonable efforts (equivalent to the efforts Agent or such Lender applies to maintain as confidential of its own confidential information) to maintain as confidential all confidential information provided

to them by the Credit Parties and designated as confidential for a period of three (3) years following the Termination Date, except that Agent and any Lender may disclose such information (a) to Persons employed or engaged by Agent or such Lender, provided such Persons are required under the terms of their employment or engagement to maintain as confidential all such confidential information on substantially the same terms as are set forth in this Section 11.8; (b) to any bona fide assignee or participant or potential assignee or participant that has agreed to comply with the covenant contained in this Section 11.8 (and any such bona fide assignee or participant or potential assignee or participant may disclose such information to Persons employed or engaged by them as described and subject to the restrictions in clause (a) above); (c) as required or requested by any Governmental Authority or reasonably believed by Agent or such Lender to be compelled by any court decree, subpoena or legal or administrative order or process; (d) as, on the advice of Agent's or such Lender's counsel, is required by law; (e) in connection with the exercise of any right or remedy under the Loan Documents or to the extent required in connection with any Litigation to which Agent or such Lender is a party; or (f) that ceases to be confidential through no fault of Agent or any Lender.

11.9   GOVERNING LAW.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ANY OF THE LOAN DOCUMENTS, IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THE LOAN DOCUMENTS AND THE OBLIGATIONS SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA (INCLUDING THE BANKRUPTCY CODE).   EACH CREDIT PARTY HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE NON-EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE CREDIT PARTIES, THE AGENT OR THE LENDERS PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO THE EXTENT THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXERCISE JURISDICTION, THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY OF NEW YORK, OR OF THE UNITED STATES OF AMERICA SITTING IN NEW YORK CITY, NEW YORK; PROVIDED,  THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF AGENT.  EACH CREDIT PARTY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH CREDIT PARTY HEREBY WAIVES ANY OBJECTION THAT SUCH CREDIT PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.  EACH CREDIT PARTY HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINTS AND OTHER PROCESS MAY BE MADE BY REGISTERED MAIL ADDRESSED TO SUCH

CREDIT PARTY AT THE ADDRESS SET FORTH IN ANNEX I OF THIS AGREEMENT AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF SUCH CREDIT PARTY'S ACTUAL RECEIPT THEREOF OR FIVE (5) BUSINESS DAYS AFTER DEPOSIT IN THE UNITED STATES MAILS, PROPER POSTAGE PREPAID.

11.10  Notices.

(a)  Notices.  Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other parties, or whenever any of the parties desires to give or serve upon any other parties any communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be deemed to have been validly served, given or delivered:  (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid, (b) upon transmission, when sent by telecopy or other similar facsimile transmission (with such telecopy or facsimile promptly confirmed by delivery of a copy by personal delivery or United States Mail as otherwise provided in this Section 11.10(a)); (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address or facsimile number indicated in Annex I or to such other address (or facsimile number) as may be substituted by notice given as herein provided; (e) upon the Effective Date of Posting (as defined below) to Intralinks® (to the extent such system is available and set up by or at the direction of Agent prior to posting) in an appropriate location by uploading such notice, demand, request, consent, approval, declaration or other communication to www.intralinks.com, faxing it to 866-545-6600 with an appropriate bar-coded fax coversheet or using such other means of posting to Intralinks® as may be available and reasonably acceptable to Agent prior to such posting; (f) upon the Effective Date of Posting (as defined below) to http://www.gemyaccounts.com (to the extent such system is available and set up by or at the direction of Agent prior to posting) in an appropriate location; or (g) upon the Effective Date of Posting (as defined below) to any other E-System set up by or at the direction of Agent in an appropriate location.  For the purposes of this Agreement, the "**Effective Date of Posting**" shall mean the later of (A) the date of posting in an appropriate location on an E-System, and (B) the date access to a posting on an E-System is given to the recipient thereof in accordance with the standard procedures applicable to such E-System.  The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.  Failure or delay in delivering copies of any notice, demand, request, consent, approval, declaration or other communication to any Person (other than Borrower Representative or Agent) designated in Annex I to receive copies shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.  Transmission by electronic mail (including E-Fax, even if transmitted to the fax numbers indicated in Annex I) shall not be sufficient or effective to transmit any such notice under this Section 11.10(a) unless such transmission is an available means to post to any E-System.

(b)  My Accounts Deliveries.  Any Notice of Revolving Credit Advance, any monthly accounting of transactions with respect to the Revolving Loans under Section 1.12 and

any other notice, demand, request, consent, approval, declaration or other communication that the parties agree to make available by posting to, or completed on, http://www.gemyaccounts.com (to the extent such system is available and set up by or at the direction of Agent prior to posting) may be given or delivered to or served upon any of the parties under this Agreement by posting the same to, or completing the same and submitting the document on, http://www.gemyaccounts.com in accordance with and subject to the terms of Section 11.10(a) above. Agent shall be entitled to rely upon, and shall be fully protected in relying upon, Electronic Transmissions submitting any Notice of Revolving Credit Advance for posting to, or completed on, http://www.gemyaccounts.com in accordance with the procedures applicable to http://www.gemyaccounts.com. Each Borrower hereby acknowledges and agrees that each certification and each representation and warranty made on or through the www.gemyaccounts.com website and/or set forth in such Notice of Revolving Credit Advance shall be deemed made when such Notice of Revolving Credit Advance is delivered to Agent through www.gemyaccounts.com or posted to http://www.gemyaccounts.com and that Agent may assume that each Person submitting and authorizing such Notice of Revolving Credit Advance or other communication was duly authorized, unless the responsible individual acting thereon for Agent has actual knowledge to the contrary.

11.11 <u>Section Titles</u>. The Section titles and Table of Contents contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

11.12 <u>Counterparts</u>. This Agreement may be executed in any number of separate counterparts, each of which shall collectively and separately constitute one agreement.

11.13 <u>WAIVER OF JURY TRIAL</u>. BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX FINANCIAL TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, AMONG THE AGENT, ANY LENDERS AND ANY CREDIT PARTY ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH, THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.

11.14 <u>Press Releases and Related Matters</u>. Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of any Lender or its affiliates or referring to this Agreement, the other Loan Documents without at least two (2) Business Days' prior notice to such Lender and without the prior written consent of such Lender unless (and only to the extent that) such Credit Party or Affiliate is required to do so under any law, rule or regulation of any Governmental Authority

and then, in any event, such Credit Party or Affiliate will consult with GE Capital before issuing such press release or other public disclosure. Each Credit Party consents to the publication by Agent or any Lender of a tombstone or similar advertising material relating to the financing transactions contemplated by this Agreement. Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

11.15   Reinstatement. This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Credit Party for liquidation or reorganization, should any Credit Party become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of any Credit Party's assets, and shall continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

11.16   Advice of Counsel. Each of the parties represents to each other party hereto that it has discussed this Agreement and, specifically, the provisions of Sections 11.9 and 11.13, with its counsel.

11.17   No Strict Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

11.18   Electronic Transmissions.

(a)     Subject to the provisions of Section 11.10, each of Agent, each Credit Party and each Lender and each of their respective Affiliates, officers, directors, employees, attorneys, agents, or representatives are authorized (but not required) to transmit, post or otherwise make or communicate, in their sole discretion, Electronic Transmissions in connection with any Loan Document and the transactions contemplated therein. Each Credit Party, Agent and each Lender hereby acknowledge and agree, and each Borrower and each other Credit Party shall cause each of their Subsidiaries to acknowledge and agree, that the use of Electronic Transmissions is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse, and each Credit Party hereby assumes and accepts such risks by hereby authorizing the transmission of Electronic Transmissions.

(b)     Subject to the provisions of Section 11.10, (i)(A) no posting to or communication through any E-System shall be denied legal effect merely because it is made electronically, (B) each E-Signature on any such posting shall be deemed sufficient to satisfy any requirement for a "signature" and (C) each such posting shall be deemed sufficient to satisfy any

requirement for a "writing", in each case, including pursuant to any Loan Document, any applicable provision of the Code, the federal Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural requirement of law governing such subject matter, (ii) each such posting or communication that is not readily capable of bearing either a signature or a reproduction of a signature may be signed, and shall be deemed signed, by attaching to, or logically associating with such posting, an E-Signature, upon which Agent, each Lender and each Credit Party may rely and assume the authenticity thereof, (iii) each such posting or communication containing a signature, a reproduction of a signature or an E-Signature shall, for all intents and purposes, have the same effect and weight as a signed paper original and (iv) each party hereto or beneficiary hereto agrees not to contest the validity or enforceability of any posting on any E-System or E-Signature on any such posting under the provisions of any applicable requirement of law requiring certain documents to be in writing or signed; provided, however, that nothing herein shall limit such party's or beneficiary's right to contest whether any posting to any E-System or E-Signature has been altered after transmission.

(c) All uses of an E-System shall be governed by and subject to, in addition to Section 11.10 and this Section 11.18, separate terms and conditions and privacy policies posted or referenced in such E-System and related documents, agreements or undertakings executed by Agent or Lenders and Credit Parties in connection with the use of such E-System.

11.19 Parties Including Trustees; Bankruptcy Court Proceedings. This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Credit Party, the bankruptcy estate of each Credit Party, and any trustee, other bankruptcy estate representative or any successor in interest of any Credit Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of any Credit Party to a case under Chapter 7 of the Bankruptcy Code, for any reason, without the necessity that Agent files financing statements or otherwise perfect its Liens under applicable law.

## 12. CROSS-GUARANTY

12.1 Cross-Guaranty. Each Borrower hereby agrees that such Borrower is jointly and severally liable for, and hereby absolutely and unconditionally guarantees to Agent and Lenders and their respective successors and assigns, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of, all Obligations owed or hereafter owing to Agent and Lenders by each other Borrower. Each Borrower agrees that its guaranty obligation hereunder is a continuing guaranty of payment and performance and not of collection, that its obligations under this Section 12 shall not be discharged until payment and performance, in full, of the Obligations has occurred, and that its obligations under this Section 12 shall be absolute and unconditional, irrespective of, and unaffected by,

(a)     the genuineness, validity, regularity, enforceability or any future amendment of, or change in, this Agreement, any other Loan Document or any other agreement, document or instrument to which any Borrower is or may become a party;

(b)     the absence of any action to enforce this Agreement (including this Section 12) or any other Loan Document or the waiver or consent by Agent and Lenders with respect to any of the provisions thereof;

(c)     the existence, value or condition of, or failure to perfect its Lien against, any security for the Obligations or any action, or the absence of any action, by Agent and Lenders in respect thereof (including the release of any such security);

(d)     the insolvency of any Credit Party; or

(e)     any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor.

Each Borrower shall be regarded, and shall be in the same position, as principal debtor with respect to the Obligations guaranteed hereunder.

12.2    <u>Waivers by Borrowers</u>.  Each Borrower expressly waives all rights it may have now or in the future under any statute, or at common law, or at law or in equity, or otherwise, to compel Agent or Lenders to marshal assets or to proceed in respect of the Obligations guaranteed hereunder against any other Credit Party, any other party or against any security for the payment and performance of the Obligations before proceeding against, or as a condition to proceeding against, such Borrower.  It is agreed among each Borrower, Agent and Lenders that the foregoing waivers are of the essence of the transaction contemplated by this Agreement and the other Loan Documents and that, but for the provisions of this <u>Section 12</u> and such waivers, Agent and Lenders would decline to enter into this Agreement.

12.3    <u>Benefit of Guaranty</u>.  Each Borrower agrees that the provisions of this <u>Section 12</u> are for the benefit of Agent and Lenders and their respective successors, transferees, endorsees and assigns, and nothing herein contained shall impair, as between any other Borrower and Agent or Lenders, the obligations of such other Borrower under the Loan Documents.

12.4    <u>Subordination of Subrogation, Etc.</u>  Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, and except as set forth in <u>Section 12.7</u>, each Borrower hereby expressly and irrevocably subordinates to payment of the Obligations any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off and any and all defenses available to a surety, guarantor or accommodation co-obligor until the Obligations are indefeasibly paid in full in cash.  Each Borrower acknowledges and agrees that this subordination is intended to benefit Agent and Lenders and shall not limit or otherwise affect such Borrower's liability hereunder or the enforceability of this <u>Section 12</u>, and that Agent, Lenders and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this <u>Section 12.4</u>.

12.5     Election of Remedies.  If Agent or any Lender may, under applicable law, proceed to realize its benefits under any of the Loan Documents giving Agent or such Lender a Lien upon any Collateral, whether owned by any Borrower or by any other Person, either by judicial foreclosure or by non-judicial sale or enforcement, Agent or any Lender may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this Section 12.  If, in the exercise of any of its rights and remedies, Agent or any Lender shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Borrower or any other Person, whether because of any applicable laws pertaining to "election of remedies" or the like, each Borrower hereby consents to such action by Agent or such Lender and waives any claim based upon such action, even if such action by Agent or such Lender shall result in a full or partial loss of any rights of subrogation that each Borrower might otherwise have had but for such action by Agent or such Lender.  Any election of remedies that results in the denial or impairment of the right of Agent or any Lender to seek a deficiency judgment against any Borrower shall not impair any other Borrower's obligation to pay the full amount of the Obligations.  In the event Agent or any Lender shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the Loan Documents, Agent or such Lender may bid all or less than the amount of the Obligations and the amount of such bid need not be paid by Agent or such Lender but shall be credited against the Obligations.  The amount of the successful bid at any such sale, whether Agent, Lender or any other party is the successful bidder, shall be deemed (absent manifest error) to be the fair market value of the Collateral and the difference between such bid amount and the remaining balance of the Obligations shall be deemed (absent manifest error) to be the amount of the Obligations guaranteed under this Section 12, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which Agent or any Lender might otherwise be entitled but for such bidding at any such sale.

12.6     Limitation.  Notwithstanding any provision herein contained to the contrary, each Borrower's liability under this Section 12 (which liability is in any event in addition to amounts for which such Borrower is primarily liable under Section 1) shall be limited to an amount not to exceed as of any date of determination the greater of:

         (a)     the net amount of all Revolving Loans advanced to any other Borrower under this Agreement and then re-loaned or otherwise transferred to, or for the benefit of, such Borrower; and

         (b)     the amount that could be claimed by Agent and Lenders from such Borrower under this Section 12 without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law after taking into account, among other things, such Borrower's right of contribution and indemnification from each other Borrower under Section 12.7.

12.7     Contribution with Respect to Guaranty Obligations.

         (a)     To the extent that any Borrower shall make a payment under this Section 12 of all or any of the Obligations (other than Revolving Loans made to that Borrower for which it is primarily liable) (a "**Guarantor Payment**") that, taking into account all other

Guarantor Payments then previously or concurrently made by any other Borrower, exceeds the amount that such Borrower would otherwise have paid if each Borrower had paid the aggregate Obligations satisfied by such Guarantor Payment in the same proportion that such Borrower's Allocable Amount (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Borrowers as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Obligations and termination of the Revolving Loan Commitments, such Borrower shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Borrower for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)     As of any date of determination, the "**Allocable Amount**" of any Borrower shall be equal to the maximum amount of the claim that could then be recovered from such Borrower under this Section 12 without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.

(c)     This Section 12.7 is intended only to define the relative rights of Borrowers and nothing set forth in this Section 12.7 is intended to or shall impair the obligations of Borrowers, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement, including Section 12.1. Nothing contained in this Section 12.7 shall limit the liability of any Borrower to pay the Revolving Loans made directly or indirectly to that Borrower and accrued interest, Fees and expenses with respect thereto for which such Borrower shall be primarily liable.

(d)     The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Borrower to which such contribution and indemnification is owing.

(e)     The rights of the indemnifying Borrowers against other Credit Parties under this Section 12.7 shall be exercisable upon the full and indefeasible payment of the Obligations and the termination of the Revolving Loan Commitments.

12.8     Liability Cumulative. The liability of each Borrower under this Section 12 is in addition to and shall be cumulative with all other liabilities of such Borrower to Agent and Lenders under this Agreement and the other Loan Documents to which such Borrower is a party.

**[SIGNATURE PAGES IMMEDIATELY FOLLOW]**

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**BORROWERS:**

**ARCHBROOK LAGUNA LLC**

By: _____

Name: _____

Title: _____

**LEHRHOFF ABL LLC**

By: _____

Name: _____

Title: _____

**GE CAPITAL COMMERCIAL SERVICES, INC.,**
as Agent and Lender


By:_____
Name: _____
Title:  Duly Authorized Signatory

**BANK OF AMERICA, NATIONAL ASSOCIATION,**
as a Lender

By: _____
Name: _____
Title: _____

**PNC BANK, NATIONAL ASSOCIATION,**
as a Lender

By: _____

Name: _____

Title: _____

Each of the following Persons is signatory to this Agreement in its capacity as a Credit Party and not as a Borrower.

## ARCHBROOK LAGUNA HOLDINGS LLC

By: _____
Name: _____
Title: _____

## ARCHBROOK LAGUNA WEST LLC

By: _____
Name: _____
Title: _____

## EXPERT WAREHOUSE LLC

By: _____
Name: _____
Title: _____

## ARCHBROOK LAGUNA NEW YORK LLC

By: _____
Name: _____
Title: _____

## CHIMERICA GLOBAL LOGISTICS LLC

By: _____
Name: _____
Title: _____

Capitalized terms used in the Loan Documents shall have (unless otherwise provided elsewhere in the Loan Documents) the following respective meanings, and all references to Sections, Exhibits, Schedules or Annexes in the following definitions shall refer to Sections, Exhibits, Schedules or Annexes of or to the Agreement:

"A Rated Bank" means a commercial bank incorporated under the laws of the United States of America, each having combined capital, surplus and undivided profits of not less than $500,000,000 and having a senior unsecured rating of "A" or better by a nationally recognized rating agency.

"ABL" has the meaning ascribed thereto in the preamble to the Agreement.

"ABL NY" has the meaning ascribed thereto in the preamble to the Agreement.

"ABL West" has the meaning ascribed thereto in the preamble to the Agreement.

"Account Debtor" means any Person who may become obligated to any Credit Party under, with respect to, or on account of, an Account, Chattel Paper or General Intangible (including a payment intangible).

"Accounting Changes" has the meaning ascribed thereto in Annex G.

"Accounts" means all "accounts", as such term is defined in the Code, now owned or hereafter acquired by any Credit Party and, in any event, including (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper, Documents or Instruments), (including any such obligations that may be characterized as an account or contract right under the Code), (b) all of such Credit Party's rights in, to and under all purchase orders or receipts for goods or services, (c) all of such Credit Party's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (d) all rights to payment due to such Credit Party for property sold, leased, licensed, assigned or otherwise disposed of, for a policy of insurance issued or to be issued, for a secondary obligation incurred or to be incurred, for energy provided or to be provided, for the use or hire of a vessel under a charter or other contract, arising out of the use of a credit card or charge card, or for services rendered or to be rendered by such Credit Party or in connection with any other transaction (whether or not yet earned by performance on the part of such Credit Party), (e) all health-care-insurance receivables and (f) all collateral security, guarantees and other Supporting Obligations of any kind given by any Account Debtor or any other Person to such Credit Party with respect to any of the foregoing.

"Advisors" means outside legal counsel (including Latham & Watkins LLP and local counsel), auditors, accountants, consultants (including FTI Consulting, Inc.), appraisers or other advisors of Agent or Lenders.

"Affiliate" means, with respect to any Person, (a) each Person that, directly or indirectly, owns or controls, whether beneficially, or as a trustee, guardian or other fiduciary, ten percent (10%) or more of the Stock having ordinary voting power in the election of directors of such Person, (b) each Person that controls, is controlled by or is under common control with such Person, (c) each of such Person's officers, directors, joint venturers, managing members and partners and (d) in the case of Borrowers, the immediate family members, spouses and lineal descendants of individuals who are Affiliates of any Borrower. For the purposes of this definition, "control" of a Person means the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise; provided, however, that the term "Affiliate" shall specifically exclude Agent and each Lender.

"Agent" means GE Capital in its capacity as Agent for Lenders under the Agreement or its successor appointed pursuant to Section 9.7.

"Agreement" means the Senior, Super-Priority Debtor-In-Possession Credit Agreement, dated as of the Closing Date, by and among Borrowers, ArchBrook Holdings, ABL West, Chimerica, Expert, ABL NY, GE Capital, as Agent and Lender and the other Lenders from time to time party thereto, and all Annexes, Exhibits and Schedules thereto, as the same may be amended, supplemented, restated or otherwise modified from time to time.

"Appendices" has the meaning ascribed thereto in the recitals to the Agreement.

"Applicable L/C Margin" means two and three-quarters percent (2.75%) per annum.

"Approved Transaction" has the meaning ascribed to it in Section 5.13 of the Agreement.

"ArchBrook Holdings" has the meaning ascribed thereto in the preamble to the Agreement and, if the context so requires, shall include its predecessor companies.

"ArchBrook Preferred Stock" means that certain Class A and Class B preferred units of ArchBrook Holdings.

"Assignment Agreement" has the meaning ascribed thereto in Section 9.1(a) of the Agreement.

"AVB" means Associated Volume Buyers, Inc., a California corporation.

"AVB Member" means any member of AVB.

"Bankruptcy Code" has the meaning ascribed to such term in the recitals hereto.

"Bankruptcy Court" has the meaning ascribed to such term in the recitals hereto.

"BDI Holdings" means BDI Laguna Holdings, Inc., a Nevada corporation.

"Bidding Procedures Order" has the meaning ascribed to it in Section 5.13 of the Agreement.

"Bidding Procedures Motion" has the meaning ascribed to it in Section 5.13 of the Agreement.

"Blocked Accounts" has the meaning ascribed thereto in Annex C to the Agreement.

"Board of Directors" means, with respect to any Person, the board of directors (or comparable managers) of such Person or any committee thereof duly authorized to act on behalf of such board.

"BofA First Priority Lien" means the first priority security interest granted to Bank of America N.A. under and in connection with that certain Loan Agreement dated as of December 31, 2008 between ABL and Bank of America N.A. (as the same may be amended, restated, supplemented or otherwise modified from time to time).

"Borrower Representative" means ABL in its capacity as Borrower Representative pursuant to the provisions of Section 1.1(b).

"Borrowers" and "Borrower" have the respective meanings ascribed thereto in the preamble to the Agreement and, unless otherwise expressly indicated, such terms shall refer to any and all of such Persons.

"Business Day" means any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in the State of New York.

"Capital Expenditures" means, with respect to any Person for any period, the sum of (i) the aggregate of all expenditures by such Person and its Subsidiaries during such period that in accordance with GAAP are or should be included in "property, plant and equipment" or in a similar fixed asset account on its balance sheet, whether such expenditures are paid in cash or financed and including all Capitalized Lease Obligations paid or payable during such period, and (ii) to the extent not covered by clause (i) above, the aggregate of all expenditures by such Person and its Subsidiaries during such period to acquire by purchase or otherwise the business or fixed assets of, or the Stock of, any other Person.

"Capitalized Lease" means, with respect to any Person, any lease of real or personal property by such Person as lessee which is (i) required under GAAP to be capitalized on the balance sheet of such Person or (ii) of a type commonly known as a "synthetic lease" (i.e. a lease that is treated as an operating lease for accounting purposes but with respect to which payments of rent are intended to be treated as payments of principal and interest on a loan for Federal income tax purposes).

"Capitalized Lease Obligations" means, with respect to any Person, obligations of such Person and its Subsidiaries under Capitalized Leases, and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" means (a) the amount of the accrued and unpaid Debtors' Professional Fees incurred before the delivery of a Carve-Out Trigger Notice that are ultimately allowed by final order of the Bankruptcy Court, but solely to the extent the same are incurred in accordance with the cumulative amounts set forth on Schedule I of the DIP Budget for each such professional retained by the Debtors, (b) the amount of the accrued and unpaid Committee Professional Fees incurred before the delivery of a Carve-Out Trigger Notice that are ultimately allowed by final order of the Bankruptcy Court, but solely to the extent the same are incurred in accordance with the cumulative amounts set forth on Schedule I of the DIP Budget for each such professional retained by the Committee, (c) all allowed and unpaid Professional Fees that are incurred from and after the delivery of a Carve-Out Trigger Notice in an aggregate amount not in excess of the Carve-Out Cap and (d) the payment of fees pursuant to 28 U.S.C. § 1930(a).

"Carve-Out Cap" means an aggregate amount equal to $500,000.

"Carve-Out Trigger Notice" means a written notice delivered by the Administrative Agent to Borrower's lead counsel, the U.S. Trustee for the Chapter 11 Case and lead counsel to any Committee following the occurrence and during the continuation of a Default or Event of Default.

"Cash" means money, currency or a credit balance in a Deposit Account.

"Cash Collateral Account" has the meaning ascribed thereto Annex B to the Agreement.

"Cash Equivalents" has the meaning ascribed thereto in Annex B to the Agreement.

"Cash Management Systems" has the meaning ascribed thereto in Section 1.8 of the Agreement.

"Change of Control" means each occurrence of any of the following:

(a)     the acquisition, directly or indirectly, by any person or group (within the meaning of Section 13(d)(3) of the Exchange Act) other than a Permitted Holder of beneficial ownership of more than 33% of the aggregate outstanding voting power of the capital Stock of ArchBrook Holdings;

(b)     during any period of twelve consecutive months, individuals who at the beginning of such period constituted the Board of Directors of ArchBrook Holdings or were thereafter elected by the members of ArchBrook Holdings, provided that the members holding Class A common Stock of ArchBrook Holdings on the Closing Date still own a majority of the outstanding common Stock of ArchBrook Holdings at the time of such election (together with

A-4

any new directors whose election by such Board of Directors or whose nomination for election by the shareholders of ArchBrook Holdings was approved by a vote of at least a majority the directors of ArchBrook Holdings then still in office who were either directors at the beginning of such period, or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of ArchBrook Holdings;

(c)     ArchBrook Holdings shall cease to have direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Exchange Act) of (i) 100% of the aggregate voting power of the capital Stock of each Credit Party other than ArchBrook Holdings and Expert, and (ii) at least 51% of the aggregate voting power of the capital Stock of Expert, each free and clear of all Liens (other than any Liens granted hereunder and Permitted Encumbrances); or

(d)     Except for any transaction expressly permitted under Section 6 of the Agreement, (i) any Credit Party consolidates or amalgamates with or merges into another entity or conveys, transfers or leases all or substantially all of its property and assets to another Person, or (ii) any entity consolidates or amalgamates with or merges into any Credit Party in a transaction pursuant to which the outstanding voting capital Stock of such Credit Party is reclassified or changed into or exchanged for cash, securities or other property, other than any such transaction described in this clause (ii) in which either (A) in the case of any such transaction involving ArchBrook Holdings, no person or group (within the meaning of Section 13(d)(3) of the Exchange Act) other than a Permitted Holder has, directly or indirectly, acquired beneficial ownership of more than 33% of the aggregate outstanding voting capital Stock of ArchBrook Holdings or (B) in the case of any such transaction involving a Credit Party other than ArchBrook Holdings, ArchBrook Holdings has beneficial ownership of 100% of the aggregate voting power of all capital Stock of the resulting, surviving or transferee entity.

"Chapter 11 Case" shall have the meaning assigned to such term in the recitals hereto.

"Charges" means all federal, state, county, city, municipal, local, foreign or other governmental taxes (including taxes owed to the PBGC at the time due and payable), levies, assessments, charges, liens, claims or encumbrances upon or relating to (a) the Collateral, (b) the Obligations, (c) the employees, payroll, income or gross receipts of any Credit Party, (d) any Credit Party's ownership or use of any properties or other assets, or (e) any other aspect of any Credit Party's business.

"Chattel Paper" means any "chattel paper", as such term is defined in the Code, including electronic chattel paper, now owned or hereafter acquired by any Credit Party.

"Chief Restructuring Officer" has the meaning ascribed to it in Section 5.15 of the Agreement.

"Chimerica" has the meaning ascribed thereto in the preamble to the Agreement.

"CLD" means the Corporate Finance Core Leasing Division of General Electric Capital Corporation.

"CLD First Priority Lien" means the first priority security interest granted to CLD.

"Closing Checklist" means the schedule, including all appendices, exhibits or schedules thereto, listing certain documents and information to be delivered in connection with the Agreement, the other Loan Documents and the transactions contemplated thereunder, substantially in the form attached to the Agreement as Annex D.

"Closing Date" means July [__], 2011.

"Code" means the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of New York; provided that to the extent that the Code is used to define any term herein or in any Loan Documents and such term is used in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Agent's or any Lender's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "Code" means the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"Collateral" means the property covered by the Collateral Documents and any other property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of Agent, on behalf of itself and Lenders, to secure the Obligations.

"Collateral Certificate" means a certificate to be executed and delivered from time to time by Borrowers substantially in the form attached to the Agreement as Exhibit 4.1(b) or, if submitted by Electronic Transmission for posting to or communication through http://www.gemyaccounts.com, in a form substantially similar to the form attached to the Agreement as Exhibit 4.1(b), or in either case, such other similar form acceptable to Agent.

"Collateral Documents" means the Security Agreement, the Pledge Agreement, the Guaranties, the Intellectual Property Security Agreements (if any) and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations.

"Collateral Reports" means the reports with respect to the Collateral referred to in Annex F.

"Collection Account" means that certain account of Agent, account number 50-279-513 in the name of Agent at Deutsche Bank Trust Company Americas in New York, New York, or such other account as Agent may specify in writing to be such "Collection Account."

"Collections" shall have the meaning ascribed to such term in Section 1.3(c) of the Agreement.

"Commitment Termination Date" means the earliest of (a) the Scheduled Commitment Termination Date, (b) the effective date of a confirmed plan of reorganization for Borrowers in any case commenced pursuant to Chapter 11 of the Bankruptcy Code, (c) the occurrence of any Termination Declaration Date, (d) the closing date of a sale pursuant to Section 363 of the Bankruptcy Code of all or substantially all of the Debtors' assets and (e) the date of indefeasible repayment in full in cash by Borrowers of the Revolving Loans and other Obligations (other than contingent indemnification obligations not yet due and payable which shall be cash collateralized) and the cancellation and return (or stand-by guarantee) of all Letters of Credit or the cash collateralization of all Letter of Credit Obligations pursuant to Annex B, and the permanent reduction of the Revolving Loan Commitments to zero dollars ($0).

"Committee" means the official committee of unsecured creditors formed in the Chapter 11 Case.

"Committee Professional Fees" means the amount of actual expenditures and disbursements for the fees, costs and disbursements of the professionals retained by the Committee that are incurred in accordance with the cumulative amounts set forth on Schedule I of the DIP Budget for each such professional retained by the Committee.

"Concentration Accounts" has the meaning ascribed thereto in Annex C to the Agreement.

"Concentration Account Bank" has the meaning ascribed thereto in Annex C to the Agreement.

"Consent Agreement" means that certain Consent Agreement dated July 1, 2011 among the Credit Parties (as defined in the Pre-Petition Credit Agreement), Pre-Petition Agent and the Prior Lenders.

"Contracts" means all "contracts", as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, in any event, including all contracts, undertakings, or agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which any Credit Party may now or hereafter have any right, title or interest, including any agreement relating to the terms of payment or the terms of performance of any Account.

"Control Letter" means a letter agreement between Agent and (i) the issuer of uncertificated securities with respect to uncertificated securities in the name of any Credit Party, (ii) a securities intermediary with respect to securities, whether certificated or uncertificated, securities entitlements and other financial assets held in a securities account in the name of any Credit Party, or (iii) a futures commission merchant or clearing house, as applicable, with respect to commodity accounts and commodity contracts held by any Credit Party, whereby, among other things, the issuer, securities intermediary or futures commission merchant disclaims or

subordinates (subject to exceptions for fees or costs related to the operation of such accounts and such other accounts as may be acceptable to the Agent) any security interest in the applicable financial assets, acknowledges the Lien of Agent, on behalf of itself and Lenders, on such financial assets, and agrees to follow the instructions or entitlement orders of Agent without further consent by such Credit Party.

"Copyright License" means any and all rights now owned or hereafter acquired by any Credit Party under any written agreement granting any right to use any Copyright or Copyright registration.

"Copyrights" means all of the following now owned or hereafter adopted or acquired by any Credit Party: (a) all copyrights and general intangibles of like nature (whether registered or unregistered), now owned or existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof, and (b) all reissues, extensions or renewals thereof.

"Corporate Overhead" means, with respect to any fiscal period, all amounts paid or incurred by ArchBrook Holdings or any of its Subsidiaries during such period in respect of all fees required to maintain ArchBrook Holdings' or such Subsidiaries' existence and provide for all other operating costs of ArchBrook Holdings and such Subsidiaries to the extent attributable to the ownership or operation of the Borrowers and their Subsidiaries, including director fees and expenses that are approved by the Agent and its Advisors, administrative, legal and accounting services provided by third parties and other costs and expenses.

"Credit Parties" means ArchBrook Holdings, ABL West, Chimerica, Expert, ABL NY, the Borrowers and any of their respective Subsidiaries.

"Daily Report" means a certificate to be executed and delivered each Business Day by Borrowers substantially in the form attached to the Agreement as Exhibit 1.1(a)(ii) or, if submitted by Electronic Transmission for posting to or communication through http://www.gemyaccounts.com, in a form substantially similar to the form attached to the Agreement as Exhibit 1.1(a)(ii), or in either case, such other similar form acceptable to Agent.

"Debtors' Professional Fees" means the fees, costs and disbursements of the professionals retained by the Debtors that are incurred in accordance with the cumulative amounts set forth on Schedule I of the DIP Budget for each such professional retained by the Debtors.

"Debtors" has the meaning ascribed to it in the recitals hereto.

"Default" means any event that, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

"Default Rate" has the meaning ascribed thereto in Section 1.5(d) of the Agreement.

"Deposit Accounts" means all "deposit accounts", as such term is defined in the Code, now or hereafter held in the name of any Credit Party.

"DIP Budget" means the Interim DIP Budget together with the Final DIP Budget.

"Disbursement Account" has the meaning ascribed in Annex C to the Agreement.

"Disclosure Schedules" means the Schedules prepared by Borrowers and denominated as Disclosure Schedules (1.4) through (6.7) in the Index to the Agreement.

"Disposition" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells, assigns, transfers or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, including any occurrence after which any Person or any of its Subsidiaries receives any Extraordinary Receipts, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person, but excluding any transaction described in Section 6.8 (a) or (c) of the Agreement.

"Documents" means all "documents", as such term is defined in the Code, now owned or hereafter acquired by any Credit Party.

"Dollars" or "$" means lawful currency of the United States of America.

"Domestic Credit Party" means ArchBrook Holdings, ABL West, Chimerica, Expert, ABL NY, Borrowers and the Domestic Subsidiaries.

"Domestic Subsidiaries" means any Subsidiary of ArchBrook Holdings which is incorporated or organized under the laws of (i) any State of the United States, (ii) District of Columbia or (iii) the Commonwealth of Puerto Rico.

"E-Fax" means any system used to receive or transmit faxes electronically.

"Effective Date of Posting" has the meaning ascribed thereto in Section 11.10(a) of the Agreement.

"Electronic Transmission" means each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail or E-Fax, or otherwise to or from an E-System or other equivalent service.

"Environmental Laws" means all applicable federal, state, local and foreign laws, statutes, ordinances, codes, rules, standards and regulations, now or hereafter in effect, and in such case as amended or supplemented from time to time, and any applicable judicial or administrative interpretation thereof, including any applicable judicial or administrative order, consent decree, order or judgment, imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata,

wildlife, aquatic species and vegetation). Environmental Laws include the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.) ("CERCLA"); the Hazardous Materials Transportation Authorization Act of 1994 (49 U.S.C. §§ 5101 et seq.); the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136 et seq.); the Solid Waste Disposal Act (42 U.S.C. §§ 6901 et seq.); the Toxic Substance Control Act (15 U.S.C. §§ 2601 et seq.); the Clean Air Act (42 U.S.C. §§ 7401 et seq.); the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 et seq.); the Occupational Safety and Health Act (29 U.S.C. §§ 651 et seq.); and the Safe Drinking Water Act (42 U.S.C. §§ 300(f) et seq.), each as from time to time amended, and any and all regulations promulgated thereunder, and all analogous state, local and foreign counterparts or equivalents and any transfer of ownership notification or approval statutes.

"Environmental Liabilities" means, with respect to any Person, all liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, capital costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest incurred as a result of or related to any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, including any arising under or related to any Environmental Laws, Environmental Permits, or in connection with any Release or threatened Release or presence of a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

"Environmental Permits" means all permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority under any Environmental Laws.

"Equipment" means all "equipment" as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located and, in any event, including all such Credit Party's machinery and equipment, including processing equipment, conveyors, machine tools, data processing and computer equipment, including embedded software and peripheral equipment and all engineering, processing and manufacturing equipment, office machinery, furniture, materials handling equipment, tools, attachments, accessories, automotive equipment, trailers, trucks, forklifts, molds, dies, stamps, motor vehicles, rolling stock and other equipment of every kind and nature, trade fixtures and fixtures not forming a part of real property, together with all additions and accessions thereto, replacements therefor, all parts therefor, all substitutes for any of the foregoing, fuel therefor, and all manuals, drawings, instructions, warranties and rights with respect thereto, and all products and proceeds thereof and condemnation awards and insurance proceeds with respect thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974 (or any successor legislation thereto), and any regulations promulgated thereunder.

"ERISA Affiliate" means, with respect to any Credit Party, any trade or business (whether or not incorporated) that, together with such Credit Party, are treated as a single employer within the meaning of Sections 414(b), (c), (m) or (o) of the IRC.

"ERISA Event" means, with respect to any Credit Party or any ERISA Affiliate, (a) any event described in Section 4043(c) of ERISA with respect to a Title IV Plan; (b) the withdrawal of any Credit Party or ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any Credit Party or any ERISA Affiliate from any Multiemployer Plan; (d) the filing of a notice of intent to terminate a Title IV Plan or the treatment of a plan amendment as a termination under Section 4041 of ERISA; (e) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (f) the failure by any Credit Party or ERISA Affiliate to make when due required contributions to a Multiemployer Plan or Title IV Plan unless such failure is cured within thirty (30) days; (g) any other event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the imposition of liability under Section 4069 or 4212(c) of ERISA; (h) the termination of a Multiemployer Plan under Section 4041A of ERISA or the reorganization or insolvency of a Multiemployer Plan under Section 4241 or 4245 of ERISA; (i) the loss of a Qualified Plan's qualification or tax exempt status; or (j) the termination of a Plan described in Section 4064 of ERISA.

"E-Signature" means the process of attaching to or logically associating with an Electronic Transmission an electronic symbol, encryption, digital signature or process (including the name or an abbreviation of the name of the party transmitting the Electronic Transmission) with the intent to sign, authenticate or accept such Electronic Transmission.

"E-System" means any electronic system, including Intralinks®, http://www.gemyaccounts.com and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by Agent, any of its Affiliates or any of its officers, directors, employees, attorneys, agents, or representatives or any other Person, providing for access to data protected by passcodes or other security systems.

"ESOP" means a Plan that is intended to satisfy the requirements of Section 4975(e)(7) of the IRC.

"Event of Default" has the meaning ascribed thereto in Section 8.1 of the Agreement.

"Excess Availability" means the amount set forth on the most recently delivered Daily Report for the line item identified as "Excess Availability" (which for the avoidance of doubt may be negative).

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Stock Issuance" means any issuance of any Stock of ArchBrook Holdings or Expert to any Person who is a member or an employee of such issuer at the time of such issuance, provided that each such issuance is made pursuant to the terms of the issuer's operating agreement in effect on the Closing Date or as amended pursuant to the terms and conditions of this Agreement.

"Existing Letters of Credit" means the outstanding letters of credit issued under the Pre-Petition Credit Agreement and listed on Disclosure Schedule (1.2).

"Expert" means Expert Warehouse LLC, a Nevada limited liability company.

"Expert Inventory Sale" means the sale by ABL and Expert of certain assets to AVB pursuant to the Expert Purchase Agreement.

"Expert Purchase Agreement" means that certain Inventory Purchase Agreement dated as of July 1, 2011 among AVB, ABL and Expert.

"Extraordinary Receipts" means any cash received by any Credit Party or any of its Subsidiaries not in the ordinary course of business including (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments and (vii) any purchase price adjustment received in connection with any acquisition purchase agreement.

"Fair Labor Standards Act" means the Fair Labor Standards Act, 29 U.S.C. §201 et seq.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System, or any successor thereto.

"Fees" means any and all fees payable to Agent or any Lender pursuant to the Agreement or any of the other Loan Documents.

"Final DIP Budget" means the updated Interim DIP Budget delivered by Borrowers prior to or in connection with the entry of the Final Order.

"Final Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to Agent and the Requisite Lenders, and from which no appeal or motion to reconsider has been timely filed and such order in any respect is not the subject of a stay pending appeal (unless Agent and the Requisite Lenders waive such requirement), together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Agent and the Requisite Lenders. The Final Order will, among other matters but not by way of limitation, authorize Borrowers to obtain credit, incur (or guaranty) Indebtedness, grant Liens under this

Agreement and the other Loan Documents, as the case may be, and provide for the super priority of Agent's and the Lenders' claims.

"Financial Advisor" has the meaning ascribed to it in Section 5.15 of the Agreement.

"Financial Statements" means the consolidated income statements, statements of cash flows and balance sheets of Borrowers or their predecessor companies delivered in accordance with Section 3.4 and Annex E.

"Financing Orders" means the Final Order and the Interim Order, together.

"First Day Orders" means the First Day Orders set forth on Exhibit A-1, which shall, to the extent (i) affecting the rights or obligations of Agent, the DIP Lenders, the Pre-Petition Agent or the Prior Lenders or (ii) which may give rise to a post-petition claim, administrative in nature or otherwise, be in form and substance reasonably satisfactory to Agent.

"Fiscal Month" means any of the monthly accounting periods of the Credit Parties.

"Fiscal Quarter" means any of the quarterly periods ending on March 31, June 30, September 30 and December 31 of each year.

"Fiscal Year" means any of the annual accounting periods of the Credit Parties ending on December 31 of each year.

"Fixtures" means all "fixtures" as such term is defined in the Code, now owned or hereafter acquired by any Credit Party.

"Foreign Subsidiary" means any Subsidiary of ArchBrook Holdings that is not a Domestic Subsidiary.

"GAAP" means generally accepted accounting principles in the United States of America consistently applied, as such term is further defined in Annex G to the Agreement.

"GE Capital" shall have the meaning given such term in the preamble to the Agreement.

"GE Capital Fee Letter" means that certain letter, dated as of the date hereof, between GE Capital and Borrowers.

"General Intangibles" means all "general intangibles", as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, including all right, title and interest that such Credit Party may now or hereafter have in or under any Contract, all payment intangibles, all customer lists, Licenses, Copyrights, Trademarks, Patents, and all applications therefor and reissues, extensions or renewals thereof, rights in Intellectual Property, interests in partnerships, joint ventures and other business associations, licenses, permits, copyrights, trade

secrets, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, experience, processes, models, drawings, materials and records, goodwill (including the goodwill associated with any Trademark or Trademark License), all rights and claims in or under insurance policies (including insurance for fire, damage, loss and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key man and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, deposit, checking and other bank accounts, rights to receive tax refunds and other payments, rights to receive dividends, distributions, cash, Instruments, and other property in respect of or in exchange for pledged Stock and Investment Property, rights of indemnification, all books and records, correspondence, credit files, invoices and other papers, including all tapes, cards, computer runs and other papers and documents in the possession or under the control of such Credit Party or any computer bureau or service company from time to time acting for such Credit Party.

"Goods" means all "goods", as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, including embedded software to the extent included in "goods" as defined in the Code, manufactured homes, standing timber that is cut and removed for sale and unborn young of animals.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guaranteed Indebtedness" means as to any Person, any obligation of such Person guaranteeing, providing comfort or otherwise supporting any indebtedness, lease, dividend, or other obligation ("primary obligation") of any other Person (the "primary obligor") in any manner, including any obligation or arrangement of such Person to (a) purchase or repurchase any such primary obligation, (b) advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency or any balance sheet condition of the primary obligor, (c) purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (d) protect the beneficiary of such arrangement from loss (other than product warranties given in the ordinary course of business) or (e) indemnify the owner of such primary obligation against loss in respect thereof. The amount of any Guaranteed Indebtedness at any time shall be deemed to be an amount equal to the lesser at such time of (x) the stated or determinable amount of the primary obligation in respect of which such Guaranteed Indebtedness is incurred and (y) the maximum amount for which such Person may be liable pursuant to the terms of the instrument embodying such Guaranteed Indebtedness, or, if not stated or determinable, the maximum reasonably anticipated liability (assuming full performance) in respect thereof.

"Guaranties" means, collectively, the Holdings Guaranty, each Subsidiary Guaranty and any other guaranty executed by any Guarantor in favor of Agent and Lenders in respect of the Obligations.

"Guarantors" means ArchBrook Holdings, ABL West, Chimerica, Expert, ABL NY and each other Person, if any, that executes a guaranty or other similar agreement in favor of Agent, for itself and the ratable benefit of Lenders, in connection with the transactions contemplated by the Agreement and the other Loan Documents.

"Hazardous Material" means any substance, material or waste that, under any Environmental Laws, is (a) defined as a "solid waste," "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "pollutant," "contaminant," "hazardous constituent," "special waste" or "toxic substance," or (b) petroleum or any fraction or by-product thereof, asbestos, polychlorinated biphenyls (PCB's), or any radioactive substance.

"Hedging Agreements" means any interest rate, foreign currency, commodity or equity swap, collar, cap, floor or forward rate agreement, or other agreement or arrangement designed to protect against fluctuations in interest rates or currency, commodity or equity values (including any option with respect to any of the foregoing and any combination of the foregoing agreements or arrangements), and any confirmation executed in connection with any such agreement or arrangement.

"Holdings Guaranty" means the Holdings Guaranty Agreement, dated as of the Closing Date, executed by ArchBrook Holdings in favor of Agent and Lenders.

"Indebtedness" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than ninety (90) days after the date such payable was created), (b) all reimbursement and other obligations of such Person with respect to letters of credit, bankers' acceptances and surety bonds, whether or not matured, (c) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments, (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capitalized Lease Obligations of such Person (which, with respect to synthetic leases, shall be deemed to be the present value of future rental payments under such synthetic leases), (f) all obligations of such Person under any Hedging Agreements, in each case whether contingent or matured, provided that the amount of each such Indebtedness shall be the net amounts required to be paid thereunder to a counterparty rather than the notional amount with regard to which payment may be calculated, (g) all management fees (or other fees of similar nature) payable by such Person, (h) all Indebtedness referred to above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property or other assets (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, provided that the amount of such Indebtedness shall be the lesser of (A) the fair market value of such property or asset at such date of determination and (B) the stated principal amount of such Indebtedness, (i) Guaranteed Indebtedness incurred by such Person with respect to the Indebtedness of another Person, (j) liabilities incurred under Title IV

of ERISA with respect to any Plan (other than a Multiemployer Plan) covered by Title IV of ERISA and maintained for employees of such Person or any of its ERISA Affiliates, (k) withdrawal liability incurred under ERISA by such Person or any of its ERISA Affiliates with respect to any Multiemployer Plan and (l) the Obligations.  Without limiting the generality of the foregoing, the term "Indebtedness" shall not include any obligations owing by any Borrower from time to time under any Repurchase Agreement.

"Indemnified Liabilities" has the meaning ascribed thereto in Section 1.13 of the Agreement.

"Indemnified Person" has the meaning ascribed thereto in Section 1.13 of the Agreement.

"Instruments" means all "instruments," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, and, in any event, including all certificated securities, all certificates of deposit, and all promissory notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"Intellectual Property" means any and all Licenses, Patents, Copyrights, Trademarks, and the goodwill associated with such Trademarks.

"Intellectual Property Security Agreement" means the Second Amended and Restated Intellectual Property Security Agreement, dated as of the date of the Agreement, entered into by and among Agent and the Credit Parties signatory thereto and all other intellectual property security agreements that may be hereafter entered into among Agent (on behalf of itself and the Lenders) and any Credit Parties pursuant to the Security Agreement or Section 5.12 of the Agreement.

"Intercompany Loans" means all loans evidenced by Intercompany Notes and made in compliance with the terms and conditions of Section 6.3(a).

"Intercompany Note" has the meaning ascribed to it in Section 6.3(a) of the Agreement.

"Interest Payment Date" means the first Business Day of each month to occur while such Revolving Loan is outstanding; provided that, in addition to the foregoing, each of (x) the date upon which all of the Revolving Loan Commitments have been terminated and the Revolving Loans have been paid in full and (y) the Commitment Termination Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued under the Agreement.

"Interim DIP Budget" means the 8-week cash flow forecast detailing cash receipts and cash disbursements on a weekly basis for such weekly period and related documents, in form and substance acceptable to Agent and the Lenders and is delivered pursuant to clause (p) of Annex E; provided that such budget may be subsequently amended, supplemented or modified

with the approval of the Agent and the Lenders in which case "Interim DIP Budget" shall be deemed to include any such amendment, supplement or modification.

"Interim Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Agent and the Requisite Lenders. The Interim Order shall, among other matters, but not by way of limitation, authorize, on an interim basis, Borrowers to execute and perform under the terms of this Agreement and the other Loan Documents, substantially in the form of Exhibit I.

"Interim Order Commitment Amount" has the meaning ascribed to it in Section 1.1(a)(i) of the Agreement.

"Inventory" means all "inventory", as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, and in any event including inventory, merchandise, goods and other personal property that are held by or on behalf of any Credit Party for sale or lease or are furnished or are to be furnished under a contract of service, or that constitute raw materials, work in process, finished goods, returned goods, or materials or supplies of any kind, nature or description used or consumed or to be used or consumed in such Credit Party's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded software.

"Investment Property" means all "investment property", as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, including (i) all securities, whether certificated or uncertificated, including stocks, bonds, interests in limited liability companies, partnership interests, treasuries, certificates of deposit, and mutual fund shares; (ii) all securities entitlements of any Credit Party, including the rights of such Credit Party to any securities account and the financial assets held by a securities intermediary in such securities account and any free credit balance or other money owing by any securities intermediary with respect to that account; (iii) all securities accounts of any Credit Party; (iv) all commodity contracts of any Credit Party; and (v) all commodity accounts held by any Credit Party.

"IRC" means the Internal Revenue Code of 1986 and all regulations promulgated thereunder.

"IRS" means the Internal Revenue Service.

"L/C Issuer" means GE Capital or a Subsidiary thereof or a bank or other legally authorized Person selected by or acceptable to Borrowers and Agent in their sole respective direction.

"Lehrhoff" means Lehrhoff ABL LLC, a Nevada limited liability company.

"Lenders" means GE Capital and any other Person which becomes a Lender pursuant to the terms of the Agreement.

"Letter of Credit Fee" has the meaning ascribed thereto in Annex B of the Agreement.

"Letter of Credit Documents" means the Master Standby Agreement and any and all applications for Letters of Credit that may be executed by any Borrower from time to time.

"Letter of Credit Obligations" means all outstanding obligations incurred by Agent and Lenders at the request of Borrower Representative, whether direct or indirect, contingent or otherwise, due or not due, in connection with the issuance of the Existing Letters of Credit by Agent or another L/C Issuer or the purchase of a participation with respect to any Existing Letter of Credit. The amount of such Letter of Credit Obligations as of any date shall equal the maximum amount that may be payable at such time by Agent or Lenders thereupon or pursuant thereto.

"License" means any Copyright License, Patent License, Trademark License or other license of rights or interests now held or hereafter acquired by any Credit Party.

"Lien" means any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Code or comparable law of any jurisdiction).

"Litigation" has the meaning ascribed thereto in Section 3.13 of the Agreement.

"Loan Accounts" has the meaning ascribed thereto in Section 1.12 of the Agreement.

"Loan Documents" means the Agreement, the Revolving Notes, the Collateral Documents, the Letter of Credit Documents and all other agreements, instruments, documents and certificates identified in the Closing Checklist executed and delivered to, or in favor of, Agent or any Lenders and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Credit Party, or any employee of any Credit Party, and delivered to Agent or any Lender in connection with the Agreement or the transactions contemplated thereby. Any reference in the Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to the Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Lock Boxes" has the meaning ascribed thereto in Annex C to the Agreement.

"M&A Advisor" has the meaning ascribed to it in Section 5.15 of the Agreement.

"Major Customers" means Amazon.com, Inc., Rent-A-Center, Inc., HSN, Inc., Systemax, Inc. and Newegg Inc.

"Major Vendors" means Toshiba America.

"Margin Stock" has the meaning ascribed thereto in Section 3.10 of the Agreement.

"Master Standby Agreement" means the Master Agreement for Standby Letters of Credit, dated as of the Closing Date, among Borrowers, as applicants, and GE Capital.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects, or financial or other condition of the Credit Parties taken as a whole, (b) any Credit Party's ability to pay any of its Obligations in accordance with the terms of the Loan Documents to which it is a party, (c) the Collateral or the Agent's Liens, on behalf of itself and the Lenders, on the Collateral or the priority of such Liens, or (d) Agent's or any Lender's rights and remedies under the Agreement and the other Loan Documents. Without limiting the generality of the foregoing, any event or occurrence adverse to one or more Credit Parties which results or could reasonably be expected to result in costs and/or liabilities or loss of revenues, individually or in the aggregate, to any Credit Party in any 30-day period in excess of 10% of the Maximum Amount at any date of determination shall constitute a Material Adverse Effect; provided, however, neither (i) the filing of the Chapter 11 Case and any events directly arising therefrom nor (ii) any event disclosed to the Agent and the Lenders prior to the Petition Date or pursuant to the first day declaration, shall, in and of itself, be deemed to constitute or give rise to a Material Adverse Effect.

"Material Contract" means, with respect to any Person, (i) each contract or agreement to which such Person or any of its Subsidiaries is a party involving aggregate consideration payable to or by such Person or such Subsidiary of $500,000 or more (other than purchase, sales or supply agreements or orders in the ordinary course of the business of such Person or such Subsidiary and other than contracts that by their terms may be terminated by such Person or Subsidiary in the ordinary course of its business upon less than 60 days' notice without penalty or premium) and (ii) all other contracts or agreements material to the business, operations, condition (financial or otherwise), performance, prospects or properties of such Person or such Subsidiary.

"Maximum Amount" means fifty million Dollars ($50,000,000), as such amount may be adjusted in accordance with the terms of the Agreement.

"Milestones" means certain milestones related to a sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code, as set forth in Section 5.13 (unless extended or modified with the consent of Agent and the Requisite Lenders).

"<u>Multiemployer Plan</u>" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any of its ERISA Affiliates has contributed to, or has been obligated to contribute, at any time during the preceding six (6) years.

"<u>Net Cash Proceeds</u>" means, (i) with respect to any Disposition by any Person or any of its Subsidiaries, the amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person or such Subsidiary in connection therewith after deducting therefrom only (A) the amount of any Indebtedness secured by any Lien permitted by <u>Section 6.7</u> on any asset (other than Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such Disposition (other than the Obligations), (B) reasonable expenses related thereto incurred by such Person or such Subsidiary in connection therewith, (C) transfer taxes paid or to be paid to any taxing authorities by such Person or such Subsidiary in connection therewith, and (D) net income taxes paid or to be paid in connection with such Disposition (after taking into account any tax credits or deductions and any tax sharing arrangements) and (ii) with respect to the issuance or incurrence of any Indebtedness by any Person or any of its Subsidiaries, or the sale or issuance by any Person or any of its Subsidiaries of any shares of its capital Stock, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person or such Subsidiary in connection therewith, after deducting therefrom only (A) reasonable expenses related thereto incurred by such Person or such Subsidiary in connection therewith, (B) transfer taxes paid or to be paid by such Person or such Subsidiary in connection therewith and (C) net income taxes paid or to be paid in connection therewith (after taking into account any tax credits or deductions and any tax sharing arrangements); in each case of clause (i) and (ii) to the extent, but only to the extent, that the amounts so deducted are (x) actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person or any of its Subsidiaries and (y) properly attributable to such transaction or to the asset that is the subject thereof.

"<u>Non-Consenting Lender</u>" has the meaning ascribed thereto in <u>Section 11.2(c)(i)</u> of the Agreement.

"<u>Non-Funding Lender</u>" has the meaning ascribed thereto in <u>Section 9.9(a)(ii)</u> of the Agreement.

"<u>Notice of Revolving Credit Advance</u>" has the meaning ascribed thereto in <u>Section 1.1(a)</u> of the Agreement.

"<u>Obligations</u>" means all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by any Credit Party to Agent or any Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement, letter of credit agreement or other instrument, arising under the Agreement or any of the other Loan Documents. This term includes all principal, interest (including all interest that accrues after the commencement of any case or proceeding by or against any Credit Party and

owing to the Agent or any Lender in bankruptcy, whether or not allowed in such case or proceeding), Fees, reimbursement obligations in respect of Letters of Credit, and expenses, attorneys' fees and any other sum chargeable to any Credit Party under the Agreement or any of the other Loan Documents.

"Operating Lease Obligations" means all obligations for the payment of rent for any real or personal property under leases or agreements to lease, other than Capitalized Lease Obligations.

"Other Lender" has the meaning ascribed thereto in Section 9.9 hereof.

"Patent License" means rights under any written agreement now owned or hereafter acquired by any Credit Party granting any right with respect to any invention on which a Patent is in existence.

"Patents" means all of the following in which any Credit Party now holds or hereafter acquires any interest: (a) all letters patent of the United States or of any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or of any other country, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state or territory thereof, or any other country, and (b) all reissues, continuations, continuations-in-part or extensions thereof.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" means a Plan described in Section 3(2) of ERISA.

"Permitted Encumbrances" means the following encumbrances: (a) Liens for taxes or assessments or other governmental Charges not yet due and payable or which are being contested in accordance with Section 5.2(b); (b) deposits and pledges of cash securing (i) obligations incurred in respect of workers' compensation, unemployment insurance, social security, public liability laws or similar legislation (excluding Liens under ERISA) or other forms of governmental insurance or benefits, (ii) the performance of bids, tenders, leases, contracts (other than for the payment of money) and statutory obligations or (iii) obligations on surety or appeal bonds, but only to the extent such deposits or pledges are made or otherwise arise in the ordinary course of business and secure obligations not past due; (c) Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's and other similar Liens arising (provided they are subordinate to the Agent's Liens on Collateral) in the ordinary course of business and securing obligations (other than Indebtedness for borrowed money) that are not overdue by more than 30 days or are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor; (d) any attachment or judgment lien not constituting an Event of Default under Section 8.1(j); (e) the CLD First Priority Lien; (f) the BofA First Priority Lien; and (g) the Permitted Prior Liens.

"Permitted Holder" means any of BDI Holdings, ABL Invest LLC, a Nevada limited liability company, TTL International GmbH, Darren Marino, Joel Blank, Peter Handy, Sawtch International Corporation or Ashdil & Company, Ltd.

"Permitted Overhead Distributions" shall mean Restricted Payments made by any Subsidiary of ArchBrook Holdings to ArchBrook Holdings or ABL West and used by ArchBrook Holdings or ABL West to pay Corporate Overhead or intercompany loans made by any Borrower to ArchBrook Holdings or ABL West pursuant to the terms and conditions of Section 6.3(a)(vii) to pay Corporate Overhead; provided that the aggregate amount of all such Restricted Payments and intercompany loans made in any Fiscal Year to pay Corporate Overhead shall not exceed $3,000,000.

"Permitted Prior Lien" means any valid, enforceable, non-avoidable security interest in existence as of the Petition Date that are senior to the Pre-Petition First Priority Liens and defined as a "Permitted Encumbrance" under the Pre-Petition Credit Agreement.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" shall have the meaning assigned to such term in the recitals hereto.

"Plan" means, at any time, an "employee benefit plan", as defined in Section 3(3) of ERISA, that any Credit Party or ERISA Affiliate at that time maintains, contributes to or has an obligation to contribute to or has maintained, contributed to or had an obligation to contribute to at any time within 7 years prior to such time on behalf of participants who are or were employed by any Credit Party or ERISA Affiliate.

"Pledge Agreement" means the Pledge Agreement, dated as of the date of the Agreement, executed by ArchBrook Holdings, ABL, Expert, Lehrhoff, ABL West and ABL NY in favor of Agent, on behalf of itself and Lenders, pledging all Stock of such Credit Parties' Subsidiaries (but limited to sixty-five percent (65%) of the total outstanding Stock of any Foreign Subsidiary), and all Intercompany Notes owing to or held by such Credit Parties, and any additional pledge agreements that may be executed by any Credit Party pursuant to Section 5.12.

"Pre-Petition" means the time period ending immediately prior to the filing of the Chapter 11 Case.

"Pre-Petition Agent" means Agent (as defined in the Pre-Petition Credit Agreement) under the Pre-Petition Credit Agreement.

"Pre-Petition Collateral" means "Collateral" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Credit Agreement" shall have the meaning assigned to such term in the recitals hereto.

"Pre-Petition Discretionary Overadvances" shall have the meaning assigned to such term in Section 1.1(a) of the Agreement.

"Pre-Petition First Priority Lien" means the first priority security interest granted pursuant to the Pre-Petition Credit Agreement.

"Pre-Petition Loan Documents" means the Loan Documents (as defined in the Pre-Petition Credit Agreement).

"Pre-Petition Revolving Credit Obligations" means all Obligations (as defined in the Pre-Petition Credit Agreement) owed to the Revolving Lenders (as defined in the Pre-Petition Credit Agreement) pursuant to the terms of the Pre-Petition Credit Agreement.

"Prime Rate" means, for any day, a rate per annum equal to the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Agent) or any similar release by the Federal Reserve Board (as determined by the Agent).  Any change in the Prime Rate due to a change in any of the foregoing shall be effective on the effective date of such change in the "bank prime loan" rate. "Prior Lenders" means the Lenders (as defined in the Pre-Petition Credit Agreement) under the Pre-Petition Credit Agreement.

"Pro Rata Share" means with respect to all matters relating to any Lender, with respect to the Revolving Loans, the percentage obtained by dividing (i) the Revolving Loan Commitment of that Lender by (ii) the aggregate Revolving Loan Commitments of all Lenders, as any such percentages may be adjusted by assignments permitted pursuant to Section 9.1.

"Proceeds" means "proceeds", as such term is defined in the Code, including (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to any Credit Party from time to time with respect to any of the Collateral, (b) any and all payments (in any form whatsoever) made or due and payable to any Credit Party from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any Governmental Authority (or any Person acting under color of governmental authority), (c) any claim of any Credit Party against third parties (i) for past, present or future infringement of any Patent or Patent License, or  (ii) for past, present or future infringement or dilution of any Copyright, Copyright License, Trademark or Trademark License, or for injury to the goodwill associated with any Trademark or Trademark License, (d) any recoveries by any Credit Party against third parties with respect to any litigation or dispute concerning any of the Collateral including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, Collateral, (e) all amounts collected on, or distributed on account of, any Collateral, including dividends, interest, distributions and

Instruments with respect to Investment Property and pledged Stock, and (f) any and all other amounts, rights to payment or other property acquired upon the sale, lease, license, exchange or other disposition of Collateral and all rights arising out of Collateral.

"Professional Fees" means the Committee Professional Fees and the Debtors' Professional Fees.

"Proposed Change" has the meaning ascribed thereto in Section 11.2(c) of the Agreement.

"Qualified Assignee" means (a) any Lender, any Affiliate of any Lender and, with respect to any Lender that is an investment fund that invests in commercial loans, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor, and which, in each case, through its applicable lending office, is capable of lending to Borrowers without the imposition of any withholding or similar Taxes and (b) any commercial bank, savings and loan association or savings bank or any other entity which is an "accredited investor" (as defined in Regulation D under the Securities Act of 1933) which extends credit or buys loans as one of its businesses, including insurance companies, mutual funds, lease financing companies and commercial finance companies, in each case, which has a rating of BBB or higher from S&P and a rating of Baa2 or higher from Moody's at the date that it becomes a Lender and which, through its applicable lending office, is capable of lending to Borrowers without the imposition of any withholding or similar Taxes; provided that (i) no Credit Party shall be a Qualified Assignee and (ii) no Person determined by Agent to be acting in the capacity of a vulture fund or distressed debt purchaser shall be a Qualified Assignee.

"Qualified Plan" means a Pension Plan that is intended to be tax-qualified under Section 401(a) of the IRC.

"Real Estate" has the meaning ascribed thereto in Section 3.6 of the Agreement.

"Receipts" has the meaning ascribed thereto in Annex C to the Agreement.

"Related Person" has the meaning ascribed thereto in Annex C to the Agreement.

"Relationship Bank" has the meaning ascribed thereto in Annex C to the Agreement.

"Release" means any release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material in the indoor or outdoor environment, including the movement of Hazardous Material through or in the air, soil, surface water, ground water or property.

"Released Parties" has the meaning ascribed to it in Section 1.21 of the Agreement.

"Releasing Parties" has the meaning ascribed to it in Section 1.21 of the Agreement.

"Requisite Lenders" means (a) to the extent that the Lenders consist solely of Prior Lenders, then, as of any date of determination, (1) at any time that there are two or fewer Lenders, all Lenders, and (2) at any time that there are more than two Lenders, Lenders having (x) more than 66 2/3% of the Revolving Loan Commitments of all Lenders or (y) if the Revolving Loan Commitments have been terminated, more than 66 2/3% of the aggregate outstanding amount of the Revolving Loan or (b) to the extent that a party other than a Prior Lender becomes a Lender, then, as of any date of determination, Lenders having (1) more than 50% of the Revolving Loan Commitments of all Lenders or (2) if the Revolving Loan Commitments have been terminated, more than 50% of the aggregate outstanding amount of the Revolving Loan.

"Reserves" means (a) reserves for amounts owing under the Pre-Petition Revolving Credit Obligations, (b) the Carve-Out Reserve and (c) such other reserves against the Revolving Loan Commitments that Agent may, in its good faith credit judgment, establish from time to time; provided that in each such case, the Agent has provided Borrower Representative with notice of the establishment or modification of such reserve and an explanation thereof.

"Responsible Officer" means any of the following officers of a Credit Party: the Chairman, any Executive Vice President, the Chief Financial Officer or the Chief Restructuring Officer.

"Restricted Payment" means, with respect to any Credit Party (a) the declaration or payment of any dividend or the incurrence of any liability to make any other payment or distribution of cash or other property or assets in respect of Stock (excluding dividends and distributions payable solely in Stock of a Credit Party); (b) any payment on account of the purchase, redemption, defeasance, sinking fund or other retirement of such Credit Party's Stock or any other payment or distribution made in respect thereof, either directly or indirectly; (c) any payment or prepayment of principal of, premium, if any, or interest, fees or other charges on or with respect to, and any redemption, purchase, retirement, defeasance, sinking fund or similar payment and any claim for rescission with respect to, any of the Subordinated Debt; (d) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire Stock of such Credit Party now or hereafter outstanding; (e) any payment of a claim for the rescission of the purchase or sale of, or for material damages arising from the purchase or sale of, any shares of such Credit Party's Stock or of a claim for reimbursement, indemnification or contribution arising out of or related to any such claim for damages or rescission; (f) any payment, loan, contribution, or other transfer of funds or other property to any Stockholder of such Credit Party other than payment of compensation or reimbursement of business related expenses in the ordinary course of business to Stockholders who are employees of such Credit Party; and (g) any payment of management fees (or other fees of a similar nature) by such Credit Party to any Stockholder of such Credit Party or its Affiliates.

"Retiree Welfare Plan" means, at any time, a Welfare Plan that provides for continuing coverage or benefits for any participant or any beneficiary of a participant after such participant's termination of employment, other than continuation coverage provided pursuant to Section 4980B of the IRC or similar state law and at the sole expense of the participant or the beneficiary of the participant.

"Revolving Credit Advance" has the meaning ascribed thereto in Section 1.1(a)(i) of the Agreement.

"Revolving Loan" means, at any time, the sum of (i) the aggregate principal amount of Revolving Credit Advances outstanding to each Borrower plus (ii) the aggregate Letter of Credit Obligations incurred on behalf of each Borrower. Unless the context otherwise requires, references to the outstanding principal amount of the Revolving Loan shall include the outstanding balance of Letter of Credit Obligations that have not been cash collateralized in accordance with clause (c) of Annex B.

"Revolving Loan Commitment" means, as to any Lender, the aggregate of such Lender's Revolving Loan Commitment as set forth on Annex J to the Agreement or in the most recent Assignment Agreement executed by such Lender, as such amount may be adjusted, if at all, from time to time in accordance with the Agreement.

"Revolving Loan Commitments" means the aggregate of all Lenders' Revolving Loan Commitments, which commitments shall be in an aggregate amount equal to the Maximum Amount as in effect from time to time.

"Revolving Note" has the meaning ascribed thereto in Section 1.1(a)(iii) of the Agreement.

"Sale Approval Order" and "Sale Approval Orders" have the meaning ascribed to them in Section 5.13 of the Agreement.

"Scheduled Commitment Termination Date" means [October [___], 2011] [90 days from Closing Date], provided that such date may be extended for an additional thirty (30) days by the Borrowers with consent of the Agent and the Lenders if, not less than three (3) Business Days prior to the then-current Scheduled Commitment Termination Date, Borrower Representative, on behalf of Borrowers, shall deliver a certificate (i) certifying that no Default or Event of Default has occurred and is continuing and (ii) attaching a DIP Budget covering such extension period, in form and substance satisfactory to the Agent and the Lenders, and demonstrating pro forma compliance with such DIP Budget through the extension period.

"Schedules" shall mean the Disclosure Schedules and Schedule 1.1 to the Agreement.

"Security Agreement" means the Security Agreement, dated as of the date of the Agreement, entered into by and among Agent, on behalf of itself and Lenders, ArchBrook Holdings, ABL West, Chimerica, Expert, ABL NY, the Borrowers and each other Credit Party

that is or may become a signatory thereto, together with any additional security agreement that may be executed by any Credit Party pursuant to <u>Section 5.12</u>.

"<u>Stock</u>" means all shares, options, warrants, general or limited partnership interests, membership interests or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934).

"<u>Stockholder</u>" means, with respect to any Person, each holder of Stock of such Person.

"<u>Subordinated Debt</u>" means any Indebtedness of any Credit Party that is (i) in an amount and otherwise on terms and conditions satisfactory to Agent and the Requisite Lenders in their sole discretion, and (ii) is subordinated to the Obligations as to right and time of payment and as to any other rights and remedies thereunder on terms and conditions satisfactory to Agent and the Requisite Lenders in their sole discretion.

"<u>Subsidiary</u>" means, with respect to any Person, (a) any corporation of which an aggregate of more than fifty percent (50%) of the outstanding Stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether, at the time, Stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned legally or beneficially by such Person or one or more Subsidiaries of such Person, or with respect to which any such Person has the right to vote or designate the vote of more than fifty percent (50%) of such Stock whether by proxy, agreement, operation of law or otherwise, and (b) any partnership or limited liability company in which such Person and/or one or more Subsidiaries of such Person shall have an interest (whether in the form of voting or participation in profits or capital contribution) of more than fifty percent (50%) or of which any such Person is a general partner or may exercise the powers of a general partner.  Unless the context otherwise requires, each reference to a Subsidiary shall be a reference to a Subsidiary of ArchBrook Holdings.

"<u>Subsidiary Guaranty</u>" means the Guaranty Agreement, dated as of the date of the Agreement, executed by ABL West, Chimerica, Expert and ABL NY in favor of Agent and Lenders, and any other subsidiary guaranty agreement entered into after the Closing Date pursuant to <u>Section 5.12</u> by any Domestic Subsidiary of ArchBrook Holdings.

"<u>Taxes</u>" means taxes, levies, imposts, deductions, Charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on or measured by the net income of Agent or a Lender by the jurisdictions under the laws of which Agent and Lenders are or were organized or conduct or conducted business or any political subdivision thereof.

"<u>Termination Date</u>" means the date on which the Revolving Loan Commitments are no longer in effect and the Loans have been indefeasibly repaid in full, and all other

Obligations under the Agreement and the other Loan Documents have been completely discharged (other than contingent indemnity obligations not yet due and payable), all Letter of Credit Obligations have been cash collateralized, canceled or backed by stand-by letters of credit in accordance with Annex B, and Borrowers shall not have any further right to obtain Revolving Loans or Letters of Credit under the Agreement.

"Termination Declaration" has the meaning ascribed thereto in Section 8.2(a) of the Agreement.

"Termination Declaration Date" has the meaning ascribed thereto in Section 8.2(a) of the Agreement.

"Toshiba America" means Toshiba America Information Services, Inc.

"Trademark License" means rights under any written agreement now owned or hereafter acquired by any Credit Party granting any right to use any Trademark.

"Trademarks" means all of the following now owned or hereafter existing or adopted or acquired by any Credit Party: (a) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof; (b) all reissues, extensions or renewals thereof; and (c) all goodwill associated with or symbolized by any of the foregoing.

"Unfunded Pension Liability" means, at any time, the aggregate amount, if any, of the sum of (a) the amount by which the present value of all accrued benefits under each Title IV Plan exceeds the fair market value of all assets of such Title IV Plan allocable to such benefits in accordance with Title IV of ERISA, all determined as of the most recent valuation date for each such Title IV Plan using the actuarial assumptions for funding purposes in effect under such Title IV Plan, and (b) for a period of 5 years following a transaction which might reasonably be expected to be covered by Section 4069 of ERISA, the liabilities (whether or not accrued) that could be avoided by any Credit Party or any ERISA Affiliate as a result of such transaction.

"Welfare Plan" means a Plan described in Section 3(i) of ERISA.

"Wholly-Owned" means, with respect to any Subsidiary, that all of the shares of the Stock of such Subsidiary (except directors' qualifying shares or, in the case of any Foreign Subsidiary, such nominal ownership interests which are required to be held by third parties under the laws of the foreign jurisdiction under which such Foreign Subsidiary was organized) are directly or indirectly owned or controlled by ArchBrook Holdings or one or more of its Wholly Owned Subsidiaries.

"Winning Bid" and "Winning Bids" have the meanings ascribed to them in Section 5.13 of the Agreement.

Rules of construction with respect to accounting terms used in the Agreement or the other Loan Documents shall be as set forth in Annex G.

All other undefined terms contained in any of the Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Code to the extent the same are used or defined therein; provided that in the event any term is defined differently in different Articles of the Code, the definition contained in Article 9 shall control. Unless otherwise specified, references in the Agreement or any of the Annexes, Exhibits or Schedules to a Section, subsection or clause refer to such Section, subsection or clause as contained in the Agreement. The words "herein," "hereof" and "hereunder" and other words of similar import refer to the Agreement as a whole, including all Annexes, Exhibits and Schedules, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular section, subsection or clause contained in the Agreement or any such Annex, Exhibit or Schedule.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders. The words "including", "includes" and "include" shall be deemed to be followed by the words "but not limited to" (or the grammatical equivalent of such phrase); the word "or" is not exclusive; references to Persons include their respective successors and assigns (to the extent and only to the extent permitted by the Loan Documents) or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons; and all references to statutes and related regulations shall include any amendments of the same and any successor statutes and regulations. Whenever any provision in any Loan Document refers to the knowledge (or an analogous phrase) of any Credit Party, such words are intended to signify that such Credit Party has actual knowledge or awareness of a particular fact or circumstance or that such Credit Party, if it had exercised reasonable diligence, would have known or been aware of such fact or circumstance.

(a)     Revolving Credit Advances Automatic; Participations.  (i) In the event that Agent or any Lender shall make any payment on or pursuant to any Letter of Credit Obligation, such payment shall then be deemed automatically to constitute a Revolving Credit Advance to the applicable Borrower under Section 1.1(a) of the Agreement regardless of whether a Default or Event of Default has occurred and is continuing and notwithstanding any Borrower's failure to satisfy the conditions precedent set forth in Section 2, and each Lender shall be obligated to pay its Pro Rata Share thereof in accordance with the Agreement; provided however, if such Revolving Credit Advance is for any reason not made, Borrowers agree to promptly reimburse (in any event within one (1) Business Day) Agent for each such payment and such obligation to reimburse shall be deemed an Obligation for purposes under the Loan Documents.  The failure of any Lender to make available to Agent for Agent's own account its Pro Rata Share of any such Revolving Credit Advance or payment by Agent under or in respect of an Existing Letter of Credit shall not relieve any other Lender of its obligation hereunder to make available to Agent its Pro Rata Share thereof, but no Lender shall be responsible for the failure of any other Lender to make available such other Lender's Pro Rata Share of any such payment.  Nothing herein shall be construed to limit Lenders' or Agent's ability to accelerate such Revolving Credit Advance should an Event of Default otherwise have occurred and be continuing at the time such Revolving Credit Advance was made or thereafter.

(ii)     If it shall be illegal or unlawful for any Borrower to incur Revolving Credit Advances as contemplated by paragraph (a)(i) above or if it shall be illegal or unlawful for any Lender to be deemed to have assumed a ratable share of the reimbursement obligations owed to an L/C Issuer, or if the L/C Issuer is a Lender, then immediately and without further action whatsoever, each Lender shall be deemed to have irrevocably and unconditionally purchased from Agent (or such L/C Issuer, as the case may be) an undivided interest and participation equal to such Lender's Pro Rata Share (based on the Revolving Loan Commitment) of the Letter of Credit Obligations in respect of all Letters of Credit then outstanding.  Each Lender shall fund its participation in all payments or disbursements made under the Existing Letters of Credit in the same manner as provided in the Agreement with respect to Revolving Credit Advances

(b)     Cash Collateral.     (i) If Borrowers are required to provide cash collateral for any Letter of Credit Obligations pursuant to the Agreement prior to the Commitment Termination Date, each Borrower will pay to Agent for the ratable benefit of itself and Lenders cash or cash equivalents acceptable to Agent ("**Cash Equivalents**") in an amount equal to 105% of the maximum amount then available to be drawn under each applicable Existing Letter of Credit outstanding for the benefit of such Borrower.  Such funds or Cash Equivalents shall be held by Agent in a cash collateral account (the "**Cash Collateral Account**") maintained at a bank or financial institution acceptable to Agent and the Borrower

Representative. The Cash Collateral Account shall be in the name of the Agent (for the benefit of itself and the Lenders) and shall be subject to the control of the Agent, for the benefit of itself and the Lenders. Each Borrower hereby pledges and grants to the Agent, for the benefit of itself and the Lenders, a security interest in the Cash Collateral Account and all such funds and Cash Equivalents held in the Cash Collateral Account from time to time and all proceeds thereof, as security for the payment of all amounts due in respect of the Letter of Credit Obligations and other Obligations, whether or not then due. The Agreement, including this Annex B, shall constitute a security agreement under applicable law.

(ii) If any Letter of Credit Obligations, whether or not then due and payable, shall for any reason be outstanding on the Commitment Termination Date, Borrowers shall either (A) provide cash collateral therefor in the manner described in subsection (c)(i) above, or (B) cause all such Existing Letters of Credit and guaranties thereof, if any, to be canceled and returned, or (C) deliver a stand-by letter (or letters) of credit in guaranty of such Letter of Credit Obligations, which stand-by letter (or letters) of credit shall be of like tenor and duration (plus 30 additional days) as, and in an amount equal to 105% of, the aggregate maximum amount then available to be drawn under, the Existing Letters of Credit to which such outstanding Letter of Credit Obligations relate and shall be issued by a Person, and shall be subject to such terms and conditions, as are be satisfactory to Agent in its sole discretion.

(iii) From time to time after funds are deposited in the Cash Collateral Account by any Borrower, whether before or after the Commitment Termination Date, Agent may apply such funds or Cash Equivalents then held in the Cash Collateral Account to the payment of any amounts, and in such order as Agent may elect, as shall be or shall become due and payable by such Borrower to Agent and Lenders with respect to such Letter of Credit Obligations of such Borrower and, upon the satisfaction in full of all Letter of Credit Obligations of such Borrower, to any other Obligations of any Borrower then due and payable in accordance with the terms and conditions of the Agreement.

(iv) No Borrower nor any Person claiming on behalf of or through any Borrower shall have any right to withdraw any of the funds or Cash Equivalents held in the Cash Collateral Account, except that upon the Termination Date, any funds remaining in the Cash Collateral Account shall be applied to other Obligations then due and owing and upon payment in full of such Obligations, any remaining amount shall be paid to Borrowers or as otherwise required by law. Interest earned on deposits in the Cash Collateral Account shall be for the account of Agent.

(c) <u>Fees and Expenses</u>. Borrowers agree to pay to Agent for the benefit of Lenders, as compensation to such Lenders for Letter of Credit Obligations incurred hereunder, (i) all costs and expenses incurred by Agent or any Lender on account of such Letter of Credit Obligations, and (ii) for each day on which any Letter of Credit Obligation shall remain outstanding, a fee (the "**Letter of Credit Fee**") in an amount equal to the quotient of (x) the Applicable L/C Margin as then in effect multiplied by the maximum amount available to be drawn at such time under the applicable Existing Letter of Credit, divided by (y) 360. Such fee shall be paid to Agent for the benefit of the Lenders in arrears, on the first day of each month and

on the Commitment Termination Date. In addition, Borrowers shall pay to Agent, on demand, any additional fees or other amounts as are required pursuant to the Master Standby Agreement.

(d)  Letter of Credit Documents. Prior to the incurrence of the initial Letter of Credit Obligations, Borrower Representative and GE Capital shall have entered into the Master Standby Agreement.

(e)  Obligation Absolute. The obligation of Borrowers to reimburse Agent and Lenders for payments made with respect to any Letter of Credit Obligation shall be absolute, unconditional and irrevocable, without necessity of presentment, demand, protest or other formalities, and the obligations of each Lender to make payments to Agent with respect to Letters of Credit Obligations shall be unconditional and irrevocable. Such obligations of Borrowers and Lenders shall be paid strictly in accordance with the terms hereof under all circumstances including the following circumstances:

(i)  any lack of validity or enforceability of any Existing Letter of Credit or the Letter of Credit Obligations, the Agreement or the other Loan Documents or any other agreement;

(ii)  the existence of any claim, setoff, defense or other right that any Borrower or any of their respective Affiliates or any Lender may at any time have against a beneficiary or any transferee of any Existing Letter of Credit (or any Persons or entities for whom any such transferee may be acting), Agent, any Lender, or any other Person, whether in connection with the Agreement, the Existing Letter of Credit, the transactions contemplated herein or therein or any unrelated transaction (including any underlying transaction between any Borrower or any of their respective Affiliates and the beneficiary for which the Existing Letter of Credit was procured);

(iii)  any draft, demand, certificate or any other document presented under any Existing Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(iv)  payment by Agent (except as otherwise expressly provided in paragraph (f)(ii)(C) below) or any L/C Issuer under any Existing Letter of Credit or guaranty thereof against presentation of a demand, draft or certificate or other document that does not comply with the terms of such Existing Letter of Credit or such guaranty;

(v)  any other circumstance or happening whatsoever, that is similar to any of the foregoing; or

(vi)  the fact that a Default or an Event of Default has occurred and is continuing.

(f)  Indemnification; Nature of Lenders' Duties.

(i)  In addition to amounts payable as elsewhere provided in the Agreement, Borrowers hereby agree to pay and to protect, indemnify, and save harmless Agent and each Lender from and against any and all claims, demands, liabilities,

damages, losses, costs, charges and expenses (including reasonable attorneys' fees and allocated costs of internal counsel) that Agent or any Lender may incur or be subject to as a consequence, direct or indirect, of (A) the issuance of any Existing Letter of Credit or guaranty thereof or the use of the proceeds of any draw thereunder, or (B) the failure of Agent or any Lender seeking indemnification or of any L/C Issuer to honor a demand for payment under any Existing Letter of Credit or guaranty thereof as a result of any act or omission with respect thereto, whether rightful or wrongful, of any present or future de jure or de facto government or Governmental Authority, in each case other than to the extent arising as a result of the gross negligence or willful misconduct of Agent or such Lender.

(ii)    As between Agent and any Lender and Borrowers, Borrowers assume all risks of the acts and omissions of, or misuse of any Existing Letter of Credit by, beneficiaries of any Existing Letter of Credit.  In furtherance and not in limitation of the foregoing, to the fullest extent permitted by law, neither Agent nor any Lender shall be responsible for:  (A) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document issued by any party in connection with the application for and issuance of any Existing Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (B) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any Existing Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, that may prove to be invalid or ineffective for any reason; (C) the failure of the beneficiary of any Existing Letter of Credit to comply fully with conditions required in order to demand payment under such Existing Letter of Credit; provided that in the case of any payment by Agent under any Existing Letter of Credit or guaranty thereof, Agent shall be liable to the extent such payment was made as a result of its gross negligence or willful misconduct in determining that the demand for payment under such Existing Letter of Credit or guaranty thereof complies on its face with any applicable requirements for a demand for payment under such Existing Letter of Credit or guaranty thereof; (D) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they may be in cipher; (E) errors in interpretation of technical terms; (F) any loss or delay in the transmission or otherwise of any document required in order to make a payment under any Existing Letter of Credit or guaranty thereof or of the proceeds thereof; (G) the credit of the proceeds of any drawing under any Existing Letter of Credit or guaranty thereof; and (H) any consequences arising from causes beyond the control of Agent or any Lender. None of the above shall affect, impair, or prevent the vesting of any of Agent's or any Lender's rights or powers hereunder or under the Agreement.

(iii)    Nothing contained herein shall be deemed to limit or to expand any waivers, covenants or indemnities made by Borrowers in favor of any L/C Issuer in any letter of credit application, reimbursement agreement or similar document, instrument or agreement between any Borrower and such L/C Issuer, including any Letter of Credit Documents.

**CREDIT AGREEMENT**

**CASH MANAGEMENT SYSTEM**

Each Borrower shall, and shall cause its Subsidiaries to, establish and maintain the Cash Management Systems described below:

(a)　　On or before the Closing Date and until the Termination Date, each Borrower shall (i) establish one or more lock boxes (collectively, the "**Lock Boxes**") and blocked Deposit Accounts (collectively, "**Blocked Accounts**") at one or more of the banks set forth in Disclosure Schedule (3.19), (ii) request in writing and otherwise take such reasonable steps to ensure that all Account Debtors of the Borrowers forward payment of their Accounts directly to such Lock Boxes, and (iii) deposit and cause their Subsidiaries to deposit or cause to be deposited promptly, and in any event no later than the first Business Day after the date of receipt thereof, all cash, checks, drafts or other items of payment relating to or constituting payments made in respect of any and all Collateral ("**Receipts**") (whether or not otherwise delivered to a Lock Box) into one or more of the Blocked Accounts in such Borrower's name or any such Subsidiary's name and at a bank identified in Disclosure Schedule (3.19) (each, a "**Relationship Bank**").  On or before the Closing Date, each Borrower shall have established one or more concentration accounts in its name (each a "**Concentration Account**" and, collectively, the "**Concentration Accounts**") at the bank or banks that are designated as the Concentration Account bank for each Borrower in Disclosure Schedule (3.19) (each a "**Concentration Account Bank**" and, collectively, the "**Concentration Account Banks**"), which banks shall be reasonably satisfactory to Agent.

(b)　　Each Borrower may maintain, in its name, an account (each a "**Disbursement Account**" and collectively, the "**Disbursement Accounts**") at a bank reasonably acceptable to Agent into which Agent shall, from time to time, deposit proceeds of Revolving Credit Advances made to such Borrower pursuant to Section 1.1 for use by such Borrower solely in accordance with the provisions of Section 1.4.

(c)　　On or before the Closing Date, each Concentration Account Bank, each bank where a Blocked Account, the Concentration Account, or the Disbursement Account is maintained and all other Relationship Banks, shall have entered into tri-party blocked account agreements with Agent, for the benefit of itself and Lenders, and the applicable Borrower and Subsidiaries thereof, as applicable, in form and substance reasonably acceptable to Agent, which shall become operative on or prior to the Closing Date.  Each such blocked account agreement shall provide, among other things, that (i) the bank executing such agreement has no rights of setoff or recoupment or any other claim against such account, as the case may be, other than for payment of its service fees and other charges directly related to the administration of such account and for returned checks, drafts or other items of payment, and (ii) from and after the Closing Date (A) with respect to banks at which a Blocked Account is maintained, such bank agrees to forward immediately all amounts in each Blocked Account to the Concentration Account Bank, to commence the process of daily sweeps from such Blocked Account into a

Concentration Account and to otherwise comply with instructions originated by Agent directing the disposition of funds from such Concentration Account without further consent of any Credit Party and (B) with respect to the Concentration Account Bank, such bank agrees to immediately forward all amounts received in each Concentration Account to the Collection Account through daily sweeps from such Concentration Account into the Collection Account and to otherwise comply with instructions originated by Agent directing the disposition of funds from such Concentration Account without further consent of any Credit Party. No Borrower shall, or shall cause or permit any Subsidiary thereof to, accumulate or maintain cash in the Disbursement Account or payroll accounts as of any date of determination in excess of checks outstanding against such accounts as of that date and amounts necessary to meet minimum balance requirements.

(d)     So long as no Default or Event of Default has occurred and is continuing, Borrowers may amend <u>Disclosure Schedule (3.19)</u> to add or replace a Relationship Bank, any Lock Box or Blocked Account or to replace the Concentration Account or the Disbursement Account; <u>provided</u> that (i) Agent shall have consented in writing in advance to the opening of such account or Lock Box with the relevant bank (if such relevant bank is an A Rated Bank, such consent not to be unreasonably withheld) and (ii) prior to the time of the opening of such account or Lock Box, the applicable Borrower or its Subsidiaries, as applicable, and such bank shall have executed and delivered to Agent a tri-party blocked account agreement, in form and substance reasonably satisfactory to Agent. Borrowers shall close any of their accounts (and establish replacement accounts in accordance with the foregoing sentence) promptly and in any event within thirty (30) days following notice from Agent that the creditworthiness of any bank holding an account is no longer acceptable in Agent's reasonable judgment, or as promptly as practicable and in any event within sixty (60) days following notice from Agent that the operating performance, funds transfer or availability procedures or performance with respect to accounts or Lock Boxes of the bank holding such accounts or Agent's liability under any tri-party blocked account agreement with such bank is no longer acceptable in Agent's reasonable judgment.

(e)     The Lock Boxes, the Blocked Accounts, the Disbursement Account and the Concentration Accounts shall be cash collateral accounts, with all cash, checks, drafts and other similar items of payment in such accounts securing payment of the Revolving Loans and all other Obligations, and in which each Borrower and each Subsidiary thereof shall have granted a Lien to Agent, on behalf of itself and Lenders, pursuant to the Security Agreement.

(f)     All amounts deposited in the Collection Account shall be deemed received by Agent in accordance with <u>Section 1.10</u> and shall be applied (and allocated) by Agent in accordance with <u>Sections 1.3(c)</u> and <u>1.11</u>. In no event shall any amount be so applied unless and until such amount shall have been credited in immediately available funds to the Collection Account.

(g)     Each Borrower shall and shall cause its Affiliates, officers, employees, agents, directors or other Persons acting for or in concert with such Borrower (each a "**Related Person**") to (i) hold in trust for Agent, for the benefit of itself and Lenders, all Collateral consisting of cash, checks, drafts and other items of payment received by such Borrower or any

such Related Person, and (ii) within one (1) Business Day after receipt by such Borrower or any such Related Person of any checks, cash or other items of payment, deposit the same into a Blocked Account of such Borrower. Each Borrower and each Related Person acknowledges and agrees that all cash, checks or other items of payment constituting proceeds of Collateral are part of the Collateral. All proceeds of the sale or other disposition of any Collateral shall be deposited directly into the applicable Blocked Accounts.

**ANNEX D <u>(Section 2.1(a))</u>**

**to**

**<u>CREDIT AGREEMENT</u>**
**<u>CLOSING CHECKLIST</u>**

In addition to, and not in limitation of, the conditions described in <u>Section 2.1</u> of the Agreement, pursuant to <u>Section 2.1(a)</u>, the following items must be received by Agent in form and substance satisfactory to Agent on or prior to the Closing Date (each capitalized term used but not otherwise defined herein shall have the meaning ascribed thereto in Annex A to the Agreement):

A.    <u>Appendices and Disclosure Schedules</u>.  All Appendices and all Disclosure Schedules to the Agreement, in form and substance satisfactory to Agent.

B.    <u>Revolving Notes</u>.  Duly executed originals of the Revolving Notes for each applicable Lender, dated the Closing Date.

C.    <u>Security Agreement</u>.  Duly executed originals of the Security Agreement, dated the Closing Date, and all Powers of Attorney required to be executed pursuant thereto.

D.    [<u>Reserved</u>].

E.    <u>Security Interests and Code Filings</u>.

(i)    Evidence satisfactory to Agent that Agent (for the benefit of itself and Lenders) has a valid and perfected first priority security interest (subject to the Carve-Out) in the Collateral, including (i) such documents and filings duly executed or authorized by each Domestic Credit Party that is party to a Collateral Document (including financing statements under the Code and other applicable documents under the laws of any jurisdiction with respect to the perfection of Liens) as Agent may request in order to perfect its security interests in the Collateral and (ii) to the extent required by Agent copies of Code search reports listing all effective financing statements that name any Collateral Credit Party as debtor, together with copies of such financing statements, none of which shall cover the Collateral, except for those relating to Permitted Encumbrances.

(ii)    Control Letters in favor of Agent (for the benefit of itself and the Lenders) from (x) all issuers of uncertificated securities and financial assets held by any Domestic Credit Party, (y) all securities intermediaries with respect to all securities accounts and securities entitlements of any Domestic Credit Party, and (z) all futures commission agents and clearing houses with respect to all commodities contracts and commodities accounts held by any Domestic Credit Party.

F.    <u>Interim DIP Budget</u>.  Agent shall have received a copy of the Interim DIP Budget, in form and substance acceptable to Agent and the Lenders, which may be updated from time to time pursuant to amendments thereto as approved by Agent and the Lenders.

G. <u>Guaranties</u>. Duly executed originals of the Holdings Guaranty and the Subsidiary Guaranty, each dated the Closing Date, and all documents, instruments and agreements executed pursuant thereto.

H. <u>Initial Collateral Certificate</u>. Duly executed original of an initial Collateral Certificate executed by each Borrower, dated the Closing Date, reflecting information concerning Accounts and Inventory of each Borrower as of a date not more than seven (7) days prior to the Closing Date.

I. <u>Initial Notice of Revolving Credit Advance</u>. Duly executed original of a Notice of Revolving Credit Advance, dated the Closing Date, with respect to the initial Revolving Credit Advances to be requested by Borrower Representative on the Closing Date for each Borrower.

J. <u>Letter of Direction</u>. Duly executed original of a letter of direction from Borrower Representative addressed to Agent, on behalf of itself and Lenders, with respect to the disbursement on the Closing Date of the proceeds of the initial Revolving Credit Advances.

K. <u>Cash Management System; Blocked Account Agreements</u>. Evidence satisfactory to Agent that, as of the Closing Date, Cash Management Systems complying with <u>Annex C</u> to the Agreement have been established and are being maintained in the manner set forth in such <u>Annex C</u>, together with copies of duly executed tri-party blocked account and lock box agreements, reasonably satisfactory to Agent, with the banks as required by <u>Annex C</u>.

L. <u>Charter and Good Standing</u>. For each Domestic Credit Party, such Person's (i) charter and all amendments thereto, (ii) good standing certificates (including verification of tax status where applicable) in its state of incorporation or organization (other than ABL West and Chimerica) and (iii) good standing certificates (including verification of tax status where applicable) and certificates of qualification to conduct business in each jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified would not result in a Material Adverse Effect, each dated a recent date prior to the Closing Date and certified by the applicable Secretary of State or other authorized Governmental Authority.

M. <u>Bylaws and Resolutions</u>. For each Domestic Credit Party, (i) such Person's bylaws or limited liability company agreement, together with all amendments thereto and (ii) resolutions of such Person's Board of Directors or Managers, approving and authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party and the transactions to be consummated in connection therewith, each certified by such Person's corporate or company secretary or an assistant secretary, or other authorized officer, as being in full force and effect without any modification or amendment.

N. <u>Incumbency Certificates</u>. For each Domestic Credit Party, signature and incumbency certificates of the officers of each such Person executing any of the Loan Documents, certified by such Person's corporate or company secretary or an assistant secretary, or other authorized signatory, as being true, accurate, correct and complete.

O.    <u>Pledge Agreement</u>.  Duly executed originals of the Pledge Agreement accompanied by (as applicable) (i) share certificates representing all of the outstanding certificated Stock being pledged pursuant to such Pledge Agreement and undated stock powers for such share certificates executed in blank, (ii) duly executed control agreements with respect to all uncertified Stock being pledged pursuant to such Pledge Agreement and (iii) the original Intercompany Notes and other instruments evidencing Indebtedness being pledged pursuant to such Pledge Agreement, duly endorsed in blank.

P.    <u>Audited Financials</u>.  The Financial Statements and other materials set forth in <u>Section 3.4</u>, certified by a Responsible Officer of ArchBrook Holdings, in each case in form and substance reasonably satisfactory to Agent and Agent shall be satisfied, in its sole discretion, with all of the foregoing.

Q.    <u>Fee Letter</u>.  Agent shall have received a duly executed original of the GE Capital Fee Letter.

R.    <u>Master Standby Agreement</u>.  A Master Agreement for Standby Letters of Credit among Borrowers and GE Capital.

S.    <u>Expert Inventory Sale</u>.  Agent shall have received satisfactory evidence that the Expert Inventory Sale has been consummated in accordance with the Consent Agreement.

T.    <u>Other Documents</u>.  Such other certificates, documents and agreements respecting any Credit Party as Agent may, in its sole discretion, reasonably request.

**ANNEX E** (Section 4.1(a))

to

**CREDIT AGREEMENT**

**FINANCIAL STATEMENTS -- REPORTING**

The Credit Parties shall deliver or cause to be delivered to Agent or to Agent and Lenders, as indicated, the following:

(a)     Monthly Financials.  To Agent and Lenders, within sixty (60) days after the end of each Fiscal Month (commencing with the Fiscal Month ended June 30, 2011), financial information regarding ArchBrook Holdings and its Subsidiaries consisting of (i) a consolidated unaudited balance sheet as of the close of such Fiscal Month and the related statement of income and cash flows for that portion of the Fiscal Year ending as of the close of such Fiscal Month; (ii) a consolidated unaudited statement of income and cash flows for such Fiscal Month; and (iii) a summary of the use of proceeds from each Revolving Credit Advance made during such period. The Credit Parties shall use commercially reasonable efforts to ensure that the financial information provided pursuant to the immediately preceding sentence is prepared in accordance with GAAP (subject to normal year-end adjustments).  Such financial information shall be accompanied by the certification of such Responsible Officer that (i) to the extent such financial information is provided in accordance with GAAP, (A) such financial information presents fairly in accordance with GAAP (subject to normal year-end adjustments) the financial position and results of operations of ArchBrook Holdings and its Subsidiaries, on a consolidated basis, in each case as at the end of such Fiscal Month and for that portion of the Fiscal Year then ended and (B) any other information presented is true, correct and complete in all material respects and (ii) there was no Default or Event of Default in existence as of such time or, if a Default or Event of Default has occurred and is continuing, describing the nature thereof and all efforts undertaken to cure such Default or Event of Default.

(b)     [Reserved].

(c)     [Reserved].

(d)     Management Letters.  To Agent and Lenders, within five (5) Business Days after receipt thereof by any Credit Party, copies of all management letters, exception reports or similar letters or reports received by such Credit Party from its independent certified public accountants.

(e)     Default Notices.  To Agent and Lenders, as soon as practicable, and in any event within five (5) Business Days after any Credit Party has actual knowledge of the existence of any Default, Event of Default or other event that has had a Material Adverse Effect, telephonic or telecopied notice specifying the nature of such Default or Event of Default or other event, including the anticipated effect thereof, which notice, if given telephonically, shall be promptly confirmed in writing on the next Business Day.

(f)     SEC Filings and Press Releases.  To Agent and Lenders, promptly upon their becoming available, copies of:  (i) all Financial Statements, reports, notices and proxy

statements made publicly available by any Credit Party to its security holders; (ii) all regular and periodic reports and all registration statements and prospectuses, if any, filed by any Credit Party with any securities exchange or with the Securities and Exchange Commission or any governmental or private regulatory authority; and (iii) all press releases and other statements made available by any Credit Party to the public concerning material changes or developments in the business of any such Person.

(g)    Other Debt, Equity and Material Contract Notices.  To Agent, as soon as possible and in any event within five (5) days after execution, receipt or delivery thereof, copies of all material written notices given or received by any Credit Party with respect to any Subordinated Debt or Stock, or any other Material Contract of such Person, and, within two (2) Business Days after any Credit Party obtains knowledge of any matured or unmatured event of default with respect to any Subordinated Debt or any other Material Contract, notice of such event of default.

(h)    Supplemental Schedules.  To Agent, supplemental disclosures, if any, required by Section 5.6.

(i)    Litigation.  To Agent in writing, promptly upon learning thereof, notice of any Litigation commenced or threatened against any Credit Party that (i) seeks damages in excess of $250,000, (ii) seeks injunctive relief, (iii) is asserted or instituted against any Plan, its fiduciaries or its assets or against any Credit Party or ERISA Affiliate in connection with any Plan, (iv) alleges criminal misconduct by any Credit Party, or (v) alleges the violation of any law regarding, or seeks remedies in connection with, any Environmental Liabilities.

(j)    Insurance Notices.  To Agent, the disclosure of losses or casualties required by Section 5.4.

(k)    Lease Default Notices.  To Agent, within five (5) Business Days after receipt thereof, a copy of (i) each default notice received under or with respect to any leased location or public warehouse where Collateral is located, and (ii) such other notices or documents as Agent may reasonably request.

(l)    Lease Amendments.  To Agent, within five (5) Business Days after receipt thereof, copies of all material amendments to all real estate leases.

(m)    Major Vendors and Account Debtors.  To Agent in writing, promptly upon learning thereof, notice of the termination or cancellation of any Borrower's purchasing arrangements with any Major Vendor or sales relationships with any Major Customer.

(n)    [Reserved].

(o)    Bankruptcy Matters.  To Agent, as soon as practicable in advance of filing with the Bankruptcy Court, (i) copies of the motions seeking approval of and proposed forms of the Interim Order and the Final Order, (ii) all other proposed orders and pleadings related to the Agreement and the Revolving Loan Commitments, (iii) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan, (iv) any motion and proposed form of order

seeking to extend or otherwise modify the Debtors' exclusive periods set forth in section 1121 of the Bankruptcy Code, (v) any motion seeking approval of any sale of the Debtors' assets, including any proposed form of a bidding procedures order and sale order and (vi) any motion and proposed form of order filed with the Bankruptcy Court relating to any management equity plan, incentive plan or severance plan, the assumption, rejection, modification or amendment of any employment agreement, or the assumption, rejection, modification or amendment of any Material Contract (each of which must be in form and substance satisfactory to Agent).

(p)     Cash Flow Forecast; DIP Budget.   To Agent on the Closing Date, the initial 8-week cash flow budget, in form and substance satisfactory to Agent and the Requisite Lenders, setting forth, on a line-item basis (i) projected cash receipts, (ii) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under the Chapter 11 Case, Capital Expenditures, asset sales and fees and expenses of Agent and Pre-Petition Agent (including counsel, financial advisors and other professionals therefor) and any other fees and expenses relating to the Revolving Loan Commitments) and (iii) the unused Revolving Loan Commitments and unrestricted cash on hand. To Agent (for distribution to the Lenders to supplement and replace the DIP Budget then in effect) on Tuesday of each week, not later than 5:00 p.m. (New York City time), (i) for each of the first eight (8) weeks of the Chapter 11 Case, an updated "non-rolling" 8-week budget, (ii) for the ninth week of the Chapter 11 Case, a 13-week cash flow budget in form and substance satisfactory to Agent and (iii) for each week thereafter, an updated "rolling" 13-week cash flow budget in form and substance satisfactory to the Agent.

(q)     Variance Report.  To Agent, on Tuesday of each week, not later than 5:00 p.m. (New York City time), a variance report setting forth (i) the actual cash receipts, expenditures and disbursements for such immediately preceding calendar week on a line-item basis and the unused Revolving Loan Commitments and unrestricted cash on hand as of the end of such calendar week and (ii) the variance in dollar amounts of the actual expenditures and disbursements (excluding debt service, professional fees and Capital Expenditures) for each weekly period from those reflected for the corresponding period in the DIP Budget.

(r)     Chief Restructuring Officer Report.  To Agent on Tuesday of each week, not later than 5:00 p.m. (New York City time), a report from the Chief Restructuring Officer.

(s)     Financial Advisor Report.     To Agent on Tuesday of each week, not later than 5:00 p.m. (New York City time), a report from the Financial Advisor to the Borrowers.

(t)     Chief Financial Officer Report.    Upon the request of the Agent, a conference call with the chief financial officer of the Borrowers to discuss the DIP Budget (and all updates and variance reports related thereto) of the Borrowers.

(u)     Monthly Reports.  To Agent, monthly reports with respect to asset sales, cost savings and other matters reasonably requested by the Agent.

(v)     Other Documents.  To Agent, such other financial and other information respecting any Credit Party's business or financial condition as Agent or any Lender shall from

time to time reasonably request (including, without limitation, information with respect to litigation, contingent liabilities and ERISA and environmental events).

**ANNEX F <u>(Section 4.1(b))</u>**

**to**

**<u>CREDIT AGREEMENT</u>**

**<u>COLLATERAL REPORTS</u>**

Each Borrower shall deliver or cause to be delivered the following:

(a)     To Agent, each of the following reports, each of which shall be prepared by the Borrowers as of the last day of the immediately preceding week and delivered at the time of delivery of each of the updated DIP Budget pursuant to <u>Annex E</u>:

(i)     a Collateral Certificate executed by each Borrower accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion including, without limitation, the Daily Report;

(ii)     summary of each Borrower's Inventory by model number with a supporting perpetual Inventory report, in each case accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion;

(iii)     a monthly trial balance showing each Borrower's Accounts outstanding aged from invoice date as follows:  1 to 30 days, 31 to 60 days, 61 to 90 days and 91 days or more, accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion;

(iv)     an aging of accounts payable and a reconciliation of the accounts payable aging to each Borrower's general ledger delivered pursuant to <u>Annex E</u>, in each case accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion;

(v)     a reconciliation of the outstanding Revolving Loans as set forth in the monthly Loan Account statement provided by Agent to each Borrower's general ledger delivered pursuant to <u>Annex E</u>, in each case accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion;

(b)     To Agent, on a Fiscal Quarter basis, (i) a listing of government contracts of each Borrower subject to the Federal Assignment of Claims Act of 1940; and (ii) a list of any applications for the registration of any Patent, Trademark or Copyright filed by any Credit Party with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in the prior Fiscal Quarter;

(c)     To Agent, at Borrowers' expense, the results of each physical verification, if any, that any Borrower or any of ArchBrook Holdings' other Subsidiaries may in their discretion have made, or caused any other Person to have made on their behalf, of all or any portion of their Inventory (and, if a Default or an Event of Default has occurred and is

F-1

continuing, the Borrowers shall, upon the request of Agent, conduct, and deliver the results of, such physical verifications as Agent may require); and

(d)     Such other reports, statements and reconciliations with respect to the Collateral or Obligations of any or all Credit Parties as Agent shall from time to time request in its reasonable discretion.

# ANNEX G
## ACCOUNTING TERMS

Unless otherwise specifically provided herein, any accounting term used in the Agreement shall have the meaning customarily given such term in accordance with GAAP, and all financial computations hereunder shall be computed in accordance with GAAP consistently applied. That certain items or computations are explicitly modified by the phrase "in accordance with GAAP" shall in no way be construed to limit the foregoing. If any "Accounting Changes" (as defined below) occur and such changes result in a change in the calculation of the financial covenants, standards or terms used in the Agreement or any other Loan Document, then Borrowers, Agent and Lenders agree to enter into negotiations in order to amend such provisions of the Agreement so as to equitably reflect such Accounting Changes with the desired result that the criteria for evaluating ArchBrook Holdings' and its Subsidiaries' financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made; provided, however, that the agreement of Requisite Lenders to any required amendments of such provisions shall be sufficient to bind all Lenders. "**Accounting Changes**" means (i) changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants (or successor thereto or any agency with similar functions), (ii) changes in accounting principles concurred in by ArchBrook Holdings' certified public accountants; (iii) purchase accounting adjustments under A.P.B. 16 or 17 and EITF 88-16, and the application of the accounting principles set forth in FASB 109, including the establishment of reserves pursuant thereto and any subsequent reversal (in whole or in part) of such reserves; and (iv) the reversal of any reserves established as a result of purchase accounting adjustments. All such adjustments resulting from expenditures made subsequent to the Closing Date (including capitalization of costs and expenses or payment of pre-Closing Date liabilities) shall be treated as expenses in the period the expenditures are made and deducted as part of the calculation of EBITDA in such period. If Agent, Borrowers and Requisite Lenders agree upon the required amendments, then after appropriate amendments have been executed and the underlying Accounting Change with respect thereto has been implemented, any reference to GAAP contained in the Agreement or in any other Loan Document shall, only to the extent of such Accounting Change, refer to GAAP, consistently applied after giving effect to the implementation of such Accounting Change. If Agent, Borrowers and Requisite Lenders cannot agree upon the required amendments within thirty (30) days following the date of implementation of any Accounting Change, then unless and until any such amendments are so agreed upon all Financial Statements delivered and all calculations of financial covenants and other standards and terms in accordance with the Agreement and the other Loan Documents shall be prepared, delivered and made without regard to the underlying Accounting Change. For purposes of Section 8.1, a Default or Event of Default arising from a breach of a Financial Covenant contained in this Annex G shall be deemed to have occurred as of any date of determination thereof by Agent or any Credit Party as of the last day of any specified measurement period, regardless of when the Financial Statements reflecting such breach are delivered to Agent.

**ACCT NAME:**      CFS Commercial Services Collections

101 South Main Street

High Point, NC  27261

**BANK NAME:**      Deutsche Bank Trust Company Americas

60 Wall Street

New York, NY  10005

**ABA#**      **021-001-033**

**ACCT#- Incoming**      **50-275-184**

**ACCT#- Outgoing**      **50-275-176**

**REF:**      **ArchBrook Laguna – CFN # 9786**

**ANNEX I (Section 11.10)**

to

**CREDIT AGREEMENT**

**NOTICE ADDRESSES**


(A)             If to Agent or GE Capital, at

                GE Capital Commercial Services, Inc.
                201 Merritt Seven, 4th Floor
                Norwalk, CT 06851
                Attention: Joseph Catarina
                Telecopier No.:  (203) 567-8200
                Telephone No.:  (203) 229-1893


with a copy to:

                General Electric Capital Corporation
                201 Merritt Seven
                Norwalk, CT  06856-5201
                Attention:  Corporate Counsel - Commercial Finance – ArchBrook-
                            Laguna
                Electronic Mail: Douglas.Taber@ge.com
                Telecopier No.: 203-956-4364
                Telephone No.: 203-229-5810



(B)             If to any Borrower, to Borrower Representative, at
                ArchBrook Laguna LLC
                350 Starke Road, Suite 400
                Carlstadt, NJ  07072
                Attention: Michael F. McIntyre
                Electronic Mail:  mmcintyre@esend.com
                Telecopier No.: (866) 429-5914
                Telephone No.: (201) 559-6730


with a copy to:

                ArchBrook Laguna LLC
                350 Starke Road, Suite 400
                Carlstadt, NJ  07072
                Attention:  Chief Restructuring Officer
                Electronic Mail:  sjgawrylewski@gmail.com
                Telecopier No.: (201) 336-9147
                Telephone No.: (503) 319-7727

and to:

ArchBrook Laguna LLC
350 Starke Road, Suite 400
Carlstadt, NJ  07072
Attention:  Interim Chief Financial Officer
Electronic Mail: dboverman@esend.com
Telecopier No.: (201) 559-6401
Telephone No.: (215) 262-0511

**ANNEX J** <u>**(from Annex A – Revolving Loan Commitment definition)**</u>

**to**

<u>**CREDIT AGREEMENT**</u>

<u>**REVOLVING LOAN COMMITMENTS**</u>

| Lender: | Revolving Loan Commitment: |
|---------|---------------------------|
|  |  |
| GE Capital Commercial Services, Inc. | $[_____] |
| [Bank of America, National Association] | $[_____] |
| [PNC Bank, National Association] | $[_____] |
|  |  |
| TOTAL : | $50,000,000 |