AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Michael P. Cooley
Alexis Freeman

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ARCHBROOK LAGUNA HOLDINGS LLC, *et al.*,[1] | ) Case No. 11-13292 (    ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

## DECLARATION OF DANIEL J. BOVERMAN PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 IN SUPPORT OF FIRST DAY PLEADINGS

Under 28 U.S.C. § 1746, I, Daniel J. Boverman, declare as follows under penalty of perjury:

1.     I am Interim Chief Financial Officer of ArchBrook Laguna Holdings LLC ("*Holdings*"), a Nevada limited liability company, and each of the other debtors and debtors in possession (collectively, the "*Debtors*") in these chapter 11 cases.  I have held this position since May 31, 2011, having been first retained by the Debtors on or about May 26, 2011.  In that capacity, I am familiar with day-to-day operations, businesses and financial affairs of each of the Debtors.

2.     On the date hereof (the "*Petition Date*"), each of the Debtors filed a petition with the United States Bankruptcy Court for the Southern District of New York (the "*Court*") under

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number, are: ArchBrook Laguna LLC (6166); ArchBrook Laguna Holdings LLC (6156); Chimerica Global Logistics LLC (3745); ArchBrook Laguna West LLC (9631); Lehrhoff ABL LLC (6386); Expert Warehouse LLC (4487); and ArchBrook Laguna New York LLC (5385).

chapter 11 of title 11 of the United States Code (the *"Bankruptcy Code"*).[2] The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to §§ 1107(a) and 1108. Concurrently with the filing of this declaration, the Debtors have sought procedural consolidation and joint administration of these chapter 11 cases.

3.     To minimize any disruption caused by the commencement of these chapter 11 cases, the Debtors have filed a number of motions and applications (the *"First Day Pleadings"*) seeking specific relief designed to minimize the disruption to the Debtors' operations as they make the transition to becoming debtors and debtors in possession. In certain of these First Day Pleadings, the Debtors request interim or final relief (as indicated) on an expedited basis. As described herein, the First Day Pleadings seek, among other things, to permit the Debtors to obtain access to postpetition secured financing, to pay certain claims that arose prior to the Petition Date, and generally to assure the continuation of the Debtors' other business operations without interruption. Other First Day Pleadings seek to establish certain administrative procedures to promote a seamless transition into chapter 11. I am familiar with the contents of each of the First Day Pleadings and I believe that, for the reasons set forth in each of them, the relief sought in each First Day Pleading is necessary to permit an effective transition into chapter 11. In my opinion, approval of the relief requested in the First Day Pleadings will minimize disruptions to the Debtors' assets, thereby preserving and maximizing the value of the Debtors' estates for the benefit of all parties in interest.

4.     I submit this declaration pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the *"Local Rules"*) to assist the Court and other parties in interest in understanding the circumstances that compelled the Debtors to seek relief in chapter 11 and to provide further support for the Debtors' petitions and the First Day Pleadings. I have

---

[2] Unless otherwise noted, section (§) references herein are to the Bankruptcy Code.

reviewed the factual statements set forth in each of the First Day Pleadings and hereby attest to the accuracy thereof. Except as otherwise indicated, all facts set forth herein are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents and my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial affairs. If called to testify, I would testify competently to the facts set forth in this declaration. I am authorized to submit this declaration on behalf of each of the Debtors.

5. This declaration is intended to provide a summary overview of the Debtors' businesses and these chapter 11 cases. Sections I through IV of the declaration provide an overview of the Debtors' businesses, organizational structure, capital structure, events giving rise to these chapter 11 cases, and information regarding the chapter 11 cases. Section V summarizes the relief requested in those First Day Pleadings for which interim or final relief is requested on an expedited basis, including the Debtors' motion for entry of interim and final orders authorizing postpetition financing. Section VI summarizes the relief requested in those First Day Pleadings for which expedited relief is not requested. Finally, Section VII lists the schedules of information provided in accordance with Local Rule 1007-2.

## I.    THE DEBTORS' BUSINESSES

### A.    General Overview

6. Headquartered in Carlstadt, New Jersey, the Debtors operate as a procurement and distribution intermediary between production companies and end retailers using state-of-the-art logistical services. The Debtors provide manufacturers with a seamless extension of their direct model through a diverse set of retail channels and customers. The ability to reach a large and diverse end-user base is one of the key benefits the Debtors provide to their vendor partners, by

acting as a "one-stop shop" for their vendor partners to sell products across a wide variety of retail channels.

7.      The Debtors' line card—or list of carried products—ranges across a wide spectrum of computer and consumer electronics, including such major manufacturers as Acer, Dell, Garmin, LG Electronics, Monster, Panasonic, Pioneer, Samsung, Sharp, Tom Tom and Toshiba.  In the white goods (or major appliance) sector, the line card includes products by Bissell, Black & Decker, Brother, Cuisinart, DeLonghi, Emeril, Fuego, George Foreman, Haan, Hamilton Beach/Proctor Silex, Hoover and Norelco.  In 2010, the Debtors shipped over 6,800,000 packages to customers and directly to consumers on behalf of their suppliers.  Based on 2011 forecasts, the Debtors' sales can be roughly apportioned among the following product categories:

| Category | % of Total Sales |
| --- | --- |
| Computers | 44% |
| TV/Audio | 25% |
| GPS | 13% |
| Housewares | 9% |
| Personal Electronics | 3% |
| Other | 6% |

8.      The Debtors' customers (or channels) range across an equally wide spectrum, including national retailers (*e.g.*, Wal-Mart, Best Buy, Costco), e-commerce (*e.g.*, Amazon.com, Gilt.com, Newegg.com), broadcast (*e.g.*, HSN, QVC, ShopNBC) and rent-to-own (*e.g.*, Rent-A-Center, Ace Furniture).  The Debtors' sales are spread relatively evenly across various channels as the following table summarizes:

| Category | % of Total Sales |
| --- | --- |
| Expert Warehouse | 18% |
| National Retail | 18% |
| Pure Play e-Commerce | 16% |
| Rent-to-Own | 14% |
| Other | 14% |
| Regional Retail | 12% |

| Broadcast | 7% |
|---|---|
| Premium Incentive | 1% |

9.     The Debtors have sales offices located in both Carlstadt, New Jersey and Kennesaw, Georgia, and maintain approximately 643,000 square feet of leased warehouse space in Carlstadt and Edison, New Jersey, Columbus, Ohio, Kennesaw, Georgia and Reno, Nevada. As of the Petition Date, the Debtors employed approximately 267 employees, 149 of which are employed by the Debtors on an hourly basis and the remainder of which are employed by the Debtors on a full-time, salaried basis.

10.     As of March 31, 2011, the consolidated financial statements for the Debtors' reflected total assets of $246,176,393 and total liabilities of $176,372,973.

**B.     Organizational Structure**

11.     As reflected on the organizational chart attached hereto as **Exhibit A**, Holdings is the parent company of each of the other Debtors.

12.     An organizational chart reflecting the relationships between the various Debtors is attached hereto as **Exhibit A**. ArchBrook Laguna LLC (*"ABL"*), a Nevada limited liability company, is the primary operating company of the Debtors and is focused principally on the distribution of consumer electronics and other products. ABL is a wholly-owned subsidiary of Holdings, which also owns 100% of the membership interests in Chimerica Global Logistics LLC (*"Chimerica"*), a Wyoming limited liability company, and 100% of the membership interest in ArchBrook Laguna West LLC (*"ABL West"*), a Nevada limited liability company. ABL, in turn, is the sole member of each of Lehrhoff ABL LLC (*"Lehrhoff"*), a Nevada limited liability company and ArchBrook Laguna New York LLC (*"ABL New York"*), a New York limited liability company. ABL also owns 60% of the membership interests in Expert Warehouse LLC (*"Expert"*), a Nevada limited liability company. For the year ending December 31, 2010, the

Debtors' gross consolidated revenues were approximately $808,000,000, of which approximately $612,000,000 was associated with ABL, $148,000,000 was associated with Lehrhoff and $49,000,000 was associated with Expert.

13. Upon information and belief, Chimerica, ABL West and ABL New York have no meaningful operations (other than as guarantors under the Pre-Petition Credit Agreement (as defined below)) except that ABL West is listed as an insured entity on the Debtors' Nevada warehouse. For a more detailed discussion of Expert, see Section I.C below.

14. The predecessor to ABL, BDI Laguna, Inc. ("*BDI*") was originally formed in 2000 out of the merger of three procurement and distribution businesses, Laguna Corporation ("*Laguna*"), a New Jersey corporation formed in 1994 and operating out of New Jersey, BDI Distributors, Inc. ("*BDI Distributors*"), a Georgia corporation formed in 1997 and operating out of Georgia, and ArchBrook Inc., a Delaware corporation. Laguna operated a high growth computer resale business in the northeast region of the United States, whereas BDI Distributors focused on the consumer electronics and nationwide rent-to-own markets. In 2008, ABL, a partnership of 24 owner/employees, was formed as successor to BDI.

## C.   Expert Warehouse

15. In 2005, BDI Laguna (now ABL) partnered with Associated Volume Buyers, Inc. ("*AVB*") to form Expert. I am informed and believe that AVB, which operates under the trade name "BrandSource," is a nonprofit buying group with a membership of approximately 2,500 independent dealers. Management authority of Expert is held by a committee of five members, of whom three are appointed by ABL and two by AVB.

16. Until recently, Expert served as the exclusive consumer electronics buying and fulfillment arm of AVB, marrying ABL's logistical support, infrastructure and vendor relationships with AVB's access to a wide buying group of smaller independent dealers.

Responding to increasing demand from AVB members, Expert launched a white goods initiative, adding major appliances to its line card in 2010. With the benefit of ABL's logistical support, Expert provides ABL a unique opportunity to access an otherwise fragmented independent dealer channel. On the consumer electronics side, Expert's largest vendor relationships have included Samsung, Toshiba, Panasonic and Sharp/Pioneer, with Samsung historically accounting for approximately 40% of Expert consumer electronics sales (although Samsung is not presently supplying ABL or Expert). In white goods, Expert's most significant vendor relationships were with Whirlpool, General Electric and Electrolux, with Whirlpool accounting for approximately 50% of Expert white good sales.

17.     Pursuant to a Resource Assistance Agreement (the "*RAA*"), dated as of May 12, 2005, each of AVB and ABL dedicated certain of their employees to provide management and other services to Expert. In addition, ABL provided various infrastructure and management services to Expert, including logistics management, accounting and treasury functions, credit control, accounts reconciliation, sales and marketing support and inventory management. In exchange, ABL received an annual management fee calculated under the terms of the RAA.

18.     As discussed in Section III.B. below, Expert and ABL sold substantially all of Expert's inventory to AVB shortly prior to the Petition Date for a combination of cash plus the assumption of certain indebtedness by AVB.

## II.    CAPITAL STRUCTURE

19.     As of the Petition Date, various of the Debtors were party to certain instruments evidencing the Debtors' long term indebtedness. A summary of these obligations is set forth below, together with a summary of the various tranches of outstanding membership interests in Holdings.

## A.    **Members' Equity**

### (i)    *Class A and B Common Units*

20.    Prior to the Petition Date, Holdings had authorized 100,000 common units (the *"Common Units"*), of which 10,000 were issued and outstanding. Of those Common Units issued and outstanding, 5,910 were issued as Class A Common Units (the *"Class A Common Units"*) and held by ABL Invest LLC (*"ABL Invest"*). The remaining 4,090 Common Units were issued as Class B Common Units (the *"Class B Common Units"*), and held by various owner/employees. The Class A and Class B Common Units have rights, preferences and privileges substantially identical to one another (except with respect to redemption, profit sharing distributions and special allocations). Holders of Common Units are eligible to receive certain profit-sharing and other distributions. Prior to June 25, 2011, the employment of approximately nine of the employees holding Class B Common Units had been terminated and they had forfeited such interests. Shortly prior to the Petition Date, all of the remaining holders of Class B Common Units abandoned their membership interests back to Holdings. Accordingly, as of the Petition Date the only Common Units of Holdings that are issued and outstanding are the 5,910 Class A Common Units.

### (ii)    *Class A and B Preferred Units*

21.    As of the Petition Date, Holdings had authorized 100,000 preferred units (the *"Preferred Units"*), of which 27,000 Class A Preferred Units (the *"Class A Preferred Units"*) and 48,000 Class B Preferred Units (the *"Class B Preferred Units"*) were held by BDI Laguna Holdings, Inc. (*"BDI Holdings"*). The Class A and Class B Preferred Units have rights, preferences and privileges substantially identical to one another (except with respect to guaranteed payments and profit sharing distributions). Under the terms of Holdings' operating agreement, holders of Class A and Class B Preferred Units are entitled to receive certain guaranteed distributions; however, payment of those distributions is subordinated to the prior payment in full

of the Pre-Petition Credit Agreement pursuant to the Shareholder Subordination Agreement (each as defined below).

### (iii)    Management Unit

22.    Pursuant to ArchBrook's operating agreement, one Management Unit (the "**Management Unit**") is authorized to be issued, and is currently owned by ABL Invest. The Management Unit is not entitled to receive any distributions.

## B.    Prepetition Indebtedness

### (i)    The Asset-Based Pre-Petition Credit Facility[3]

23.    The Debtors' primary source of liquidity is through an asset-based revolving credit facility (the "**Pre-Petition Credit Facility**") provided by GE Capital Commercial Services, Inc. ("**GE**"), Bank of America, National Association ("**BofA**") and PNC Bank, National Association, ("**PNC**" and, together with GE and BofA, the "**Pre-Petition Lenders**") in the original commitment amount of up to $150,000,000. The terms of the Pre-Petition Credit Facility are set forth in that certain Second Amended and Restated Credit Agreement (the "**Pre-Petition Credit Agreement**") dated December 22, 2010 among ABL, Expert and Lehrhoff, as borrowers, the Pre-Petition Lenders, as lenders, GE, as agent (in such capacity, the "**Pre-Petition Agent**"), and Holdings and ABL West as guarantors. Chimerica and ABL New York subsequently became additional guarantors of the outstanding obligations under the Pre-Petition Credit Agreement. The Pre-Petition Credit Agreement is secured by a first lien on substantially all of the Debtors' assets, including all inventory and receivables (the "**Pre-Petition Collateral**"), but excluding the CLD Priority Collateral and the BofA Priority Collateral (each as defined below). The Pre-Petition Lenders have a second priority lien on the CLD Priority Collateral and a subordinated lien on the BofA Priority Collateral.

---

[3] Capitalized terms used but not defined in this section have the meanings assigned to them in the Pre-Petition Credit Agreement.

24.    Amounts outstanding under the Pre-Petition Credit Agreement currently bear interest at a default rate equal to the LIBOR Rate plus 4.75% per annum, and are due on December 23, 2013. Prior to March 28, 2011, amounts outstanding under the Pre-Petition Credit Agreement other than Discretionary Overadvances bore interest at a rate of LIBOR plus 2.75% per annum.

25.    Contemporaneously with the execution of the Pre-Petition Credit Agreement, the Pre-Petition Agent and Toshiba America Information Systems, Inc. (*"Toshiba"*) entered into that certain Second Amended and Restated Subordination Agreement (the *"Toshiba Subordination Agreement"*), pursuant to which Toshiba agreed to subordinate its liens on certain assets of the Debtors (specifically, inventory sold to ABL, Expert and Lehrhoff by Toshiba and the proceeds thereof), to the liens of the Pre-Petition Agent and Pre-Petition Lenders on the same assets. Additionally, ABL, Expert, Lehrhoff, Holdings, ABL West, the Pre-Petition Agent and BDI Holdings are parties to an Amended and Restated Shareholder Subordination Agreement (the *"Shareholder Subordination Agreement"*), pursuant to which Holdings, ABL, Expert and Lehrhoff are prohibited from paying dividends or other payments to BDI Holdings and its successors or assigns arising under or in connection with the Preferred Units of Holdings and any equity into which such Preferred Units are or may be converted.

26.    As of July 8, 2011, approximately $36,907,752.85 was owed under the Pre-Petition Credit Agreement.

### (ii)    *Bank of America Loan*

27.    ABL borrowed an additional $2,300,000 pursuant to that certain Loan Agreement, dated December 31, 2008 between ABL and BofA (the *"BofA Facility"*). The BofA Facility, which matures February 1, 2012, is guaranteed by Holdings and currently bears interest at a rate equal to LIBOR plus 2.25% per annum. The BofA Facility is secured by a first priority lien on certain enumerated machinery, furniture, fixtures and other equipment (the *"BofA Priority*

*Collateral*"). Pursuant to subordination agreements executed contemporaneously with the BofA Facility, each of General Electric Capital Corporation acting through its Corporate Finance Core Leasing Division ("*CLD*") and GE subordinated their respective liens in the BofA Priority Collateral to BofA's liens.

28.     As of July 5, 2011, approximately $383,333 was due and owing under the BofA Facility.

### (iii)     CLD Financing Facility

29.     ABL finances the purchase of certain equipment and fixtures ("*CLD Priority Collateral*") through a Master Lease Agreement, dated as of December 9, 2005 between ABL (acting under its former name, BDI-Laguna, Inc.) and CLD (as the same may be amended, restated, supplemented or otherwise modified from time to time, and together with the security documents thereto, the "*CLD Financing Facility*"). Under the CLD Financing Facility, (i) CLD was granted a first priority lien on the CLD Priority Collateral and a second priority lien (behind the Pre-Petition Lenders) on the remaining Pre-Petition Collateral of ABL, and (ii) the Pre-Petition Lenders were granted a second priority lien (behind CLD) on the CLD Priority Collateral and a first priority lien on the remaining Pre-Petition Collateral of ABL. Contemporaneously with the execution of the Pre-Petition Credit Agreement, ABL, CLD and the Pre-Petition Agent entered into that certain Second Amended and Restated Intercreditor Agreement (the "*CLD Intercreditor Agreement*"), setting forth the respective rights of CLD and the Pre-Petition Lenders in the Pre-Petition Collateral and the CLD Priority Collateral.

30.     As of July 5, 2011, approximately $39,000 remains outstanding under the CLD Financing Facility.

### III.  EVENTS LEADING TO THE CHAPTER 11 CASES

31.     The following is a general description of factors that ultimately led to the commencement of the Debtors' chapter 11 cases.  The Debtors' overall aim is to be a strategic partner to its customers and suppliers with best-practice distribution capabilities.  This is a high-volume business in which gross margins and profit margins—relative to sales—must be managed closely.  The success of the Debtors also depends upon the availability of ample liquidity to assure the Debtors can procure sufficient inventory.  Recently, however, the Debtors suffered a series of events that effectively erased the remaining availability under the Pre-Petition Credit Facility, placed additional demands on the Debtors' ability to manage cash flow properly, and ultimately prompted the liquidity crisis that necessitated this filing.

### A.     Liquidity Factors

#### (i)      Obsolete and Excess Inventory

32.     The Debtors currently carry approximately $46,000,000 of inventory on their balance sheets, of which approximately $29,000,000 has aged out of eligible inventory from which the Debtors' borrowing base is calculated for purposes of determining available liquidity under the Pre-Petition Credit Agreement.  Included in that $29,000,000 are approximately 165,000 units of inventory that the Debtors purchased in late 2010 as part of a series of orders totaling approximately 225,000 units at a total cost to the Debtors of $16,700,000.  In connection with the purchase of these units, the Debtors received what they believed was favorable pricing from the supplier, coupled with certain advertising commitments from the supplier.  However, the supplier failed to meet the advertising commitments.  Although the Debtors believe that the supplier's failure to provide the required advertising triggered a $17/unit credit against amounts otherwise owed by the Debtors, unit sales were nevertheless substantially lower than expected, leaving the

Debtors with a sizeable inventory of remaining units. The Debtors are informed that the supplier disputes the applicability of the $17/unit credit.

33. Since that time, approximately $13,100,000 worth of this inventory (before application of the $17/unit credit) has now aged out of inventories eligible for inclusion as eligible collateral under the Pre-Petition Credit Agreement, thereby placing significant additional pressure on the Debtors' ability to general availability under the Pre-Petition Credit Agreement, which is not expected to be alleviated until July 2011 at the earliest, when the Debtors expect to receive purchase orders for a substantial number of the units from at least one retailer for shipment beginning in October 2011.

### (ii)    *Warehouse Logistics*

34. Since 2005, the Debtors' distribution system was originally built around Manhattan's Warehouse Management Solution software. In the fourth quarter of 2010, however, the Debtors made the decision to migrate to a new platform and implemented Oracle Financial System, IBM DOM (Distributed Order Management) solution (*"Oracle"*) and Manhattan's RLM (Return Logistics Management) tool at a cost of over $15,000,000. Shortly following the rollout of the Oracle software package, the Debtors encountered difficulties in meshing the new software with the existing platform. This led to a variety of problems, including delays in invoicing (and therefore collections) for products shipped, and inaccuracies in tracking returns to ensure proper reimbursement from vendors for returned inventory, with a resulting adverse impact to the Debtors' cash flow in the first quarter of 2011. Additionally, problems associated with the migration to Oracle delayed the start of the year-end audit of the Debtors' books and records. As of the date hereof, the audit is still substantially incomplete, which the Debtors believe was a contributing factor in the decision by certain insurers to

withdraw the Debtors' trade credit insurance and negatively impacted the willingness of certain other vendors to continue to extend trade credit to the Debtors.

### *(iii)* *The Overadvance*

35.     Following the migration to the new Oracle software platform, the Debtors' software miscalculated the "Aggregate Borrowing Base" under the Pre-Petition Credit Agreement by inadvertently including certain intercompany claims in the accounts receivable portion of the calculation. The error—which was not discovered until February 2011—resulted in a larger draw under the Pre-Petition Credit Agreement than should otherwise have been permitted, and further resulted in an approximately $7,000,000 overadvance in excess of the actual availability under the Pre-Petition Credit Agreement. By the time the error was discovered, the overadvanced funds had already been disbursed to various vendors as outstanding invoices were paid down prior to the end of 2010.

36.     On each of March 28, 2011 and May 12, 2011, the Pre-Petition Agent notified the Debtors of the existence of certain events of default under the Pre-Petition Credit Agreement, including as a result of the overadvance, and, on June 22, 2011, notified the Debtors of its decision to terminate a portion of the commitments under the Pre-Petition Credit Agreement, thereby reducing the aggregate commitments under the Pre-Petition Credit Agreement from $150,000,000 to $100,000,000 effective June 22, 2011.

### *(iv)* *Vendor Relationships*

37.     As a precondition to executing a distribution agreement with the Debtors, many of the Debtors' vendors require the Debtors to maintain certain levels of credit insurance, which the Debtors have maintained in accordance with vendor requirements. The Debtors' credit insurance relating to certain of these vendor agreements was terminated by the insurer, however, in April 2011.

38.	At least one of these vendors, Samsung Electronics America, Inc. ("*Samsung*"),
informed the Debtors that it would be necessary to post a $7,500,000 letter of credit to replace the
credit insurance.  The Debtors have been unable to obtain such a letter of credit from their
Pre-Petition Lenders and, accordingly, have been precluded from placing any further orders for
Samsung products.  Samsung is a leader in the television market; it has historically been among the
Debtors' top five vendors, and Expert's primary vendor by sales volume.  In 2010, Samsung
products generated over $100,000,000 in sales by the Debtors—over half of which were by Expert
alone, representing over 35% of Expert's total business.

**B.	Sale of Expert Inventory**

39.	The Debtors' inability to place orders with certain vendors (including Samsung)
promptly raised concerns for AVB, the minority party in Expert, about the continued viability of
Expert and the subsequent effect on AVB's members.  AVB subsequently initiated discussions
with the Debtors to purchase certain inventory from Expert.

40.	On June 29, 2011, Expert, ABL and AVB entered into an Inventory Purchase
Agreement, pursuant to which Expert and ABL sold all of the inventory held by or for the account
of Expert as of that date, including both electronics and appliance inventory (the "*Expert
Inventory*").  Contemporaneously, Expert and BrandSource Expert Finance (a trade name of GE
Commercial Distribution Finance Corporation) ("*BSEF*") entered into a Transfer and Assumption
Agreement pursuant to which Expert assigned to AVB its obligations under (i) that certain
Inventory Financing Agreement, dated as of December 30, 2005 (as amended from time to time,
the "*GECDF Inbound Facility*") between Expert and BSEF and (ii) that certain Vendor
Agreement, dated as of December 30, 2005 (as amended, the "*GECDF Outbound Facility*" and,
together with the GECDF Inbound Facility, the "*GECDF Facilities*").  The aggregate purchase
price paid by AVB to acquire the Expert Inventory was equal to the sum of (i) for the electronics

15

inventory, $5,027,121 (less a $250,000 holdback for purchase price adjustments), and (ii) for the appliance inventory, the assumption by AVB of Expert's obligations to BSEF under the GECDF Facilities. The transaction closed, and AVB took title to the Expert Inventory, on July 5, 2011.

## C.     Other Steps to Mitigate

41.     In response to the other challenges facing the Debtors, in late May 2011 the Debtors engaged crisis management support, including Stephen J. Gawrylewski of Hawkwood Consulting and Daniel J. Boverman of Boverman Associates LLC as chief restructuring officer (CRO) and interim chief financial officer, respectively. The Debtors also engaged Macquarie Capital (USA) Inc. ("*Macquarie*") to provide additional financial advisory support, including to develop a new cash flow forecast and source alternative financing options.

42.     Under the guidance of the CRO and with the assistance of their financial and other advisors, the Debtors have begun to sell off ineligible inventory to generate additional cash. The Debtors have also been able to reduce the current balance of past due accounts receivable through improved communications between the collections and sales departments. Careful cash management has further reduced the initial overadvance to approximately $2,643,563 as of July 5, 2011. Despite these efforts, the Debtors have been unable to completely reverse the effects of the current liquidity crisis, thus necessitating this filing.

## D.     The Marketing Process

43.     Beginning on May 26, 2011, the Debtors embarked on a comprehensive restructuring effort, including exploring various strategic alternatives, such as a transaction involving a sale of all or a portion of the Debtors' assets. Prior to the commencement of these cases, the Debtors, together with their advisors, initiated an extensive sale process, which included actively marketing their assets in an effort to maximize value for all of their creditors. This marketing process included calling various parties that the Debtors and their advisors believed

may have an interest in potentially purchasing some or all of the Debtors' assets (the "*Assets*") and discussing such possibilities with them. Specifically, the Debtors or their advisors contacted and sent form non-disclosure agreements ("*NDAs*") to 47 potential bidders, 23 of whom executed NDAs to obtain additional information.

44.     As a result of these efforts, the Debtors received several preliminary indications of interest from potential purchasers expressing an interest in acquiring the Assets. Ultimately, however, the Debtors were unable to negotiate a stalking horse agreement prior to the commencement of these cases because of their liquidity needs. Given the Debtors' significant liquidity constraints and the difficulty of obtaining long term financing to support the Debtors in their reorganization efforts, the Debtors believe that a prompt sale of all or substantially all of the Assets is necessary in order to maximize value for the Debtors' estates and their creditors. Rather than delay the filing of these cases, the Debtors determined that it was in the best interests of their estates and creditors to commence these chapter 11 cases as quickly as possible (and without a stalking horse) and open the sale process to all interested parties.

## IV.     THE CHAPTER 11 CASES

45.     On the Petition Date, each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. The Debtors have requested that their cases be jointly administered under the caption *In re ArchBrook Laguna Holdings LLC, et al.,* Case No. 11-13292 (   ). The Debtors continue to manage their properties as debtors in possession under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court.

46.     As described below, through the First Day Pleadings, the Debtors seek to ensure the continuation of their business operations without interruption. The Debtors also seek

authorization to obtain a postpetition senior secured debtor in possession financing facility from the Pre-Petition Lenders that will provide them with access to necessary liquidity.

47. The Debtors believe it is in the best interests of all stakeholders to commence these chapter 11 cases to facilitate an orderly liquidation of the Debtors' assets, and are hopeful that the process will result in the continued operation of the underlying businesses under new ownership.

## V. SUMMARY OF FIRST DAY PLEADINGS[4]

48. As discussed above, concurrently with the filing of their chapter 11 petitions, the Debtors filed various First Day Pleadings, which they believe are necessary to enable them to operate with minimal disruption and loss of productivity. Through the First Day Pleadings, the Debtors seek to, among other things, pay their employees' wages and continue all employee benefits in the ordinary course of business, continue using their existing cash management system, and make certain other payments that are critical to the Debtors' ongoing operations. It is my understanding that Rule 6003 of the Federal Rules of Bankruptcy Procedure permits a bankruptcy court to approve a motion to "pay all or part of a claim that arose before the filing of the petition" within the first 21 days of a chapter 11 case to the extent "relief is necessary to avoid immediate and irreparable harm." As set forth in more detail herein, in such instances, I believe the relief sought is necessary to avoid immediate and irreparable harm to the Debtors.

## A. DIP Facility and Use of Cash Collateral

49. The Debtors have filed a *Motion for Interim and Final Orders (a) Approving Postpetition Financing, (b) Authorizing Use of Cash Collateral, (c) Granting Liens and Providing Superpriority Administrative Expense Status, (d) Granting Adequate Protection, (e) Modifying Automatic Stay, and (f) Scheduling a Final Hearing* (the *"DIP Motion"*). Pursuant to the DIP

---

[4] Capitalized terms used but not defined in Sections V and VI have the meanings assigned to them in the corresponding First Day Pleading.

Motion, the Debtors seek authority to use Cash Collateral and to enter into a $50,000,000 senior secured postpetition debtor in possession credit facility (the *"DIP Facility"*) intended to provide the Debtors with necessary liquidity during their chapter 11 cases.

50.     The Debtors are currently in the midst of a liquidity crisis brought on by a series of recent events. The Debtors do not have sufficient availability under the Prepetition Loan Agreement to cover their operating expenses and require additional funds to meet their obligations to existing vendors and customers. Like other procurement and distribution companies, the Debtors' businesses require access to a reliable and substantial source of liquidity to continue normal business operations, maintain business relationships with vendors, suppliers, and customers, pay employees and satisfy other working capital and operational needs—each of which is vital to preserving and maintaining the Debtors' going concern value. Currently available and projected Cash Collateral is insufficient to meet these needs. The inability to make these capital expenditures, meet payments to vendors, pay employees and satisfy customers would impair, if not destroy, the Debtors' prospects for reorganization. In short, without access to liquidity, the Debtors would be compelled to shut their doors and liquidate the remaining assets in piecemeal fashion to the detriment of all parties in interest.

51.     The Debtors have, with the assistance of their financial advisors, analyzed their cash needs in an effort to determine what is necessary to maintain their operations in chapter 11. In undertaking this analysis, the Debtors and their advisors have considered the impact of the current economic outlook on the Debtors' near-term projected financial performance. The Debtors also conferred with individuals in the Debtors' operational and management teams to understand key business metrics in both the near and long term.

52. As part of the Debtors' recent financial analysis and projections, the Debtors developed a 13-week cash flow forecast, which takes into account anticipated cash receipts and disbursements during that time. This forecast considers a number of factors, including the impact of a bankruptcy filing, material cash disbursements, required vendor payments, cash flows and the cost materials. That forecast has since been modified to an 8-week cash flow forecast, which the Debtors have proposed to the proposed DIP Lenders as the first Approved Budget (as defined below).

53. Macquarie also solicited the credit markets for alternative sources of postpetition financing to ensure all practicable avenues were explored and considered. Among other things, the Debtors and Macquarie surveyed various sources of postpetition financing to ensure sufficient liquidity to fund the Debtors' operations in chapter 11, including both the Pre-Petition Lenders and unrelated third parties. In exploring those options, the Debtors recognized that the obligations owed to the Pre-Petition Lenders are secured by substantially all of the Debtors' assets, such that either (i) the liens of the Pre-Petition Lenders would have to be primed to obtain postpetition financing, or (ii) the Debtors would have to find a postpetition lender willing to extend credit secured by liens junior to the existing liens of the Pre-Petition Lenders.

54. After diligence and an extensive review of their alternatives, the Debtors determined it was in their best interests to solicit DIP proposals from all potential lender parties. To that end, in the weeks preceding the filing, Macquarie contacted approximately 17 potential lenders, including the Pre-Petition Lenders, to ascertain the terms on which any of them would be willing to extend postpetition financing to the Debtors. Of the parties contacted by Macquarie, only four were willing to sign nondisclosure agreements and receive additional information about the Debtors; however, none were willing to extend postpetition financing secured only by junior

liens to the liens securing the Prepetition Indebtedness, nor were any willing to provide a sufficiently large postpetition facility to repay the Prepetition Indebtedness in full. Given the Debtors' view that a priming fight with the Pre-Petition Lenders would be expensive, time-consuming and fruitless, the Debtors concluded that their only feasible option for postpetition financing lay with the Pre-Petition Lenders (as proposed DIP Lenders).

55.     Ultimately, the proposed DIP Lenders were the only parties willing to provide the Debtors with the needed postpetition financing. Thereafter, the Debtors conducted several diligence meetings and held various calls with the proposed DIP Lenders. In tandem with this process, the Debtors began intensive and arm's length negotiations with the proposed DIP Lenders over the terms of the DIP Credit Agreement, which culminated in an agreement with the DIP Lenders to provide the DIP Facility in an aggregate principal amount of up to $50,000,000. During the negotiations, the Debtors, with the assistance of their advisors, went to great lengths under difficult circumstances to achieve the best deal possible for themselves and their constituents.

56.     The Debtors and the DIP Lenders engaged in extensive, good faith, arm's-length negotiations with respect to the terms and conditions of the proposed DIP Facility. These negotiations culminated in agreement on terms for the proposed DIP Facility. As such, I believe that they reflect the most advantageous terms (including availability, pricing, fees and covenant flexibility) available to the Debtors in this credit market. The Debtors have been unable to find alternative or better financing without the proposed priming liens from other sources. Based on these factors, and in light of the fair and thorough negotiation process undertaken by the Debtors, the DIP Facility is the only feasible financing option for the Debtors and is in the best interests of the Debtors' estates. Significantly, the DIP Credit Agreement allows the Debtors to borrow

immediately under the DIP Facility on an interim basis, pending this Court's entry of the Final Order, which will allow the Debtors to cure the outstanding overadvance under the Pre-Petition Credit Agreement and meet their immediate administrative obligations in the initial weeks of the case.

57.     The Debtors and the DIP Lenders have agreed upon an initial budget for the 8-week period beginning on the Closing Date (as defined in the DIP Credit Agreement), which budget may be updated from time to time and will be replaced after eight weeks with a rolling 13-week budget (collectively, including the initial budget, the *"Approved Budget"*).  The Debtors believe that the Approved Budget, which must be in form and substance acceptable to the DIP Lenders in their sole discretion, is achievable and will allow the Debtors to operate without the accrual of unpaid administrative expenses.

58.     The Debtors carefully considered the terms of the proposed pay-down and the scope and validity of the Pre-Petition Lenders' secured claims (and any associated causes of action).  Based on that analysis, the Debtors determined that the pay-down is appropriate under the circumstances and provides the only opportunity to continue their business operations.  In addition, because the Pre-Petition Credit Agreement is a "pure" asset based revolving credit facility that was designed to ensure that the Pre-Petition Lenders remain oversecured at all times, the proposed roll-up of the Pre-Prepetition Credit Facility into the DIP Facility will not substantially improve the position of the Pre-Petition Lenders at the expense of other creditors.  Rather, it will help facilitate a seamless transition from the Pre-Petition Credit Facility to the DIP Facility without putting further pressure on the Debtors' ability to access the necessary liquidity they need to operate.  In all events, however, the Court's power under Local Bankr. R. 4001-2(k)(3) is expressly preserved to unwind the roll-up in the event of a timely and successful challenge to the

validity, enforceability, extent, perfection or priority of the Pre-Petition Lenders' claims and liens, or a determination that the Pre-Petition Credit Agreement was in fact undersecured as of the Petition Date such that the Pre-Petition Lenders were unduly advantaged.

59. The continued viability of the Debtors' businesses and the success of the Debtors' reorganization efforts hinge upon obtaining access to financing to allow for a restructuring of debt. Absent an infusion of capital or access to financing, the Debtors simply cannot meet their financial obligations. I believe that the Debtors' liquidity needs can be satisfied if the Debtors are authorized to borrow up to a total of $50,000,000 under the proposed DIP Credit Agreement and use such proceeds to, among other things, repay the Prepetition Indebtedness and fund the Debtors' continued operations in chapter 11. Accordingly, the DIP Facility is absolutely necessary to pay the costs of maintaining the Debtors' business operations. Without the liquidity provided by the DIP Facility, the Debtors' objective of restructuring their businesses as a going concern, while maintaining the value of their assets for the benefit of creditors, will fail without a fair opportunity to achieve the purposes of the chapter 11 process. Approval of the DIP Credit Agreement will allow the Debtors to remain operational, to make critical capital expenditures, maintain business relationship with vendors, suppliers and customers, and pay their employees.

60. Moreover, as described in more detail in the Sale Motion (defined below) filed contemporaneously herewith, the Debtors seek to maximize the value of their estates in these chapter 11 cases through a competitive auction process. The Debtors believe that the conduct of such a competitive auction process will best maximize both the value of their businesses and the recoveries to the Debtors' creditors. The proposed postpetition financing gives the Debtors the opportunity to maintain nearly-normal business operations while they attempt to sell their

businesses and/or their assets to interested parties. For this reason, the Debtors submit that the proposed postpetition financing is in the best interests of all creditor constituencies.

61.     As stated above, the DIP Facility is the culmination of an arm's-length process to negotiate the best financing options available to the Debtors. For the reasons set forth in the DIP Motion, I believe that entering into the DIP Facility is a sound exercise of the Debtors' business judgment and is in the best interest of the Debtors' estates because this financing will preserve the value of the Assets and operations for the benefit of their creditors, employees, and other parties in interest.

**B.     Sale Motion; Summary of Bid Procedures**

62.     The Debtors have filed the *Debtors' Motion, Pursuant to 11 U.S.C. §§ 105, 363, 364, 365, 503 and 507 and Fed. R. Bankr. P. 2002, 4001, 6004, 6006, 9008 and 9014, for Entry of (i) an Order Approving (a) Bid Procedures, (b) Notice of Sale, Auction, and Sale Hearing, (c) Assumption Procedures And Related Notices; And (ii) an Order Approving the Sale of Substantially All of the Debtors' Assets* (the "*Sale Motion*"). Contemporaneously therewith, the Debtors have filed a motion requesting expedited consideration of the Sale Motion (the "*Motion to Shorten*").

63.     By the Sale Motion, the Debtors seek authority to sell (the "*Sale Transaction*") substantially all of the their Assets and related transactions to the bidder who submits the highest or otherwise best offer at the conclusion of an auction, which the Debtors propose be scheduled for August 8, 2011 (the "*Auction*"), which bidder may be selected by the Debtors as the winning bidder (the "*Successful Bidder*"). Additionally, the Debtors request entry of an order authorizing and approving, among other things: (i) the procedures (the "*Bid Procedures*") for the conduct of the Auction of the Assets; (ii) the procedures for the assumption and assignment of certain contracts and leases to the Successful Bidder and the resolution of any objections thereto and

related notices; (iii) the scheduling of a hearing to approve any such Sale Transaction with respect to any bid accepted by the Debtors (the *"Sale Hearing"*) on August 10, 2011; and (iv) the form and manner of notice with respect to the proposed sale of the Assets, the Auction, and the Sale Hearing (the *"Sale Notice"*).

64.     As discussed more fully in the Sale Motion, the Debtors believe that the Sale Transaction is in the best interest of the Debtors, their estates and creditors. As more fully set forth in the Sale Motion, the Debtors have attempted to maximize value in these cases by securing a stalking horse bidder. The Debtors, however, believe that, at this juncture, a Sale Transaction without a stalking horse bidder provides the Debtors with the best alternative to maximize the value of their estates. By proceeding with the Sale Transaction, the Debtors will encourage competitive bidding to obtain the best recovery for their creditors on assets in which the market has demonstrated an interest while still maintaining sufficient flexibility for other parties to propose alternative transactions that may yield more value for the Debtors' estates and their creditors. Accordingly, the Debtors believe that the Sale Transaction presents the best path to unlock the value of their Assets.

65.     Additionally, the Debtors believe that the proposed Sale Notice and Bid Procedures are appropriate, reasonable and designed to ensure the most robust bidding and auction process possible for the Assets. Specifically, the Bid Procedures provide an appropriate framework for selling the Assets in an orderly fashion and will enable the Debtors to review, analyze and compare all bids received to determine which bid(s) are in the best interests of the Debtors, their estates and creditors. Furthermore, the Debtors believe that the Bid Procedures are designed to ensure that the Debtors do not discourage any Potential Bidder from participating in the Auction and, thus, to maximize the value of the Assets.

66. As set forth in the Sale Motion, the Sale Notice will be promptly served on the Sale Notice Parties and will be timely published in *The New York Times*. In addition, before the bid deadline, the Debtors' financial advisors will continue to contact various parties who have previously expressed an interest in acquiring assets of the Debtors to determine whether such parties are interested in submitting a bid. The Debtors believe that this process provides sufficient notice and a reasonable period in which to attract bids, particularly in view of the extensive marketing activities engaged in by the Debtors and their financial advisor prior to the Petition Date with respect to any potential alternative transaction.

67. The Debtors believe that considering the Sale Motion on shortened notice is appropriate. As discussed in the Motion to Shorten, the Debtors believe that establishing Bid Procedures and the timeframe for an Auction as proposed in the Sale Motion is essential in order to maximize the value of the Debtors' estates and the recovery of the Debtors' creditors. Considering the Sale Motion on shortened notice will ensure that the Debtors have sufficient time to run a full and robust Auction and provide the Debtors with the best opportunity to gain approval for and complete a Sale Transaction prior to encountering damaging liquidity constraints.

**C.    Operations Motions**

   *(i)    Cash Management Motion*

68. The Debtors have filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to (a) Continue Their Existing Cash Management System and (b) Maintain Existing Bank Accounts and Business Forms* (the "***Cash Management Motion***").

69. In the ordinary course of business, and as is common with businesses of this kind, the Debtors maintain an integrated, centralized cash management system that provides well-established mechanisms for the collection, management and disbursement of funds used in their operations (the "***Cash Management System***"). Such a system provides numerous benefits,

including the ability to (i) quickly create status reports on the location and amount of funds, thereby allowing management to track and control company funds; (ii) ensure cash availability; and (iii) reduce administrative costs by facilitating the efficient movement of funds. The Cash Management System includes various bank accounts (collectively, the *"Bank Accounts"*) with Bank of America, N.A. and Wells Fargo Bank used in the ordinary course of the Debtors' businesses. The Debtors have used their Cash Management System for a number of years, and the Cash Management System has evolved over time into a mainstay of the Debtors' ordinary, usual and essential business practices.

70.     In order to minimize expenses to the Debtors' estates, avoid delays and facilitate the Debtors' smooth transition into chapter 11, the Debtors seek authority to (i) continue using the existing Cash Management System and Bank Accounts; (ii) treat the Bank Accounts for all purposes as accounts for the Debtors as debtors in possession; (iii) disburse funds from the Bank Accounts by all usual methods; and (iv) perform obligations under the documents governing the Cash Management System and the Bank Accounts, including paying ordinary course bank fees incurred in connection with the Bank Accounts. The Debtors will ensure that all postpetition transfers and transactions are documented in their books and records and are readily ascertainable from their books and records documenting transfers and transactions.

71.     I believe that, under the circumstances, the relief requested in the Cash Management Motion is both essential and in the best interests of the Debtors' estates, their creditors, and other parties in interest, and should, therefore, be granted.

     *(ii)*     ***Employee Wage Motion***

72.     The Debtors have filed the *Debtors' Motion for Entry of Interim and Final Orders (a) Authorizing, but Not Directing, Debtors (i) to Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (ii) to Pay and Honor Employee Medical and Other Benefits*

*and (iii) to Continue Employee Benefits Programs and (b) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests* (the *"Employee Wage Motion"*).

73.     As explained above, the Debtors employ a total of approximately 267 employees (the *"Employees"*), 149 of which are employed by the Debtors on an hourly basis and the balance of which are employed by the Debtors on a full-time salaried basis.  The Debtors incur and pay a number of obligations related to their Employees such as payroll, federal and state withholding taxes and other withheld amounts (including wage garnishments, Employees' share of insurance premiums, taxes and 401(k) contributions), health benefits, retirement benefits, workers' compensation benefits, vacation time, life and accidental dismemberment insurance, short and long-term disability coverage, various reimbursable expenses and other benefits that the Debtors have historically provided in the ordinary course of business (collectively, the *"Employee Obligations"*).  In an effort to minimize the personal hardship to Employees and to maintain morale and stability in the Debtors' business operations, the Debtors seek authority to continue these programs and pay and honor amounts arising under or in connection with the Debtors' Employee Obligations.

74.     By the Employee Wage Motion, the Debtors request authority to pay Employee Obligations during the interim period.  As further described in the Employee Wage Motion, the Debtors believe that certain Employee Obligations, including Unpaid Compensation, Commissions and payments under the Employee Incentive Plan remain outstanding as of the Petition Date.  In addition to these Employee Obligations, certain other Employee Obligations may remain outstanding due to a number of factors, including (i) discrepancies that exist between amounts paid prepetition and the amounts that should have been paid; (ii) the possibility some prepetition checks or other payments may not have cleared before the Petition Date; and (iii) the

fact that certain accrued obligations may not yet have become due and payable as of the Petition Date. Additionally, certain prepetition amounts related to the Employees may have accrued but remain outstanding because they are pending approval or they have not yet been submitted.

75.     Additionally, the Debtors request authority to continue, in their discretion, certain other benefit programs including programs related to employee incentive bonuses, commission and severance programs, paid-time-off and flexible healthcare spending (the *"Employee Benefit Programs"*) that the Debtors provide as a service to their Employees.

76.     I believe that the payment of the Employee Obligations and continuation of the Employee Benefit Programs are essential to the preservation of the Debtors' businesses. As an initial matter, it is important to ensure the morale of the Employees does not diminish in light of our filing these chapter 11 cases. Additionally, failing to pay the Employee Obligations and continue the Employee Benefit Programs could lead many employees to terminate their employment with the Debtors leaving the Debtors unable to operate their businesses. I have also been informed that the Debtors must continue certain of the programs mentioned above, especially the workers compensation program, in order to maintain the legal right to operate their businesses.

### (iii)     Customer Programs Motion

77.     The Debtors have filed the *Debtors' Motion for Entry of an Interim and Final Order Authorizing the Debtors to Maintain and Administer Customer Programs and Practices and Honor Related Prepetition Obligations* (the *"Customer Programs Motion"*).

78.     The Debtors sell large quantities of consumer electronic and household products to a variety of dealers and major retailers (the *"Customers"*), who in turn market and sell these products to the commercial public. Maintaining the loyalty and goodwill of the Customers is critical to the Debtors' continued operation. To develop and sustain their reputations and to support their worldwide sales efforts, the Debtors, in the ordinary course of their business,

maintain programs to generate goodwill, meet competitive market programs and ensure Customer and commercial public satisfaction (the *"Customer Programs"*). As part of their Customer Programs, the Debtors utilize, among other things, various vendor funded and Debtor funded rebate programs to enhance product loyalty among their existing Customers and attract new Customers. Additionally, consistent with industry practice, the Debtors maintain return, refund and exchange policies with respect to both cash and credit purchases to accommodate the Customers' needs. These and other Customer Programs are more fully described in the Customer Programs Motion.

79.     By the Customer Programs Motion, the Debtors seek authority to (i) pay or otherwise honor prepetition obligations to their Customers, including to honor Debtor and vendor-funded rebates issued prepetition to Customers that had not yet been presented for payment as of the Petition Date; and (ii) continue to develop, maintain and implement the Customer Programs postpetition in the ordinary course of business consistent with past practice, as necessary in the Debtors' sound business judgment.

80.     As stated above, continuing to administer their Customer Programs without interruption during the pendency of these chapter 11 cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' creditors and benefit their estates. In contrast, if the Debtors are unable to continue their Customer Programs postpetition or pay amounts due and owing to customers, the Debtors risk alienating certain customer constituencies (who could then initiate business relationships with the Debtors' competitors) and could suffer corresponding losses in customer loyalty and goodwill that will harm their prospects for reorganization and/or maximizing value. Additionally, the Debtors' Customer Programs are essential marketing strategies for attracting new customers.

81.     I believe that failure to honor the Customer Programs could place the Debtors at a competitive disadvantage in the marketplace, amplifying the negative effective of customer uncertainty that may arise from these chapter 11 filings. Such uncertainty could erode the Debtors' hard-earned reputation, which, in turn, could adversely impact their prospects for a successful sale process. I believe that the relief requested in the Customer Programs Motion will benefit the Debtors and their estates by, among other things, engendering goodwill at this critical time in these cases. Accordingly, the Customer Programs and any customer obligations relating thereto should be approved.

### *(iv)* *Distribution Network Vendors And Warehouse Motion*

82.     The Debtors have filed the *Debtors' Motion for Entry of Interim and Final Orders (a) Authorizing Debtors to Pay Prepetition Claims of Distribution Network Vendors and Third-Party Warehouses; (b) Authorizing the Debtors to Grant Administrative Expense Priority to All Undisputed Obligations for Merchandise Ordered Prepetition and Delivered Postpetition and Satisfy Such Obligations in the Ordinary Course of Business; and (c) Scheduling a Final Hearing* (the *"Distribution Network Vendors and Warehouse Motion"*).

83.     As described in more detail above, the Debtors are a total solution provider committed to supplying consumer electronics and computer products to the nation's most successful retailers and e-tailers through state-of-the-art logistical services. The success of the Debtors' businesses hinge on their ability to fulfill customer orders in a timely and efficient manner. As such, it is critical to the Debtors' success that their warehouse facilities are continuously stocked, and replenished, with a supply of goods, including computers, televisions, personal electronics and houseware items (collectively, the *"Merchandise"*), for sale to their Customers and that their Customers timely receive such Merchandise.

84. Maintaining the Debtors' businesses requires the coordinated efforts of, among others, a variety of third-party common carriers, movers, shippers, and customs brokers (collectively, the *"Distribution Network Vendors"*) who ship, transport, move through customs and deliver the Merchandise through distribution networks. These Distribution Network Vendors invoice the Debtors directly for their fees and custom charges (the *"Distribution Network Charges"*). In addition, the Debtors utilize a number of warehouse facilities for the purpose of storing the Merchandise prior to the point of sale to the Customers. A majority of these warehouse facilities are leased directly by the Debtors; however, the Debtors also have two warehouse facility agreements in place with third-party warehouse facilities (the *"Third-Party Warehouses"* and, together with the Distribution Network Vendors, the *"Lien Claimants"*) in Columbus, Ohio and Sparks, Nevada. The Third-Party Warehouses invoice the Debtors directly for charges associated with the Debtors' use of the Third-Party Warehouses (the *"Warehouse Charges"*).

85. The Debtors' businesses are inextricably tied to their ability to deliver the Merchandise to their customers in a timely and efficient manner. To this end, the Debtors rely heavily on the Distribution Network Vendors and Third-Party Warehouses to deliver and store, respectively, their Merchandise. If the Distribution Network Charges and Warehouse Charges are not paid, the Debtors believe that the products held by the Lien Claimants may be subject to possessory liens arising under applicable state law. Accordingly, payment of the Distribution Network Vendors and Third-Party Warehouses will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.

86. At this critical point in the Debtors' business operations, any interruption in the timely delivery of products resulting from the retention of such goods by the Lien Claimants would immediately disrupt and irreparably harm the Debtors' businesses, as well as harm the Debtors'

long-term operations. Thus, I believe the interests of the Debtors and their estates are best served by authorizing the Debtors to pay the Distribution Vendor Charges and Warehouse Charges.

**D.    Procedural Motions**

###### (i)    *Joint Administration Motion*

87.    The Debtors have filed the *Debtors' Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases* (the "***Joint Administration Motion***").  As discussed above, Holdings directly or indirectly owns or controls 100% of the membership interests in each of the other Debtors (except for Expert, in which ABL holds a 60% interest).  Accordingly,  the seven Debtors in these chapter 11 cases are affiliates, as defined under § 101(2).  In addition to sharing common ownership and management, the Debtors are engaged in a common business enterprise and share other key financing and operational systems.

88.    The joint administration of these chapter 11 cases, to the best of my knowledge, will not give rise to any conflict of interest among the Debtors' estates.  Nor will joint administration adversely affect the Debtors' respective creditors because this motion requests only administrative, not substantive, consolidation of the estates.  Thus, I believe individual creditors' rights will not be harmed by the relief requested; to the contrary, the Debtors, their estates and creditors will benefit from the increased procedural and cost efficiencies associated with the joint administration of these cases.

###### (ii)    *Schedules Extension Motion*

89.    The Debtors have filed the *Debtors' Motion for Entry of an Order Granting an Extension Of Time To File Schedules And Statements* (the "***Schedules Extension Motion***").  As a consequence of the complexity of the Debtors' business operations, and the geographical spread of the Debtors' operations, the Debtors have not yet finished gathering the statements of financial

affairs, schedules of assets and liabilities, schedules of current income and expenditures, statements of executory contracts and unexpired leases and lists of equity security holders.

90.     Given the numerous critical operational matters that the Debtors' accounting and legal personnel must address in the early days of these chapter 11 cases, I believe that with an additional 20-day extension, the Debtors will be able to focus the attention of key accounting and legal personnel on vital operational and restructuring issues during the critical first weeks after filing these chapter 11 cases. This will help the Debtors make a smooth transition into chapter 11 and, therefore, ultimately will maximize the value of the Debtors' estates to the benefit of creditors and all parties in interest.

### (iii)     Case Management Motion

91.     The Debtors have filed the *Debtors' Motion for Entry of an Order Establishing Certain Notice, Case Management and Administrative Procedures* (the "**Case Management Motion**"). I expect that there will be numerous parties in interest in these cases, that those parties will file requests for service of filings and that numerous motions and applications will be filed in these chapter 11 cases. The costs and burdens that might arise absent adoption of these case management procedures—including, for example, those associated with multiple hearings per month and increased mailing costs—could impose significant economic and administrative burdens on the Debtors' estates, the Court and all other parties in interest. Given the size and scope of these cases, I believe that implementation of case management procedures will facilitate their efficient administration.

### (iv)     GCG Application

92.     The Debtors have filed the *Debtors' Application Pursuant to 28 U.S.C. § 156(c) for Entry of an Order Authorizing the Employment and Retention of the Garden City Group as Notice and Claims Agent, Nunc Pro Tunc to the Petition Date* (the "**GCG Retention Application**"). The

Debtors propose to engage The Garden City Group, Inc. ("*GCG*") to act as claims and noticing in these chapter 11 cases, and they respectfully submit that this retention will maximize efficiency in administering these cases and will ease administrative burdens such as providing notice to all creditors and parties in interest in these cases, that otherwise would fall upon the Court and the United States Trustee for the Southern District of New York.

### (v)    *Creditor Matrix Motion*

93.    The Debtors have filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to (a) Prepare an Electronic List of Creditors in Lieu of Submitting and Filing a Formatted Mailing Matrix, (b) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors and (c) Mail Initial Notices* (the "*Credit Matrix Motion*"). The Debtors propose to retain GCG as notice and claims agent in connection with the Debtors' chapter 11 cases to assist the Debtors in preparing creditor lists and mailing initial notices. With such assistance, the Debtors will be prepared to file a computer-readable consolidated list of creditors and a list of equity security holders upon request and will be capable of undertaking all necessary mailings. Indeed, because the Debtors have numerous creditors, converting the Debtors' computerized information to a format compatible with the matrix requirements would be an exceptionally burdensome task and would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents.

94.    I believe that consolidation of the Debtors' computer records into a creditor database and mailing notices to all applicable parties in such database will be sufficient to permit GCG to promptly notice those parties. Accordingly, maintaining electronic-format lists of creditors and equity security holders rather than preparing and filing separate matrices will maximize efficiency and accuracy, and reduce costs.

## VI.    SUMMARY OF SECOND DAY PLEADINGS

95.    The following motions and applications, although filed on the Petition Date, are to be scheduled for hearing in accordance with normal noticing procedures except as may otherwise be requested by the Debtors.

### (i)    *Akin Gump Application*

96.    The Debtors have filed the *Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Akin Gump Strauss Hauer & Feld LLP as Attorneys for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date* (the "***Akin Gump Application***"). The Debtors seek to retain Akin Gump Strauss Hauer & Feld LLP ("***Akin Gump***") as their attorneys because Akin Gump has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. Akin Gump has served as counsel to ArchBrook Laguna LLC and certain of its affiliates since 2005, providing litigation-related services. More recently, prior to the commencement of these chapter 11 cases, the Debtors retained Akin Gump to provide general bankruptcy and restructuring advice, and in the weeks leading up to the Petition Date, Akin Gump was actively involved in the preparation of these chapter 11 cases.

### (ii)    *Macquarie Application*

97.    The Debtors have filed the *Debtors' Application for Entry of Interim and Final Orders Authorizing the Employment and Retention of Macquarie Capital (USA) Inc. as Financial Advisor for the Debtors and Debtors in Possession Effective Nunc Pro Tunc to the Petition Date* (the "***Macquarie Application***"). The Debtors seek to retain Macquarie as their financial advisor because, among other things, Macquarie has extensive experience and an excellent reputation in providing high quality financial advisory services to debtors and creditors in bankruptcy

reorganizations and other restructurings. Macquarie has been working with the Debtors since May 2011 with respect to various restructuring and other related matters.

### (iii) *PricewaterhouseCoopers Application*

98. The Debtors have filed the *Debtors' Application for Entry of an Order Authorizing the Employment and Retention of PricewaterhouseCoopers LLP as Accounting Consultant for the Debtors Nunc Pro Tunc to the Petition Date (the "PricewaterhouseCoopers Application")*. The Debtors seek to retain PricewaterhouseCoopers LLP ("*PwC*") as their accounting consultants because, among other things, PwC has extensive experience and an excellent reputation in providing high quality consulting services to debtors and creditors in bankruptcy reorganizations and other restructurings. PwC has been working with the Debtors since June 8, 2011 in connection with the review and evaluation of the Debtors' accounting and credit practices. PwC's services, however, will not include an audit of the Debtors' financial statements.

### (iv) *Crisis Management Application*

99. The Debtors have filed the *Debtors' Application for Entry of an Order Authorizing (a) the Employment and Retention of Hawkwood Consulting LLC as Crisis Manager for the Debtors and (b) the Appointment of Stephen J. Gawrylewski as Chief Restructuring Officer for the Debtors Effective Nunc Pro Tunc to the Petition Date* (the "*Crisis Management Application*").

100. The Debtors seek to retain Hawkwood Consulting LLC ("*Hawkwood*") as crisis manager and to appoint Stephen J. Gawrylewski as Chief Restructuring Officer of the Debtors.

101. Certain of the Hawkwood professionals have been providing crisis management services to the Debtors since May 26, 2011, when the Debtors initially selected those individuals as restructuring consultants to assist in the Debtors' restructuring process, in order to address certain financial issues. On June 13, 2011, certain of the Hawkwood Professionals formed

Hawkwood, which the Debtors seek authority to retain to assist in the Debtors restructuring process.

102. Beginning in May 2011, and continuing through the Petition Date, several of the Hawkwood Professionals, including Mr. Gawrylewski, have devoted substantial amounts of time and effort working with members of the Debtors' senior management to, among other things, sell ineligible inventory to generate additional cash, reduce the current balance of past due accounts receivable by improving internal communications between departments, and reducing the overadvance on the Pre-Petition Credit Facility.

### (v) Ordinary Course Professionals Motion

103. The Debtors have filed the *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (the *"OCP Motion"*). The Debtors employ various attorneys in the ordinary course of their business (each, an *"OCP"* and, collectively, the *"OCPs"*). The OCPs provide services for the Debtors in a variety of matters unrelated to these chapter 11 cases, including legal services with regard to specialized areas of the law and litigation.

104. I believe that although the OCPs will wish to continue to represent or provide other services to the Debtors during these chapter 11 cases, many would not be in a position to do so if the Debtors cannot pay them on a regular basis. Without the background knowledge, expertise and familiarity that the OCPs have relative to the Debtors and their operations, the Debtors undoubtedly would incur additional and unnecessary expenses in educating and retaining replacement professionals. Accordingly, I believe that the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' businesses. Moreover, in light of the substantial number of OCPs and the significant costs associated with the preparation of employment applications and fee

applications for professionals who will receive relatively modest fees, I believe that it would be impractical, inefficient and extremely costly for the Debtors and their legal advisors to prepare and submit individual applications and proposed retention orders for each OCP.

105.    I am aware that some of the OCPs may hold unsecured claims against the Debtors in connection with services rendered to the Debtors prepetition. I do not believe that such claims would cause any of the OCPs to have an interest materially adverse to the Debtors, their creditors or other parties in interest.

### *(vi)*    *Insurance Motion*

106.    The Debtors have filed the *Debtors' Motion for Entry of an Order (a) Authorizing, but Not Directing, Debtors to Continue to Administer Insurance Coverage and (b) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests* (the "***Insurance Motion***"). The Debtors maintain a comprehensive insurance program that provides primary coverage, and in certain instances excess or umbrella coverage, related to, among other things, property liability, general liability, directors' and officers' liability, business automobile liability, and employment practices liability[5] (collectively, the "***Insurance Programs***").

107.    I believe that the Insurance Programs are essential to the preservation of the value of the Debtors' businesses, property and assets. In many cases, insurance coverage such as that provided by the Insurance Programs is required by the diverse regulations, laws and contracts that govern the Debtors' commercial activities. Moreover, maintaining certain of these Insurance Programs is a necessary condition to the DIP Facility and the failure to maintain them could jeopardize the Debtors' restructuring efforts.

---

[5] The workers compensation insurance policies, along with the Debtors' medical and dental benefits are described in further detail in the Employee Wage Motion. The Debtors do not seek authority to continue to administer their prepetition insurance coverage policies and practices related to workers' compensation, medical and dental benefits under this motion but rather request such authority as part of the Employee Wage Motion filed contemporaneously herewith.

### (vii)    Sales, Use and Tax Motion

108.    The Debtors have filed the *Debtors' Motion for Entry of an Order (a) Authorizing, but Not Directing, the Debtors to Pay Taxes and Fees and (b) Authorizing Financial Institutions to Honor All Checks and Electronic Payment Requests* (the "**Sales, Use and Tax Motion**"). In the ordinary course of their businesses, the Debtors (i) collect and incur taxes, including certain business, franchise, personal property, sales and use, goods and services, excise and other taxes in operating their businesses (collectively, the "**Taxes**"); (ii) charge fees and other similar charges and assessments (collectively, the "**Fees**") on behalf of various taxing, licensing and other governmental authorities (collectively, the "**Authorities**"); and (iii) pay Fees to such Authorities for licenses and permits required to conduct the Debtors' business in the ordinary course. The Debtors pay the Taxes and Fees monthly, quarterly or annually to the respective Authorities, in each case as required by applicable laws and regulations.

109.    It is my understanding from various members of the Debtors' tax and legal departments that the Debtors' failure to pay the Taxes and Fees could materially and adversely impact the Debtors' business operations in several ways. The Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the tasks required by the reorganization process at a critical time for the Debtors' businesses. The Authorities may also attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that will be administratively burdensome to the estates. Furthermore, certain directors and officers could be subject to personal liability, which would likely distract those key personnel from their duties related to the Debtors' restructuring. Moreover, with respect to the Fees, the Debtors' failure to pay such Fees to the Authorities and other relevant third parties would cause the Debtors to incur late fees, penalties and other charges in addition to the Fees.

110. In the ordinary course of business, the Debtors purchase equipment necessary to the Debtors' business operations. The Debtors pay sales taxes on a monthly, quarterly or annual basis, and remit approximately $57,500 in the aggregate in sales taxes per year to certain of the Authorities. Based on historical monthly payments, I believe that, as of the date hereof, the Debtors may owe approximately $6,000 to the Authorities for prepetition use taxes.

111. Under applicable law, state and local governments in jurisdictions where the Debtors' operations are located, including Georgia, Nevada and New Jersey are granted the authority to levy property taxes against real and personal property. The Debtors do not own real property but typically pay approximately $45,000 per year in property taxes on their personal property in the ordinary course of business as such taxes are invoiced. I believe that, as of the Petition Date, the Debtors have approximately $35,000 in accrued, unpaid property taxes that will come due in the third quarter of 2011.

112. Certain states require the Debtors to pay various business taxes. These taxes may be based on gross receipts or other bases determined by the taxing jurisdiction. Further, certain states require the Debtors to pay annual reporting fees to state governments to remain in good standing for purposes of conducting business within the state. The Debtors pay approximately $140,000 per year with respect to these various business taxes and annual reporting fees. I believe that, as of the date hereof, the Debtors have approximately $74,079 in accrued, unpaid prepetition business taxes and annual reporting fees.

113. The Debtors pay franchise taxes to the states of California and Texas to operate their businesses in these states. The franchise taxes are paid on an annual basis, in the approximate amount of $26,800 per year. I believe that, as of the Petition Date, there are no amounts owing to the various Authorities with respect to prepetition franchise taxes.

114.    The Debtors also pay income taxes to the states of New Jersey and Pennsylvania. The income taxes are paid on an annual basis, in the approximate aggregate amount of $160,500. I believe that, as of the Petition Date, there are no amounts owing to the various Authorities with respect to prepetition income taxes.

### (viii)    Utilities Motion

115.    The Debtors have filed the *Debtors' Motion for Entry of an Order Determining Adequate Assurance of Payment for Future Utility Services* (the "*Utilities Motion*"). The Debtors incur utility expenses for electric, natural and industrial gas, steam, water, telephone, internet, and other similar utility services. Approximately 26 utility providers (collectively, the "*Utility Providers*") provide these services through approximately 30 accounts. On average, the Debtors spend approximately $96,961 each month on utility costs.

116.    The Utility Providers service the Debtors' corporate headquarters, storage facilities and operation centers. Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, any interruption in utility services, even for a brief period of time, would disrupt the Debtors' ability to continue operations. I believe such a result could seriously jeopardize the Debtors' value and creditor recoveries. It is therefore critical that utility services continue uninterrupted during these chapter 11 cases.

## VII.    INFORMATION REQUIRED BY LOCAL RULE 1007-2

117.    Local Rule 1007-2 requires certain information related to the Debtors. The information requested in Local Rule 1007-2(a)(1) is set forth in Sections I and III above. The remaining information required by Local Rule 1007-2 is set forth in the schedules contained in **Exhibit B** attached hereto, as described below.

(a)    L. Bankr. R. 1007-2 (a)(2): Not applicable.

(b)    L. Bankr. R. 1007-2 (a)(3): Schedule 1 hereto lists the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in the chapter 11 case, and a brief description of the circumstances surrounding the formation of the committee and the date of its formation.

(c)    L. Bankr. R. 1007-2(a)(4): Schedule 2 hereto lists the following information with respect to each of the holders of the Debtors' 30 largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; the name(s) of person(s) familiar with the Debtors' accounts; the amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.[6]

(d)    L. Bankr. R. 1007-2(a)(5): Schedule 3 hereto provides the following information with respect to the holders of secured claims against the Debtors:[7] (a) the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; (b) the amount of the claim; (c) a brief description of the collateral securing the claim; (d) an estimate of the value of the collateral; and (e) whether the claim or lien is disputed.

(e)    L. Bankr. R. 1007-2(a)(6): Schedule 4 hereto provides a summary of the Debtors' assets and liabilities on a consolidated basis.

(f)    L. Bankr. R. 1007-2(a)(7): Schedule 5 hereto provides a list of the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held, and the number of holders thereof, listing separately those held by each of the Debtors' officers and directors and the amounts so held.

(g)    L. Bankr. R. 1007-2(a)(8): Schedule 6 hereto provides a list of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor or agent for any such entity, giving the name, address and telephone number of such entity and the location of the court in which any proceeding relating thereto is pending.

(h)    L. Bankr. R. 1007-2(a)(9): Schedule 7 hereto provides a list of the premises owned, leased or held under other arrangement from which the Debtors operate their businesses.

(i)    L. Bankr. R. 1007-2(a)(10): Schedule 8 hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

---

[6] Local Rule 1007-2(a)(4) requires that this information be listed for the holders of the 20 largest unsecured claims of the Debtors, excluding insiders.

[7] Local Rule 1007-2(a)(5) requires that the top five secured claims be listed. Upon information and belief, the claims listed on Schedule 2 are the only secured claims asserted against the Debtors.

(j)    <u>L. Bankr. R. 1007-2(a)(11)</u>: Schedule 9 hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

(k)    <u>L. Bankr. R. 1007-2(a)(12)</u>: Schedule 10 hereto provides the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors and a brief summary of their relevant responsibilities and experience.

(l)    <u>L. Bankr. R. 1007-2(b)(1) - (2)(A) and (C)</u>: Schedule 11 hereto provides the estimated amount of the weekly payroll to employees (exclusive of officers, directors, shareholders, and partners) for the 30-day period following the filing of the chapter 11 petition.

(m)    <u>L. Bankr. R. 1007-2(b)(3)</u>: Schedule 12 hereto provides, for the 30-day period following the filing of the chapter 11 petitions, a list of the Debtors' estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees and any other information relevant to an understanding of the foregoing.

*[This space left intentionally blank.]*

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _____ day of July 2011.

Name:   Daniel J. Boverman
Title:    Interim Chief Financial Officer

**EXHIBIT A**

**The Company's Corporate Organization Chart**

# Organizational Chart of ArchBrook Entitites*



* Non-debtor entities owning more than 10% of the units of the Debtor entities include: (i) Associated Volume Buyers, Inc. (owning a 40% interest in Expert Warehouse LLC) (ii) ABL Invest LLC (owning 100% of the designated Common Units of Archbrook Laguna Holdings LLC) and (iii) BDI Laguna Holdings, Inc. (owning 100% of the designated Preferred Units in Archbrook Laguna Holdings LLC).

**EXHIBIT B**

**Additional Information Required Pursuant to Local Rule 1007-2**

## Schedule 1 – Organized Committees

*None.*

# Schedule 2 - Holders of the Debtors' 30 Largest Unsecured Claims on a Consolidated Basis

Pursuant to Local Rule 1007-2(a)(4), the following provides information with respect to the holders of the 30 largest unsecured claims (not including claims of insiders) against the Debtors on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule estimates outstanding claim amounts (including principal and interest) as of July 8, 2011.

| Name of Creditor | Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Amount of claim | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff |
|---|---|---|---|---|
| Dell Marketing LP | Srinivas Bhima Ramch<br>One Dell Way Round Rock, TX 78682<br>Tel: 866-380-3355 | $9,763,350 | Trade Debt | Contingent, Unliquidated |
| Direct Entertainment Media Group Inc. | Beverly A. Baker<br>8280 Willow Oaks Corporate Drive, Suite 800 Farifax, VA 22031<br>Tel: 703-663-4504 | $8,448,363 | Trade Debt | Contingent, Unliquidated |
| Garmin International Inc. | Yvette Price<br>PO Box 843611<br>Kansas City, MO 64184<br>Tel: 913-440-2327 | $5,681,842 | Trade Debt | Contingent, Unliquidated |
| Toshiba America Information System | Tom Cathy<br>91865 Collections Center Drive Chicago, IL 60693<br>Tel: 949-587-6208 | $5,341,800 | Trade Debt | Contingent, Unliquidated |
| Samsung Electronics America | Lanicia McCloud<br>105 Challenger Road, Ridgefield Park, NJ 07660<br>Tel: 201-229-4217 | $4,919,706 | Trade Debt | Contingent, Unliquidated |
| Hewlett-Packard US Operations | Jonathan Faulkner<br>Bldg. CCM3<br>MC CCM0301-050<br>20555 SH 249<br>Houston, TX 77070<br>Tel: 281-514-9749 | $4,911,641 | Trade Debt | Contingent, Unliquidated |
| Tomtom Inc. | Brenda Towne<br>150 Baker Avenue Ext Concord, MA 1742<br>Tel: 978-287-9555 | $3,747,046 | Trade Debt | Contingent, Unliquidated |

| Name of Creditor | Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Amount of claim | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff |
|---|---|---|---|---|
| Acer America | Nga Ly<br>333 West San Carlos Street<br>Suite 1500<br>San Jose, CA 95110<br>Tel: 408-533-7202 | $2,992,557 | Trade Debt | Contingent, Unliquidated |
| Toshiba Consumer Products | Tom Cathy<br>9740 Irvine Blvd.<br>Irvine, CA 92618<br>Tel: 949-587-6208 | $2,095,761 | Trade Debt | Contingent, Unliquidated |
| LG Electronics USA Inc. | Alicia Almonte<br>910 Sylvan Avenue<br>Englewood Cliffs, NJ 07632<br>Tel: 201-266-2541 | $1,780,419 | Trade Debt | Contingent, Unliquidated |
| Lenovo | Scott Brassington<br>1009 Think Place<br>Bldg 1 - 2nd Floor 2G2<br>Morrisville, NC 27560<br>Tel: 919-257-4867 | $993,065 | Trade Debt | Contingent, Unliquidated |
| Sharp Electronics Corp. | Maggie DeLibero<br>Sharp Plaza,<br>P.O. Box 650<br>Mahwah, NJ 07495-1163<br>Tel: 201-684-6048 | $985,181 | Trade Debt | Contingent, Unliquidated |
| Panasonic/First Chicago Nat'l | Johannes Wang<br>5201 Tollview Drive E1B-9<br>Rolling Meadows, IL 60008<br>Tel: 847-637-4794 | $946,188 | Trade Debt | Contingent, Unliquidated |
| Philips Consumer Lifestyle | Rogier van Wijk<br>1600 Summer Street<br>P.O. Box 120015<br>Stamford, Connecticut 06905 | $946,145 | Trade Debt | Contingent, Unliquidated |
| DXG Technology USA Inc. | Alicia Funderburk<br>1001 Lawson Street<br>City of Industry, CA 91748<br>Tel: 626-581-3742 | $768,044 | Trade Debt | Contingent, Unliquidated |
| Mitac Digital Corp. | Kris Aponte<br>960 Overland Court<br>San Dimas, CA 91773<br>Tel: 909-394-6012 | $724,754 | Trade Debt | Contingent, Unliquidated |
| YRC | Martha Y Talavera<br>PO Box 7914<br>Overland Park, KS 66207<br>Tel: 913-344-4589 | $702,106 | Trade Debt | Contingent, Unliquidated |
| Tongfang Global LLC | Erin Walters<br>Tongfang Global /Element Electronics Corp.<br>10909 Valley View Rd.,<br>Eden Prairie, MN 55344<br>Tel: 952-641-6794 | $653,600 | Trade Debt | Contingent, Unliquidated |

| Name of Creditor | Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Amount of claim | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff |
|---|---|---|---|---|
| Sterling Commerce | Brett Ingram<br>Sterling Commerce (America), Inc.<br>4600 Lakehurst Ct.<br>PO Box 8000<br>Dublin, OH 43016<br>Tel: 614-790-8714 | $651,109 | Trade Debt | Contingent, Unliquidated |
| Hamilton Beach Brands Inc | James Taylor<br>4421 Waterfront Dr.<br>Glen Allen, VA 23060 | $518,076 | Trade Debt | Contingent, Unliquidated |
| Federal Express Freight East | Carol Breen<br>Department CH<br>PO Box 10306<br>Palentine, IL 60055<br>Tel: 870-741-9000 | $512,487 | Trade Debt | Contingent, Unliquidated |
| Sharp Appliances | Maggie DeLibero<br>SharpPlaza, P.O. Box 650 Mahwah, NJ 07495-1163<br>Tel: 201-684-6048 | $373,011 | Trade Debt | Contingent, Unliquidated |
| McElroy, Deutsch, Mulvaney & Carpenter, LLP | Thomas P. Scrivo, Esq.<br>Three Gateway Center<br>100 Mulberry Street<br>Newark, New Jersey 07102-4079<br>Tel: (973) 565-2042 | $321,655 | Legal | Contingent, Unliquidated |
| Fuego North America LLC | Dan Popovich<br>1500 Sansome St.,<br>Roundhouse One,<br>San Francisco, CA 94111<br>Tel: 925-830-2105 | $315,388 | Trade Debt | Contingent, Unliquidated |
| Helen of Troy LP | Paul Levy<br>#1 Helen of Troy Plaza<br>El Paso, TX 79912 | $298,950 | Trade Debt | Contingent, Unliquidated |
| Centon Electronics Inc. | Lilly Zhang<br>27412 Aliso Viejo Pkwy.<br>Aliso Viejo, CA 92656<br>Tel: 949-699-2045 | $273,112 | Trade Debt | Contingent, Unliquidated |
| Jarden Consumer Solutions | Richard Broxey<br>2381 Executive Center Drive<br>Boca Raton, FL 33431<br>Tel: 561-912-4597 | $272,237 | Trade Debt | Contingent, Unliquidated |
| Manhattan Associates | Dennis B. Story<br>2300 Windy Ridge Pkwy<br>10th Floor<br>PO Box 405696<br>Atlanta, GA 30384<br>Tel: 770-955-7070 | $196,019 | Trade Debt | Contingent, Unliquidated |
| EB Excalibur | Lorraine Leal<br>18001 Old Cutler Road<br>Suite 556<br>Miami, FL 33157<br>Tel: 786-619-2828 | $175,418 | Trade Debt | Contingent, Unliquidated |

| Name of Creditor | Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Amount of claim | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff |
| --- | --- | --- | --- | --- |
| Home Entertainment Source | Jim Ristow<br>100 S. Anaheim Blvd. #250<br>Anaheim, CA 92805-3872<br>Tel: 714-502-9620 | $171,231 | Trade Debt | Contingent, Unliquidated |

## Schedule 3 - Holders of the Debtors' 5 Largest Secured Claims

Pursuant to Local Rule 1007-2(a)(5), the following lists the Debtors' five largest secured claims on a consolidated basis. The five largest secured creditors are GE Capital Commercial Services, Inc.; GE Commercial Distribution Finance Corporation (trading as BrandSource Expert Finance);

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule estimates outstanding claim amounts (including principal and interest) as of July 8, 2011.

| | Creditor | Contact, Mailing Address & Telephone Number & Fax Number | Amount of Claim | Type of Collateral |
|---|---|---|---|---|
| 1. | GE Capital Commercial Services, Inc. | 201 Merritt Seven, 4th Floor Norwalk, CT 06851 USA Attn: Katherine Reichle Branch Tel: 203-229-1916 Fax: 203-567-8200 | $36,907,753<br><br>Note: Above amount does not include Lehrhoff ABL letter of credit exposure totaling $257,035 | • Senior secured first lien on all assets other than the collateral subject to the GECDF/BSEF Inbound Facility, the Bank of America Loan Agreement and the GECFS Facility<br>• Senior secured second lien on the collateral subject to the GECDF/BSEF Inbound Facility and the GECFS Facility<br>• Subordinated lien on the collateral subject to the Bank of America Loan Agreement |
| 2. | Raymond Leasing Corporation | P.O. Box 203905 Houston, TX 77216-3905 Tel: 607-656-2568 Fax: 607-656-2186 | $554,222 | • Various forklift trucks, including counterbalance, order pickers, and reach |
| 3. | Bank of America, N.A. | 208 Harristown Road Glen Rock, NJ 07452 Attn: Stacey Hamilton Sandler Tel: 201-251-5736 Fax: 201-251-6042 | $383,333 | • Senior secured first lien on specific machinery, furniture, fixtures and other equipment, as well as any related proceeds. |
| 4. | De Lage Landen Financial Services, Inc. | P.O. Box 41602 Philadelphia, PA 19101-1602 Attn: Andrew Chesbro Tel: 800-355-6760 Email: achesbro@leasedirect.com | $148,006 | • Leases on HP servers |
| 5. | Crown Credit Company, Inc. | P.O. Box 640352 Cincinnati, OH 45264-0352 Attn: Paula Topp Tel: 419-629-2220 x2098 | $64,025 | • Various forklift trucks, including reach, clamp, order picker and stand-up |

## Schedule 4 - Summary of Debtors' Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), the following financial data (unaudited) is the latest available information and reflects the Debtors' financial condition, as consolidated with its domestic affiliated debtors and non-debtors as of March 31, 2011. The following financial data shall not constitute an admission of liability by the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

Total Assets (Book Value): $246,176,393

Total Liabilities and Members' Equity: $176,372,973

## Schedule 5 – Schedule of Publicly Held Securities

*None.*

## Schedule 6 - Debtors' Property Not in the Debtors' Possession

*None.*

## Schedule 7 - Debtors' Property

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their businesses as of July 8, 2011.

Leased Property

| Address | City | State | Country | Zip Code |
|---|---|---|---|---|
| Heller Industrial Park | Edison | NJ | USA | 08837 |
| 620 Spice Island Dr. | Sparks | NV | USA | 89431 |
| 6241 Shook Road | Columbus | OH | USA | 43137 |
| 3960-A Royal Dr. NW | Kennesaw | GA | USA | 30144 |
| Suite 400, 350 Stark Rd. | Carlstadt | NJ | USA | 07072 |
| Lear 390 Building | Reno | NV | USA | 89506 |

## Schedule 8 - Location of Debtors' Assets, Books and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

The books and records for all Debtors are primarily located at 3960-A Royal Dr. NW, Kennesaw, GA 30144, and Suite 400, 350 Starke Rd., Carlstadt, NJ 07072.

The Debtors' primary assets consist of product inventory, which is currently warehoused at: (i) Suite 400, 350 Starke Rd., Carlstadt, NJ 07072; (ii) 3960-A Royal Dr. NW, Kennesaw, GA 30144; (iii) Lear 390 Building, Reno, NV 89506; and (iv) Heller Industrial Park, Edison, NJ 08837.

# Schedule 9 - Litigation

Pursuant to Local Rule 1007-2(a)(11), the following is a list of the nature and present status of each action or proceeding, pending or threatened against the Debtors or their properties. This list reflects all actions or proceedings currently pending against the Debtors however, the Debtors reserve the right, if necessary, to supplement this list in the corresponding Schedules to be filed by the Debtors in these chapter 11 cases.

| No. | Matter Name | Jurisdiction | Type | Status |
|-----|-------------|--------------|------|--------|
| 1. | ArchBrook Laguna LLC vs. New Age Electronics, Inc., Adam Carroll, Marshall Mizell, Charles Marsh and Lee Perlman | NJ (Federal) | Business Torts | Settlement pending |
| 2. | ArchBrook Laguna LLC and Yvette Myers Zimmerman vs. D&H Distributing | NJ (State) | Business Torts | Active Litigation, discovery phase |
| 3. | Charles Marsh vs. ArchBrook Laguna LLC | GA (State) | Indemnification | Settlement negotiations underway. |
| 4. | ArchBrook Laguna LLC vs. Charles Marsh | GA (State) | Costs of suit | (Closed) |
| 5. | Expresso Satellite Navigation, Inc. | IN (State) | Contract Claim (balance owed) | Complaint filed. |
| 6. | Transend Inform., Inc. v. ArchBrook Laguna, and DOES 1-50, incl. | CA (State) | Contract Claim (balance owed) | Complaint filed. |

# Schedule 10 - Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management and a brief summary of their relevant responsibilities and experience.

| Name | Title | Tenure | Prior Experience |
|---|---|---|---|
| **ArchBrook Laguna Holdings LLC; ArchBrook Laguna LLC; and ArchBrook Laguna West LLC** | | | |
| Stephen Gawrylewski[1] | Chief Restructuring Officer | May 26, 2011 - Present | Mr. Gawrylewski has more than forty years' experience in operations, turnarounds, restructurings and mergers and acquisitions.<br><br>Previously he served as President of C.T. Film Corporation, and as General Engineering Manager at Tenneco Chemicals. Mr. Gawrylewski's clients have included both publicly held and privately owned companies ranging from $50 million to $1.5 billion in revenues. Mr. Gawrylewski's equity sponsor clients have included Investcorp, KPS, Citicorp Venture Capital, RFE Investment Partners and Pegasus Partners. Prior to joining Hawkwood, he was a managing director of a restructuring firm and previously a partner in the Restructuring Practice of Deloitte & Touche LLP and Arthur Andersen LLP.<br><br>Mr. Gawrylewski obtained his Bachelor of Science degree from University of Maryland in industrial management in 1970. |
| Daniel J. Boverman[2] | Interim Chief Financial Officer | May 26, 2011 - Present | Mr. Boverman's 25 years of business experience includes crisis management, operational turnarounds, facility consolidations, mergers and acquisitions, and workouts in which he represented the company, shareholders, lenders, or investment banking firms. He has worked with many of the most prominent legal, financial, and advisory firms in the U.S. and Canada.<br><br>In 2009, he formed Boverman & Associates, LLC. Prior to forming Boverman & Associates, Mr. Boverman spent seven years as a Restructuring & Turnaround Advisor and interim executive for Glass & Associates and Huron Consulting Group where his involvement led to substantial improvement in the outcomes for stakeholders of companies whose annual sales ranged from less than $50 million to over $1.5 billion.<br><br>Mr. Boverman obtained his Bachelor of Science degree in Business Administration from the University of California, Berkeley in 1982. |

---

[1] Mr. Gawrylewski serves as Chief Restructuring Officer for all Debtor entities.
[2] Mr. Boverman serves as Interim Chief Financial Officer for all Debtor entities.

| Joel Blank | Executive Vice President | December 31, 2007-June 7, 2011 | Prior to the merger of BDI Inc. and Laguna Corporation, Mr. Blank served as president of Laguna Corporation for six years. As a founding partner of Laguna Corporation, Mr. Blank managed various aspects of the company including sales, marketing and purchasing. Under his leadership, Laguna was voted one of the top 50 fastest growing companies in New Jersey by *New Jersey Business Weekly*.<br><br>Prior to founding Laguna Corporation, Mr. Blank spent most of his career in the computer industry working for both manufacturers and distributors. From 1980 to 1986, Mr. Blank was a Major Account Manager for C. Itoh Corp., an OEM computer printer manufacturer. He continued in the printing industry joining Epson America, Inc. in 1986 as a Major Account Manager. His career in distribution began with Zemax/Promark Corporation, serving as its Director of Sales from 1990-1992. Mr. Blank continued his career in distribution as Vice President of Sales for Atlantic Logix from 1992-1994<br><br>Mr. Blank obtained his undergraduate degree in Economics from Penn State University in 1978. |
|---|---|---|---|
| Darren Marino | Chairman<br><br>Executive Vice President | June 7, 2011 – Present<br><br>December 31, 2007-June 7, 2011 | Mr. Marino co-founded Laguna Corporation. As a founding partner of Laguna Corporation, Mr. Marino directed various aspects of the Company including sales, operations and finance.<br><br>Prior to founding Laguna Corporation, Mr. Marino established his expertise by working at all levels of the computer industry from manufacturers, distributors, and retailers. From 1991 to 1994, Mr. Marino was principal at Beyond Technology, a leading consumer electronics manufacturers representative firm. Prior to joining Beyond Technology, Mr. Marino served as National Sales Director for Epson America, Inc., the leading computer and printer manufacturer. In addition to Epson, Mr. Marino served as National Sales Manager for Emerson Radio. Mr. Marino began his career in consumer electronics retailing with the Tandy Corporation.<br><br>Mr. Marino earned his bachelor's degree in Business Administration from University of South Florida in 1981. |

| Lehrhoff ABL LLC | | | |
|---|---|---|---|
| **Name** | **Title** | **Tenure** | **Prior Experience** |
| Arthur Lehrhoff | Chief Executive Officer and Director | June 16, 2008-Present | Mr. Arthur Lehrhoff previously served as Chairman and Chief Executive Officer of I. Lehrhoff & Co., Inc. and its wholly owned subsidiaries (collectively, *"Lehrhoff"*). Lehrhoff was a 90 year old distribution company at the time of its sale to ArchBrook Laguna LLC in 2008. Mr. Arthur Lehrhoff co-managed several areas of the company with a concentration in merchandising, purchasing, and sales, while participating in banking relationships, union relationships, human resources, operations, and real estate.<br><br>Prior to joining Lehrhoff, Mr. Arthur Lehrhoff was a regional manager for Adlers Jewelers, a New Jersey based jewelry store chain.<br><br>Mr. Arthur Lehrhoff attended Upsala College and Temple University majoring in Business Administration. |
| Daniel Lehrhoff | President and Director | June 16, 2008-Present | In addition to his role at Lehrhoff ABL LLC, Mr. Daniel Lehrhoff serves as Secretary of the board of Foundation for Morristown Medical Center and Chair of the Board Development Committee, as well as a member of the board of directors of Menlo Acquisition Corporation and a co-chair of the financial oversight committee.<br><br>Previously, Mr. Daniel Lehrhoff served as president of Lehrhoff. Mr. Daniel Lehrhoff co-managed several areas of Lehrhoff, including but not limited to merchandising, purchasing, sales, banking relationships, union relationships, human resources, operations, and real estate. Prior to joining Lehrhoff, Mr. Daniel Lehrhoff was a buyer for Abraham & Straus Department Stores.<br><br>Mr. Daniel Lehrhoff earned a Bachelor's degree from Boston University. |

| | | | Expert Warehouse LLC | | | |
|---|---|---|---|

| Name | Title | Tenure | Prior Experience |
|---|---|---|---|
| Michael Bohardt | Executive Vice President | April 13, 2009-Present | Prior to joining Expert Warehouse, Mr. Bohardt was employed by Whirlpool Corporation for 28 years where he most recently served as Sales Director - Key Accounts with accountability for revenue and profit plan attainment for all of the company's key accounts in the Northeastern United States.<br><br>Mr. Bohardt obtained his Bachelor's degree in Business Administration from University of Dayton. |
| Dean Sottile | Executive Vice President | May 12, 2005-Present | Prior to joining ArchBrook Laguna in 1995, Mr. Sottile worked for Packard Bell NEC where he served as a Regional Sales Manager.<br><br>Mr. Sottile obtained his Bachelor's degree in business administration from the University of California, Riverside. |
| John White | Executive Vice President | May 12, 2005-Present | In addition to his role as Executive Vice President of Expert Warehouse, LLC, Mr. White serves as Executive Vice President of appliances and Services at Brand Source.<br><br>Prior to joining Brand Source, Mr. White served as Market Manager of the Maytag Corporation from 1994 to 2004.<br><br>Mr. White obtained his Bachelor's degree from North Dakota State University and his Master's degree in Business Administration from Kaplan University. |

## Schedule 11 - Payroll

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors and equityholders) and the estimated amount to be paid to officers, equityholders, directors and financial and business consultants retained by Debtors, for the 30-day period following the Petition Date.

| | |
|---|---|
| **Payments to Employees (not including Officers, Directors and Equityholders)** | Approximately $1,165,267.00 for the 30 days. |
| **Payments to Officers, Directors and Equityholders** | <u>Officers</u>: Approximately $185,725.00 for the 30 days.<br><br><u>Directors</u>: $0<br><br><u>Equity Holders</u>: $0 |
| **Payments to Financial and Business Consultants** | Approximately $941,750.00 for the 30 days. |

## Schedule 12 - Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables

Estimated Financial Data for the 30 Day Period Post-petition

Pursuant to Local Rule 1007-2(b)(3), the following provides the estimated aggregated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid (other than professional fees) for the 30 day period following the Petition Date.

| | |
|---|---|
| Cash Receipts | $29,605,850 |
| Cash Disbursements (excluding professional fees) | $28,213,601 |
| Net Cash Loss (excluding professional fees) | $0 |
| Unpaid Obligations (excluding professional fees) | $0 |
| Unpaid Receivables | $30,291,000 |